IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| MELISSA SUZETTE ARZU, Individually and as the Administrator of the Estate of KEVIN GREENIDGE, Deceased, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. |
| AMERICAN AIRLINES, INC., | § § § | |
| Defendant. | § § | |

## COMPLAINT

1.      Plaintiff, Melissa Suzette Arzu, as an individual and as the Administrator of the Estate of Kevin Greenidge, Deceased ("Plaintiff"), by her undersigned counsel, brings her Complaint against Defendant American Airlines, Inc. ("Defendant") and alleges as follows:

## INTRODUCTION

2.      This civil action arises out of personal injuries to and the wrongful death of 14-year-old Kevin Greenidge ("Greenidge"), who died following a series of accidents that occurred while he and his family were traveling internationally via American Airlines from Honduras to New York.

3.      While in flight, Greenidge experienced a medical emergency and became unconscious. Greenidge's family immediately yelled out for assistance, but American Airlines' flight personnel delayed in responding to their cries for help and failed to render effective assistance.

4.      American Airlines flight personnel failed to timely respond to Greenidge's medical emergency, failed to timely transfer Greenidge from his window seat to the back of the airplane where aid could be rendered, failed to timely request the assistance of medically trained passengers on board AA Flight 614, and failed to timely initiate automated external defibrillator ("AED") resuscitation on Greenidge.

5.       When flight personnel eventually attempted to use the AED on Greenidge, they were either unable to properly operate the machine or the machine did not function properly. According to eyewitnesses, each time the AED gave a "clear" warning for people to step back from Greenidge's body so that a shock could be administered, a shock was not delivered. Instead, the machine simply kept advising that CPR should be continued.

6.       The airline records discovered to date reveal that, in violation of federal law, American Airlines flight personnel were not trained to use the type of AED machine that was on board AA Flight 614.

7.       The airline records discovered to date also reveal that, in violation of federal law, the contents of the airline emergency medical kit on board AA Flight 614 were unmarked.

8.       Had AA Flight 614 been properly equipped with the necessary and functional medical equipment, had American Airlines properly trained its airline personnel for in-flight medical events, and had airline personnel timely responded to Greenidge's medical emergency and effectively implemented the skills learned in their training, Greenidge would not have experienced the intense physical and emotional pain he suffered on AA Flight 614.

9.       Had AA Flight 614 been properly equipped with the necessary medical equipment— including but not limited to a medical kit with clearly marked contents and an operable AED machine—and had flight personnel been properly trained regarding the use of such equipment and effectively implemented the skills learned in their training, an operable AED machine would have been timely utilized on Greenidge, vastly increasing his chances for survival.

10.       Tragically, and as a direct result of American Airlines' actions and failures outlined in this Complaint, Greenidge passed away at the young age of 14 years old.

## PARTIES

11.     Plaintiff Melissa Suzette Arzu and her son, Kevin Greenidge, Deceased, have been, at all relevant times, residents of the State of New York, residing in the County of The Bronx, and citizens of the United States of America.

12.     Melissa Suzette Arzu ("Arzu") was appointed as the Administrator of the Estate of her minor son, Kevin Greenidge, Deceased ("Greenidge"), by the Bronx County Surrogate's Court on October 27, 2022 pursuant to Section 702(1) of the New York Surrogate Court Procedure Act.

13.     Defendant American Airlines, Inc. ("American Airlines") is incorporated under the laws of the State of Delaware and headquartered in the State of Texas. American Airlines also does extensive business within the State of New York, including having two of its ten national hubs within the State of New York and conducting business from multiple airports in New York where Plaintiff resides.

14.     On and before June 4, 2022, Defendant American Airlines was in the business of selling tickets for international carriage of passengers.

15.     On and before June 4, 2022, Defendant American Airlines operated services for the carriage of passengers by air and conducted its business of carriage of passengers by air from premises leased or owned by American Airlines itself, or by another carrier with which it has a commercial agreement, at the Dallas Fort Worth International Airport in Dallas, Texas.

