UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**MELISSA SUZETTE ARZU,**

Plaintiff,

v.

No. **4:24-cv-00433-P**

**AMERICAN AIRLINES, INC.,**

Defendant.

## OPINION & ORDER

Before the Court are two cross-motions for summary judgment: one filed by Melissa Suzette Arzu, the administrator of the estate of Kevin Greenidge, and another filed by American Airlines Inc. ("American Airlines"). ECF Nos. 49, 53. Having considered both Motions, other relevant docket filings, and the applicable law, the Court will **DENY** Arzu's Motion and **GRANT** American Airlines' Motion.

## BACKGROUND

This case follows the tragic death of fourteen-year-old Kevin Greenidge. On June 4, 2022, Kevin boarded American Airlines Flight 614 from San Pedro Sula, Honduras to Miami, Florida. Kevin flew with his aunt Anna, his uncle Leonard, Leonard's partner Janell, and Leonard and Janell's daughter. Leonard, Janell, and their daughter sat in row 31. Anna and Kevin sat in row 32. Kevin sat in the window seat and Anna in the aisle seat. Nobody sat in the seat between Kevin and Anna.

Following a multi-hour weather delay, Flight 614 departed. After takeoff, Kevin asked Anna for his asthma inhaler to help him breathe, which Anna provided. But Kevin's breathing only worsened. Shortly after reaching altitude, Kevin became unconscious. Anna began calling for help, and Leonard unsuccessfully attempted to lift Kevin from his window seat in row 32.

When the flight attendants responded to Anna's calls, they found Kevin unconscious and unresponsive and called a Code Red. The flight attendants made multiple announcements requesting assistance from medically trained passengers. The first passenger to respond was Karenna Thatcher, a nurse. The second passenger to respond was Rachel Amador, a general surgeon. When Thatcher saw Kevin, she indicated that Kevin needed to be placed on the floor. With the help of multiple people, Kevin was removed from his seat and placed on the ground.

Once Kevin was on the ground, Thatcher and Amador, with the help of one flight attendant, began administering CPR. Another flight attendant brought a medical kit and an automated external defibrillator ("AED"). Thatcher and Amador set up the AED and placed the pads on Kevin. The flight deck was then alerted of the medical emergency, and just over an hour into the flight, the pilots began an emergency descent into Cancún International Airport at 7:33 p.m. The plane arrived at the gate at 7:50 p.m. During the descent, Amador and Thatcher continued administering CPR and applying the AED machine. Emergency medical services were waiting at the gate to transport Kevin to Amerimed Hospital via ambulance. Kevin was pronounced dead at 8:45 p.m. At the time of the flight, Kevin weighed 319 pounds and suffered from a host of diagnosed health complications including asthma, obesity, sleep apnea, and type II diabetes.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact" and "is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" if the evidence presented would allow a reasonable jury to return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" when it might affect the outcome of a case. *Id.* Generally, the "substantive law will identify which facts are material," and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.*

2

When determining whether summary judgment is appropriate, the Court views the evidence in the light most favorable to the nonmovant. *First Am. Title Ins. Co. v. Cont'l Cas. Co.*, 709 F.3d 1170, 1173 (5th Cir. 2013). In conducting its evaluation, the Court may rely on any admissible evidence available in the record but need only consider those materials cited by the parties. FED. R. CIV. P. 56(c)(1)–(3). The Court need not sift through the record to find evidence in support of the nonmovant's opposition to summary judgment; the burden falls on the moving party to simply show a lack of evidence supporting the nonmovant's case. *See Malacara v. Garber*, 353 F.3d 393, 404–05 (5th Cir. 2003).

## ANALYSIS

American Airlines' Motion seeks summary judgment on all three of Arzu's claims: (1) the Montreal Convention claim; (2) the loss-of-consortium claim; and (3) the breach-of-contract claim. Arzu's Motion only seeks summary judgment on her first and third claims. The Court will address each claim in the order presented in American Airlines' Motion.

### A. Montreal Convention Claim

Known formally as the Convention for Unification of Certain Rules for International Carriage by Air, the Montreal Convention is an international treaty to which the United States is a signatory. The Montreal Convention "applies to all international carriage of persons, baggage or cargo performed by aircraft for reward."[1]

Article 17 provides a remedy to passengers for damages caused by "accidents" on international flights.[2] Strict liability is imposed against air carriers "for damage sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft or in the course of any of the

---

[1]Convention for the Unification of Certain Rules for International Carrier by Air, art. 1(1), May 28, 1999, reprinted in S. TREATY DOC. NO. 106–45 (2000), 1999 WL 33292734, at *33 (1999) (hereinafter "Montreal Convention").

