**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **MELISSA SUZETTE ARZU, Individually and as the Administrator of the Estate of KEVIN GREENIDGE, Deceased,** | § | |
| ***Plaintiff,*** | § | |
| **v.** | § | **CIVIL ACTION NO. 4:24-cv-00433-P** |
| **AMERICAN AIRLINES, INC.,** | § | |
| ***Defendant.*** | § | |

**DEFENDANT AMERICAN AIRLINES, INC.'S MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. CORWIN WARMINK AND BRIEF IN SUPPORT**

# TABLE OF CONTENTS

PAGE

I. INTRODUCTION & SUMMARY OF MOTION .......... 1

II. BACKGROUND & PROCEDURAL HISTORY .......... 4

A. Despite American's rescue efforts, Kevin Greenidge died onboard an international American Airlines flight .......... 4

B. Arzu alleged that American's "deficient" or "delayed" response and/or an AED malfunction "caused" Kevin's death .......... 5

C. To establish causation, Arzu relies on Dr. Corwin Warmink, who intends to opine that the time-lapse in administering CPR contributed to Kevin's death .......... 5

1. While Dr. Warmink's opinion focuses on the alleged delay, he initially declined to opine that a faster response would have saved Kevin .......... 6

2. After American moved for summary judgment, Dr. Warmink ultimately opined that American was a cause-in-fact of Kevin's death, relying on inapt studies .......... 8

D. The Fifth Circuit affirmed-in-part this Court's grant of summary judgment, limiting the dispute to Arzu's AED-malfunction theory .......... 10

III. ARGUMENTS & AUTHORITIES .......... 11

A. District courts have considerable discretion to exclude unreliable testimony .......... 12

B. Because Dr. Warmink's causation opinion is irrelevant, self-defeating, and unreliable, this Court should exclude it .......... 14

1. Dr. Warmink's opinion is irrelevant to the appropriate causation inquiry .......... 14

2. Dr. Warmink's opinion is necessarily inconsistent with the relevant causal question .......... 15

3. The proffered bases for Dr. Warmink's opinion directly contradict his ultimate opinion .......... 16

a. Dr. Warmink's opinion is baseless .......... 16

b. Dr. Warmink's reliance on generic statistics fails to account for the particular circumstances that further reduced Kevin's odds .......... 17

IV. CONCLUSION .......... 21

# TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*Air France v. Saks*,
470 U.S. 392 (1985) ... 11

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) ... 20

*Arzu v. Am. Airlines, Inc.*,
176 F.4th 343 (5th Cir. 2026) ... 11

*Berry v. Armstrong Rubber Co.*,
989 F.2d 822 (5th Cir.1993) ... 13

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ... *passim*

*DeWolff, Boberg & Assocs., Inc. v. Pethick*,
No. 3:20-CV-3649-L, 2024 WL 1396267 (N.D. Tex. Mar. 31, 2024), *aff'd on other grounds*, 133 F.4th 448 (5th Cir. 2025) ... 12

*Free v. Wal-Mart Louisiana, LLC*,
815 Fed. Appx. 765 (5th Cir. 2020) ... 10

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ... 13, 17, 20

*Groover v. Polk Cnty. Bd. of Cnty. Comm'rs*,
570 F. Supp. 3d 1134 (M.D. Fla. 2021) ... 20

*Guillory v. Domtar Indus. Inc.*,
95 F.3d 1320 (5th Cir. 1996) ... 19

*Guy v. Crown Equip. Corp.*,
394 F.3d 320 (5th Cir. 2004) ... 12

*Honey-Love v. United States*,
664 Fed. Appx. 358 (5th Cir. 2016) ... 20

*Johnson v. Cox*,
No. 3:21-CV-3105-E, 2023 WL 4686435 (N.D. Tex. July 21, 2023) ... 10

*Knight v. Kirby Inland Marine Inc.*,
482 F.3d 347 (5th Cir. 2007) ... 13

*Moore v. Ashland Chem. Inc.*,
151 F.3d 269 (5th Cir. 1998) ....................20

*Prescod v. AMR, Inc.*,
383 F.3d 861 (9th Cir. 2004) ....................11

*Slade v. City of Marshall, Tex.*,
814 F.3d 263 (5th Cir. 2016) ....................11

*TitleMax of Tex., Inc. v. City of Dallas*,
No. 3:21-CV-1040-S-BN, 2023 WL 4711365 (N.D. Tex. July 24, 2023) ....................13

*United States v. Eff*,
524 F.3d 712 (5th Cir. 2008) ....................14

*United States v. Reed*,
908 F.3d 102 (5th Cir. 2018) ....................12

*Watkins v. Telsmith, Inc.*,
121 F.3d 984 (5th Cir. 1997) ....................12

**STATUTES**

TEX. CIV. PRAC. & REM. CODE §§ 71.001-71.012 ....................12

**RULES**

FED. R. EVID. 402 ....................14

FED. R. EVID. 702 ....................1, 11, 12, 20

**OTHER AUTHORITIES**

Montreal Convention, art. 17 ....................1, 2, 10

TO THE HONORABLE UNITED STATES DISTRICT JUDGE MARK T. PITTMAN:

Defendant, American Airlines, Inc. ("American"), respectfully files this *Motion to Exclude Expert Testimony of Dr. Corwin Warmink and Brief in Support* pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). In support, American shows as follows:

## I. INTRODUCTION & SUMMARY OF MOTION

In this survival and wrongful death case brought under Article 17 of the Montreal Convention, Melissa Suzette Arzu, individually and as the Administrator of the Estate of Kevin Greenidge ("Arzu"), alleges that American is liable for the June 2022 in-flight death of fourteen-year-old Kevin. Initially, Arzu raised two liability theories arising out of American's response to Kevin's sudden, in-flight heart attack: (1) American's alleged "deficient" response delayed the administration of CPR or other intervention; and (2) once used, the plane's on-board Automated External Defibrillator ("AED") allegedly malfunctioned by not shocking Kevin.