16.     On and before June 4, 2022, Defendant American Airlines operated services for the carriage of passengers by air and conducted its business of carriage of passengers by air from premises leased or owned by American Airlines itself, or by another carrier with which it has a commercial agreement, at the John F. Kennedy International Airport in New York, New York and LaGuardia Airport in New York, New York.

**JURISDICTION**

17.    This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because a federal question is presented pursuant to the Convention for the Unification of Certain Rules for International Carriage by Air done at Montreal on May 28, 1999 (hereinafter "Montreal Convention").

18.    This Court has general personal jurisdiction over American Airlines because American Airlines is headquartered in Fort Worth, Texas.

19.    Venue is proper in this District pursuant to Article 33 of the Montreal Convention because American Airlines is domiciled and has its principal place of business in Fort Worth, Texas.

**FACTUAL ALLEGATIONS**

20.    On June 4, 2022, Greenidge embarked on a flight itinerary under American Airlines Confirmation Number UDUZFG to fly internationally from Ramón Villeda Morales International Airport ("SAP") in Honduras to LaGuardia Airport ("LGA") in New York.

21.    Greenidge's UDUZFG American Airlines itinerary included roundtrip travel on American Airlines from New York to Honduras on May 28, 2022 and June 4, 2022.

22.    On May 28, 2022, Greenidge traveled via American Airlines from New York to Honduras on American Airlines Flight 1249 ("AA Flight 1249") from LGA to Miami International Airport ("MIA") and American Airlines Flight 1635 from MIA to SAP.

23.    On June 4, 2022, the return portion of Greenidge's international itinerary included American Airlines Flight 614 ("AA Flight 614") from SAP to MIA, an approximate two-hour layover in MIA, and American Airlines Flight 1171 ("AA Flight 1171") from MIA to LGA.

24.    Greenidge was a New York resident and a citizen of the United States of America.

25.    The purchase of Greenidge's ticket to fly internationally via American Airlines roundtrip from New York to Honduras was made in New York.

26.     A true and accurate copy of Greenidge's American Airlines itinerary is attached to Plaintiff's Complaint as **Exhibit 1** and incorporated herein by reference.

27.     At all relevant times, AA Flights 614 and 1171 were operated and controlled by Defendant American Airlines, acting by and through its authorized employees and/or agents.

28.     With respect to Greenidge, Defendant American Airlines operated AA Flights 614 and 1171 as a single itinerary constituting same-day international carriage from Honduras to New York.

29.     All transportation of passengers by American Airlines, including the transportation of Greenidge from Honduras to New York, is subject to the American Airlines Conditions of Carriage.

30.     A true and accurate copy of the American Airlines Conditions of Carriage in effect in June 2022 is attached to Plaintiff's Complaint as **Exhibit 2** and incorporated herein by reference.

31.     At all relevant times, the American Airlines Conditions of Carriage expressly incorporated the Warsaw Convention and Montreal Convention in their entireties.

32.     A true and accurate copy of the "Liability for international flights" section of the American Airlines Conditions of Carriage regarding the Montreal Convention and in effect in June 2022 is attached to Plaintiff's Complaint as **Exhibit 3** and incorporated herein by reference.

33.     At all relevant times, the American Airlines Conditions of Carriage expressly incorporated the "American Airlines General Rules of the International Tariff."

34.     A true and accurate copy of the American Airlines General Rules of the International Tariff in effect in June 2022 is attached to Plaintiff's Complaint as **Exhibit 4** ("Tariff No. AA1") and incorporated herein by reference.

35.     At all relevant times, the American Airlines Conditions of Carriage specified that, to the extent not preempted by federal law, Texas law applies to a passenger's contract with American Airlines and any dispute from a passenger's ticket purchase or travel on American Airlines.

36.     Greenidge was a fare-paying passenger ticketed to travel aboard AA Flights 614 and 1171, which Defendant American Airlines "regarded as a single operation" under Rule 55(A) of Tariff No. AA1.