[2]*See id.* art. 17.

3

operations of embarking or disembarking."[3] "Accident" is not defined anywhere in the Montreal Convention. However, in *Air France v. Saks*, the Supreme Court of the United States clarified that an "accident" is "an unexpected or unusual event or happening that is external to the passenger." 470 U.S. 392, 395 (1985).[4] The *Saks* Court determined that "accident" should "be flexibly applied after assessment of all the circumstances surrounding a passenger's injuries." *Id.* at 405. In addition to identifying an unusual or unexpected event, liability only arises if "a passenger's injury is caused by [the] . . . event." *Id.* at 392. The Court further recognized that "[a]ny injury is the product of a chain of causes." *Id.* at 406. Thus, when evaluating causation, a plaintiff need only show that "some link in the chain was an unusual or unexpected event external to the passenger." *Id.*

Roughly twenty years after *Saks*, another Supreme Court case considered an "accident" that occurred when an airline's crew refused to help a passenger three times. *See Olympic Airways v. Husain*, 540 U.S. 644 (2004). In *Husain*, two airline passengers, husband and wife, boarded a flight that allowed smoking. *See id.* at 646–47. The husband suffered from asthma and was sensitive to secondhand smoke. *Id.* at 647. Upon boarding, the husband and wife were seated "three rows in front of the economy-class smoking section." *Id.* The wife told a flight attendant about the husband's condition and asked to be moved, but the flight attendant refused, saying the plane was full and she was too busy. *See id.* Following two more refusals by the flight attendant to aid the husband, the husband moved to the front of the plane to get fresh air but soon after began struggling to breathe and passed away. *Id.* at 648. The lower court determined that "the flight attendant's conduct in three

---

[3]*Id.*

[4]*Air France v. Saks* considered a claim under the Warsaw Convention, which predated the Montreal Convention. In 1999, the Montreal Convention replaced the Warsaw Convention, and courts have found that interpretations of the Warsaw Convention, such as in *Saks,* apply to the Montreal Convention. *White v. Emirates Airlines*, Inc., 493 Fed. App'x 526 (5th Cir. 2012) (citations omitted) (The Montreal Convention replaces the "Warsaw Convention and all of its related instruments and . . . eliminate[s] the need for the patchwork of regulation and private voluntary agreements.").

times refusing to move [the husband] was unusual or unexpected" and therefore constituted an "accident." *Id.* at 652. The lower court's finding of an "accident" was not challenged on appeal. *Id.* As for causation, and despite the husband's pre-existing asthma condition, the Supreme Court found that the "flight attendant's refusal on three separate occasions to move [the husband]" was "a link in the chain of causes that led to [the husband's] death." *Id.* at 653 (quotations omitted). Thus, the plaintiffs also proved causation. *Id.*

On the other hand, courts have found that a flight crew's "imperfect" response to a passenger's medical emergency does not necessarily constitute an "accident." *See, e.g.*, *White v. Emirates Airlines, Inc.*, 493 Fed. App'x 526, 531 (5th Cir. 2012). For example, in *White*, a man and his mother traveled aboard an Emirates Airlines flight from Dubai to Houston. *Id.* at 527. As the plane began its descent, the mother used the lavatory, and five minutes later, a flight attendant found that the mother had collapsed. *Id.* The flight crew took the mother out of the lavatory, placed her on the ground, administered oxygen through a mask, and alerted the captain. *Id.* The plaintiff alleged that the flight crew's non-compliance with the man's request that the flight crew perform CPR or use a defibrillator constituted an "accident." *Id.* at 530–31. But the Fifth Circuit affirmed the district court's grant of summary judgment in the airline's favor because "a flight crew's arguably imperfect response to a passenger's medical emergency does not necessarily constitute an Article 17 'accident.'" *Id.* at 531.

Plaintiff alleges that the American Airlines crew's response to Kevin's emergency included four different "accidents": (1) failure to immediately notify the flight deck; (2) failure to immediately administer CPR; (3) failure to contact the physician on call; and (4) failure to establish and adhere to emergency team roles. ECF No. 55 at 22–28. All four relate to policies found in the American Airlines Inflight Manual.