To establish causation—*i.e.*, that but for American's allegedly improper response to Kevin's medical emergency, Kevin more-likely-than-not would have survived—Arzu relies on the expert opinion of Dr. Corwin Warmink.

Despite initially refusing to do so, Dr. Warmink ultimately opined that Kevin "more likely than not would have survived his cardiac arrest on Flight 614 had the American flight crew promptly initiated cardiopulmonary resuscitation (CPR) and effectively utilized a functional [] AED." [Ex. A at Appx. 012 ¶ 6, ECF No. 80-2, Appx. 003 ¶ 6].[1] Dr. Warmink bases this opinion

[1] Consistent with its previous Brief in Support of its Motion for Summary Judgment, American files certain exhibits containing confidential information under seal. In particular, American files Exhibits D, E, F, G, J, K, M and Q under seal—as reflected in American's *Unopposed Motion for Leave to File Under Seal Portions of American's Appendix in Support of its Motion to Exclude*.

on two observational studies assessing survival statistics for off-plane, out-of-hospital cardiac arrests.

Previously, this Court granted summary judgment in American's favor, and the Fifth Circuit affirmed-in-part and reversed-in-part. The Fifth Circuit affirmed on Arzu's theory that the American flight crew failed to initiate CPR promptly, holding that this theory does not rise to the "unexpected or unusual" standard that Article 17 of the Montreal Convention requires. But the court reversed on Arzu's theory that the AED did not shock Kevin during American's rescue efforts, holding a fact dispute precluded summary judgment. As a result, Arzu's only live theory is that American is liable because the AED allegedly malfunctioned, causing Kevin's death.[2] Still, the Fifth Circuit indicated that American should challenge the admissibility of Dr. Warmink's opinion under *Daubert*.

American now does so. This Court should exclude Dr. Warmink's unreliable and unsupported causation opinion. First, Dr. Warmink's theory is irrelevant in light of the Fifth Circuit's dismissal of Arzu's delayed-CPR theory. The focal point of Dr. Warmink's opinion remains on the alleged delay in CPR or other intervention and its impact on Kevin's survival odds. This theory is now out-of-bounds, so Dr. Warmink's opinion is unhelpful to the jury—and thus inadmissible.

Second, Dr. Warmink's causation opinion is self-defeating. The opinion does not, and cannot, support the conclusion that Kevin would have survived but for any alleged AED

---

The majority of American's exhibits to this Motion to Exclude have previously appeared in this Court's record. The "ECF" citations refer to the specific location of those previous exhibits.

[2] American fiercely disputes Arzu's allegations, and nothing in this Motion to Exclude should be construed as a concession that the AED did not function as intended. Instead, the AED's clear, uninterrupted telemetry strip conclusively establishes that the AED was fully functional.

malfunction. In other words, Dr. Warmink's opinion is necessarily at odds with the relevant causal question: *If Kevin received a shock at the time the crew administered the AED, would Kevin have ultimately survived?* Based on Dr. Warmink's own assumptions about the alleged delay in administering CPR, and how this alleged delay diminished Kevin's survival odds, Dr. Warmink's own answer must be "No."

Finally, beyond these foundational defects, the bases offered in support of Dr. Warmink's opinion do not actually support Arzu's theory that, more likely than not, Kevin would have survived, had he received an AED shock. In fact, the scientific studies from which Dr. Warmink cherry-picks *directly contradict* his ultimate opinion; they reveal that Kevin's survival odds were low—*far* below 50%—regardless of Arzu's unsubstantiated criticisms of American's response. At best, the studies ruin Dr. Warmink's ultimate opinion. At worst, the studies betray Dr. Warmink's opinions as transparently baseless, offered only to confuse and mislead the trier of fact.

And while Dr. Warmink labors to avoid the clear import of these studies—that Kevin's ultimate survival was highly unlikely—his efforts only underscore the unreliability of his opinion. Kevin's particular circumstances—including his undisputed initial non-shockable heart rhythm while 35,000 feet over the Atlantic Ocean—reveal an uncomfortable but unavoidable truth: American's robust efforts to save Kevin's life could not have changed the tragic outcome.

* * *

Kevin Greenidge's death undeniably was a tragedy. But to hold American responsible, Arzu must provide admissible evidence that, more likely than not, but for American's alleged failure to provide a functioning AED, Kevin would have survived. Because Dr. Warmink's causation opinion is unhelpful, self-defeating, and fundamentally unreliable, the Court should exercise its gatekeeping function and exclude his proffered opinion testimony.