37.     Greenidge was traveling from Honduras to New York with several members of his family.

38.     On AA Flight 614 from Honduras to Miami, Greenidge and his family were seated at the back of the airplane in rows 31 and 32.

39.     During AA Flight 614, Greenidge experienced a medical emergency.

40.     Greenidge's family members immediately started yelling out for help.

41.     Greenidge became unconscious and was unresponsive.

42.     Greenidge's uncle began trying to transfer unconscious Greenidge from his window seat to the aisle.

43.     After some delay, two flight attendants responded to Greenidge's family's urgent calls for help and came to the back of the airplane to assess the situation.

44.     Airline personnel eventually assisted Greenidge's uncle in transferring unconscious Greenidge from his window seat to the aisle and to the back of the airplane.

45.     At least one member of the airline personnel team was panicking and appeared to have no idea what to do during Greenidge's medical emergency.

46.     A different member of the airline personnel team made an overhead announcement to ask if there were any doctors on board the airplane.

47.    At least two medically-trained passengers came to the back of the airplane to render aid to Greenidge. One of these passengers began administering CPR to Greenidge.

48.    After further additional delay, airline personnel brought out the automated external defibrillator ("AED") machine present on AA Flight 614.

49.    Airline personnel struggled to figure out how to turn on and operate the AED machine.

50.    After airline personnel eventually figured out how to turn on the AED machine and position the patches on Greenidge's chest, the machine advised that CPR should continue to be administered.

51.    Each time the AED gave a "clear" warning for people to step back from Greenidge's body so that a shock could be administered, a shock was not delivered. Instead, the machine simply kept advising that CPR should be continued.

52.    AA Flight 614 made an unscheduled, emergency landing in Cancun, Mexico. Greenidge was deplaned on a stretcher and transported to the hospital in an ambulance, where he was pronounced dead at the age of 14.

53.    Upon information and belief, American Airlines flight personnel must follow the policies and procedures established in an operations manual called "Part 1."

54.    Upon information and belief, the Part 1 manual includes policies and procedures that American Airlines personnel must follow if a passenger presents with a medical emergency.

55.    Upon information and belief, the policies and procedures in the Part 1 manual are intended to ensure the safety of all passengers on board American Airlines flights.

56.    Upon information and belief, the airline personnel on board AA Flight 614 did not adhere to American Airlines policies and procedures, including but not limited to the policies and procedures outlined in the Part 1 manual.

57.     Contrary to American Airlines policies and procedures, the airline personnel on board AA Flight 614 did not timely respond to Greenidge's medical emergency.

58.     Contrary to American Airlines policies and procedures, the airline personnel on board AA Flight 614 did not timely transfer Greenidge from his seat to the back of the airplane where aid could be rendered.

59.     Contrary to American Airlines policies and procedures, the airline personnel on board AA Flight 614 did not timely request the assistance of medically trained passengers on board AA Flight 614.

60.     Contrary to American Airlines policies and procedures, the airline personnel on board AA Flight 614 did not timely initiate AED resuscitation on Greenidge.

61.     Contrary to American Airlines policies and procedures, the airline personnel on board AA Flight 614 did not effectively utilize the AED machine on board AA Flight 614 on Greenidge.

62.     Upon information and belief, and in violation of federal law, American Airlines failed to equip AA Flight 614 with requisite medical equipment, including but not limited to a medical kit with clearly marked contents and an operable AED machine.

63.     Upon information and belief, and in violation of federal law, American Airlines failed to regularly and sufficiently inspect the AED machine on board AA Flight 614 to ensure its readiness to perform during an emergency.

64.     Upon information and belief, and in violation of federal law, American Airlines failed to provide sufficient training for in-flight medical emergencies to the flight personnel on board AA Flight 614, including but not limited to recurrent training in the proper use of AEDs and cardiopulmonary resuscitation.

65.    Before traveling from New York to Honduras via American Airlines, 14-year-old Greenidge was an active eighth grader who enjoyed swimming at the YMCA, playing games with his friends, and spending time with his younger cousin.