For the first, the Inflight Manual requires that flight attendants contact the flight deck immediately in the event of a medical emergency. ECF No. 56, App. 045. Plaintiff argues that the evidence shows such notification did not occur immediately. *See* ECF No. 55 at 22. Rather, finding Kevin unconscious and unresponsive, the flight attendant

waited until Kevin was transferred from his seat to the galley, Thatcher and Amador began administering CPR, and the AED began analyzing Kevin's heart rhythm; only then was the flight deck notified. *Id.*

As for the alleged failure to immediately administer CPR, the Inflight Manual directs that CPR be "administered immediately" if an unconscious person is not breathing and there are no signs of life. ECF No. 56, App. 058. Plaintiff contends the flight crew did not immediately administer CPR. ECF No. 55 at 24. Instead, the flight attendants waited for medically trained passengers to arrive and for Kevin to be removed from his seat and placed in the galley. *Id.* At this time, Amador initiated CPR. *Id.*

Next, Arzu points out that the Inflight Manual states that when there is a "Code Red," the crew should contact the physician on call. ECF No. 56, App. 042. The physician on call is a doctor "specially trained in handling inflight medical emergencies and advising which diversion city is most capable of handling the ill/injured person's condition." *Id.* The flight crew never contacted the physician on call.

Lastly, the Inflight Manual requires that flight attendants establish and adhere to certain roles during an inflight emergency. ECF No. 56, App. 057. Those roles include establishing a communicator, responder, and runner. *Id.* Arzu asserts that such roles were not clearly established by the flight crew. ECF No. 55 at 26. For example, one flight attendant was acting as both the runner and the communicator. *Id.*

Even under Arzu's version of the facts, the American Airlines crew's response to Kevin's emergency does not amount to an "accident" under the Montreal Convention.[5] This case is unlike other cases in which

---

[5]In reaching this holding, the Court notes its agreement with Judge Edward C. Burks of the Supreme Court of Virginia, who in 1878, and writing in an equally heartrending opinion, stated: "The unhappy condition of the appellee excites my commiseration; but courts of justice are not allowed to be controlled in their decisions by considerations of that character. 'Compassion,' said an eminent Virginia chancellor, 'ought not to influence a judge, in whom, acting officially, apathy is less a vice than sympathy.'" *Harris v. Harris*, 72 Va. 31 Gratt. 13, 32 (1878) (quoting Chancellor George Wythe, Commentary on *Field's Ex'x v. Harrison & wife, in* Wythe's Reports 282 (Minor's Ed. 1794)).

6

courts have found an "accident." For example, the facts here are not analogous to those in *Husain*, where the flight crew's multiple refusals to move the husband from the smoking section constituted an "accident." To the contrary, the four instances highlighted by Arzu reflect concerted efforts by the crew to provide emergency assistance to Kevin.

Moreover, courts have found that a departure from an airline's policy does not necessarily mean that an "accident" occurred. *See Blansett v. Cont'l Airlines, Inc.*, 379 F.3d 177, 182 (5th Cir. 2004). In *Blansett*, the Fifth Circuit held that there is *no per se* rule that any deviation from an airline's policy would constitute an "accident." *Id.* Instead, any departure from policy must still undergo the "unexpected or unusual" analysis. *See id.* at 181–82.

For this reason, this case more closely resembles *White*, in which the Fifth Circuit determined no accident occurred. *White*, 493 Fed. App'x. at 535. Just as in *White*, here it is "undisputed . . . that the [American Airlines] flight crew responded to [Kevin's family's] request for medical assistance." *Id.* at 531. The Court accepts Arzu's contentions that there may have been reactionary delays, confusion of roles, and departures from policy, such as the failure to contact the physician on call. Notwithstanding all of that, the flight crew "took action to assist" Kevin in multiple ways. *Id.* at 531. The flight attendants sought medical assistance from other passengers, provided a medical kit and AED machine, and alerted the flight deck to facilitate a diversion to Cancún for quicker medical attention. The Court has little doubt that the American Airlines crew could have done *more* to aid Kevin.[6] In fact, there is rarely, if ever, a perfect response to a medical emergency. But ultimately, even accepting Arzu's recitation of the facts, the failure of American Airlines to follow all relevant procedures, "when evaluated in context . . . was not unusual or unexpected." *Id.* at 534.

Kevin's underlying conditions also suggest that the flight crew's response was not unusual or unexpected. Again, the unusual and unexpected inquiry must be applied "flexibly" after "assessment of all

---

[6]The same argument was made in *White*. *See White*, 493 Fed. App'x at 531 ("[Plaintiff] faults the flight crew for failing to do more.").

the circumstances surrounding a passenger's injuries." *Saks*, 470 U.S. at 405. The Court finds that Kevin's pre-existing conditions including asthma, obesity, sleep apnea, and diabetes complicated the flight crew's emergency response efforts. Indeed, amid the various emergency protocols, the crew also navigated the unexpected difficulty of removing Kevin from his seat, which required assistance from multiple passengers. As a consequence, CPR could not be administered immediately because Kevin needed to be placed on the floor first, as Amador and Thatcher directed. This complication also likely contributed to the delay in alerting the flight deck of the emergency. Any deficiency in following the protocol can, at least to some extent, be attributed to unique challenges presented in this situation.