## II. BACKGROUND & PROCEDURAL HISTORY

### A. Despite American's rescue efforts, Kevin Greenidge died onboard an international American Airlines flight.

Fourteen-year-old Kevin suffered a heart attack onboard American Airlines Flight 614 from Honduras to Miami. [*See* Ex. B at Appx. 015, ECF No. 51-1 at Appx. 089; Ex. C at Appx. 017-18, ECF No. 51-1 at Appx. 093-94; Ex. D at Appx. 026, ECF No. 52-1 at Appx. 084; Ex. E at Appx. 028-29, ECF No. 52-1 at Appx. 104-05]. The flight crew rendered aid, including by climbing over beverage carts to reach Kevin, exerting brute strength to physically remove his 319-pound body from his window seat, and securing the assistance of trained medical personnel. [Ex. F at Appx. 034, 43:16-45:17, ECF No. 63-2 at Appx. 010; Ex. G at Appx. 043-44, 26:4-31:8, 32:10-17, ECF No. 63-3 at Appx. 043-44]. Arzu's evidence, including testimony from Dr. Warmink, estimates that it took approximately 10 to 15 minutes to move Kevin—unconscious—from his window seat to the aft galley, the first place the crew and medical personnel could perform CPR. [Ex. H at Appx. 049, ECF No. 51-1 at Appx. 066; Ex. I at Appx. 059, 42:13-21].

While Flight Attendant De Fitzpatrick performed CPR, the captain diverted the plane to Cancun, landing just seventeen minutes after the crew notified him of the emergency. [Ex. F at Appx. 035, 62:11-21, ECF No. 63-2 at Appx. 012; Ex. J at Appx. 074, 34:1-16, ECF No. 52-1 at Appx. 037; Ex. K at Appx. 077, ECF No. 52-1 at Appx. 091; Ex. L at Appx. 081, 83:15-23, ECF No. 62-1 at Appx. 070]. Despite Kevin's initial, non-shockable heart rhythm, the crew and medically trained passengers were eventually able to generate a shockable rhythm through continued CPR. [Ex. I at Appx. 062, 68:3-13, Appx. 055-56, 105:20-106:16; Ex. M at Appx. 087, 098, ECF No. 52-2 at Appx. 124]. The crew then used the plane's fully functional AED machine to attempt to shock Kevin's heart back into rhythm, while preparing the cabin for imminent landing. [Ex. F at Appx. 036, 84:2-85:3; Ex. M at Appx. 085, 098, ECF No. 52-2 at Appx. 122,

135].

Despite American's efforts, Kevin did not survive.

**B. Arzu alleged that American's "deficient" or "delayed" response and/or an AED malfunction "caused" Kevin's death.**

In this survival and wrongful death case, Kevin's estate seeks to hold American liable under the Montreal Convention—an international treaty that provides recourse for onboard "accidents." Initially, Arzu's central allegation was that American's untimely and imperfect response caused Kevin's death. [*See* Ex. N at Appx. 128-29, ECF No. 18 at 1-2]. Specifically, Arzu alleged that American's delayed and disorganized efforts to render emergency care were "unexpected or unusual," constituting an "accident" under the Convention. [*See id.* at Appx. 139].

Arzu also separately alleged that the AED malfunctioned and failed to deliver a shock, and American "spoliated" the AED. [*Id.* at Appx. 133, 139]. But after American produced the AED's data strip and invited Arzu to inspect the AED—which she did—Arzu (and Dr. Warmink) focused her causation theory on Arzu's former delay/deficient-response theory. [*E.g.*, *id.*; Ex. H at Appx. 050-51, ECF No. 51-1 at Appx. 065-66].

**C. To establish causation, Arzu relies on Dr. Corwin Warmink, who intends to opine that the time-lapse in administering CPR contributed to Kevin's death.**

Arzu designated Dr. Warmink as a retained medical expert on causation. [Ex. O at Appx. 151]. In his report, Dr. Warmink's opined that American's "delay" contributed to Kevin "not surviving":

> It is my opinion based upon my education, experience, and training that, within a reasonable degree of medical certainty, the delay in initiation of cardiopulmonary resuscitation coupled with the delayed and ineffectual automatic external defibrillator usage contributed to Kevin Greenidge not surviving this event.

[Ex. H at Appx. 051, ECF No. 51-1 at Appx. 066].

### 1. While Dr. Warmink's opinion focuses on the alleged delay, he initially declined to opine that a faster response would have saved Kevin.

Central to Dr. Warmink's theory is that American's alleged delay in administering CPR drastically reduced Kevin's odds of survival. [Ex. H at Appx. 050, ECF No. 51-1 at Appx. 065 ("This delay was definitely significant enough to critically decrease Kevin's chance of survival."); *id.* ("Detection of this rhythm supports that if [CPR] and automatic external defibrillation had been initiated without a significant delay that Kevin's survival would have been several times more likely."); *id.* at Appx. 051 ("It is my opinion … that … the delay in initiation of [CPR] coupled with the delayed and ineffectual [AED] usage contributed to Kevin Greenidge not surviving this event."); Ex. P at Appx. 155 ("Kevin's return to a shockable rhythm also indicates that if he had received CPR in a more timely fashion his likelihood of survival would have been dramatically increased …"); *id.* ("Every minute delay in this situation is directly correlated to a dramatic decrease in survivability.")].

Based on his review of the record, Dr. Warmink offered a "very conservative" estimate that at least 10 to 15 minutes passed before Kevin received CPR, and that this delay contributed to Kevin's death. [Ex. H at Appx. 049, ECF No. 51-1 at Appx. 066; Ex. I at Appx. 059, 42:13-21]. According to Dr. Warmink, "[t]he chance of survival diminishes by 7% to 10% for every minute that passes without intervention in a witnessed cardiac arrest." [Ex. H at Appx. 050, ECF No. 51-1 at Appx. 065].

Still, in his deposition, Dr. Warmink initially declined to opine that, but for alleged this delay, *Kevin would have lived*:

A. I think we've established I'm not really looking to say I can tell you exact time frames …

…

Q. Okay. What is the point here at which [Kevin's] odds go from he likely would have survived to he wouldn't have survived?