66.    After embarking on his American Airlines voyage, however, Greenidge's short life was tragically cut short.

67.    Due to multiple accidents aboard AA Flight 614, each of which was the result of an act or omission by American Airlines personnel, Greenidge suffered a tragic death at the young age of 14. Each of these accidents was external to the medical emergency Greenidge suffered while on board AA Flight 614.

68.    Arzu, as Greenidge's mother, has experienced and continues to experience excruciating pain and suffering as a result of the sudden loss of her young son.

69.    On April 9, 2024, Plaintiff, through counsel, sent written correspondence to American Airlines regarding Plaintiff's significant pain and suffering associated with the loss of her 14-year-old son as well as the significant economic burden of cremating and internationally transporting Greenidge's remains from Mexico to New York.

70.    On April 9, 2024, Plaintiff, also through counsel, demanded from American Airlines the full value of the 113,100 special drawing rights to which the Estate of Kevin Greenidge is entitled as an advance payment.

71.    To date, Defendant has not tendered any advance payment to Plaintiff.

## COUNT I – DEFENDANT'S LIABILITY UNDER THE MONTREAL CONVENTION

72.    Greenidge was severely injured and died while he was flying internationally via American Airlines from Honduras to New York.

73.     The return portion of Greenidge's international itinerary included AA Flight 614 from SAP to MIA, an approximate two-hour layover in MIA, and AA Flight 1171 from MIA to LGA.

74.     With respect to Greenidge, Defendant American Airlines operated AA Flights 614 and 1171 as a single itinerary constituting international carriage from Honduras to New York.

75.     Greenidge's American Airlines travel was subject to the American Airlines Conditions of Carriage incorporated into Greenidge's ticket.

76.     At all relevant times, AA Flights 614 and 1171 were operated and controlled by Defendant American Airlines through its employees, agents, and/or servants.

77.     At all relevant times, AA Flights 614 and 1171 were operated as common carriers engaged in the business of transporting fare paying passengers.

78.     As a common carrier, American Airlines, including its agents, servants, and employees, owed the highest duty of care to its passengers, including Greenidge.

79.     Federal regulations govern the conduct and procedures of common carriers like Defendant American Airlines.

80.     For example, 14 C.F.R. § 121.801-805 requires airline vessels to be equipped with specific emergency medical equipment and requires airlines to provide crew members with specific emergency medical training.

81.     Specifically, as of April 12, 2004, 14 C.F.R. § 121.803(c)(4) requires passenger-carrying vessels to be equipped with an approved automated external defibrillator ("AED") machine.

82.     Pursuant to 14 C.F.R. § 121.803(b)(1), an aircraft's AED machine must be inspected regularly at specific inspection periods "to ensure its condition for continued serviceability and immediate readiness to perform its intended emergency purposes" (emphasis added).

83.     Pursuant to 14 C.F.R. § 121.803(b)(2)-(4), an aircraft's AED machine must be readily accessible to the crew, clearly identified, marked to indicate its method of operation, and marked as to date of last inspection.

84.     Pursuant to 14 C.F.R. § 121.805(b), airlines must provide crewmember training for in-flight medical emergencies, including instruction in emergency medical event procedures, coordination among crewmembers, instruction in the location, function, and intended operation of medical emergency equipment, and instruction in the content of the emergency medical kit.

85.     Specifically, each flight attendant must be trained "in the proper use of automated external defibrillators" and "cardiopulmonary resuscitation." This "recurrent training" is to "include performance drills . . . at least once every 24 months." *See* 14 C.F.R. § 121.805(b)(5)(i)-(iii).

86.     In addition to the AED machine, 14 C.F.R. § 121.803(c)(1)-(3) also requires passenger-carrying vessels to be equipped with approved first-aid kits and emergency medical kits.

87.     Pursuant to 14 C.F.R. § 121.803(b)(3), the contents of first-aid kits and emergency medical kits must be "clearly identified and <u>clearly marked</u>" (emphasis added).

88.     Upon information and belief, American Airlines flight personnel have specific protocols they must follow when a passenger is experiencing a medical emergency or otherwise appears unwell or in need of medical assistance.