For these reasons, the Court finds that American Airlines' response to Kevin's medical emergency does not constitute an "accident" under the Montreal Convention and will therefore grant summary judgment in favor of American Airlines on this claim.[7]

### B. Loss-of-Consortium Claim

Under Texas law, a loss-of-consortium claim is a derivative claim. *See, e.g.*, *Brewerton v. Dalrymple*, 997 S.W.2d 212, 217 (Tex. 1999). Arzu's loss-of-consortium claim is derivative of her Montreal Convention claim. Accordingly, given the Court's ruling on Arzu's Montreal Convention claim that there was no "accident," American Airlines is also entitled to summary judgment on the loss-of-consortium claim.

### C. Breach-of-Contract Claim

Both Parties move for summary judgment on Arzu's breach-of-contract claim. American Airlines makes two arguments: (1) that Arzu's breach-of-contract claim is preempted by the Montreal Convention; and (2) that American Airlines' decision to make a payment was merely discretionary under the terms of the contract and therefore the claim

---

[7]Given the Court's ruling, it need not determine whether American Airlines was the "cause" of Kevin's death. And as a result, American Airlines' Motion for Leave to File Reply Appendix concerning expert opinion on the cause of Kevin's death is unnecessary. ECF No. 72.

fails as a matter of law. Arzu disputes both contentions and argues that there is no genuine dispute of material fact that American Airlines owes Arzu 16,000 Special Drawing Rights ("SDR")[8] as a mandatory, minimum payment. The Court will first discuss whether the breach-of-contract claim is preempted by the Montreal Convention before determining whether the agreement required a discretionary or mandatory payment from American Airlines.

### 1. Preemption by the Montreal Convention

As discussed above, the Montreal Convention applies to "accidents" that occur during the course of an international flight.[9] Generally, the Montreal Convention provides an exclusive remedy to address injuries under its purview.[10] This is true even if "a passenger['s] . . . injury is not compensable under the Convention," as the Court has found here. *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 160 (1999); *see also Best v. BWIA W. Indie Airways Ltd.*, 581 F. Supp. 2d 359, 362 (E.D.N.Y. 2008) (citations omitted) ("By its own terms, the [Montreal Convention], where applicable, preempts the remedies of a signatory's domestic law, whether or not the application of the [Montreal] Convention will result in recovery in a particular case.").

Nonetheless, as cited by Arzu, there are instances where the Montreal Convention does not preempt contractual claims based on *nonperformance. See Nankin v. Cont'l Airlines, Inc.*, No. CV-09-07851, 2010 WL 342632, at *7 (C.D. Cal. Jan. 29, 2010) (finding the Montreal Convention not applicable to plaintiffs' claims because airlines refused to perform the contract); *Mullaney v. Delta Air Lines, Inc.*, No. 08-civ-7324, 2009 WL 1584899, at *3 (S.D.N.Y. June 3, 2009) (same); *In re Nigeria Charter Flights Contract Litig.*, 520 F. Supp. 2d 447, 455 (E.D.N.Y. 2007) (same); *Weiss v. El Al Israel Airlines, Ltd.*, 433 F. Supp.

---

[8]Approximately $21,000 USD.

[9]*See* Montreal Convention, art. 17.

[10]*Id.* art. 29 ("In the carriage of passengers . . . any action for damages, however founded, whether under this Convention or in contract or in tort or otherwise, can only be brought subject to the conditions and such limits as are set out in this Convention . . . .").

2d 361, 369 (S.D.N.Y. 2006) (same). In each of these cases, the plaintiff's contract claim dealt with an airline failing to transport a passenger. The court in each case concluded that such nonperformance by the airline was not preempted by the Montreal Convention because such "claims [do] not fall within the scope of the Montreal Convention." *See, e.g.*, *Nankin*, 2010 WL 342632, at *7 (citations omitted). Arzu contends that, like these cases, American Airlines failed to perform its contractual obligations by not tendering an advance payment of at least 16,000 SDR following Kevin's death on Flight 614.