A. It's impossible for me to give you like an exact time-stamp of when it went from -- like you want me to give like a survival ratio?

Q. Yes.

A. Yeah. I -- I mean, like, that would be folly for me to claim that I could do that.

…

Q. … I believe your testimony is - and correct me if I'm wrong - that your opinion is based on the fact that the chance of survival diminished for every minute that passes; is that correct?

A. Right. … I can't give you an exact number of what his survivability was at any point, but we do know that time is of the essence and that decreases your chance of survival.

[Ex. I at Appx. 061, 62:18-64:9, Appx. 065, 108:3-14].

To substantiate his opinion on Kevin's chances of survival, Dr. Warmink relied on data from the AED's readout strip. The data indicated—and Dr. Warmink agreed—that Kevin's initial heart rhythm was "non-shockable." [Ex. I at Appx. 062, 68:3-13, Appx. 064-65, 105:20-106:16; Ex. M at Appx. 87, ECF No. 52-2 at Appx. 124]. Thus, the AED advised continued CPR. After roughly eight minutes of CPR, the AED detected a shockable rhythm, advised that a shock be administered, and delivered a 150-joule shock. [Ex. M at Appx. 085, 098, ECF No. 52-2 at Appx. 122, 135]. For Dr. Warmink, this shockable rhythm indicated that Kevin's heart "wanted to live." [Ex. I at Appx. 063, 70:19-71:4].

Despite Dr. Warmink's reliance on the data strip, and despite Dr. Warmink's concession that the AED "was functioning," Arzu separately alleged that the AED malfunctioned by not administering a shock. [Ex. I at Appx. 069, 159:23-160:2].[3]

### 2. After American moved for summary judgment, Dr. Warmink ultimately opined that American was a cause-in-fact of Kevin's death, relying on inapt studies.

American moved for summary judgment, arguing in part that Dr. Warmink opined only that delay decreased Kevin's odds of survival, *but he refused to testify that Kevin would have lived.* In the face of that argument, Arzu attached a new declaration from Dr. Warmink in a proposed sur-reply. There, Dr. Warmink revised his opinion to reflect—for the first time—his professed belief that, "*more likely than not*," Kevin "would have survived his cardiac arrest on Flight 614 had the American flight crew promptly initiated cardiopulmonary resuscitation (CPR) and effectively utilized a functional automatic external defibrillator (AED)." [Ex. A at Appx. 012 ¶ 6, ECF No. 80-2 at Appx. 003 ¶ 6 (emphasis added)]. For support, Dr. Warmink relied on two scientific, observational studies assessing survival statistics for victims of out-of-hospital cardiac arrest: The "Menant Study," which assessed adolescents in France, and the "Weisfeldt Study," which surveyed 170 patients with initial shockable rhythms who received an AED shock before EMS arrival. [Ex. R at Appx. 162, ECF No. 72-1 at Appx. 005; Ex. S at Appx. 201, ECF No. 80-2 at Appx. 018].

---

[3] Arzu has never explained how the AED could give verbal, audible instructions (as Arzu's own witnesses concede it did, Ex. Q at Appx. 158, ECF No. 14 at Appx. 003), record events on a data strip (including "Pads On," "Start CPR," "Stop CPR," "SHOCK #1 (150J)" (as the data strip shows, Ex. M at Appx. 085, ECF No. 52-2 at Appx. 122), show a stark but temporary spike in heart rhythm after "SHOCK #1 (150J)" (as the data strip shows, Ex. M at Appx. 098, ECF No. 52-2 at Appx. 135)—without actually delivering a shock to Kevin. Regardless, this motion focuses on Dr. Warmink's defective causation opinion.

The Menant Study surveyed adolescents with median ages and weights of 5.18 years and 12 kilograms (26.5 pounds), respectively. [Ex. R at Appx. 178, ECF No. 72-1 at Appx. 023]. The Weisfeldt Study surveyed primarily adult patients. [Ex. S at Appx. 192, ECF No. 80-2 at Appx. 009]. Both studies explicitly disclaimed any findings or conclusions on the patients' neurological outcomes or long-term survival. [Ex. R at Appx. 171, ECF No. 72-1 at Appx. 016; Ex. S at Appx. 195, ECF No. 80-2 at Appx. 012]. Neither surveyed patients suffering cardiac arrest onboard airplanes—much less international overwater flights. Both found that the majority of patients did not survive. [Ex. R at Appx. 170, ECF No. 72-1 at Appx. 015; Ex. S at Appx. 192, ECF No. 80-2 at Appx. 009].

Nonetheless, Dr. Warmink represented the Menant and Weisfeldt studies as finding that pediatric patients who receive an AED shock have a 71.4% and 86% survival rate *to hospital admission*, respectively. [Ex. A at Appx. 012 ¶ 6, ECF No. 80-2 at Appx. 003 ¶ 6; Ex. P at Appx. 155].

But Dr. Warmink recognized that survival to hospital admission is not survival *to hospital discharge*—the more relevant inquiry.[4] [Ex. A at Appx. 012-13 ¶ 7, ECF No. 80-2 at Appx. 003-04 ¶ 7]. For this metric, the Menant Study found that nearly two-thirds of shocked patients—65.7%—*did not survive* (meaning only 34.3% survived to discharge). [Ex. R at Appx. 178, ECF No. 72-1 at Appx. 023]. The Weisfeldt Study found a similar number—62%—*did not survive* (meaning only 38% survived to discharge). [Ex. S at Appx. 192, ECF No. 80-2 at Appx. 009]. Per the Menant Study, for patients whose "first annotation" is non-Ventricular Fibrillation—which

[4] Survival to hospital discharge is more relevant, but still not *the* relevant inquiry, because the studies did not assess long-term survival or adverse neurological outcomes.

includes Kevin—the survival rate to hospital discharge is just 23.1%. [Ex. R at Appx. 168, ECF No. 72-1 at Appx. 013; Ex. I at Appx. 064-65, 105:20-106:13].