89.     Upon information and belief, American Airlines flight personnel are trained on and required to follow the policies and procedures established in the "Part 1" manual.

90.     Upon information and belief, American Airlines policies and procedures, including but not limited to those contained in the Part 1 manual, instruct flight personnel to timely respond to medical emergencies, timely request assistance from medically-trained passengers in the event of a medical emergency, and timely initiate AED resuscitation in the event that a passenger is experiencing a medical emergency that requires such response.

91.     It is alleged that American Airlines, through its authorized employees and/or agents, failed to engage in the following activities:

a.  Failure to equip AA Flight 614 with an operable AED machine in violation of 14 C.F.R. § 121.803(c)(4);

b.  Failure to regularly and sufficiently inspect the AED machine on board AA Flight 614 "to ensure its condition for continued serviceability and immediate readiness to perform its intended emergency purposes" in violation of 14 C.F.R. § 121.803(b)(1);

c.  Failure to provide sufficient training for in-flight medical emergencies to the flight personnel on board AA Flight 614 in violation of 14 C.F.R. § 121.805(b);

d.  Failure to provide sufficient, "recurrent training" "in the proper use of automated external defibrillators" and "cardiopulmonary resuscitation" to the flight personnel on board AA Flight 614 in violation of 14 C.F.R. § 121.805(b)(5);

e.  Failure to incorporate "performance drills" regarding AED use and cardiopulmonary resuscitation into the training of the flight personnel on board AA Flight 614 in violation of 14 C.F.R. § 121.805(b)(5);

f.  Failure to equip AA Flight 614 with a "clearly marked" first-aid and/or medical kit in violation of 14 C.F.R. § 121.803(c)(1)-(3);

g.  Failure to follow established American Airlines protocol, including but not limited to the failure to timely respond to Greenidge's medical emergency, the failure to timely transfer unconscious Greenidge from his seat to the back of the airplane, the failure to timely request the assistance of medically-

trained passengers on board AA Flight 614, and the failure to timely initiate AED resuscitation on Greenidge; and

h. Failure to effectively utilize the AED machine on board AA Flight 614 on unconscious minor Greenidge.

92. Had AA Flight 614 been properly equipped with the necessary and functional medical equipment as required by federal law (including but not limited to a medical kit with clearly marked contents and an operable AED machine), had American Airlines properly trained the airline personnel on board AA Flight 614 for in-flight medical events as required by federal law, and had airline personnel timely responded to Greenidge's medical emergency and effectively implemented the skills learned in their required training, Greenidge would not have experienced intense physical and emotional pain and tragically died at the age of 14.

93. Pursuant to Article 17(1) of the Montreal Convention, American Airlines "is liable for damage sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or bodily injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

94. Under the provisions of Article 17 of the Montreal Convention, American Airlines' conduct, including but not limited to the acts and omissions set forth above, constitutes an accident, in that it was an unexpected or unusual event or happening external to the passenger, Greenidge, and was causally linked to Greenidge's bodily injuries and ultimate demise.

95. Under the provisions of Article 17 of the Montreal Convention, American Airlines is liable for damages sustained by both Plaintiff Arzu and by Greenidge in the bodily injury and death of Greenidge that occurred on AA Flight 614.

**Spoliation of Evidence Material to Plaintiff's Montreal Convention Claim:**

96. Plaintiff hereby alleges and incorporates all paragraphs in the preceding sections by reference herein.

97. Plaintiff also seeks from this Court a finding that Defendant spoliated material evidence and the eventual submission of a spoliation instruction to the jury.

98. As set forth in detail in the preceding paragraphs, the flight personnel on board AA Flight 614 attempted to utilize an AED machine on minor Greenidge, and the AED did not work properly. Plaintiff's counsel has made numerous attempts to inspect the AED machine prior to filing this suit. Based on conversations with American Airlines' counsel and the airline's refusal to permit inspection of the AED machine, it appears the AED machine has either been destroyed or put back into service and "lost."