But unlike the cases Arzu cites, her claim of nonperformance does not deal with an airline failing to transport Kevin. This distinction is important because in *Nankin*, for example, the court reasoned that the Montreal Convention would preempt passengers' claims for "delays" but not nonperformance of transportation. *Id*. And "courts scrutinize the facts to determine whether the claim" actually related to a refusal to transport or just a delay. *Id*. Thus, the cases cited by Arzu do not suggest that *all* suits involving nonperformance of contracts avoid preemption by the Montreal Convention. Rather, they stand for the proposition that an airline's nonperformance of *transportation* is not preempted because such claims fall outside the scope of the Montreal Convention.

For this reason, if the Court concluded that Arzu's nonperformance claim of the advance payment was not preempted by the convention, such a holding would expand the preemption exceptions set forth in Arzu's cases. The Court is further wary of making such a determination given that the nonperformance of the advance payment is directly tied to Kevin's death on Flight 614, and the death of a passenger on an international flight is indisputably covered by the Montreal Convention.

Nonetheless, the Court need not decide whether the breach-of-contract claim was preempted by the Montreal Convention because the Conditions of Carriage are unambiguous and merely provide for a discretionary payment by American Airlines. Therefore, the Court declines to rule on whether Arzu's breach-of-contract claim is preempted by the Montreal Convention.

## 2. Mandatory vs. Discretionary Nature of Contract

As discussed above, the Conditions of Carriage are unambiguous and do not require any mandatory payment by the "carrier": American Airlines. The Conditions of Carriage provides in relevant part:

> (2) In cases of bodily injury or death, the Carrier shall make an advance payment where [American] determines it is necessary to meet the economic needs of, and hardship suffered by, a Passenger as provided under the following paragraphs:

> (a) Unless a dispute arises over the identity of the person to whom an advance payment shall be made, [American] shall, without delay, make the advance payment to the Passenger in an amount or amounts determined by the Carrier in its sole discretion. In the event of death of a Passenger, the amount of the advance shall not be less than 16,000 Special Drawing Rights, which shall be paid to a representative of the Passenger's next of kin eligible to receive such advance payment as determined by [American] in its sole discretion.

ECF No. 18-3 ¶ 2.

The plain language of the Conditions of Carriage suggests that American Airlines' advance payment in the event of a passenger's death was non-mandatory. As a threshold to making an advance payment for bodily injury or death of a passenger, American Airlines must "determine[] it is necessary to meet the immediate economic needs of, and hardship suffered by, a Passenger . . . ." *Id.* Subparagraph (a) then says that, "in the event of death of a Passenger, the amount of the advance payment shall not be less than 16,000 Special Drawing Rights . . . ." *Id.* ¶ 2(a). Thus, American Airlines must *first* determine that such an advance payment is necessary to meet the needs of a Passenger, and *second*, if such a determination is made, and a death of a passenger occurred, the payment must not be less than 16,000 SDR. Given this threshold requirement, American Airlines was not obligated to make any advance payment. And failure to make a discretionary payment

11

does not constitute a breach of contract under Texas law. *See, e.g.*, *Farmer v. Ben E. Keith Co.*, 919 S.W.2d 171, 177 (Tex. App.—Fort Worth 1996, no writ) (employer's failure to make a discretionary payment to employee did not constitute breach of contract).[11]

For these reasons, the Court finds there is no genuine dispute of material fact that American Airlines did not breach any agreement, and summary judgment should be entered on behalf of American Airlines.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Arzu's Motion. ECF No. 53. The Court **GRANTS** American Airlines' Motion and **ENTERS** summary judgment in American Airlines' favor on all three counts. ECF No. 49. Given the Court's rulings, the Court further finds that American Airlines' Motion for Leave to File Reply Appendix is **MOOT**. ECF No. 72.

**SO ORDERED** on this **8th day of May 2025.**

**MARK T. PITTMAN**
UNITED STATES DISTRICT JUDGE

---

[11]The Parties make various contentions about the origin of the contractual language. American Airlines argues that the Conditions of Carriage originate from the Montreal Convention itself, further confirming that its provisions are potentially preempted by the Convention. Arzu argues that the language is taken from an order by the Department of Transportation ("DOT") and that American Airlines is estopped from making its argument that the advance payment is discretionary given previous arguments made by American Airlines' representative trade organization before DOT. Regardless, "[i]f a contract is unambiguous on its face, the contract's meaning and intent of the parties must be sought within the four corners of the document and cannot be explained or contradicted by extrinsic evidence." *Shocklee v. Mass. Mut. Ins. Co.*, 369 F.3d 437, 439–40 (5th Cir. 2004). A determination of the origin of the Conditions of Carriage is therefore unnecessary for this Court because the language of the agreement is clear—the advance payment was non-mandatory.