In his summary judgment sur-reply declaration, Dr. Warmink sought to explain the discrepancy between the Menant Study's bottom-line and his ultimate opinion that Kevin would have survived, "had CPR and the AED been effectively and timely deployed" (a delay-based theory). [Ex. A at Appx. 012 ¶ 6, ECF No. 80-2 at Appx. 003 ¶ 6].[5] To avoid the conclusion that, more likely than not, Kevin would not have survived, Dr. Warmink remarked that the Menant Study "did not exclude children who suffered cardiac arrest as a result of severe trauma, congenital heart defects, and terminal illnesses, which Kevin did not have." [Ex. A at Appx. 012-13 ¶ 7, ECF No. 80-2 at Appx. 003-04 ¶ 7]. Dr. Warmink offered no other basis to substantiate his stated opinion.[6]

**D. The Fifth Circuit affirmed-in-part this Court's grant of summary judgment, limiting the dispute to Arzu's AED-malfunction theory.**

This Court granted summary judgment in American's favor on Arzu's Article 17 claim, reasoning that American's response was not an "accident." [Ex. T at Appx. 212, ECF No. 82 at 8]. In light of this holding, the Court did not reach American's alternative ground for dismissal, causation. [*Id.* at n.7].

---

[5] To be sure, Dr. Warmink's declaration is an improper sham affidavit because it contradicts Dr. Warmink's previous refusal to opine on cause-in-fact. *See Free v. Wal-Mart Louisiana, LLC*, 815 Fed. Appx. 765, 766 (5th Cir. 2020)

[6] Dr. Warmink also stated, in conclusory fashion, that his opinion was based on his "education, experience, and training[.]" [Ex. H at Appx. 051, ECF No. 51-1 at Appx. 066]. But Dr. Warmink does not connect this background to his ultimate opinion. The statement does not rise above the mere *ipse dixit* of a credentialed witness. *E.g., Johnson v. Cox*, No. 3:21-CV-3105-E, 2023 WL 4686435, at *14 (N.D. Tex. July 21, 2023) (excluding an expert witness who purportedly based his opinion on his "experience and expertise," reasoning that the analytical gap between the opinion and available data was "too wide").

On appeal, the Fifth Circuit affirmed summary judgment on Arzu's central theory—alleged delay in responding to Kevin's emergency. *Arzu v. Am. Airlines, Inc.*, 176 F.4th 343, 355 (5th Cir. 2026). The court held that Arzu's "ineffective-response theory fails as a matter of law," reasoning that "[t]here is no evidence that the flight crew's response was unusually slow or chaotic compared to other crew's responses to similar emergencies." *Id.* at 351. As a result, this theory, including Arzu's central contention that American wrongfully "fail[ed] to begin CPR immediately," is now non-actionable and off-limits. *Id.* at 349.

But the court reversed on Arzu's AED-malfunction theory, determining that "a genuine dispute remains whether American equipped Kevin's flight with a functional AED, in violation of FAA regulations." *Id.* at 352. The court declined to reach causation, determining that American's refutation of Dr. Warmink's survival opinion "challenges its admissibility." *Id.* at 353. The court further remarked that American "should have moved under Evidence Rule 701[7] in the district court." *Id.* American now moves to exclude Dr. Warmink's unreliable, inadmissible testimony.

## III. ARGUMENT & AUTHORITIES

The Montreal Convention applies a proximate causation standard, which requires both cause-in-fact and foreseeability. *See Air France v. Saks*, 470 U.S. 392, 396 (1985); *Prescod v. AMR, Inc.*, 383 F.3d 861, 870 (9th Cir. 2004). Thus, Arzu must offer reliable opinion evidence that, more likely than not, but for American's alleged "accident," Kevin would have survived.[8]

---

[7] The court no doubt intended Rule 702, governing expert testimony.

[8] In her proposed sur-reply to American's previous summary judgment motion, Arzu complained that American "cited no case to support [its] new proposition" that the relevant causation question is whether Kevin would have ultimately survived the incident, and not whether Kevin would have "survived transportation to the hospital." [Ex. U at Appx. 219, ECF No. 80-1 at 2]. American offers this Fifth Circuit case: "[A] plaintiff seeking to recover under Texas's wrongful death statute must demonstrate that the *defendant's wrongful actions more likely than not caused the decedent's death—not just that they reduced the decedent's chance of survival by some lesser degree*." *Slade v. City of Marshall, Tex.*, 814 F.3d 263, 264-65 (5th Cir. 2016) (emphasis added); [*See* Ex. V at

Because Dr. Warmink's causation opinion is unhelpful to the fact-finder, and because the bases offered in support of Dr. Warmink's opinion do not actually support his theory, Dr. Warmink's proffered testimony is inadmissible. The Court should exclude it.

**A. District courts have considerable discretion to exclude unreliable testimony.**

Trial courts act as gatekeepers for expert testimony, determining admissibility based on Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals., Inc.*, 509 U.S. 579 (1993). Under Rule 702, an expert witness may provide expert opinions if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Framed differently, expert testimony is admissible only if the proponent of the testimony establishes: (1) the expert is qualified; (2) the evidence is relevant to the suit; and (3) the evidence is reliable. *See Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988-89 (5th Cir. 1997).