99. Upon information and belief, Defendant American Airlines either no longer retains possession of the AED machine (and associated data) utilized on minor Greenidge or does not know where the machine is located.

100. Defendant American Airlines knew or reasonably should have known that there was a substantial chance that a wrongful death claim would be filed following the death of 14-year-old Greenidge.

101. Defendant knew or reasonably should have known that the AED machine (and associated data) utilized on minor Greenidge on AA Flight 614 is both material and relevant to Plaintiff's wrongful death claim against the airline.

102. Defendant had a duty to reasonably preserve evidence in the form of the AED machine (and associated data) utilized on Greenidge.

103. Specifically, Defendant should have removed the AED machine from service, created a copy and/or backup of the data contained on the AED machine, and ensured that both

the AED machine and the data backup were preserved and available for discovery in subsequent litigation.

104.    Defendant either intentionally or negligently breached its preservation duty by failing to preserve the AED machine utilized on Greenidge and the data contained therein.

105.    By failing to preserve the AED machine utilized on Greenidge and the data contained therein, Defendant American Airlines acted with the subjective purpose of concealing or destroying discoverable evidence that is material to Plaintiff's case.

106.    The AED machine (and associated data) utilized on Greenidge is materially relevant to key issues in Plaintiff's case. Among other things, Plaintiff alleges that American Airlines wrongfully delayed in utilizing the AED machine on Greenidge, that American Airlines personnel were not properly trained to use the AED machine that was on board AA Flight 614, that American Airlines personnel incorrectly utilized the AED machine on board AA Flight 614 on Greenidge, and that the AED machine utilized on Greenidge did not function properly. The AED machine and the data contained therein are materially relevant to each and every one of these key allegations.

107.    Among other things, the missing evidence would provide concrete proof of key details and contested facts such as the exact time that the AED machine was turned on and utilized on Greenidge, how long the AED machine was utilized on Greenidge, and whether or not the AED machine delivered a shock to Greenidge's body.

108.    As a result of Defendant's intentional or negligent conduct in failing to preserve the AED machine and its associated data, Plaintiff does not have access to the primary source of evidence regarding key elements of her allegations.

109.    Moreover, if the AED was "put back into service" and cannot now be located, this too is a violation of 14 C.F.R. § 121.803(b)(1), which requires AA to regularly inspect each AED

machine "to ensure its condition for continued serviceability and immediate readiness to perform its intended emergency purposes."

110. The AED machine utilized on Greenidge and the data contained therein is the best evidence of the performance, functionality, and maintenance of the AED machine and is not cumulative of other competent evidence that may be used instead of the spoliated device and data.

111. By failing to preserve the AED machine utilized on Greenidge and the data contained therein, Defendant American Airlines acted with the subjective purpose of concealing or destroying discoverable evidence that is material to Plaintiff's case, and Defendant did, in fact, conceal or destroy discoverable evidence that is material to Plaintiff's case.

112. As a result of Defendant's spoliation of the AED machine utilized on minor Greenidge and the data contained therein, Arzu is entitled to a finding by this Court that Defendant spoliated material evidence, the submission of a spoliation instruction to the jury, and the prohibition of American submitting evidence or argument to the jury that the AED machine was properly maintained and in working order.

## COUNT II – LOSS OF CONSORTIUM UNDER MONTREAL CONVENTION

113. Plaintiff hereby alleges and incorporates all paragraphs in the preceding section by reference herein.

114. Pursuant to Article 29 of the Montreal Convention, domestic law controls the issue of whether loss of consortium is cognizable.

115. Texas law permits a parent's loss of consortium claim resulting from the death of a minor child.

116. At all relevant times, Greenidge was the minor son of Arzu.

117. As alleged herein, Greenidge was seriously injured and ultimately died from a series of accidents that occurred while he was traveling internationally from Honduras to New York via American Airlines.

118. As a direct result of Greenidge's death caused by the accidents that occurred during Greenidge's international travel via American Airlines, Arzu has suffered a loss of consortium.