"The burden is on the proponent of the expert testimony to establish its admissibility by a preponderance of the evidence." *DeWolff, Boberg & Assocs., Inc. v. Pethick*, No. 3:20-CV-3649-L, 2024 WL 1396267, at *3 (N.D. Tex. Mar. 31, 2024), *aff'd on other grounds*, 133 F.4th 448 (5th Cir. 2025). This Court is afforded "wide latitude" and "broad discretion" to exclude the testimony, and its decision is reviewed for "manifest error." *United States v. Reed*, 908 F.3d 102, 117 (5th Cir. 2018); *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004).

---

Appx. 235 ¶ 63, ECF No. 99 at ¶ 63 ("Plaintiff pleads an action for Wrongful Death under Chapter 71, Subchapter A, of Tex. Civ. Prac. & Rem. Code §§ 71.001-71.012.")]. Arzu's Second Amended Complaint now appears to recognize the correct inquiry. [Ex. V at Appx. 234 ¶ 58, ECF No. 99 at ¶ 58].

"Reliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.'" *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 592-93). Expert testimony "must be reliable at each and every step," including "the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion." *Id.* at 355 (citation omitted). Where "opinion evidence … is connected to existing data only by the *ipse dixit* of the expert," a "court may conclude that there is simply too great an analytical gap between the data and the opinion proffered" and exclude the testimony. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Similarly, this Court has recognized that exclusion may be warranted when an expert opinion rests on an invalid basis:

> Although the basis of an expert's opinion usually goes to the weight and not the admissibility of expert testimony, in some cases the source upon which an expert's opinion relies is of such little weight that the jury should not be permitted to receive that opinion. In the words of the Third Circuit, the suggestion that the reasonableness of an expert's reliance on facts or data to form his opinion is somehow an inappropriate inquiry under Rule 702 results from an unduly myopic interpretation of Rule 702 and ignores the mandate of *Daubert* that the district court must act as a gatekeeper.

*TitleMax of Tex., Inc. v. City of Dallas*, No. 3:21-CV-1040-S-BN, 2023 WL 4711365, at *3 (N.D. Tex. July 24, 2023) (cleaned up); *see also Berry v. Armstrong Rubber Co.*, 989 F.2d 822, 824 (5th Cir.1993) ("If the basis for the expert's opinion is so unreliable that no reasonable expert could base an opinion on that data, the opinion may be excluded in the district court's determination of whether there is a genuine issue regarding an essential element of the claim.").

### B. Because Dr. Warmink's causation opinion is irrelevant, self-defeating, and unreliable, this Court should exclude it.

For at least three reasons, the Court should exclude Dr. Warmink's proffered opinion testimony. The opinion is unhelpful, self-defeating, and contradicted by the very bases that purportedly support it.

#### 1. Dr. Warmink's opinion is irrelevant to the appropriate causation inquiry.

Expert testimony is unhelpful to the fact-finder when it advances a non-actionable theory. *See Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.") (cleaned up); *United States v. Eff*, 524 F.3d 712, 720 (5th Cir. 2008) (affirming the exclusion of expert testimony on insanity when that defense was legally nonviable); *see also* Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

Most fundamentally, Dr. Warmink's causation theory is now irrelevant. He opined that American's purported *delay* in the administration of CPR and the AED decreased Kevin's odds of survival:

> It is my opinion based upon my education, experience, and training that, within a reasonable degree of medical certainty, the delay in initiation of cardiopulmonary resuscitation coupled with the delayed and ineffectual automatic external defibrillator usage contributed to Kevin Greenidge not surviving this event.

[Ex. H at Appx. 051, ECF No. 51-1 at Appx. 066].

Because any alleged delay is not actionable under the Montreal Convention, Dr. Warmink's opinion—dependent on this delay—is not helpful to the jury. It bears repeating—because the Fifth Circuit affirmed this Court's dismissal of Arzu's delayed-CPR/AED theory, the relevant causal inquiry is now this: *Had the AED shocked Kevin when it was administered, would Kevin have ultimately survived?*

Dr. Warmink's opinion sheds no light on this question. Instead, that opinion is necessarily predicated on the now-immaterial, non-actionable question of whether any delay in administering CPR or AED caused Kevin's death. Accordingly, it does not help the jury, and the Court should exclude it.

**2. Dr. Warmink's opinion is necessarily inconsistent with the relevant causal question.**

Beyond this relevance problem, Dr. Warmink's opinion does not support the conclusion that Kevin would have survived, but for any alleged AED malfunction. Instead, based on Dr. Warmink's own factual assumptions, the non-actionable delayed-CPR theory *alone* establishes that, more likely than not, Kevin would not have survived. That is, Dr. Warmink's theory is self-defeating; it necessarily entails that any alleged delay in administering CPR reduced Kevin's survival odds below 50%—irrespective of the AED's functionality and before the AED could even be administered.

According to Dr. Warmink's own figures, the delay alone meant that, more likely than not, Kevin would not have survived. Dr. Warmink noted that no cardiac arrest patient begins with a 100% chance-of-survival; that a ten to fifteen minute delay in administering CPR was "very conservative"; and that for each minute of delay, Kevin's survival decreased seven to ten percent. [Ex. I at Appx. 059-60, 42:13-21, 56:1-57:11; Ex. H at Appx. 050, ECF No. 51-1 at Appx. 065].