119. Pursuant to the pass-through provisions of Article 29 of the Montreal Convention and Texas law, American Airlines is liable for Arzu's loss of consortium.

## COUNT III – BREACH OF CONTRACT UNDER TEXAS LAW

120. Plaintiff hereby alleges and incorporates all paragraphs in the preceding section by reference herein.

121. Separate and apart from Plaintiff's claims under the Montreal Convention, there is a binding and enforceable contract between Greenidge and Defendant American Airlines, as set forth in Exhibits 1 – 4, attached to this complaint (the "AA Contract").

122. The AA Contract specifies that "[t]o the extent not preempted by federal law, Texas law applies to this contract and any dispute from your ticket purchase or travel on American Airlines without regard to conflict of law principles." See Exhibit 2 at 2. Defendant American Airlines has breached the AA Contract in the following ways:

### Failure to Perform:

123. The AA Contract provided that "in cases of bodily injury or death, the carrier shall make an advance payment where the carrier determines it is necessary to meet the immediate economic needs of, and hardship suffered by, a passenger." Exhibit 3 at 1; Exhibit 4 at 55.

124. The AA Contract further states that "[i]n the event of <u>death of a Passenger</u>, the amount of the payment <u>shall not be less than</u> 16,000 Special Drawing Rights." Exhibit 3 at 1; Exhibit 4 at 55 (emphasis added).

125.     Under the AA Contract, any advance payment is without prejudice to Defendant's right to contest liability, to seek contribution, or to recover such advance payment if it is proven that the Defendant is not liable. Exhibit 3 at 1–2; Exhibit 4 at 55.

126.     The aforementioned provisions contained in the AA Contract purport to provide financial support for passengers and the families of passengers who are injured or killed while traveling with Defendant American Airlines. Notwithstanding these provisions, upon information and belief, Defendant American Airlines has never authorized an advance payment to an injured passenger or the family of a deceased passenger.

127.     On April 9, 2024, Defendant was provided with notice of Plaintiff's significant pain, suffering, immediate economic needs, and general hardship associated with the loss of her minor son, Greenidge, entitling Plaintiff to at least 16,000 (and up to 113,100) in special drawing rights from American Airlines as an advance payment.

128.     Defendant American Airlines was provided with notice uncontrovertibly establishing that the full value of the special drawing rights was necessary to meet the significant "hardship suffered by" Plaintiff as a result of the loss of her minor son, Kevin Greenidge.

129.     The expenses associated with the preparation, cremation, and international transportation of Kevin Greenidge's remains from Mexico to New York, alone, exceed the 16,000 Special Drawing Rights minimum owed by Defendant in the event of the death of a passenger.

130.     As of the date of this filing, Defendant has not tendered any advance payment to Plaintiff.

131.     Defendant's failure to perform by failing to tender the advance payment constitutes a breach of the AA Contract.

132.     Plaintiff seeks and demand is hereby made for the full value of Plaintiff's 113,100 in special drawing rights.

133.     As a result of Defendant's breach of the AA Contract, Plaintiff has incurred and continues to suffer damages.

**Repudiation of the AA Contract:**

134.     The AA Contract provided that Defendant would transport Greenidge from San Pedro Sula, Honduras to New York, New York, and that such action would constitute "a single operation."

135.     The AA Contract incorporated by reference the Montreal Convention. Exhibit 2 at 16 ("For international travel, the Warsaw Convention and the Montreal Convention govern liability for personal injury, death or damage. The terms and conditions are set by those international conventions and are not subject to change or modification by American Airlines.").

136.     Under paragraph 1 of Article 33 of the Montreal Convention, Plaintiff may sue for damages "where it has a place of business through which the contract has been made," which was the state of New York.

137.     Under paragraph 2 of Article 33 of the Montreal Convention, Plaintiff is also permitted to sue Defendant for damages "in the territory . . . in which at the time of the accident the passenger has his or her principal and permanent residence."