Even supposing Kevin initially had a 100% chance of survival, and taking the more conservative of his "very conservative" estimates, Dr. Warmink's own calculation reveals that the alleged, non-actionable delay in CPR *alone* entailed that, more likely than not, Kevin would not have survived. A seven percent reduction for a ten-minute period means that, at best, Kevin's survival odds were thirty percent (even assuming the admittedly *not* possible 100% survival

odds).[9] Nothing in Dr. Warmink's opinion indicates that, after this delay, an AED shock alone would have saved Kevin's life—which Arzu must now establish.

Instead, per Dr. Warmink's own theory, more likely than not, the alleged failure of the AED *could not* have been a cause-in-fact of Kevin's death. By the time the crew could remove Kevin from his window seat, move him to the aft galley, and begin performing CPR, Kevin's survival odds were between 0% and 30% (even under conservative estimates). Dr. Warmink's self-defeating causation opinion is thus inadmissible.

**3. The proffered bases for Dr. Warmink's opinion directly contradict his ultimate opinion.**

Beyond these foundational defects, an even more glaring deficiency plagues Dr. Warmink's causation opinion: The bases for his opinion *directly contradict* his theory. Dr. Warmink's unscientific reliance on the Menant and Weisfeldt studies presents precisely the sort of unreliable opinion evidence this Court is tasked with excluding. Simply put, the Menant and Weisfeldt studies do not support Dr. Warmink's opinion that, but for prompt CPR and proper AED administration, Kevin would not have died. *They establish the opposite*.

**a. Dr. Warmink's opinion is baseless.**

The Menant and Weisfeldt studies are not only "inadequate" to support Dr. Warmink's opinion; they explicitly undermine it. The Menant Study found, for example, that the survival rate at hospital discharge for pediatric cardiac-arrest patients who receive an AED shock was a mere 34.3%. [Ex. R at Appx. 178, ECF No. 72-1 at Appx. 023]. In other words, this very study found

---

9 In his deposition, Dr. Warmink could not determine whether this percentage reduction applied as a percentage-point decrease (*i.e.*, 100% → 93% → 86% → 79%) or a percentage decrease (100% → 93% → 86.5% → 80.4%). [Ex. I at Appx. 067-68, 129:9-131:2]. Even under the latter scenario, in which the survival decreases by seven percent from the previous figure, Kevin's survival odds remained less than 50%.

that, *more likely than not*, a pediatric patient would not survive—even with an AED shock. The 71.4% statistic that Dr. Warmink cites relates *only to survival to hospital admission*—not hospital discharge or ultimate survival. [*Id.*].

Similarly, the Weisfeld Study found that, in a survey of 170 non-pediatric patients who suffered cardiac arrest and received an AED shock before EMS arrival—all of whom had initial shockable heart rhythms (unlike Kevin)—*only 38% survived to hospital discharge*. [Ex. S at Appx. 201, ECF No. 82-1 at Appx. 018]. Yet Dr. Warmink disingenuously represents this study as finding that 86% of patients survived to hospital admission. [Ex. A at Appx. 012 ¶ 6, ECF No. 80-2 at Appx. 003 ¶ 6]. The study made no such finding; it concluded only that 86% of these initially shockable patients were *transported to the hospital*. [Ex. S at Appx. 201, ECF No. 82-1 at Appx. 018]. Transportation to the hospital is not survival to hospital admission—and the more relevant inquiry is survival to hospital discharge, in any event.

Simply put, these studies provide no support for Dr. Warmink's opinion, and the Court should exclude it. *See Joiner*, 522 U.S. at 145-46 (affirming the district court's exclusion of an expert witness because the studies on which the experts relied "were not a sufficient basis" to support the opinions).

**b. Dr. Warmink's reliance on generic statistics fails to account for the particular circumstances that further reduced Kevin's odds.**

Nonetheless, abandoning the scientific method and the Menant Study he offered, Dr. Warmink now seeks to undermine that study's 34.3% survival-to-hospital-discharge figure. These efforts backfire.

Dr. Warmink avers that this 34.3% survival statistic does not apply to Kevin because the Menant Study did not exclude children with "severe trauma, congenital heart defects, and terminal

illnesses, which Kevin did not have." [Ex. A at Appx. 012-13 ¶ 7, ECF No. 80-2 at Appx. 003-04 ¶ 7]. This distinction is unavailing for at least three reasons:

First, Dr. Warmink ignores the multiple factors and data that significantly reduced Kevin's survival odds—and he makes no effort to explain them. Never mind, for example, that Kevin's initial rhythm was non-shockable, *which further reduced his survival odds*. [Ex. I at Appx. 062, 67:21-68-5 (Dr. Warmink conceding that "if someone is in a non-shockable rhythm versus a shockable rhythm when you start the AED, survival is worse for someone that is in a non-shockable rhythm")]. Never mind that a study compiling eighty-two *other* scientific studies found that *fewer than two percent* of patients with initial asystolic rhythms survived. [Ex. W at Appx. 240, 242, Dwivedi, D. B., Ball, J., Smith, K., & Nehme, Z. (2025). Incidence and outcomes of out-of-hospital cardiac arrest from initial asystole: a systematic review and meta-analysis. Resuscitation, 212, 110629. https://doi.org/10.1016/j.resuscitation.2025.110629].