138.     At the time of the accidents as alleged in Counts I and II, Arzu and Greenidge were both residents of New York.

139.     On March 13, 2023, Arzu, individually and as the administrator of Greenidge's estate, filed suit in the United States District Court for the Southern District of New York asserting her rights under the Montreal Convention. *Arzu et al v. American Airlines, Inc.*, 1:23-cv-02116-SDA, ECF No. 1.

140.     On May 19, 2023, Defendant filed a Motion to Dismiss contesting personal jurisdiction in New York. *Arzu et al v. American Airlines, Inc.*, 1:23-cv-02116-SDA, ECF Nos. 20–21.

Defendant filed this Motion to Dismiss despite the fact that Defendant had contractually agreed to litigate Montreal Convention claims in Plaintiff's home forum. *See* Exhibit 2 at 16; Montreal Convention, Art. 33(1)-(2). Defendant's Motion was ultimately granted, and Plaintiff's case was dismissed from her home forum of New York. *Arzu et al v. American Airlines, Inc.*, 1:23-cv-02116-SDA, ECF No. 37.

141.     Defendant's Motion to Dismiss was a repudiation of its contractual obligations under the AA Contract to permit Arzu to litigate her claims in New York, where Plaintiff resides, where Greenidge resided before his death, and where American Airlines and Greenidge entered into a contract for roundtrip, international transportation from New York to Honduras.

142.     As a result of Defendant's repudiation of the AA Contract, Arzu has incurred and continues to suffer damages in the form of litigation costs, attorney's fees, and lost interest.

## MONTREAL CONVENTION DAMAGES

143.     Plaintiff hereby alleges and incorporates all paragraphs in the preceding sections by reference herein.

144.     As a direct and proximate result of the aforesaid accidents, Greenidge was seriously injured and died.

145.     As a direct and proximate result of the aforesaid accidents, Arzu and Greenidge were both caused to suffer great pain, distress, agony, and mental anguish.

146.     As a direct and proximate result of the aforesaid accidents, Arzu and Greenidge were both caused to suffer great economic loss and, in the future, shall continue to suffer great economic loss.

147.     As a direct and proximate result of the aforesaid accidents, Arzu and Greenidge were forced to expend great sums of money on medical treatment, cremation, and funeral expenses.

148. As a direct and proximate result of the aforesaid accidents, Greenidge was caused to suffer the complete loss of all future income.

149. As a direct and proximate result of the aforesaid accidents, Arzu, as the administrator of Greenidge's estate, is entitled to compensation for the wrongful death of Greenidge, past and future lost earnings, past and future lost accumulations, past and future medical expenses, and mental anguish and suffering.

150. As a direct and proximate result of the aforesaid accident, Arzu, as an individual, is entitled to compensation for past and future loss of services, comfort, society, companionship, moral support, loss of consortium, and mental anguish and suffering.

## CONTRACT DAMAGES

151. As a result of the aforesaid breaches of the AA Contract, Plaintiff has suffered and continues to suffer breach of contract damages in the form of financial hardship, lost interest, increased costs and expenses, and attorney's fees.

152. Plaintiff seeks and demand is hereby made for attorney's fees for Defendants' breach of the AA Contract pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code.

## DEMAND FOR JUDGMENT

153. Plaintiff Arzu, as an Individual and as the Administrator of the Estate of Kevin Greenidge, Deceased, hereby demands judgment against Defendant American Airlines, Inc. in an amount to be determined at trial, together with attorney's fees pursuant to Tex. Civ. Prac. & Rem. Code § 38.001, *et seq.*, interest, costs, and disbursements of this action.

## DEMAND FOR JURY TRIAL

154. Pursuant to Federal Rules of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims and issues so triable.

Dated: May 13, 2024

Respectfully submitted:

*/s/ Darren P. Nicholson*

Darren P. Nicholson
State Bar No. 24032789
Hannah M. Crowe
State Bar No. 24131156
Clay R. Mahaffey (*pro hac vice* to be filed)
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, TX 75202
Telephone: (469) 904-4550
dnicholson@burnscharest.com
hcrowe@burnscharest.com
cmahaffey@burnscharest.com

ATTORNEYS FOR PLAINTIFF