Never mind that Kevin was *morbidly obese*, which Dr. Warmink agreed rendered CPR more difficult to administer effectively. [Ex. I at Appx. 066, 120:3-7]. Never mind that *another study* of over 6,500 patients found "no statistically significant relationship between conversion from shockable rhythms to subsequent shockable rhythms and survival to hospital discharge," finding a less-than-three-percent survival rate. [Ex. X at Appx. 255-56, 258, Thomas, A. J., Newgard, C. D., Fu, R., Zive, D. M., & Daya, M. R. (2013). Survival in out-of-hospital cardiac arrests with initial asystole or pulseless electrical activity and subsequent shockable rhythms. Resuscitation, 84(9), 1261–1266. https://doi.org/10.1016/j.resuscitation.2013.02.016].

Never mind an American Heart Association study finding that "survival to hospital discharge [is] 3-fold higher in those who sustained off-plane [cardiac arrest] compared with on-plane [cardiac arrest] (44% versus 15%)." [Ex. Y at Appx. 270, Chatterjee NA, Kume K, Drucker

C, Kudenchuk PJ, Rea TD. Incidence, Mechanism, and Outcomes of On-Plane Versus Off-Plane Cardiac Arrest in Air Travelers. *J. Am. Heart Association*. 2021; 10:e021360. DOI: 10.1161/JAHA.120.021360]. Never mind that this same study found *a 0% survival rate to hospital discharge for on-plane cardiac arrest patients with an initial non-shockable rhythm*. [*Id.* at Appx. 271].

Dr. Warmink's failure to account for *any of this* itself renders his opinion inadmissible. *See, e.g,, Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996) (affirming the exclusion of expert testimony "not based upon the facts in the record but on altered facts and speculation").

Second, even setting aside this damning defect, Dr. Warmink's cherry-picked opinion ignores relevant findings from the Menant and Weisfeldt studies themselves. While the Menant Study, for example, did not exclude certain patients with terminal conditions, it *did* assess those patients whose initial heart rhythm was "non-iVF" (non-Ventricular Fibrillation)—which includes Kevin. For these patients, "the survival rate at hospital discharge is 23.1%." [Ex. R at Appx. 168, ECF No. 72-1 at Appx. 013]. Thus, all else being equal, Kevin's survival rate was less than 50%. *Far less*.

The Weisfeldt Study reinforces this conclusion—that an initial non-shockable rhythm reduces survival odds. That study found that, in a sample of 170 patients who suffered cardiac arrest and received an AED shock before EMS arrived—*all of whom, unlike Kevin, had an initial shockable rhythm*—only 38% survived to hospital discharge. [Ex. S at Appx. 201, ECF No. 80-2 at Appx. 018]. In fact, the Weisfeldt Study explicitly notes that "*[n]on-VT/VF arrests (asystole and pulseless electrical rhythms) do not benefit from AEDs*, and furthermore, their use may delay life-saving measures such as bystander CPR in such patients." [Ex. S at Appx. 189, ECF No. 80-

2 at Appx. 006 (emphasis added); *see id.* at Appx. 194 ("Particularly for patients with non-VT/VF arrest, the AED offers no obvious benefit and the potential for delay in other important links in the chain of survival.")]. So, Dr. Warmink is right that Kevin's survival odds were not 34.3% with an AED shock. They were much worse.

Simply put, Dr. Warmink's opinion fails to account for the specific circumstances that decreased Kevin's odds of survival—rendering it unreliable and thus inadmissible. *E.g.*, *Groover v. Polk Cnty. Bd. of Cnty. Comm'rs*, 570 F. Supp. 3d 1134, 1150 (M.D. Fla. 2021) (excluding an expert's odds-of-survival opinion based on generic statistics when the expert "fail[ed] to account for [decedent's] medical history" that could "potentially make CPR less efficacious"); *see Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 279 (5th Cir. 1998) (affirming the exclusion of a physician's causation opinion); *Honey-Love v. United States*, 664 Fed. Appx. 358, 363 (5th Cir. 2016) (similar); *see also Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) ("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony.").

Third, Dr. Warmink's abandonment of the very Menant Study on which he relies *removes* a cited (albeit deficient) basis for his opinion; it does not create one. Ultimately, even if Kevin lacked the comorbidities that Dr. Warmink described, it remains the case that Dr. Warmink's ultimate opinion (>50% survival odds) remains baseless. The fact that the Menant Study did not exclude other aggravating factors provides no basis to conclude that, in Kevin's situation, the 23.1% survival rate for non-iVF patients somehow rises above 50%. Dr. Warmink's opinion is based only on his say-so—and say-so is insufficient. *See Joiner*, 522 U.S. at 146. The gaping

analytical gap between the foundational data on which Dr. Warmink relies and his ultimate opinion compels exclusion of his testimony.

## IV. CONCLUSION

WHEREFORE, PREMISES CONSIDERED, American respectfully requests that the Court grant this Motion to Exclude and exclude the testimony of Dr. Warmink from trial. American further requests all other relief to which it may be entitled, whether at law or in equity.

Respectfully submitted,

*/s/ Meredith Knudsen*

Shauna J. Wright
State Bar No. 24052054
shauna.wright@kellyhart.com
(817) 878-3587
Meredith W. Knudsen
State Bar No. 24088617
meredith.knudsen@kellyhart.com
(817) 878-3578
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102

**ATTORNEYS FOR DEFENDANT AMERICAN AIRLINES, INC.**

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that on August 26 and August 27, 2026 counsel for American, Meredith Knudsen, conferred with counsel for Plaintiff, Hannah Crowe, via e-mail regarding this motion and the relief sought herein. Plaintiff is opposed to the relief requested herein.

*/s/ Meredith Knudsen*
Meredith Knudsen

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 28, 2026, a true and correct copy of the foregoing was served on all counsel of record via the Court's CM/ECF system.

*/s/ Meredith Knudsen*
Meredith Knudsen