**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **MELISSA SUZETTE ARZU, Individually and as the Administrator of the Estate of KEVIN GREENIDGE, Deceased,** | § | |
| | § | |
| **Plaintiff,** | § | **CIVIL ACTION NO. 4:24-cv-00433-P** |
| | § | |
| **v.** | § | |
| | § | |
| **AMERICAN AIRLINES, INC.,** | § | |
| | § | |
| **Defendant.** | § | |

**AFFIDAVIT OF MEREDITH KNUDSEN**

STATE OF TEXAS §
§
COUNTY OF TARRANT §

BEFORE ME, the undersigned authority, on this day personally appeared Meredith Knudsen, who is personally known to me, and first being duly sworn according to law, on her oath deposed and stated:

1. "My name is Meredith Knudsen. I am over twenty-one years of age, and I am of sound mind. I have never been convicted of any crime or offense that would disqualify me from making this Affidavit. I have personal knowledge of the statements made herein and they are all true and correct. I am fully competent to testify to the matters stated herein. I am a licensed attorney in the State of Texas and am currently a partner with the law firm of Kelly Hart & Hallman

LLP. I represent American Airlines, Inc. ('**American**') in connection with the above-styled matter.

2. "This affidavit is offered in support of American's *Motion to Exclude Expert Testimony of Dr. Corwin Warmink and Brief in Support*.

3. "Attached hereto as **Exhibit A** is a true and correct copy of the Declaration of Dr. Corwin Warmink, MD, previously filed in this cause on April 10, 2025. [*See* ECF 80-2].

4. "Attached hereto as **Exhibit B** is a true and correct copy of a document produced in this matter by American with the Bates label AA000040, previously filed in this cause on March 3, 2025 as an attachment to the declaration of Debra Shaffer. [*See* ECF 51; *see* ECF 51-1]. A copy of that declaration is attached hereto for ease of reference.

5. "Attached hereto as **Exhibit C** is a true and correct copy of a document produced in this matter by American with the Bates labels AA000001-AA000008, previously filed in this cause on March 3, 2025 as an attachment to the declaration of Debra Shaffer. [*See* ECF 51; *see* ECF 51-1]. A copy of that declaration is attached hereto for ease of reference.

6. "Attached hereto as **Exhibit D** is a true and correct copy of a document produced in this matter by American with the Bates label AA000051, previously filed under seal in this cause on March 3, 2025 as an attachment to the declaration of Debra Shaffer. [*See* ECF 51; *see* ECF 52-1]. A copy of that declaration is attached hereto for ease of reference.

7. "Attached hereto as **Exhibit E** is a true and correct copy of a document produced in this matter by American with the Bates labels AA000018-AA000019, previously filed under seal in this cause on March 3, 2025 as an attachment to the declaration of Debra Shaffer. [*See* ECF 51; *see* ECF 52-1]. A copy of that declaration is attached hereto for ease of reference.

8. “Attached hereto as **Exhibit F** is a true and correct copy of excerpts of the deposition of De M. Fitzpatrick taken in the above-referenced matter on October 30, 2024. A portion of these excerpts were previously filed under seal in this cause on March 24, 2025. [*See* ECF 63-2]. All excerpts are the original or exact duplicates of the original.

9. “Attached hereto as **Exhibit G** is a true and correct copy of excerpts of the deposition of Judy Gilbert-Blanchard taken in the above-referenced matter on October 29, 2024 and previously filed under seal in this cause on March 24, 2025. [*See* ECF 63-3]. These excerpts are the original or exact duplicates of the original.

10. “Attached hereto as **Exhibit H** is a true and correct copy of the expert report of Dr. Corwin Warmink, previously filed in this cause on March 3, 2025. [*See* ECF 51; *see* ECF 51-1].

11. “Attached hereto as **Exhibit I** is a true and correct copy of excerpts of the deposition of Dr. Corwin Warmink taken in the above-referenced matter on January 22, 2025. These excerpts are the original or exact duplicates of the original.

12. “Attached hereto as **Exhibit J** is a true and correct copy of excerpts of the deposition of Matthew Wingham taken in the above-referenced matter on October 24, 2024 and previously filed under seal in this cause on March 3, 2025. [*See* ECF 52-1]. These excerpts are the original or exact duplicates of the original.

13. “Attached hereto as **Exhibit K** is a true and correct copy of a document produced in this matter by American with the Bates label AA000252, previously filed under seal in this cause on March 3, 2025 as an attachment to the declaration of Debra Shaffer. [*See* ECF 52-1]. A copy of that declaration is attached hereto for ease of reference.

14. Attached hereto as **Exhibit L** is a true and correct copy of excerpts of the deposition of Richard Levy taken in the above-referenced matter on January 24, 2025 and previously filed in this cause on March 24, 2025. These excerpts are the original or exact duplicates of the original.

15. "Attached hereto as **Exhibit M** is a true and correct copy of a document produced in this matter by American with the Bates labels AA000211-AA000251, previously filed under seal in this cause on March 3, 2025 as an attachment to the declaration of Debra Shaffer. [*See* ECF 51; *see* ECF 52-2]. A copy of that declaration is attached hereto for ease of reference.

16. "Attached hereto as **Exhibit N** is a true and correct copy of Plaintiff, Melissa Suzette Arzu, as an individual and as the Administrator of the Estate of Kevin Greenidge, Deceased's ('**Plaintiff**' or '**Arzu**') Amended Complaint, previously filed in this cause on August 8, 2024.

17. "Attached hereto as **Exhibit O** is a true and correct copy of Plaintiff's Rule 26(a)(2) Expert Disclosures, served in this matter on November 2, 2024.

18. "Attached hereto as **Exhibit P** is a true and correct copy of Dr. Corwin Warmink's Rebuttal Report, dated January 21, 2025 and provided by Plaintiff in this lawsuit.

19. "Attached hereto as **Exhibit Q** is a true and correct copy of the Declaration of Leonard Ismael Arzu, dated April 5, 2024 and previously filed under seal in this cause on August 20, 2024.

20. "Attached hereto as **Exhibit R** is a copy of the "Menant Study," E. Menant, D. Lavignasse, et al., Automated external defibrillator: rhythm analysis and defibrillation on paediatric out-of-hospital cardiac arrest, *Resuscitation Plus* (2025), produced by Plaintiff in this matter with the Bates label Arzu_Warmink_001150 and previously filed in this cause on April 4, 2025. [ECF 72-1].

21. “Attached hereto as **Exhibit S** is a copy of the “Weisfeldt Study,” Myron L. Weisfelt, MD, et al., Survival After Application of Automatic External Defibrillators before Arrival of the Emergency Medical System: Evaluation in the Resuscitation Outcomes Consortium Population of 21 Million, *J Am Coll Cardiol.* Author Manuscript (2010), previously attached to Dr. Warmink’s April 10, 2025 Declaration. [*See* ECF 80-2].

22. “Attached hereto as **Exhibit T** is a true and correct copy of this Court’s Opinion & Order granting American’s *Motion for Summary Judgment*, dated May 8, 2025.

23. “Attached hereto as **Exhibit U** is a true and correct copy of *Plaintiff’s Sur-Reply to Defendant’s Reply and Brief in Support of its Motion for Summary Judgment*, filed in this cause on April 10, 2025.

24. “Attached hereto as **Exhibit V** is a true and correct copy of Plaintiff’s Second Amended Complaint, filed in this cause on July 17, 2026.

“FURTHER AFFIANT SAYETH NAUGHT.”

Meredith Knudsen

SUBSCRIBED AND SWORN TO BEFORE ME on the 27th day Aug., 2026, to certify which witness my hand and official seal.

JUDY COLLINS
Notary Public
STATE OF TEXAS
Notary ID # 126950548
My Comm. Exp. July 2, 2029

Notary Public in and for the State of Texas

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| MELISSA SUZETTE ARZU, Individually and as the Administrator of the Estate of KEVIN GREENIDGE, Deceased, | § § § § | |
| Plaintiff, | § | CIVIL ACTION NO. 4:24-cv-00433-P |
| v. | § § § | |
| AMERICAN AIRLINES, INC., | § § | |
| Defendant. | § | |

**AFFIDAVIT OF DEBRA SHAFFER**

STATE OF TEXAS §
§
COUNTY OF TARRANT §

BEFORE ME, the undersigned authority, on this day personally appeared Debra Shaffer, who is personally known to me, and first being duly sworn according to law, on his oath deposed and stated:

1. "My name is Debra Shaffer. I am over twenty-one years of age and I am of sound mind. I have never been convicted of any crime or offense that would disqualify me from making this Affidavit. I have personal knowledge of the statements made herein and they are all true and correct. I am fully competent to testify to the matters stated herein.

2. "This affidavit is offered in support of American Airlines, Inc.'s ('American') Motion for Summary Judgment.

3. "I am currently employed as a member of the Corporate Insurance and Risk Management division at American and act as custodian of the records attached.

4. "In my role as a member of the Corporate Insurance and Risk Management division, I assisted in maintaining and gathering documentary evidence with respect to the above-captioned litigation.

5. "Attached hereto as Exhibit C-1 is a true and correct copy of a document produced in this matter by American with the Bates label beginning with AA000051.

6. "Attached hereto as Exhibit C-2 is a true and correct copy of a document produced in this matter by American with the Bates label beginning with AA000040.

7. "Attached hereto as Exhibit C-3 is a true and correct copy of a document produced in this matter by American with the Bates label beginning with AA000252.

8. "Attached hereto as Exhibit C-4 is a true and correct copy of a document produced in this matter by American with the Bates label beginning with AA000001.

9. "Attached hereto as Exhibit C-5 is a true and correct copy of a document produced in this matter by American with the Bates label beginning with AA000027.

10. "Attached hereto as Exhibit C-6 is a true and correct copy of a document produced in this matter by American with the Bates label beginning with AA000018.

11. "Attached hereto as Exhibit C-7 is a true and correct copy of a document produced in this matter by American with the Bates label beginning with AA000041.

12. "Attached hereto as Exhibit C-8 is a true and correct copy of a document produced in this matter by American with the Bates label beginning with AA000338.

13. "Attached hereto as Exhibit C-9 is a true and correct copy of a document produced in this matter by American with the Bates label beginning with AA000253.

14. "Attached hereto as Exhibit C-10 is a true and correct copy of a document produced in this matter by American with the Bates label beginning with AA000551.

15. "Attached hereto as Exhibit C-11 is a true and correct copy of a document produced in this matter by American with the Bates label beginning with AA000211.

16. "Attached hereto as Exhibit C-12 is a true and correct copy of a document produced in this matter by American with the Bates label beginning with AA000036.

17. "Attached hereto as Exhibit C-13 is a true and correct copy of a document produced in this matter by American with the Bates label beginning with AA000544.

18. "Attached hereto as Exhibit C-14 is a true and correct copy of a document produced in this matter by American with the Bates label beginning with AA000528.

19. "I hereby certify that the above-cited and attached business records from American (a) were made at or near the time of the occurrence of the matters set forth by, or from information by, a person with knowledge of those matters; (b) were kept in the course of the regularly conducted activity; and (c) were made by the regularly conducted activity as a regular practice.

20. "FURTHER, AFFIANT SAYETH NAUGHT."

Debra Shaffer

Debra Shaffer

SUBSCRIBED AND SWORN TO BEFORE ME on the 28 day 02, 2025, to certify which witness my hand and official seal.

Keisha N Castillo Morales

Notary Public in and for the State of Texas

KEISHA NICOLE CASTILLO MORALES
Notary ID #134535760
My Commission Expires
August 31, 2027

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| MELISSA SUZETTE ARZU, Individually and as the Administrator of the Estate of KEVIN GREENIDGE, Deceased, | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. 4:24-cv-00433-P |
| AMERICAN AIRLINES, INC., | § | |
| Defendant. | § | |

**DECLARATION OF DR. CORWIN WARMINK, MD**

My name is Dr. Corwin Warmink, M.D. I am over eighteen years of age and competent to make this Declaration. I have personal knowledge of the facts stated below and if called and sworn as a witness, I would testify as follows:

1. I am a Medical Doctor and am board certified in General Pediatrics and Pediatric Emergency Medicine by the American Board of Pediatrics. I am a licensed physician in the state of Texas and have been practicing Pediatric Emergency Medicine continuously since 2003.

2. I practiced as an Attending Physician in the Cook Children's Medical Center Emergency Department prior to being named Medical Director of the Emergency Department in 2014. I served in that role for nine years and was directly involved in all Emergency Department quality reviews and served on multiple committees related to quality improvement, chart reviews, and root cause analysis.

3. Currently, I am the Chief Clinical Officer of the Cook Children's Physician Network in Fort Worth, Texas.

4. I have reviewed Defendant American Airlines, Inc.'s Motion for Leave to File Reply Appendix and Brief in Support.

5. As I have previously testified, it is my opinion based upon my education, experience, and training that Kevin Greenidge ("Kevin") more likely than not would have survived his cardiac arrest on Flight 614 had the American flight crew promptly initiated cardiopulmonary resuscitation (CPR) and effectively utilized a functional automatic external defibrillator (AED). This is my opinion to a reasonable degree of medical certainty based upon my education, experience, training, review of medical literature (including the Menant and Weisfeldt studies cited in my January 2025 Report), and review of the evidence in this case.

6. The Menant Study reports a 71.4% survival rate to hospital admission for pediatric patients that receive a shock from an AED. The Weisfeldt Study (attached) reports an 86% survival rate to hospital admission for patients that receive a shock from an AED. Both the Menant and Weisfeldt studies are highly relevant and informative and support my opinion that, to a reasonable degree of medical certainty, it is more likely than not that Kevin would have survived his cardiac arrest on Flight 614 had CPR and the AED been effectively and timely deployed.

7. For the patients in the Menant Study, although 71.4% were resuscitated and admitted to the hospital through timely CPR and AED intervention, the study found 34.3% of those patients survived through hospital discharge. The Menant patient cohort did not exclude children who suffered cardiac arrest as a result of severe trauma, congenital heart defects, and terminal illnesses, which Kevin did not have. Kevin's autopsy report identified no structural cardiac defects or abnormalities. Kevin's medical records do not reflect that he suffered from any terminal disease. And the deposition testimony does not indicate Kevin suffered a severe

physical trauma that gave rise to his cardiac arrest. Accordingly, it would be improper to conclude that Kevin's chances of "survival to hospital discharge" was "only 34.4%" based on the Menant study.

8. Based on my review of Kevin's medical records and post-mortem autopsy report, Kevin did not have a condition that precluded him from being resuscitated or from surviving following resuscitation.

9. Cardiac arrests in minors are rare but survivable events when aid is promptly rendered and a functioning AED is used.

10. Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed in Fort Worth, Texas, United States on this 10 day of April, 2025.

MD

Dr. Corwin Warmink, M.D.

# Exhibit B

Form# 2020-01-23

American Airlines

# Medical Emergency Information Sheet (MEIS)

**Tell the medical volunteer** "The captain or FA will be talking with an emergency physician on the ground"

**Tell the captain immediately if one of these is occurring**
- ☐ CPR is in progress
- ☐ Uncontrolled bleeding
- ☐ AED delivers a shock
- ☐ Pregnancy with active labor

**Then complete the MEIS form**

**Customer information:**
☒ Male ☐ Female Age: 14 Seat#: ____ Customer's name: ____ Accompanied by: aunt & uncle

**Problems/symptoms:**
Check appropriate symptoms:
☒ Fainted ☒ Vomiting ☐ Chest pain ☐ Abdominal pain
☐ Seizure ☐ Dizziness ☐ Nausea ☐ Back pain

☐ Stroke symptoms
Stroke symptoms include:
- Slurred speech
- Facial droop
- Weakness in one arm or leg

Pain level: Least 1 2 3 4 5 6 7 8 9 10 Most

Current status: ☐ Alert & oriented ☐ Semi-conscious ☒ Unconscious

Other symptoms: pulseless, dilated symptoms, clamy, diaphoretic
Duration: 45 min *per aunt, patient complaining of calf pain throughout the week, saying his legs hurt and couldn't walk. He didn't eat or drink anything out of normal

**Vital signs:**
Must be numerical values; not high, low, normal etc.
Blood pressure: unknown
Heart rate: Ø / beats per minute
Breathing rate: Ø / per minute

**Skin:** ☐ Normal ☒ Pale ☐ Flushed ☐ Sweaty ☐ Other ____

**Medical history:**
Check if history of:
☐ Heart disease ☐ Seizures ☒ Diabetes ☐ High blood pressure ☐ Fainting asthma

Uses oxygen at home? Ⓨ ● (N)
Prescribed medication taken today? ● (Y) Ⓝ
Name of medication, if known: metformin, rescue inhalers
Known allergies? ● (Y) Ⓝ shellfish and nuts

**Medical volunteer:**
Name: Rachael Amador
Specialty: Surgical Resident physician

**Inflight treatment:**
Check treatment provided:
☐ Oxygen ☐ Nitroglycerin ☐ Phenergan ☐ Aspirin ☐ Benadryl
☐ Juice / Beverage ☐ IV fluid ☒ AED pads applied → RUE & LLE
Lying down? ● (Y) Ⓝ Other treatment: epi x 2, BVM ventilation
Feet elevated? Ⓨ ● (N) Has the customer improved with treatment? Ⓨ ● (N) CPR x 45 min

**Death and communicable disease reporting:**
Apparent death in flight? ● (Y) Ⓝ (See Flight Operations Manual section 1p.2.7)
Communicable disease symptoms - Check if present:
☐ Fever > 100° F - for 48 hours or longer
☐ Fever > 100° F - with other symptoms: rash - swollen glands - jaundice - persistent cough persistent vomiting - unexplained bleeding - persistent diarrhea
☐ Other ____

AA000040

# Exhibit C

# American Airlines

Record Locator: UIGUYU Sabre Status Purged Report Date & Time: Jul 15, 2022 10:11:16 AM

**Passenger Information**

| Pax nbr | Name | Grp Qty | Group |
|---|---|---|---|
| 1.01 | GREENIDGE/KEVIN | | |

**Flight Information**

| Seq Nbr | Flight | Class | Date | Dep | Arv | Stat | Qty | Dep Time | Arv Time | Operat Flight | Operat Class | Operat Rec Loc | Market Flight | Market Class |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | AA1249 | B | May 28, 2022 | LGA | MIA | HK | 1 | 06:00 | 09:15 | | | | | |
| 2 | AA1635 | B | May 28, 2022 | MIA | SAP | HK | 1 | 11:30 | 11:53 | | | | | |
| 3 | AA1171 | B | Jun 4, 2022 | MIA | LGA | NO | 1 | 19:39 | 22:40 | | | | | |
| 4 | AA614 | B | Jun 4, 2022 | CUN | MIA | HK | 1 | 22:30 | 17:19 | | | | | |

**Ticket Information**

| Seq Nbr | Ticket or TLT Text |
|---|---|
| 1 | T-03APR |
| 2 | TE 0017757081867 GREEN/K SYSSYS 2002/03APR* |
| 3 | TK 0010266021088 ARZU/A SAP5SSM 1105/04JUN |
| 4 | TK 0010266021090 GREEN/K SAP5SSM 1105/04JUN |

**Phone Information**

| Seq Nbr | City | Phone Number | Type |
|---|---|---|---|
| 1 | MIA | 347 964 2418 PACHECOS | O |

**Pre Requested Seats Info**

| Seq Nbr | Pax Nbr | Airline | Flight | Class | Seat | Depart | Arrive | Status | Type | Name |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2 | AA | 1249 | B | 32B | LGA | MIA | HK | N P G | GREENIDGE, KEVIN |
| 2 | 2 | AA | 1635 | B | 28B | MIA | SAP | HK | N P G | GREENIDGE, KEVIN |

**Agency IATA Information**

| Agency IATA |
|---|
| 33616343 |

**OSI Info**

| Seq Nbr | OSI Type | OSI Text |
|---|---|---|
| 1 | AA FACTS | OSI AA CTCP MIA347 964 2418 PACHECOS |
| 2 | AA FACTS | OSI AA TCP2 1GREENIDGE/KEVIN |
| 3 | AA FACTS | OSI AA WAIVER 24HR |
| 4 | AA FACTS | OSI AA RLOC HDQ1SUDUZFG |

**SSR**

| SSR Seq | SSR Type | Airline | Status | Qty | Board | Arrive | Flight | Class | Date | SSR Text |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | YADT | | NN | 1 | | | | | | YADT /15MAR08 NN1 |
| 2 | TKNE | AA | HK | 1 | LGA | MIA | 1249 | B | May 28, 2022 | LGAMIA1249B28MAY/0017757081867C1 |
| 3 | TKNE | AA | HK | 1 | MIA | SAP | 1635 | B | May 28, 2022 | MIASAP1635B28MAY/0017757081867C2 |
| 4 | BESH | AA | NN | 1 | | | 1249 | B | May 28, 2022 | 1249B28MAY/NN1 |
| 5 | BESH | AA | NN | 1 | | | 1635 | B | May 28, 2022 | 1635B28MAY/NN1 |
| 6 | DBSS | | NN | 2 | | | | | | /AA1635IMIASAP202205281530AUCB202205281753LGASAP202205280930 NN2 |
| 7 | PCTC | AA | HK | | | | | | | PSGR/DECLINED |
| 8 | PCTC | AA | HK | | | | | | | KEVIN GREENIDGE/US4685341275 |
| 9 | PTPH | AA | HK | 1 | | | | | | PTPH AA HK1/10000000000 |

**SSR**

| SSR Seq | SSR Type | Airline | Status | Qty | Board | Arrive | Flight | Class | Date | SSR Text |
|---|---|---|---|---|---|---|---|---|---|---|
| 10 | PTEM | AA | HK | 1 | | | | | | PTEM AA HK1/NOEMAILADDRESS//NULL.COM |
| 11 | WCHR | | NN | 1 | | | | | | 1 |
| 12 | IRSS | | NN | 1 | | | | | | /AA0614ISAPMIA202206041851DLYB202206050240SAPLGA202206071851Y0 NN1 |
| 13 | DOCS | AA | HK | 1 | | | | | | /P/USA/658829274/USA/15MAR08/M/12AUG26/GREENIDGE/KEVIN/ISMAEL//S1 |
| 14 | DOCA | AA | HK | 1 | | | | | | /R/US |
| 15 | PCTC | AA | HK | | | | | | | PSGR/DECLINED |
| 16 | PCTC | AA | HK | | | | | | | KEVIN GREENIDGE/US4685341275 |
| 17 | ADTK | YY | KK | 1 | | | | | | ADTK YY KK01 AA WILL CANCEL IF NO TKT BY 2359 04APR CST |
| 18 | SEAT | AA | KK | 1 | LGA | MIA | 1249 | B | May 28, 2022 | LGAMIA1249B28MAY-1ARZU/ANNA VICTORIA.32AC |
| 19 | SEAT | AA | KK | 1 | LGA | MIA | 1249 | B | May 28, 2022 | LGAMIA1249B28MAY-1GREENIDGE/KEVIN.32BC |
| 20 | SEAT | AA | KK | 1 | MIA | SAP | 1635 | B | May 28, 2022 | MIASAP1635B28MAY-1ARZU/ANNA VICTORIA.28AC |
| 21 | SEAT | AA | KK | 1 | MIA | SAP | 1635 | B | May 28, 2022 | MIASAP1635B28MAY-1GREENIDGE/KEVIN.28BC |
| 22 | SEAT | AA | KK | 1 | MIA | LGA | 1171 | B | Jun 4, 2022 | MIALGA1171B04JUN-1ARZU/ANNA VICTORIA.32AC |
| 23 | SEAT | AA | KK | 1 | MIA | LGA | 1171 | B | Jun 4, 2022 | MIALGA1171B04JUN-1GREENIDGE/KEVIN.32BC |
| 24 | SEAT | AA | NO | 1 | MIA | LGA | 1171 | B | Jun 4, 2022 | MIALGA1171B04JUN-1ARZU/ANNA VICTORIA.32A |
| 25 | SEAT | AA | NO | 1 | MIA | LGA | 1171 | B | Jun 4, 2022 | MIALGA1171B04JUN-1GREENIDGE/KEVIN.32B |
| 26 | SEAT | AA | NO | 1 | SAP | MIA | 614 | B | Jun 4, 2022 | SAPMIA0614B04JUN-1GREENIDGE/KEVIN.32D |
| 27 | SEAT | AA | NO | 1 | MIA | LGA | 1735 | B | Jun 5, 2022 | MIALGA1735B05JUN-1GREENIDGE/KEVIN.27E |

**Remarks Information**

| Seq Nbr | Type | Remarks Text |
|---|---|---|
| 1 | H- | DOX OK |
| 2 | H- | TIMATIC AUTOCHECK - CONDITIONAL ID 1 |
| 3 | H- | MESSAGE - TMID 10672 |
| 4 | H- | N PARSAN/LGA/28MAY/0442AM |
| 5 | H- | DOX OK |
| 6 | H- | TIMATIC AUTOCHECK - CONDITIONAL ID 1 |
| 7 | H- | MESSAGE - TMID 10672 |
| 8 | H- | N PARSAN/LGA/28MAY/0444AM |
| 9 | H- | /OSO$04JUN13 |
| 10 | H- | /OSO$DLY$INTL$04JUN |
| 11 | | BAG-01UPTO50LB 23KG AND62LI 30.00USD |
| 12 | | BAG-01UPTO50LB 23KG AND62LI 30.00USD |
| 13 | | BAG-TAG ACCEPTED 5001914937 04JUN2022 1208/SAP/8MSG |
| 14 | | BAG-TAG ACCEPTED 5001914939 04JUN2022 1208/SAP/8MSG |
| 15 | | BAG-SELFTAG 914937 D ACTIVATED BY 737564 04JUN2022 1208/SAP |
| 16 | | BAG-SELFTAG 914939 D ACTIVATED BY 737564 04JUN2022 1208/SAP |
| 17 | H- | /OSO$04JUN13 |

American Airlines

Record Locator: UIGUYU Sabre Status Purged Report Date & Time: Jul 15, 2022 10:11:16 AM

**Remarks Information**

| Seq Nbr | Type | Remarks Text |
|---|---|---|
| 18 | H- | /OSOSDLYSINTLS04JUN |
| 19 | H- | /OSOS04JUN13 |
| 20 | H- | /OSOSDLYSINTLS04JUN |
| 21 | H- | /OSOS04JUN13 |
| 22 | H- | /OSOSDLYSINTLS04JUN |
| 23 | H- | /OSOS04JUN13 |
| 24 | H- | /OSOSDLYSINTLS04JUN |
| 25 | H- | C-**************************************************** |
| 26 | H- | C-****CUSTOMER ILLNESS EVENT 220601262 ***** |
| 27 | H- | C-0614/4 SAP-MIA DIVERTED CUN ACCOUNT 14YRS MALE |
| 28 | H- | C-PASSENGER KEVIN GREENIDGE UNCONSCIOUS AND HAD NO PULSE. |
| 29 | H- | C-DOCTOR AND NURSE ONBOARD RENDERED AID. EMERGENCY WAS |
| 30 | H- | C-DECLARED AND FLIGHT LANDED OVERWEIGHT WITHOUT INCIDENT |
| 31 | H- | C-PARAMEDICS MET THE FLIGHT AND TRANSPORTED PASSENGER |
| 32 | H- | C-TO HOSPITAL. PASSENGER WILL REQUIRE A MEDICAL CERTIF |
| 33 | H- | C-STATING HE IS STABLE FOR AIR TRAVEL. |
| 34 | H- | C-SCSM/JTORRES/4JUN22. |
| 35 | H- | C-**************************************************** |
| 36 | H- | ************************************************** |
| 37 | H- | -***CUSTOMER WAS TAKEN BY PARAMEDICS TO********* |
| 38 | H- | ***AMERIMED CANCUN HOPITAL*********************** |
| 39 | H- | *************************************************** |
| 40 | | DIVIDED/CUN55RL 0825/05JUN22 LRCITD |
| 41 | H- | SPLIT FR/082547/05JUN22 LRCITD 02/02 01/01 GREENIDGE/KEVI |
| 42 | H- | ORIG PNR SIGNATURE PLT.PLTRM1S |
| 43 | H- | ***************************************** |
| 44 | H- | COMPANION REPORTED AT GATE FOR FLT 614 THAT PAX |
| 45 | H- | KEVIN IN WCHR WAS ASTHMATIC AND DIABETIC AND SHE WANTED |
| 46 | H- | TO MODIFY THEIR CONNECTION FROM MIA TO LGA FOR AN EARLIER |
| 47 | H- | FLIGHT BUT NONE WAS AVAILABLE AND PAX WAS ALREADY |
| 48 | H- | REBOOKED. PAX DIDNT NOTIFY ANY OTHER ISSUE WITH HER OR |
| 49 | H- | COMPANION IN WHCR |
| 50 | H- | ***************************************** |
| 51 | H- | 05JUN22 -CC C CRUZ SAP 073041 AM |

# American Airlines

Record Locator: UIGUYU Sabre Status Purged Report Date & Time: Jul 15, 2022 10:11:16 AM

**Received From Information**

| Trans Received From |
|---|
| HDQRM1S031747/DKAE5444C17A05/15B543000000217D 3CB1672D-001 |

**Signature Line Information**

| OA Record Locator | AAA Code | Home Station Code | TTY Office | TTY Airline or CRS Code | Duty Code | Agent Sine | Create Time | Create Date | Record Locator | Sabre Purge Date | History Indicator |
|---|---|---|---|---|---|---|---|---|---|---|---|
| HDQ1SYNKTPK/85BA/33616343/MIA/1S/T/US/USD/AS | PLT | PLT | | | | | 12:47:00 PM | Apr 3, 2022 | UIGUYU | Jun 5, 2022 | H |

**Baggage Info**

| Bag Routing Checkin Seq Nbr | Bag Routing Airline | Bag Routing Flight | Bag Routing Flight Arrive | Bag Routing Seq Nbr | History Bag Routing Seq Nbr | History Bag Routing | Bag Routing Status | Bag Psgr Checkin Seq Nbr | Bag Psgr Name | Bag Tag Destination | Bag Tag Airline | Bag Tag Number | Bag Checkin Agent | Bag Checkin Time | Bag Checkin Date | Bag Status | Bag Tag Index Code |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | AA | 1735 | LGA | 1 | 1 | ROUTE | REROUTE | 2 | GREENIDGE/ KEVIN | LGA | AA | 5001914939 | SAP 5SSM | 11:05:00 AM | Jun 4, 2022 | | 5 |
| 1 | AA | 614 | MIA | 1 | | | ROUTE | 2 | GREENIDGE/ KEVIN | LGA | AA | 5001914939 | SAP 5SSM | 11:05:00 AM | Jun 4, 2022 | | 5 |
| 1 | AA | 1171 | LGA | 2 | | | ROUTE | 2 | GREENIDGE/ KEVIN | LGA | AA | 5001914939 | SAP 5SSM | 11:05:00 AM | Jun 4, 2022 | | 5 |

**BPPR Status Info**

| BPPR Psgr Nbr | BPPR Psgr Name | BPPR Itn Nbr | BPPR INF Ind | BPPR Seq Nbr | BPPR Status |
|---|---|---|---|---|---|
| 2 | GREENIDGE/KEVIN | 0 | N | 3 | DHS CLEARED |
| 2 | GREENIDGE/KEVIN | 2 | N | 3 | DHS CLEARED |
| 2 | GREENIDGE/KEVIN | 3 | N | 9 | DHS CLEARED |
| 2 | GREENIDGE/KEVIN | 7 | N | 8 | DHS CLEARED |

| Hist Seq ID | Update Date/Time | Received From | AAA Code | Home Station Code | TTY Office | TTY Airline or CRS Code | Duty Code | Agent Sine | Trans Seq Nbr | Code | History Data |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 37 | Jun 5, 2022 6:08:00 PM | PDCAAMIA | MIA | MIA | | | 5 | PD | 1 | X4S* | SSR BESH AA NN1 1735B5JUN/NN1 |
| | | | | | | | | | 2 | X3S* | SSR SEAT AA KK1 MIALGA1735B05JUN-1ARZU/ANNA VICTORIA.28EC |
| | | | | | | | | | 3 | X3S* | SSR SEAT AA KK1 MIALGA1735B05JUN-1GREENIDGE/KEVIN.27EC |
| | | | | | | | | | 4 | SC | AA 1735 B Jun05,2022 MIALGA /NS1 18:25 21:20 |
| 36 | Jun 5, 2022 5:25:00 PM | CKI | | | | | | | 1 | A3S | SSR SEAT AA NO1 MIALGA1735B05JUN-1GREENIDGE/KEVIN.27E |
| | | | | | | | | | 2 | X4G | AA1735B Jun05,2022 MIALGA HK/ 27E |
| 35 | Jun 5, 2022 10:41:00 AM | PDCAACUN | CUN | CUN | | | 5 | PD | 1 | X4S* | SSR TKNE AA HK1 SAPMIA0614B04JUN/0017757081867C3 |
| | | | | | | | | | 2 | X4S* | SSR BESH AA NN1 614B4JUN/NN1 |
| | | | | | | | | | 3 | X3S* | SSR SEAT AA KK1 SAPMIA0614B04JUN-1ARZU/ANNA VICTORIA.32CC |
| | | | | | | | | | 4 | X3S* | SSR SEAT AA KK1 SAPMIA0614B04JUN-1GREENIDGE/KEVIN.32DC |
| | | | | | | | | | 5 | A3S | SSR SEAT AA NO1 SAPMIA0614B04JUN-1GREENIDGE/KEVIN.32D |
| | | | | | | | | | 6 | X4G* | AA614B Jun04,2022 SAPMIA HK/ 32D |
| | | | | | | | | | 7 | XS | AA 614 B Jun04,2022 SAPMIA /HK1 12:51 17:19 |
| | | | | | | | | | 8 | AS | AA 614 B Jun04,2022 CUNMIA /HK1 22:30 17:19 |
| 34 | Jun 5, 2022 8:30:00 AM | | SAP | SAP | | | 5 | -CC | 1 | A5H | H-************************************** |
| | | | | | | | | | 2 | A5H | H-COMPANION REPORTED AT GATE FOR FLT 614 THAT PAX |
| | | | | | | | | | 3 | A5H | H-KEVIN IN WCHR WAS ASTHMATIC AND DIABETIC AND SHE WANTED |

AA000004

# American Airlines

Record Locator: UIGUYU Sabre Status Purged Report Date & Time: Jul 15, 2022 10:11:16 AM

| Hist Seq ID | Update Date/Time | Received From | AAA Code | Home Station Code | TTY Office | TTY Airline or CRS Code | Duty Code | Agent Sine | Trans Seq Nbr | Code | History Data |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 34 | Jun 5, 2022 8:30:00 AM | | SAP | SAP | | | 5 | -CC | 4 | A5H | H-TO MODIFY THEIR CONNECTION FROM MIA TO LGA FOR AN EARLIER |
| | | | | | | | | | 5 | A5H | H-FLIGHT BUT NONE WAS AVAILABLE AND PAX WAS ALREADY |
| | | | | | | | | | 6 | A5H | H-REBOOKED. PAX DIDNT NOTIFY ANY OTHER ISSUE WITH HER OR |
| | | | | | | | | | 7 | A5H | H-COMPANION IN WHCR |
| | | | | | | | | | 8 | A5H | H-******************************************* |
| | | | | | | | | | 9 | A5H | H-05JUN22 -CC C CRUZ SAP 073041 AM |
| 33 | Jun 5, 2022 8:25:00 AM | HDQRM1S051325 52AC0C4A-001 NRL | PLT | PLT | | | | | 1 | A4O | OSI AA RLOC HDQ1SUDUZFG |
| | | | | | | | | | | A5H | H-ORIG PNR SIGNATURE PLT.PLTRM1S |
| 32 | | | CUN | CUN | | | 5 | 5RL | 1 | A5H | H-SPLIT FR/082547/05JUN22 LRCITD 02/02 01/01 GREENIDGE/KEVI |
| 31 | Jun 5, 2022 3:51:00 AM | CKI | | | | | | | 1 | X4S | SSR DOCS AA HK1 /P/USA/658829274/USA/15MAR08/M/12AUG26/GREENIDGE/KEVIN/ ISMAEL//S1 |
| | | | | | | | | | 2 | X4S | SSR DOCA AA HK1 /R/US |
| | | | | | | | | | 3 | A4S | SSR DOCS AA HK1 /P/USA/658829274/USA/15MAR08/M/12AUG26/GREENIDGE/KEVIN/ ISMAEL//S1 |
| | | | | | | | | | 4 | A4S | SSR DOCA AA HK1 /R/US |
| | | | | | | | | | 5 | A4S | SSR PCTC AA HK PSGR/DECLINED |
| | | | | | | | | | 6 | A4S | SSR PCTC AA HK KEVIN GREENIDGE/US4685341275 |
| 30 | Jun 4, 2022 8:55:00 PM | | CUN | CUN | | | 7 | JAA | 1 | A5H | H-************************************************** |
| | | | | | | | | | 2 | A5H | H--***CUSTOMER WAS TAKEN BY PARAMEDICS TO********* |
| | | | | | | | | | 3 | A5H | H-***AMERIMED CANCUN HOPITAL********************** |
| | | | | | | | | | 4 | A5H | H-*************************************************** |
| 29 | Jun 4, 2022 8:40:00 PM | | FTW | FTW | | | 7 | JCT | 1 | A5H | H-C-******************************************************** |
| | | | | | | | | | 2 | A5H | H-C-****CUSTOMER ILLNESS EVENT 220601262 ***** |
| | | | | | | | | | 3 | A5H | H-C-0614/4 SAP-MIA DIVERTED CUN ACCOUNT 14YRS MALE |
| | | | | | | | | | 4 | A5H | H-C-PASSENGER KEVIN GREENIDGE UNCONSCIOUS AND HAD NO PULSE. |
| | | | | | | | | | 5 | A5H | H-C-DOCTOR AND NURSE ONBOARD RENDERED AID. EMERGENCY WAS |
| | | | | | | | | | 6 | A5H | H-C-DECLARED AND FLIGHT LANDED OVERWEIGHT WITHOUT INCIDENT |
| | | | | | | | | | 7 | A5H | H-C-PARAMEDICS MET THE FLIGHT AND TRANSPORTED PASSENGER |
| | | | | | | | | | 8 | A5H | H-C-TO HOSPITAL. PASSENGER WILL REQUIRE A MEDICAL CERTIF |
| | | | | | | | | | 9 | A5H | H-C-STATING HE IS STABLE FOR AIR TRAVEL. |
| | | | | | | | | | 10 | A5H | H-C-SCSM/JTORRES/4JUN22. |
| | | | | | | | | | 11 | A5H | H-C-********************************************************* |

## American Airlines

Record Locator: UIGUYU Sabre Status Purged Report Date & Time: Jul 15, 2022 10:11:16 AM

| Hist Seq ID | Update Date/Time | Received From | AAA Code | Home Station Code | TTY Office | TTY Airline or CRS Code | Duty Code | Agent Sine | Trans Seq Nbr | Code | History Data |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 28 | Jun 4, 2022 3:31:00 PM | WWW$RPTODM | CRC | CRC | | | 8 | OD3 | 1 | A4G | AA1735B Jun05,2022 MIALGA SS/ 27E |
| 27 | Jun 4, 2022 3:25:00 PM | RIPACLIENT | CRC | CRC | | | 8 | OD2 | 1 | A4S | SSR BESH AA NN1 1735B5JUN/NN1 |
| 26 | Jun 4, 2022 3:24:00 PM | REAACCOM UPDATE | CRC | CRC | | | 8 | YMG | 1 | A5H | H-/OSO$04JUN13 |
| | | | | | | | | | 2 | A5H | H-/OSO$DLY$INTL$04JUN |
| | | | | | | | | | 3 | X4S | SSR TKNE AA HK1 MIALGA1171B04JUN/0017757081867C4 |
| | | | | | | | | | 4 | X4S | SSR BESH AA NN1 1171B4JUN/NN1 |
| | | | | | | | | | 5 | X4G | AA1171B Jun04,2022 MIALGA HK/ 32B |
| | | | | | | | | | 6 | SC | AA 1171 B Jun04,2022 MIALGA /NO2 19:39 22:40 |
| | | | | | | | | | 7 | AS | AA 1735 B Jun05,2022 MIALGA /KK2 18:25 21:20 |
| 25 | Jun 4, 2022 2:56:00 PM | WWW$RPTREACCOM | HDQ | HDQ | | | 5 | IRP | 1 | X4S | SSR IRSS<br>NN2 /<br>AA0614ISAPMIA202206041851DLYB202206050240SAPLGA202206071851Y0<br>NN2 |
| | | | | | | | | | 2 | A4S | SSR IRSS<br>NN2 /<br>AA0614ISAPMIA202206041851DLYB202206050240SAPLGA202206071851Y0<br>NN2 |
| 24 | Jun 4, 2022 2:19:00 PM | WWW$RPTREACCOM | HDQ | HDQ | | | 5 | IRP | 1 | X4S | SSR IRSS<br>NN2 /<br>AA0614ISAPMIA202206041851DLYB202206050240SAPLGA202206071851Y0<br>NN2 |
| | | | | | | | | | 2 | A4S | SSR IRSS<br>NN2 /<br>AA0614ISAPMIA202206041851DLYB202206050240SAPLGA202206071851Y0<br>NN2 |
| 23 | Jun 4, 2022 2:08:00 PM | WWW$RPTREACCOM | HDQ | HDQ | | | 5 | IRP | 1 | X4S | SSR IRSS<br>NN2 /<br>AA0614ISAPMIA202206041851DLYB202206050240SAPLGA202206071851Y0<br>NN2 |
| | | | | | | | | | 2 | A4S | SSR IRSS<br>NN2 /<br>AA0614ISAPMIA202206041851DLYB202206050240SAPLGA202206071851Y0<br>NN2 |
| 22 | Jun 4, 2022 1:22:00 PM | REAACCOM UPDATE | CRC | CRC | | | 8 | YMG | 1 | A5H | H-/OSO$04JUN13 |
| | | | | | | | | | 2 | A5H | H-/OSO$DLY$INTL$04JUN |
| 21 | Jun 4, 2022 1:17:00 PM | WWW$RPTREACCOM | HDQ | HDQ | | | 5 | IRP | 1 | X4S | SSR IRSS<br>NN2 /<br>AA0614ISAPMIA202206041851DLYB202206050240SAPLGA202206071851Y0<br>NN2 |
| | | | | | | | | | 2 | A4S | SSR IRSS |

| Hist Seq ID | Update Date/Time | Received From | AAA Code | Home Station Code | TTY Office | TTY Airline or CRS Code | Duty Code | Agent Sine | Trans Seq Nbr | Code | History Data |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 21 | Jun 4, 2022 1:17:00 PM | WWW$RPTREACCOM | HDQ | HDQ | | | 5 | IRP | | | NN2 / AA0614ISAPMIA202206041851DLYB202206050240SAPLGA202206071851Y0 NN2 |
| 20 | Jun 4, 2022 1:15:00 PM | REAACCOM UPDATE | CRC | CRC | | | 8 | YMG | 1 | A5H | H-/OSO$04JUN13 |
| | | | | | | | | | 2 | A5H | H-/OSO$DLY$INTL$04JUN |
| 19 | Jun 4, 2022 1:10:00 PM | SAPEBH | SAP | SAP | | | 5 | EBH | 1 | A4S | SSR WCHR NN1 1 |
| 18 | Jun 4, 2022 1:03:00 PM | WWW$RPTREACCOM | HDQ | HDQ | | | 5 | IRP | 1 | X4S | SSR IRSS NN2 / AA0614ISAPMIA202206041851DLYB202206050240SAPLGA202206071851Y0 NN2 |
| | | | | | | | | | 2 | A4S | SSR IRSS NN2 / AA0614ISAPMIA202206041851DLYB202206050240SAPLGA202206071851Y0 NN2 |
| 17 | Jun 4, 2022 12:39:00 PM | REAACCOM UPDATE | CRC | CRC | | | 8 | YMG | 1 | A5H | H-/OSO$04JUN13 |
| | | | | | | | | | 2 | A5H | H-/OSO$DLY$INTL$04JUN |
| 16 | Jun 4, 2022 12:35:00 PM | WWW$RPTREACCOM | HDQ | HDQ | | | 5 | IRP | 1 | X4S | SSR IRSS NN2 / AA0614ISAPMIA202206041851DLYB202206050240SAPLGA202206071851Y0 NN2 |
| | | | | | | | | | 2 | A4S | SSR IRSS NN2 / AA0614ISAPMIA202206041851DLYB202206050240SAPLGA202206071851Y0 NN2 |
| 15 | Jun 4, 2022 12:03:00 PM | | HDQ | HDQ | | | 4 | TVL | 1 | A4S | SSR PCTC AA HK KEVIN GREENIDGE/US4685341275 |
| | | | | | | | | | 2 | A4S | SSR PTPH AA HK1 PTPH AA HK1/10000000000 |
| | | | | | | | | | 3 | A4S | SSR PTEM AA HK1 PTEM AA HK1/NOEMAILADDRESS//NULL.COM |
| 14 | Jun 4, 2022 11:50:00 AM | WWW$RPTIROP | HDQ | HDQ | | | 5 | IRP | 1 | A4S | SSR IRSS NN2 / AA0614ISAPMIA202206041851DLYB202206050240SAPLGA202206071851Y0 NN2 |
| 13 | Jun 4, 2022 11:10:00 AM | RIPACLIENT | CRC | CRC | | | 8 | OD2 | 1 | XS | AA 1389 B Jun04,2022 MIALGA /HK2 20:32 23:30 |
| 12 | | | SAP | SAP | | | 5 | -FR | 1 | AS | AA 1389 B Jun04,2022 MIALGA /SS2 20:32 23:30 |
| 11 | Jun 4, 2022 12:02:00 AM | REAACCOM UPDATE | CRC | CRC | | | 8 | YMG | 1 | A5H | H-/OSO$04JUN13 |
| | | | | | | | | | 2 | A5H | H-/OSO$DLY$INTL$04JUN |
| 10 | May 28, 2022 4:38:00 AM | CKI | | | | | | | 1 | X4S | SSR DOCS AA HK1 /DB/15MAR08/M/GREENIDGE/KEVINISMAEL |
| | | | | | | | | | 2 | A4S | SSR DOCS AA HK1 /P/USA/658829274/USA/15MAR08/M/12AUG26/GREENIDGE/KEVIN/ ISMAEL//S1 |
| 9 | May 28, 2022 | | LGA | LGA | | | 5 | 4NP | 1 | A5H | H-DOX OK |

| Hist Seq ID | Update Date/Time | Received From | AAA Code | Home Station Code | TTY Office | TTY Airline or CRS Code | Duty Code | Agent Sine | Trans Seq Nbr | Code | History Data |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 9 | 3:44:00 AM | | LGA | LGA | | | 5 | 4NP | 2 | A5H | H-TIMATIC AUTOCHECK - CONDITIONAL ID 1 |
| | | | | | | | | | 3 | A5H | H-MESSAGE - TMID 10672 |
| | | | | | | | | | 4 | A5H | H-N PARSAN/LGA/28MAY/0444AM |
| 8 | | CKI | | | | | | | 1 | A4S | SSR PCTC AA HK PSGR/DECLINED |
| 7 | | CKI | | | | | | | 1 | A4S | SSR DOCA AA HK1 /R/US |
| 6 | May 28, 2022 3:42:00 AM | | LGA | LGA | | | 5 | 4NP | 1 | A5H | H-DOX OK |
| | | | | | | | | | 2 | A5H | H-TIMATIC AUTOCHECK - CONDITIONAL ID 1 |
| | | | | | | | | | 3 | A5H | H-MESSAGE - TMID 10672 |
| | | | | | | | | | 4 | A5H | H-N PARSAN/LGA/28MAY/0442AM |
| 5 | Apr 3, 2022 8:16:00 PM | WWW$RPTODM | CRC | CRC | | | 8 | OD1 | 1 | A4G | AA1249B May28,2022 LGAMIA SS/ 32B |
| | | | | | | | | | 2 | A4G | AA1635B May28,2022 MIASAP SS/ 28B |
| | | | | | | | | | 3 | A4G | AA614B Jun04,2022 SAPMIA SS/ 32D |
| | | | | | | | | | 4 | A4G | AA1171B Jun04,2022 MIALGA SS/ 32B |
| 4 | Apr 3, 2022 8:05:00 PM | RIPACLIENT | CRC | CRC | | | 8 | OD2 | 1 | A4S | SSR BESH AA NN1 1249B28MAY/NN1 |
| | | | | | | | | | 2 | A4S | SSR BESH AA NN1 1635B28MAY/NN1 |
| | | | | | | | | | 3 | A4S | SSR BESH AA NN1 614B4JUN/NN1 |
| | | | | | | | | | 4 | A4S | SSR BESH AA NN1 1171B4JUN/NN1 |
| 3 | Apr 3, 2022 8:03:00 PM | HDQRM1S040103 533D1CF5-001 | PLT | PLT | | | | | 1 | A4S | SSR TKNE AA HK1 LGAMIA1249B28MAY/0017757081867C1 |
| | | | | | | | | | 2 | A4S | SSR TKNE AA HK1 MIASAP1635B28MAY/0017757081867C2 |
| | | | | | | | | | 3 | A4S | SSR TKNE AA HK1 SAPMIA0614B04JUN/0017757081867C3 |
| | | | | | | | | | 4 | A4S | SSR TKNE AA HK1 MIALGA1171B04JUN/0017757081867C4 |
| 2 | Apr 3, 2022 4:10:00 PM | RIPACLIENT | CRC | CRC | | | 8 | OD2 | 1 | A4S | SSR YADT NN1 YADT /15MAR08 NN1 |
| 1 | Apr 3, 2022 4:02:00 PM | HDQRM1S032102 520BD4A0-001 | PLT | PLT | | | | | 1 | A4S | SSR DOCS AA HK1 /DB/15MAR08/M/GREENIDGE/KEVINISMAEL |

# Exhibit D

## *(Filed Under Seal)*

# Exhibit E

***(Filed Under Seal)***

# Exhibit F

***(Filed Under Seal)***

# Exhibit G

***(Filed Under Seal)***

# Exhibit H

Burns Charest LLP
900 Jackson Street
Suite 500
Dallas, Texas 75202

Dear Ms. Crowe,

I am a licensed physician in the state of Texas and have been practicing Pediatric Emergency Medicine continuously since 2003. I am board certified in General Pediatrics and Pediatric Emergency Medicine by the American Board of Pediatrics. I practiced as an Attending Physician in the Cook Children's Medical Center Emergency Department prior to being named Medical Director of the Emergency Department in 2014. I served in that role for nine years and was directly involved in all Emergency Department quality reviews and served on multiple committees related to quality improvement, chart reviews and root cause analysis. Currently, I am the Chief Clinical Officer of the Cook Children's Physician Network.

I have reviewed the following discovery records, data and literature to formulate my opinion on the case of Arzu vs American Airlines:

1. Montefiore Health System Medical Records for Kevin Greenidge
2. Report 2206401306, Hernandez
3. Report 2206401998, Gilbert-Blanchard
4. Report 2206401414, Anderson
5. Report 2206401796, Tran
6. Report 2206402554, Wingham
7. Report 2206401968, Fitzpatrick
8. Declaration of Anna Victoria Arzu
9. Declaration of Janell Nicole Zachary
10. Declaration of Leonard Ismael Arzu
11. Declaration of Dr. Rachael Amador
12. Declaration of Judy Blanchard
13. Declaration of Passenger in seat 32B
14. Medical Emergency Information Sheet, Dr. Rachael Amador
15. Medical Emergency Information Sheet, Karenna Thatcher, RN
16. Medical Emergency Information Sheet, Judy Blanchard
17. AED Event Capture S/N-13C00424577
18. Amerimed Hospital Emergency Note
19. Amerimed Hospital Notice to Public Ministry
20. Death Certificate and Certification Documents
21. Brooke Anderson Deposition Transcript
22. De Fitzpatrick Deposition Transcript

Medical Literature reviewed:

1. Nguyen DD, Spertus JA, Kennedy KF, et al. Association Between Delays in Time to Bystander CPR and Survival for Witnessed Cardiac Arrest in the United States. Circulation: Cardiovascular Quality and Outcomes. 2024 Feb; 17(2):e010116
2. Hasselqvist-Ax I, Riva G, Herlitz J, et al. Early Cardiopulmonary Resuscitation in Out-of-Hospital Cardiac Arrest. New England Journal of Medicine. 2015;372:2307-35

3. Ibrahim WH. Recent Advances and Controversies in Adult Cardiopulmonary Resuscitation. Postgraduate Medical Journal. 2007 Oct;83(984):649–654
4. DeLuca LA, Simpson A, Beskind D, et al. Analysis of Automated External Defibrillator Device Failures Reported to the Food and Drug Administration. Annals of Emergency Medicine. 2012;59(2):103-111
5. Weisfeldt ML, Sitlani CM, Ornato JP, et al. Survival After Application of Automatic External Defibrillators Before Arrival of the Emergency Medical System. Journal American College of Cardiology. 2010 Apr 20;55(16):1713-20
6. Baekgaard JS, Viereck S, Moller TP, et al. The Effects of Public Access Defibrillation on Survival After Out-of-Hospital Cardiac Arrest. Circulation. 2017 Sep;136(10):954-965

Summary of Kevin Greenidge's Clinical Course:

Kevin was a fourteen year old male with a history of obesity, asthma, Type 2 diabetes, atopic dermatitis and obstructive sleep apnea. Other than a hospitalization in 2020, Kevin's medical conditions were controlled with basic outpatient medication and treatment. On June 4, 2022, he was scheduled to fly from San Pedro Sula, Honduras to Miami, Florida on American Airlines flight 614 along with multiple family members (with a connecting flight from Miami to New York City). Flight 614 was significantly delayed and he and his family spent several hours waiting in the San Pedro Sula airport prior to departure. Once in flight, Kevin began experiencing difficulty breathing and requested his asthma inhaler. He acutely decompensated and was noted to be unresponsive but still breathing by his family. Flight staff was alerted and came to assess the situation where he was noted to be unconscious but breathing. Flight staff then made an announcement for any on board medically trained personnel to respond. A nurse initially responded and after a second overhead request a physician also responded. Kevin was still in his seat when the physician arrived. After this, it took several minutes for Kevin to be moved from his seat to the rear galley. Aggregating all the reports and declarations, it appears that at least ten to fifteen minutes passed before Kevin started to receive any treatment. At this point cardiopulmonary resuscitation was begun under the direction of the physician. A medical kit was produced but there was reported to be difficulty in breaking the seal and finding items since they were not labeled. An automatic external defibrillator was brought to the back of the airplane but various statements indicate confusion by the flight staff on the operation of the defibrillator and if it was functioning properly. The defibrillator pads were placed on Kevin but it was noted to be very difficult to adhere them to his body since he was noted to be diaphoretic. Cardiopulmonary resuscitation was continued while the automatic external defibrillator was active. The automatic external defibrillator report produced by American Airlines shows a defibrillation shock was required and this was recorded by the machine. However, the physician present specifically reported that no shock was administered to Kevin at any time. The plane was diverted to Cancun while cardiopulmonary resuscitation continued. Cardiopulmonary resuscitation was reported to have been performed for approximately forty-five minutes on the airplane and Kevin was given two injectable doses of epinephrine with no response. At some point during the flight, Kevin's body released multiple bodily fluids and it became apparent to all involved, including the physician at the scene, that he was deceased. Upon arrival in Cancun, Kevin was transported to emergency services for transfer to a local hospital. He was noted to have no vital signs at this time. Upon arrival to the emergency department he was noted to have no vital signs, a temperature of 34.0 C and a capillary blood glucose of 35. He was intubated, given a glucose infusion and treated with epinephrine. Treatment in the emergency department was brief as it was clear Kevin was deceased upon arrival and further treatment would be futile.

Assessment:

This is a tragic case of death in a fourteen-year-old child during a flight. It is clear that Kevin died during flight AA614 and prior to arrival in Cancun. Statements from the flight attendants, nurse, and physician involved in the resuscitation attempt declare that Kevin died on the airplane. Upon transfer to EMS, witness statements clearly state Kevin had no vital signs. Upon arrival to the emergency department in Cancun Kevin had no vital signs and a temperature of 34.0 C (93.2 F). This directly supports death having occurred on the airplane well before arrival of EMS and transfer to the emergency department.

The emergency medicine physician diagnosed Kevin with asystole, severe hypoglycemia, and cardiac arrest. While hypoglycemia is not an accurate predictor of time of death, the hypoglycemia upon arrival to the emergency department is more consistent with pre and post-mortem metabolism than being clinically significant to the cause of death. The emergency medicine physician noted nothing that would support a neurological event. The Mexican Death Certificate lists Myocardial Infarction, Hemorrhagic Cerebral Vascular Event, and Diabetes Mellitus. This is confounding information as there is zero evidence to support a cerebral vascular event or diabetes being associated with his demise. Kevin had acute difficulty breathing which rapidly progressed to cardiopulmonary arrest. There was zero symptomatology of a cerebral event or diabetic crisis and this appears to be pure conjecture by the Mexican authorities or simply a listing of a common causes of death when it is not specified by the terminally treating physician.

Prompt administration of cardiopulmonary resuscitation has been shown to dramatically increase survival rates in cardiopulmonary arrests. The chance of survival diminishes by 7% to 10% for every minute that passes without intervention in a witnessed cardiac arrest. There was a significant delay in initiation of cardiopulmonary resuscitation in this case. The reports and declarations obtained do not directly correlate with each other, but even estimating conservatively there was a significant delay from the time the alert was sounded that Kevin had collapsed and the initiation of cardiopulmonary resuscitation. This delay was definitely significant enough to critically decrease Kevin's chance of survival.

Automatic external defibrillator usage has also been proven to be a powerful tool to increase survival in out of hospital cardiac arrests. Survivability when utilizing an automatic external defibrillator is also directly time dependent. In this case, there was a significant delay in initiation of cardiopulmonary resuscitation but also a delay in preparing and attaching the automatic external defibrillator. The automatic external defibrillator report produced by American Airlines shows that, once engaged, the automatic external defibrillator did detect a rhythm and determined Kevin Greenidge would benefit from a defibrillation shock. Detection of this rhythm supports that if cardiopulmonary resuscitation and automatic external defibrillation had been initiated without a significant delay that Kevin's survival would have been several times more likely. The automatic external defibrillator record that was produced by American Airlines indicates that a defibrillation shock was delivered by the defibrillator, but it is unclear that this defibrillation ever actually reached Kevin. Failed defibrillation attempts from automatic external defibrillator devices is not uncommon. Pads and connections are the most common cause of these failures. Witness statements show there was considerable difficulty in adhering the pads to Kevin. The physician present during the resuscitation also states very clearly that no defibrillation shock was administered. This physician is well trained in cardiopulmonary resuscitation and automatic external defibrillator use, and is by far the most reliable witness in regards to what occurred during the resuscitation. By contrast, members of the flight crew report medically improbable occurrences. Specifically, the shock of an AED machine will not cause an "entire body" to

"lift off the ground" or "come off the galley floor" as reported by Flight Attendants Anderson and Fitzpatrick.

It is my opinion based upon my education, experience, and training that, within a reasonable degree of medical certainty, the delay in initiation of cardiopulmonary resuscitation coupled with the delayed and ineffectual automatic external defibrillator usage contributed to Kevin Greenidge not surviving this event.

Discovery in this case is ongoing, and I reserve the right to modify my opinions based upon new information that is provided to me.



Corwin Warmink, MD
Chief Clinical Officer
Cook Children's Physician Network
Fort Worth, Texas

# Corwin A. Warmink, MD

4521 Cloudview Road
Fort Worth, Texas 76109
cwarmink@att.net
(214) 284-5901

## EDUCATION

**Pediatric Emergency Medicine Fellowship**
University of Texas Southwestern Medical Center
Dallas, Texas
2000-2003

**Pediatric Residency**
University of Texas Southwestern Medical Center
Dallas, Texas
1997-2000

**Doctor of Medicine**
University of Texas Southwestern Medical School
Dallas, Texas
1993-1997

**Bachelor of Arts**
Baylor University
Waco, Texas
1989-1993
*University Scholar*
*Magna Cum Laude*
*Phi Beta Kappa*

## CERTIFICATION AND LICENSURE

- Pediatric Emergency Medicine Certificate #1283
  American Board of Pediatrics
- General Pediatrics Certificate #71555
  American Board of Pediatrics
- Texas Medical License #K7939

## PROFESSIONAL EXPERIENCE

**Chief Clinical Officer**

Cook Children's Physician Network

Fort Worth, Texas

2022-present

**Medical Director of Emergency Department**

Cook Children's Medical Center

Fort Worth, Texas

2015-2022

**Assistant Medical Director of Emergency Department**

Cook Children's Medical Center

Fort Worth, Texas

2013-2015

**Emergency Department Attending Physician**

Cook Children's Medical Center

Fort Worth, Texas

2003-2013

**Cook Committee Experience**

Cook Children's Physician Network Board of Directors
Quality Committee-Chairman
Joint Credentials Committee
Emergency Management Committee
Clinical Excellence Committee
Diversion Committee
Sepsis Committee
Pharmacy & Therapeutics Committee
Lab Stewardship Committee
Covid-19 Command Center Task Force

## PUBLICATIONS/PRESENTATIONS

Warmink, C., Ryan, L., DePiero, A., Sadow, K., Chamberlain, J., Teach, S., and Johns, C. "Recognition and Management of Pediatric Fractures by Pediatric Residents." The Journal of Pediatrics December 2004, 114 (6) 1530-1533.

Warmink, C., Miller, E., Yeh, A., Bentley, M., and Limo, R. "A Collaborative Practice Agreement for Pharmacist Triage of Medication Related Calls Following Patient Discharge from a Pediatric Emergency Department" Journal of Pediatric Pharmacy and Therapeutics. 2016 May-Jun; 21(3): 263–303.

Warmink, C., Gammons, H., Graichen-Keffer, M. "Advocating for Best Practices: Using Process and Quality Improvement Methods to Drastically Decrease False-Positive Blood Cultures in a Pediatric Emergency Department" *Society of Pediatric Nurses, Washington D.C., 2019.*

**Corwin A. Warmink, MD**
4521 Cloudview Road
Fort Worth, Texas 76109
cwarmink@att.net
(214) 284-5901

## Attorney Fee Schedule

The fee for consultation on legal cases is $600/hour. This fee includes initial records review, phone, video conference and face-to-face consultation regarding the case with Dr. Warmink, deposition preparation, and production of a written report, if required. There is a 4 hour minimum retainer of $2,400 that must be prepaid in full before services are rendered, credited to the services below, and non-refundable once services have commenced.

If a deposition is needed, there is a minimum fee of $2,000 for up to 2 hours and $750/hour thereafter. Payment of the $2,000 must be paid 7 days in advance or the deposition will be cancelled.

If a trial date is set and Dr. Warmink is expected to witness, a fee of $1000 will be due with the notice that a date has been set. The $1000 is non-refundable if the case is settled, but will be applied to the fee for court testimony if there are no changes.

If testimony is required at trial, a fee of $4,000 for ½ day (Up to 4 hours) and a fee of $8,000 for a full day (8 hours) are required.

Travel time and expenses will be added to these hourly calculations.

With the exception of hourly fees, fees are to paid one week in advance of the service to be rendered and are non-refundable.

Accepted Yes___________ No___________

_______________________________ _______________
Signature Date

_______________________________
Printed Name

______________________________
Law Firm

______________________________ _______________
Corwin Warmink, MD Date

# Exhibit I

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| MELISSA SUZETTE ARZU, Individually and as the Administrator of the Estate of KEVIN GREENIDGE, Deceased, | § | |
| Plaintiff, | § | CIVIL ACTION NO. 4:24-cv-00433-P |
| v. | § | |
| AMERICAN AIRLINES, INC., | § | |
| Defendant. | § | |

ORAL AND VIDEOTAPED DEPOSITION OF

DR. CORWIN WARMINK

January 22, 2025

ORAL AND VIDEOTAPED DEPOSITION OF DR. CORWIN WARMINK, produced as a witness at the instance of the Plaintiff, and duly sworn, taken in the above-styled and numbered cause on January 22, 2025, from 10:05 a.m. to 2:11 p.m., before Joseph D. Hendrick, Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, at the offices of Burns Charest LLP, 900 Jackson Street, Suite 500, Dallas, Texas, pursuant to Notice and the Federal Rules of Civil Procedure and any provisions stated on the record or attached hereto.

Job No. CS7124620

APPEARANCES

FOR THE PLAINTIFF:
Hannah Crowe
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, TX 75202
Telephone 469-904-4550
hcrowe@burnscharest.com
Clay Mahaffey
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, TX 75202
Telephone 469-904-4550
cmahaffey@burnscharest.com

FOR THE DEFENDANT:
Meredith W. Knudsen
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone (817) 332-2500
meredith.knudsen@kellyhart.com

THE VIDEOGRAPHER:
Patrick Salvant, Legal Video Specialist



INDEX


Appearances .................................. 2
DR. CORWIN WARMINK
EXAMINATION BY MS. KNUDSEN ............... 5
Signature and Changes .........................163
Reporter's Certification ......................165


EXHIBITS


| NO. | DESCRIPTION | PAGE(S) |
|---|---|---|
| EXHIBIT 1 | Expert Report of Corwin Warmink, MD | 10 |
| EXHIBIT 2 | Corwin Warmink, MD, Invoice #104 | 24 |
| EXHIBIT 3 | Terms of Engagement | 32 |
| EXHIBIT 4 | Rebuttal Report | 37 |
| EXHIBIT 5 | AED readout/rhythm strip | 89 |
| EXHIBIT 6 | Certificado de Conservacion | 123 |




THE VIDEOGRAPHER: Good morning. We are going on the record at 10:05 a.m. on January 22nd, 2025. Please note that this deposition is being conducted virtually as well as in-person. Quality of recording depends on the quality of camera and Internet connection of participants. What is seen from the witness and heard on screen is what will be recorded. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit 1 of the video-recorded deposition of Dr. Corwin Warmink taken by counsel for the defendant in the matter of Melissa Suzette Arzu individually and as the administrator of the estate of Kevin Greenidge deceased versus American Airlines Inc. Filed in the United States District Court for the Northern District of Texas, Fort Worth division, Case Number 4:24-cv-00433-P. Location of the deposition is the offices of Burns Charest located at 900 Jackson Street, Suite 500, Dallas, Texas 75202.

My name is Patrick Salvant representing Veritext and I'm the videographer. The court reporter is Joe Hendrick also from Veritext. I am not authorized to administer an oath. I am not related to any party in this action nor am I financially interested in the outcome. If there are any objections



to proceeding, please state them at the time of your appearance.

Counsel and all present, including remotely, will now state their appearances and affiliations for the record beginning with the noticing attorney.

MS. KNUDSEN: Meredith Knudsen for the defendant American Airlines Inc.

MS. CROWE: Hannah Crowe on behalf of the plaintiff.

MR. MAHAFFEY: Clay Mahaffey on behalf of plaintiff.

THE VIDEOGRAPHER: Would the court reporter please swear in the witness and then counsel may proceed.

THE REPORTER: Would you raise your right hand, please.

THE WITNESS: (Complied)

THE REPORTER: Do you swear or affirm that the testimony you're about to give in this case will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

DR. CORWIN WARMINK

having been duly sworn, testified as follows:

EXAMINATION

Page 42

saying do I believe that she testified to that or --
BY MS. KNUDSEN:
Q. Were you aware of that fact?
MS. CROWE: Object to the form. Misstates testimony.
A. Yeah, I mean, I reviewed her declaration.
BY MS. KNUDSEN:
Q. Did you review her deposition testimony?
A. Her deposition? No.
Q. Okay, I believe you testified earlier that there was a significant delay. How long do you define "delay" to be in this circumstance?
A. In the case of CPR, any delay is significant. Right? Every minute increases the chance of death by potentially 10 percent. So to pinpoint an exact number of what the delay was, it's difficult with all the different testimony, you yourself have just listed several different numbers of what people have said, and so I think conservatively saying that there was a delay in 10 to 15 minutes is -- it's actually very conservative.
Q. Why is that very conservative?
A. Because we have other testimony that says it was longer, right? And so -- and if you just do the math on someone raised an alarm, we know that, then

Page 43

they responded to said alarm. That takes time. We're already looking at probably a minute or so, right? And then they had to assess the situation to see where he was at to realize that this is serious enough to require calling someone overhead; that's another good minute or so. And then they call overhead and I think the -- Nurse Blanchard's testimony is that she had like AirPods in or something, it took her a little while to respond. So we know it took her some time to get back there and respond and discuss it with the flight attendants.
And then there's another couple of minutes that have probably passed, and then it takes a second overhead page for the physician to respond, who also, I think, was -- had -- was listening to -- I don't know. And so by that point, just for them -- the physician to get back to the plane, we have several minutes that have passed, right? And then multiple people respond. By -- by the time the physician got there, he was still in his seat reportedly, and so then we know it took several minutes for them to extract him from his seat. So I think we're already -- that's easy to say that's probably 10 minutes, plus by the time they alert to get him out of the seat. And then they said it was very difficult to get him to the back of the plane and

Page 44

there's difficulty in getting kind of V attached. There's difficulty. They're trying to work with the packaging on the -- the medical kit.
I mean, there's just -- I -- it's hard to say exactly what, but I think saying 10 to 15 minutes is conservative just because if you start adding up all the different declarations and reports, it points to a considerable delay.
MS. KNUDSEN: Object to the non-responsive portions of the answer.
BY MS. KNUDSEN:
Q. What testimony are you referring to that it took longer than 15 minutes?
A. I would have to review the different declarations. But if you -- if you take them all together, right, they're -- they all report it was a struggle. It was difficult. Multiple people used I think the term, "When we finally got him back to the back of the plane." Dr. Amador says, "When I got back there," which we know was a pretty significant delay for her to get back there, it still took a great deal of time, right? It took two overhead pages for her to get back there.
So, you know, even -- I think you're -- it's difficult to put a time frame on it in exact

Page 45

minutes. In a way, it doesn't matter because every minute counts, right? So we know there was the delay. To tell you it was 12 minutes, 18 minutes, I can't tell you, but obviously he didn't survive, so it's significant.
Q. So would you consider one minute to be a delay?
MS. CROWE: Object to the form.
A. Well, it's a passage of time. To define it as a delay, no.
BY MS. KNUDSEN:
Q. Okay. When do you start defining it as delay?
A. I don't think it's my job to define what a delay is. Now we're arguing over the definition of the word delay, right? Like that's -- I'm saying that we know time passed and a significant amount of time passed before he got to CPR. So I -- I'm not here to define, "Well, it's three minutes." We know that if someone gets to CPR at a quicker time frame, their survival is better. That's medically -- I don't think anyone would argue that fact and it's just common sense. The quicker you get someone to CPR, the better their outcome is going to be. So, every minute causes a decrease in survivability. In this case, it was

Page 54

him to the back. And so I there's no exact minute I can give you, but it does seem like there was a delay in kind of just the -- the function of how quickly it was happening.

MS. KNUDSEN: Object to the non-responsive portions of the answer.

BY MS. KNUDSEN:

Q. My question is limited to they've got Kevin in the back aft galley and they're starting CPR. How much time passed before CPR could be initiated once Kevin was in the back of the plane?

MS. CROWE: Object to the form.

A. I cannot --

MS. CROW: Lack of foundation.

A. Yeah, I cannot speak to the exact time of how long that took.

BY MS. KNUDSEN:

Q. And then you stated that there was some passage of time in initiating the AED. What amount of time is that?

MS. CROWE: Same objections.

A. Yes, same answer in that I can't tell you the exact amount of time it took to initiate the AED.

BY MS. KNUDSEN:

Q. How long do you think it should have taken

Page 55

the flight attendants to get Kevin out of his seat into the aft galley?

A. You're asking me to state a time? I -- I can't do that. Right? I don't think it's my job to state what the expected time for a flight attendant to remove someone from a seat is. It's my job to say: Was there a significant delay in doing so? And that -- to me, the answer is yes.

Q. Okay. So you have no opinion on the amount of time that it should have taken if this was too long?

A. I mean, I -- you're saying how long it should have taken them to extract Kevin from his seat?

Q. Correct. Do you have an opinion on that?

MS. CROWE: Object to the form. Asked and answered.

A. Yeah, I'm not -- I don't have like an exact time of how long it should take.

BY MS. KNUDSEN:

Q. The timing of events is essential to your medical causation opinion, isn't it?

A. What is the -- repeat that one more time?

Q. Sure. The timing of the events is essential to your medical causation opinion?

A. When you say, "medical causation," what do you mean?

Page 56

Q. I mean the opinion that you have here in your report on page 4 that, "the delay in initiation of cardiopulmonary resuscitation coupled with the delayed and ineffectual automatic external defibrillator usage contributed to Kevin Greenidge not surviving this event."

A. Right. So I would agree that, yes, the timing is important to his likelihood of survival in this case.

Q. And is it your opinion that the 10 to 15-minute timing that you have mentioned here in your report and here today signifies the difference between life and death for Kevin Greenidge?

MS. CROWE: Object to the form.

A. Right. I mean, we're talking about percentages of survival, right? And so I've produced articles that show in an out-of-hospital arrest when a bystander, not a -- not a medical professional, provides care, those children survive to the hospital -- it's like 71.4 percent. And there's other articles that show it's up to 86 percent when bystanders rendered care with an AED, right?

So we're starting with a certain percentage. It's never going to be 100 percent. But every minute of time that passes, that percentage of

Page 57

survival decreases, right, dramatically. So yes, the delay in getting him and just -- or time passing decreases his likelihood to survive. And we know in this case he didn't survive. We also know in this case when he was hooked up to the AED, he was already in a rhythm that wasn't shockable but they got him back to shockable, which shows that like his heart probably was initially in a shockable rhythm. And so the quicker they could have gotten to him, the way, way, way more likely the success of this resuscitation would have been.

MS. KNUDSEN: I am going to object to the non-responsive portions of that answer.

BY MS. KNUDSEN:

Q. The articles that you mentioned, are those concerning bystander CPR on an airplane?

A. They are not.

MS. CROWE: Okay, Meredith, we've been going a little over an hour. Can we take a short break?

MS. KNUDSEN: Sure.

THE VIDEOGRAPHER: We're off the record at 11:12 a.m. This is the end of file number 1.

(Break taken 11:12 a.m. until 11:25 a.m.)

THE VIDEOGRAPHER: Stand by.

she was very on top of what was happening with him. So can I tell you exactly how long? No, but it seemed like it was very brief.
Q. But you have no opinion as to the amount of time that occurred between him falling unconscious and her yelling out for help?
A. No, I mean it most likely was immediate.
Q. You say, "it most likely was immediate." What's that based on?
A. I mean, she was right there with him. It seemed like she was very concerned about him during the flight. And so, I mean, it seems like when he collapsed -- and I don't know if there was a collapsing or what happened, but it doesn't seem like she wasn't right there to alert very quickly.
Q. But you don't intend to testify at trial that you know 30 seconds passed or no time passed?
A. I think we've established I'm not really looking to say I can tell you exact time frames, and so no, I wouldn't in that regard either.
Q. Is it your opinion that if CPR had commenced within X amount of time, Kevin Greenidge would have survived?
A. So kind of like I said before, you -- there's a percentage chance of survival, right, in any



one of these cases. I do believe that if he had gotten to CPR quicker, his chance of survival would be considerably higher.
Q. How much quicker?
A. So every minute counts. So again, I can't say a minute time frame, but, you know, it's a -- it's a delay. Right? Any delay causes him to have decreased survival.
Q. But you don't have an opinion that had he received CPR within five minutes, six minutes, seven minutes, his odds of surviving would be more probable than not; you can't say that as you sit here today?
A. No, I can --
MS. CROWE: Objection to form.
A. Right. So studies definitely have shown that if -- the sooner you get to CPR in general, the better your survival rate. Like if you get to CPR immediately, you start off at this level, let's say it's 80/90 percent. So a minute goes by, now you're down 5 percent, 7 percent, and each minute it decreases, right? There probably is a point to which you get where it's too late. Right? So after an hour, you're not going down minute by minute, because your rate has gone to zero.
BY MS. KNUDSEN:



Q. Okay. What is the point here at which his odds go from he likely would have survived to he wouldn't have survived?
A. It's impossible for me to give you like a time-exact stamp of when it went from -- like you want me to give like a survival ratio?
Q. Yes.
A. Yeah. I -- I mean, like, that would be folly for me to claim that I could do that.
Q. So is it fair to say that your opinion is that sooner is better with respect to CPR but you can't state with any certainty at what point Kevin Greenidge would have survived if he had received CPR X amount of time sooner?
MS. CROWE: Object to the form.
A. So the study I produced shows that in every child, right, that has an out-of-hospital event that gets an AED shock, their survival to hospital was 71.4 percent. Right? And so even within those kids -- they survived at 71.4 percent. Imagine the ones that got CPR immediately. Their survival is probably up at 90-something percent, right?
And so I tried to find the closest corollary to what was happening here to say like: Hey, we know that in all these kids, whenever CPR is



started, their survival is 71.4 percent. We know that it gets worse and degrades over time, right? And so we -- and we know there was delay in this case for him to get to CPR. And so those two together show that he had a way-better-than-coin-flip odds of surviving, and we know that that went considerably worse over time and we know he didn't survive. So...
MS. KNUDSEN: I object to the non-responsive portions of that answer.
BY MS. KNUDSEN:
Q. The study that you're referencing is -- does not concern the survival for cardiac arrest on an airplane, right?
A. No, but the -- the study that I did review from your expert witness is not at a corollary of this case.
MS. KNUDSEN: Objection to the non-responsive portions of the answer.
BY MS. KNUDSEN:
Q. I'm talking about the study that you keep referring back to. And you said that you tried to find --
MS. CROWE: Objection to form.
BY MS. KNUDSEN:
Q. Hold on a second.

Page 66

-- you tried to find the closest corollary to this case?
A. Correct.
Q. And that study didn't have to do with cardiac arrest on an airplane, right?
A. Correct. There is not a study that I know that exists of pediatric patients' arrests on airplanes. It doesn't exist.
Q. Are you familiar with studies that do consider cardiac arrests on airplanes?
A. Yes.
Q. Did you review those in connection with your opinions?
A. Everything I reviewed is in either your -- kind of what I put here, and I did review your experts'.
Q. The study you're referring to also doesn't concern patients with a non-shockable initial rhythm?
A. Oh, it absolutely does.
Q. It does?
A. Mm-hmm. Actual and a non-shockable initial rhythm survive, but it's pretty much the exact same rate, about 70 percent. So the difference between a non-shockable initial and shockable initial in that study, there's no differentiation.

Page 67

Q. No differentiation in the study that you cite to?
A. It's like 1 percent.
Q. And the study that you cite to also concerns EMS coming within a matter of minutes, correct?
A. No. The study actually is based on bystanders providing an AED shock, and that those rates are better, actually, than EMS coming. Bystanders do better because it's temporally related, right? So if you wait until an EMS arrives and they provide the shock, the survival is actually worse. So when I say I got the exact corollary as close as possible, I got the exact corollary as close as possible; bystanders, non-medically trained personnel, out-of-hospital arrests in a pediatric patient.
Q. And it's your testimony that whether the initial rhythm is shockable or non-shockable is totally immaterial to the survival rate?
MS. CROWE: Object to the form.
A. No, that's not what I said. You -- you referenced my specific study, and in that study, it didn't, right? There definitely is literature that states if someone is in a non-shockable rhythm versus a shockable rhythm when you start the AED, survival is

Page 68

worse for someone that is in a non-shockable rhythm.
BY MS. KNUDSEN:
Q. And you understand that Kevin Greenidge was in a non-shockable rhythm when this AED started?
A. Right. By the time he was brought back, after the delay, by the time they put him on the AED, he was in a non-shockable rhythm. But they did get him back to a shockable rhythm, which also in multiple studies has shown to greatly improve your chances of survival by multiple fold. It could be tenfold. So the fact that he was able to get back in that shockable rhythm points to the fact that he probably was in it to begin with before the delay.
Q. Is it your opinion that that shockable rhythm was a normal heart rate?
A. No. No -- an AED won't shock if you're in a normal heart rate. Like if -- if you put an AED on me, it's not going to shock me, right, because I'm just beating along, right?
Q. Right.
A. You -- he was, I believe, to be in ventricular fibrillation, then it reads that and then it shocks that.
Q. So earlier when you referenced showing the EKG to your boss to confirm whether Kevin was in

Page 69

ventricular fibrillation, was that just prior to him receiving a shock?
A. You're -- you're asking me the -- you thought -- if I thought he was in V-fib before he received a shock?
Q. At what point was Kevin in V-fib?
MS. CROWE: Object to the form.
A. Right. So throughout the tracing -- you know, tracings on an AED are very muddy because there's CPR going on too, so a lot of times you see the CPR, so we don't know what he was in during that. He's in like kind of PEA, pulseless electrical activity, at times, but there's a fine gradation kind of between that and can be like a fine V-fib or V-tach, ventricular tachycardia. But for the shockable rhythm that he presented in -- like at a certain time within the AED, I believe was when ventricular fibrillation, yes, before, like, American provided us as the rhythm strip indicated that a shock was indicated.
BY MS. KNUDSEN:
Q. And what basis do you have for your opinion that the fact that he, in your opinion, reached V-fib at some point means that he was likely in V-fib prior to CPR being administered?
A. Right. So in general, when someone has a

Page 70

cardiac event, right, you can end up in just like, boom, flat line, there's nothing there, or they in general will start in some kind of ventricular fibrillation, like a shockable rhythm. I can't say for certain he was. I can tell you that delay in time decreases the likelihood for him to be in a shockable rhythm, right?

So if you take me and I fall down right now, boom, and you come and put the AED on me, after an hour I'm very unlikely to be in a shockable rhythm, right? But if you get me back to that shockable rhythm, it points to the fact that my heart was -- still has the capacity, right? And so the fact that they got him back to a shockable rhythm shows that his heart wasn't just like gone-gone. And it's just kind of common sense that the quicker you get to somebody if they start in a little bit of V-fib, every minute the likelihood of that happening decreases.

So to say like, "Oh, hey, he was in a non-shockable rhythm when we put on the AED," it's like, well, yeah, he was probably in a non-shockable rhythm because it took quite some time to get him on to that AED. We don't know for certain what happened in however many minutes before that. But the fact that he got back to a shockable rhythm shows that there was

Page 71

hope. His heart wanted to live, it wanted to beat. The quicker you get to it and start that CPR and get that AED on, the more likely he's going to be in a shockable rhythm. That's just kind of common sense.

Q. But you can't state with certainty that he was in V-fib or any other shockable rhythm prior to receiving CPR?

A. I cannot.

Q. I believe you stated that while you can't say if CPR had commenced within X amount of time, he would have survived, you can say his prognosis would have improved; is that right?

A. The quicker you get to CPR, the higher the likelihood of survival, yes.

Q. And by what amount would his prognosis have improved each minute?

MS. CROWE: Object to the form.

A. Right. So studies in general, you know, there's some that say 10 percent per minute, some I've seen say 7. I saw one that said -- it's like -- no, 7's probably, about 7 to 10 I would say. Maybe 5 to 10. I don't know. It's difficult to know exactly. Different studies kind of show different things, I think, but I think the article that -- the one I actually reviewed for this case, the one that Dr. Dimas

Page 72

provided, said 10 percent per minute.

BY MS. KNUDSEN:

Q. The article Dr. Dimas provided, in your opinion, states that his prognosis would have improved 10 percent per minute?

MS. CROWE: Object to the form.

A. Well, you're kind of stating it backwards, I guess. So let's say you start off with 90 percent survivability. That article, I think, stated for every minute delay, your survivability goes down by 10 percent.

BY MS. KNUDSEN:

Q. Okay. And what percentage of survivability was Kevin Greenidge starting out with?

MS. CROWE: Object to the form.

A. That's impossible to say. But again, the studies that I cited show that if you take everyone in this age group that has an out-of-hospital arrest that ends up getting a shock, they end up surviving to 71 percent, right? So some of them are going to have a hundred percent likelihood of survival, some are going to have zero. But on that range, the people that actually end up surviving at the hospital is 71.2 percent or 4 percent.

And so, theoretically, he's somewhere in

Page 73

that range, if not higher, when it first starts because we know that in that study they didn't all get a CPR, an AED shock immediately. So I can't tell you the exact -- his exact number. I can just kind of relate to children in similar circumstances and what their survival rate ends up being.

BY MS. KNUDSEN:

Q. Did you say 2 to 4 percent?

A. Do what?

Q. What percentage did you say? I think I misheard you. Did you say to 2 to 4 percent?

A. 71.4.

Q. 71.4 percent?

A. Yeah.

Q. And that's children who receive an AED shock on the ground?

A. Out-of-hospital by pass -- by lay people. But in this case, you don't -- that's an amount -- that's like thousands of kids, right? So like some of those kids are going to start off at 100, some of them are going to start off at less, so I can't tell you exactly what level Kevin started at.

Q. So is it fair to say that even if Kevin had been removed from his seat in two minutes, those two minutes would contribute to him not surviving the

Page 102

that we just looked at is somehow unreliable, is it?
A. I mean, it was produced by American. We -- I'm working under the assumption that this is the strip from Kevin, but I'm not saying the strip itself is unreliable, no.
Q. How many heart attacks in children have you seen that present as cardiac arrest?
A. Heart attacks have I personally seen?
Q. Correct.
A. Oh, jeez. So you're saying like the diagnosis is heart attack?
Q. Yes.
A. Or are you just saying cardiac arrest?
Q. How many heart attacks -- how many --
A. Heart attack? Like, we don't use the word "heart attack" in that sense. So like define what you mean by "heart attack."
Q. Well, how many cardiac --
A. People that had cardiac arrests?
Q. How many cardiac arrests have you seen in children?
A. I would say more than 50, less than 100, but -- well, maybe more than 100 actually. Cardiac arrest where a child arrests? Yeah, that's actually dozens. There may be more than a hundred.

Page 103

Q. Okay. So more than 50, less -- sorry. What's the --
A. Let -- let me say approximately 100 -- 100 to 150 I would guess. Gosh, I'd have to do the math on that. I've been in practice a long time, so it may be more actually. Over 100. How about that?
Q. Okay. And what was the mechanism of Kevin's myocardial infarction?
MS. CROWE: Object to the form.
A. One, we don't know that he had a myocardial infarction, right? Like, so that is what a layperson would call a heart attack and I have no idea of knowing that.
BY MS. KNUDSEN:
Q. You have no idea of knowing if he had a heart attack?
A. Correct. But like a heart attack being -- like when -- you need to define what you're saying by "heart attack." He had a cardiac arrest, but that's not the same thing. Those two terms aren't equivalent.
Q. What's the cause of death, in your opinion?
A. I'm not here to opine on his cause of death. He had cardiopulmonary arrest. He died because his heart stopped and he stopped breathing, but I can't make an opinion on what caused that to happen.

Page 104

Q. But you say it's not myocardial infarction?
A. No, that's definitely one of the -- I mean, there's probably 10 different things that could have done it. You said, "What causes myocardial infarction?" We don't know it was a myocardial infarction, right? You're -- a myocardial infarction is like a -- you -- like you don't get blood to your heart so it stops, right? A heart attack. We know he had his heart stopped but that could have been by various different causes that aren't a, quote, heart attack. You understand what I'm saying?
Q. And you have no opinion as to what the cause was?
A. No, I mean, I -- no.
Q. So it's not your opinion that it wasn't a myocardial infarction, it's just that you don't know whether or not it was a myocardial infarction?
A. You got it. Exactly. Right. No, he definitely could have had a myocardial infarction, but I don't know that. No one can know that.
Q. Have you seen any cases of children with a myocardial infarction?
A. Absolutely.
Q. How many?
A. I can't give you a number exactly. I mean,

Page 105

gosh, you know, the same thing happens with us, right? Like if you come into the ER and your heart stops, we don't diagnose you at that point like you had a heart attack, right? We know that your heart stopped for whatever purpose. So I can't give you a number that states exactly how many were myocardial infarctions.
MS. CROWE: Okay, Meredith, we've been going about an hour. Can we take a break?
MS. KNUDSEN: Sure.
THE VIDEOGRAPHER: We're off the record at 12:24 p.m. This is the end of file number 2.
(Break from 12:25 p.m. until 12:40 p.m.)
THE VIDEOGRAPHER: We are back on the record at 12:40 p.m. This is the beginning of file number 3.
BY MS. KNUDSEN:
Q. Okay, Dr. Warmink, we took a short break. Do you understand you're still under oath?
A. Yes, ma'am.
Q. We were looking earlier at the AED strip from the flight marked as Deposition Exhibit 5. You would agree with me that the initial rhythm is one of asystole, correct?
A. Pulseless electrical activity maybe.
Q. On page 213?

Page 106

A. Yeah, it's -- it's hard to say if that's asystole or pulseless electrical activity.
Q. You can't be certain which it is?
A. No, because it's hard to know exactly where it begins, right? And so, you know, I would say there's a portion that's -- that's PEA and a portion that's asystole, I would guess.
Q. Which portion is pulseless electrical activity?
A. It's at the very beginning there. I don't know if that's residual or that's him, you know. On the line two, I don't know if that's like him starting in PEA and then going to asystole or not.
Q. Okay. And for the record, you're referring to the time that's marked between 50 and 55 seconds --
A. Yes.
Q. -- those are the graphics you're looking at?
A. Yeah, I don't know exactly what that represents.
Q. Okay.
A. I -- yeah.
Q. After that blip or --
A. Right. From 55 to the next page, that does look like asystole, I believe.

Page 107

Q. Okay.
A. Yeah.
Q. And what are some causes of asystole?
A. Like -- like your heart stops, right? So a heart attack like you talked about or do you want a list of how many ways your heart might stop?
Q. Well, is low oxygen a cause of asystole?
A. So -- of asystole? So like of your heart stopping? It -- it can, yes. Sure. Yes.
Q. Okay. And stroke could be a cause of asystole?
A. Yes.
Q. What causes of cardiac arrest result in ventricular fibrillation or tachycardia?
A. I mean, anything that causes asystole can also do that, theoretically. I mean, like your heart kind of stops and it will go into certain rhythms as it's like either trying to come back or just slowly going into decline. So it's not like there's any particular like this thing causes you to do one or the other - you know what I'm saying - in my mind.
Q. It could be any number of things?
A. Correct.
Q. Including a cerebral hemorrhage?
A. Yes.

Page 108

Q. Or a pulmonary embolus?
A. Those are one of the options, yes.
Q. Your report says that the delays which we've previously talked about contributed to Kevin not surviving the event, and we've talked some about contributed to one extent. And I believe your testimony is - and correct me if I'm wrong - that your opinion is based on the fact that the chance of survival diminishes for every minute that passes; is that correct?
A. Right. I think -- I can't give you an exact number of what his survivability was at any point, but we do know that time is of the essence and that decreases your chance of survival.
Q. And in your report you cite, "diminishes survival by 7 to 10 percent." Which article did those numbers come from?
A. Actually, your -- I think Dimas's article that she cited had that in there.
Q. Okay. You had not reviewed Dimas's article at the time you wrote this Deposition Exhibit 1?
A. Correct. Where I do say 7 to 10 percent?
Q. It's on page 3.
A. Page 3. Okay. Maybe that's in one of my journal articles. I'd have to look at which one.

Page 109

MS. CROWE: Where are you looking at?
BY MS. KNUDSEN:
Q. Let me find it on the page. Okay. It's the second full paragraph --
MS. CROWE: I got it.
BY MS. KNUDSEN:
Q. -- halfway down the page, "The chance of survival diminishes by 7 to 10 percent" --
A. Right.
Q. -- "for every minute that passes."
A. Yeah. It's in one of -- obviously in one of these journal articles that I cited. I can't tell you exactly which one. Probably number 3, I would guess, Ibrahim, because the Weisfeldt one's about defibrillators. Yeah. It's in one of these articles. And actually her article maybe references one of these art -- you know, but it's all very self-referential at a point with references. And so, yeah, it's in one of these. It's either, I would say, 2 -- 1, 2 or 3 probably, but I can't tell you the exact one. Sorry.
Q. Okay. It's in one of these articles?
A. Yeah, yeah. I wouldn't -- that wasn't just off the top of my head. I promise you that. That came from one of these articles.
Q. You would agree with me that the resources

Page 118

Q. Shockable rhythm and non-shockable rhythm?
A. Yeah, there's -- all the studies are different, right, so I don't have a specific number for each of those.
Q. Okay. Well, you keep -- the 71 percent number, that's a shockable rhythm, right?
A. No. Yeah, so we can pull the study. So I think in the study, the initial shock was like 71.4 and then the non-shockable rhythm is like 70.2.
Q. And that's an asystole -- asystolic rhythm?
A. Right, that's non-shockable.
Q. And your testimony is that that's 71.2 percent --
A. No, 71.4 was both of them together. So I can't remember if it was like -- I think 72 percent was shockable and -- may be either 70 or 69, but it added up to 71.4. So the differential between the shockable rhythm and non-shockable was like 1 percent, one and a half percent.
Q. And that's contained in one of these six --
A. Menant term. It's a French study.
MS. CROWE: Rebuttal.
A. On the rebuttal. It's brand-new. It's actually was like from January 2025.
BY MS. KNUDSEN:

Page 119

Q. Okay. So it's your testimony that the Menant study is the one that says the differential -- differential between a shockable and non-shockable rhythm is something --
A. Negligible, right.
Q. Negligible?
A. There are other studies that I'm sure you will be able to provide that show that that number is greater. I don't think they're appropriate to this setting in that a lot of them aren't pediatric, a lot of them aren't pediatric out-of-hospital events that have layperson AED. So again, I just tried to get the one that was the closest corollary to what we have here.
Q. Not on an airplane, right?
MS. CROWE: Asked and answered.
A. That study was not on an airplane, no.
BY MS. KNUDSEN:
Q. To what degree did Kevin's prior medical conditions contribute to him not surviving the event?
A. That's impossible to state, you know. I mean, he had asthma, we know. He definitely could have arrested due to his asthma, so that contributed to the arrest. It didn't necessarily contribute to him not surviving. But I can't say a percentage of what his

Page 120

prior medical condition decreased his likelihood to survive. It's impossible to really conjecture even on.
Q. Is it more difficult to administer CPR on an obese patient?
A. I -- I think it's pretty standardly accepted that that is a yes, it's more difficult just because of their body size.
Q. Did any of the studies that you reference in either your initial report or rebuttal report pertain to the administration of CPR on obese patients?
A. The ones in my declaration and my rebuttal --
Q. Correct?
A. -- that I referenced?
Q. Correct.
A. I don't believe so.
Q. Have you ever seen obesity affect the efficacy of a shock from an AED?
A. No, not that I recall.
Q. Looking now at page 3 of your report.
A. Need a bigger font. Need my glasses.
Q. You discuss the death certificate listing myocardial infarction, hemorrhagic cerebral vascular event and diabetes, and say that's confounding. Is it your opinion that the Mexican authorities are mistaken

Page 121

as to the cause of death?
A. You know, that whole death certificate is -- it's quite mysterious, like how that was formed and who formed that. I don't know if that's based on any like medical determination that they made or they just like: Let's list some things that can cause death. Like, I -- there's nothing that backs it up. The ER doc just wrote like cardio -- cardiac arrest, like he was real nonspecific. So I -- it's just -- I don't know where they got -- I mean, he has a history of diabetes but there's nothing that shows that he was in any kind of diabetic crisis or anything, from what we have at the ER. I don't know why they would say hemorrhagic cerebral vascular event. I -- there's no event of that that I've seen in any other record.
Myocardial infarction is -- could have caused cardiac arrest, but that's -- it's almost like they said: What's the top things that can kill somebody? Heart attack and stroke, and let's throw in diabetes because we know he had diabetes. So yeah, I don't know, it's -- it's -- it's kind of a confusing document, honestly.
Q. So is it fair to say that you're not disagreeing, you're just not understanding the basis for the document?

Page 126

BY MS. KNUDSEN:
Q. But that's something you think would be helpful to your analysis?
MS. CROWE: Object to the form. Misstates testimony.
A. I mean, I think any information that I can receive about Kevin's care is helpful in, like, outcome. So...
BY MS. KNUDSEN:
Q. Would that assist in your determination of the survivability of the event?
A. Not necessarily, because no matter what caused it, we're talking about getting him to live to get off the airplane, right? And so if he had a stroke, that doesn't change that fact. If he had a heart attack, it doesn't change that fact. If he had rhabdomyolysis, it doesn't change that fact. Right?
It change -- well, basically, what I'm looking at is: He had an event. Did we get him back? Right? And so his heart showed that it wanted to come back. It got to a rhythm. And so kind of the cause of what got him there doesn't really -- it wouldn't change my opinion.
Q. It's your testimony that the cause of death wouldn't alter the survivability of the event?

Page 127

MS. CROWE: Object to the form.
A. It's my opinion that the cause of his arrest would not change the survivability of him getting off that airplane.
BY MS. KNUDSEN:
Q. Of him getting off that airplane alive?
A. Alive, right. Right. It would change the long-term potential for him, but none of those that are listed would change my opinion that the delay caused him to have a significant decreased likelihood of survival, no. Because I was aware of them all. Like I knew that they had said that, and so -- I didn't know where it came from, but like that was also part of my forming the opinion that there's a chance he had a stroke, there's a chance he had a heart attack, there's a chance it was diabetes. Right? So like I was aware. This isn't new to me.
Q. And if he had had a stroke, your opinion regarding his survivability would not change the outcome?
MS. CROWE: Asked and answered.
A. Correct.
BY MS. KNUDSEN:
Q. If it took less than 10 to 15 minutes to get Kevin out of his seat, would you still believe that

Page 128

the delay decreased Kevin's chances of survival critically?
MS. CROWE: Object to the form.
A. You know, I feel like we've covered this before, but every minute decreased his likelihood of survival. So there's not a threshold number to which I would change my opinion that a delay decreases survivability, no.
BY MS. KNUDSEN:
Q. Do you know if ventilators are available on planes?
A. I do not believe ventilators are available on planes.
Q. Would that be helpful in an instance of a stroke?
MS. CROWE: Object to the form.
A. Would a ventilator be helpful? If a patient is not breathing, a ventilator assists with breathing. There's plenty of strokes where patients are breathing that would not be an assistance. So a ventilator wouldn't have been a -- I mean, if we had a ventilator, 100 percent it's a different outcome at all? No.
BY MS. KNUDSEN:
Q. You talked about percentage of decrease in

Page 129

survivability caused by delay, right? Do you recall that testimony?
A. It's in my report, correct? We talked about it before already.
Q. Yes, and I'm referring to your testimony here today.
A. My testimony, okay. Yes, we talked about decreases in survivability based on time. Yes.
Q. So my question to follow up on that is: Is that decrease a percentage-point decrease or a percentage decrease?
A. What?
Q. Do you understand --
A. I do not understand.
Q. -- the difference?
A. No.
Q. Okay. If the percentage that we're starting out is 50 percent and then you said every minute, 7 to 10 percent decrease, is that 7 percent of 50 percent or are you saying 7 percentage points?
Do you understand the distinction?
A. So you're saying like is it an aggregate. If you go from 50 to 43, then is it from 43 to 36 or is it 70 percent down from 43 --
Q. Yes.

Page 130

A. -- right?
Q. My question is: In which way are you -- do you understand the literature to measure the percentage decrease?
A. Yeah, I mean, it'd be a lot easier if we actually pull -- like do you have an article that would -- let's pull up an article and look at it, because I think every article, they may report it differently, right? I don't think there's a standard measure by which medical journals report decreases in survivability, right? So one may -- it may be exactly what you said. It may be: Hey, we start at 80 percent, now it's 73, now it's down 7 percent, but I think the majority of them would say: It's 7 percent each time from that number, right, not at -- absent 7 percent from 100. But I'd have to look at an article because different articles, I think, do it different. There's -- there's not a lot of standardization in CPR survival rate reportability in articles. You know what I'm saying? It's not like a standard form that everyone follows, so they're all -- they're -- they're different.
Q. Okay. So when you say in your report that it's a 7 to 10 percent decrease every minute, you're not sure if that's a percentage point?

Page 131

A. Yeah, I would have to look at the -- the exact article.
Q. Okay. And those would be found in articles 1 through 6 in your report?
A. Yeah. Yeah. So, I mean, I think -- I mean, we -- I could sit here and do the math on it. I don't think that makes an appreciable difference really. I mean, it'll be a fine difference, but if you take it down 7 percent every minute or just like a standard 7 percent versus 7 percent from the number, you're not going to end up with like vast differences in survivability over time.
Q. Okay. But you're not sure how to do that calculation here today?
MS. CROWE: Object to form.
A. I mean... What do you mean? I could do the calculation. Like, do you want me to do it?
BY MS. KNUDSEN:
Q. Well, I don't know if you can if you're not sure if it's a percentage point decrease or a percentage decrease.
A. No, I can -- let's do it. If you want me to take a number and say, "I'm going to absolutely subtract 7 from it each time," I can do that, and then I'll take a number and subtract 7 percent from it each

Page 132

time, and then we'll see what the difference is.
Q. Which one's the accurate method to do it is my question?
MS. CROWE: Asked and answered.
A. So I'm referencing studies. They chose a way to do it. I can't tell you exactly which method they took in that study because there's different studies that I reference, right? And one study may have done it one way and one may have done it a different way. So we could pull up the studies and look at that and then kind of reverse engineer it and see what -- how they did it.
BY MS. KNUDSEN:
Q. Did you do that exercise in forming your opinion in your report?
MS. CROWE: Object to the form.
A. Did I actually calculate out the numbers myself?
BY MS. KNUDSEN:
Q. Correct.
A. I did not.
Q. Okay. Okay. In your report on page 2 towards the bottom of the page, you say, "At some point during the flight, Kevin's body released multiple bodily fluids and it became apparent to all involved,

Page 133

including the physician at the scene, that he was deceased."
Do you see that?
A. Where are you at on my report?
Q. In your report towards the bottom of page 2, probably fourth sentence up.
A. So on 2, I have physician at the -- "some point," yes, I got it. Okay. Yes. What is your question?
Q. Do you have an opinion as to time of death?
A. Time of death? No. I mean, I do think he -- he died on that flight, but exactly when, it's hard to say.
Q. Putting time aside, do you have an opinion based on the events at what point he was deceased?
A. Well, I mean, I think -- you know, time of death is a -- a label that we put on someone. Like how do you define death, right? So like what is your definition of death?
Q. Well, I'm not here to testify today, so I'm asking you: Based on your definition of death as a medical professional, at what point did you consider Kevin to be deceased based on the testimony and declarations that you read?
A. Well, I think that's kind of just what we

Page 158

life support is not available on an airplane, right?
A. Define "advanced life support."
Q. Well, how would you define "advanced life support"?
A. CPR. They can do CPR. They have an AED. That's advanced.
Q. Okay. What else is advanced life support, in your medical opinion?
A. I think CPR and AED is advanced life support.
Q. Anything else?
A. I mean, if you want to get into like the full-on PALS algorithm, that involves medications, right, like epinephrine, various medications.
Q. Okay.
A. Yeah, I guess it depends on how you would define "advanced."
Q. And how is the epinephrine administered with respect to advanced life support saving measures?
A. It depends on kind of what access you have. You can do it through an ET tube. You can do it subcutaneously. You can do it through an IV --
Q. Is there a preferred method?
A. -- interosseous. Hmm?
Q. Is there a preferred method?

Page 159

MS. CROWE: Object to the form.
BY MS. KNUDSEN:
Q. In your view?
A. Yeah, I'd say the standard is subcu until you obtain IV access, and then you would use an IV. But if you -- you can also put it through their ET tube, if they have a tube. In kids, we put something called NIO in, which goes into their tibia. So you can use that too.
Q. So in your experience, when a patient presents in cardiac arrest, you would first try to administer epinephrine subcutaneously?
A. If they didn't have an IV. If they had an IV, you could use the IV.
Q. IV would be preferred to subcutaneous?
A. Yes.
Q. Okay. I'm going to ask you if you are offering opinions on certain categories. And understand that I'm not asking you to give these opinions. It's simply me trying to find out what you intend to testify at -- at this trial.
A. Okay.
Q. Do you intend to offer an opinion as to whether the AED was functional?
A. Whether the AED was functional. So the

Page 160

AED, we believe, from the strip that was produced by American, was functioning.
Q. Okay.
A. I do have a question of whether that shock was delivered to Kevin.
Q. And you don't have any training in aircraft maintenance, right?
A. I do not.
Q. You don't have any training in AED inspection, right?
A. That is correct.
Q. And you don't have any training in AED maintenance?
A. I do not.
Q. Do you intend to offer an opinion in this case as to whether or not the flight attendants acted negligently?
A. No, I don't think that is my scope.
Q. Do you intend to offer any opinion -- any opinion in this case as to whether or not the plane should have diverted sooner?
A. I -- yeah, that's not on my radar screen at all -- all know.
Q. I'm sorry, did you say, "not on my radar"?
A. Yes.

Page 161

Q. Is that what you said?
A. That is not something I'm going to opine upon, no. It's a flight joke, radar screen.
Q. And you have no opinion as to whether there was a delay in diverting or landing?
A. I wasn't asked to formulate an opinion on that. I'm not going to create one before trial.
Q. Okay. Do you intend to supplement either your initial report or your rebuttal report as you -- as you sit here today?
A. Unless there's information that I receive further, no.
Q. Based on the information you've received as of today, you have no plans to supplement either your initial or rebuttal report; is that fair?
A. Correct.
Q. Do you want to correct anything in either your initial or rebuttal report?
A. I don't believe so, no.
MS. KNUDSEN: If we could go off for five minutes while I review my notes real quick.
MS. CROWE: Okay.
MS. KNUDSEN: Almost done.
THE VIDEOGRAPHER: We're off the record at 2:05 p.m.

Page 162

(Break from 2:05 p.m. until 2:10 p.m.)

THE VIDEOGRAPHER: We're back on the record at 2:10 p.m.

MS. KNUDSEN: Okay. At this time, I'll pass the witness. Thank you very much, Dr. Warmink.

THE WITNESS: Thank you.

MS. CROWE: And we will reserve ours for trial.

THE VIDEOGRAPHER: We're off the record at 2:10 p.m. This is the end of file number 4.

(Time noted: 2:11 p.m.)

-o0o-

Page 163

CHANGES AND SIGNATURE

WITNESS: DR. CORWIN WARMINK

DATE: January 22, 2025

Page/Line Change Reason

_______________________________________________________________________

(lines 5–25 blank)

Page 164

I, DR. CORWIN WARMINK, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

________________________________
DR. CORWIN WARMINK

STATE OF __________)
COUNTY OF __________)

Before me __________________ on this day personally appeared DR. CORWIN WARMINK, known to me (or proved to me on the oath of __________________ or through __________________ (description of identity card or other document)) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this ______ day of _____________, _______.

________________________________
Notary Public in and for the
State of ___________

Page 165

REPORTER'S CERTIFICATION

DEPOSITION OF DR. CORWIN WARMINK

January 22, 2025

I, Joseph D. Hendrick, Notary Public and Certified Shorthand Reporter in the State of Texas, hereby certify to the following:

That the Witness, DR. CORWIN WARMINK, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

I further certify that pursuant to FRCP Rule 30(f)(1) the signature of the deponent:

X was requested by the deponent or a party before the completion of the deposition and is to be returned within 30 days from date of receipt of the transcript;

___________ was not requested by the deponent or a party before the completion of the deposition;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken;

Further, I am not a relative or employee of any attorney of record, nor am I financially or

Page 166

otherwise interested in the outcome of the action.

Subscribed and sworn to on this date:

February 4, 2025.

Joseph D. Hendrick, CSR #947
Expiration Date: 04/30/2025
Notary Comm. Exp. 02/13/27
Veritext Legal Solutions
Firm Registration No. 571
300 Throckmorton Street, Ste. 1600
Fort Worth, TX 76102
Telephone (800) 336-4000

Attorney Times:
Meredith W. Knudsen - 03:26:03
All Other Counsel - 00:00:00

Page 167

Hannah Crowe, Esq.
hcrowe@burnscharest.com

February 4, 2025

RE: Arzu, Melissa Suzette v. American Airlines, Inc
1/22/2025, Dr. Corwin Warmink (#7124620)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at (Erratas-CS@veritext.com).

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions

# Exhibit J

***(Filed Under Seal)***

# Exhibit K

***(Filed Under Seal)***

# Exhibit L

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

MELISSA SUZETTE ARZU, )
Individually and as the )
Administrator of the )
Estate of KEVIN GREENIDGE, )
Deceased, )
)
Plaintiff, )
)
VS. ) CIVIL ACTION NO.
) 4:24-cv-00433-P
AMERICAN AIRLINES, INC., )
)
Defendant. )

-----------------------------------
ORAL AND VIDEO DEPOSITION OF
RICHARD LEVY
JANUARY 24, 2025
-----------------------------------

ORAL AND VIDEO DEPOSITION OF RICHARD LEVY, produced as a witness at the instance of the DEFENDANT, and duly sworn, was taken in the above-styled and -numbered cause on January 24, 2025, from 10:16 a.m. to 1:02 p.m., before Mercedes Arellano, CSR in and for the State of Texas, reported by machine shorthand, at the law offices of BURNS CHAREST, LLP, 900 Jackson Street, Suite 500, Dallas, Texas, pursuant to the Federal Rules of Civil Procedure.

Job No. CS7064389

A P P E A R A N C E S

FOR THE PLAINTIFF:

Hannah M. Crowe
and Clay Mahaffey
BURNS CHAREST LLP
900 Jackson Street
Suite 500
Dallas, Texas 75202
(469) 904-4550
hcrowe@burnscharest.com

FOR THE DEFENDANT:

Shauna Wright
KELLY HART & HALLMAN LLP
201 Main Street
Suite 2500
Fort Worth, Texas 76102
(817) 332-2500
shauna.wright@kellyhart.com

ALSO PRESENT:

William Blalock, Via Zoom
Anna Kate Benedict, Via Zoom
Patrick Salvant, Videographer



INDEX


| | PAGE |
|---|---|
| Appearances | 2 |
| Proceedings | 4 |
| RICHARD LEVY | |
| Examination by Shauna Wright | 6 |
| Examination by Hannah M. Crowe | 114 |
| Signature and Changes | 120 |
| Reporter's Certificate | 123 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Richard J. Levy's expert report | 18 |
| 2 | Flight Operations Manual Bates AA000064 | 39 |
| 3 | Medical Emergencies Bates AA000065 and AA000066 | 41 |
| 4 | Declaration of Dr. Rachael Amador | 54 |
| 5 | Declaration of Miguel Diaz Rosales | 63 |




P R O C E E D I N G S

THE VIDEOGRAPHER: Good morning. We are going on the record at 10:16 a.m., on January 24th, 2025.

Please note that this deposition is being conducted virtually, as well as in person. Quality of recording depends on the quality of camera and Internet connection of participants. What is seen from the witness and heard on screen is what will be recorded.

Audio and video recording will continue to take place unless all parties agree to go off the rec- -- record.

This is Media Unit 1 of the video recorded deposition of Captain Richard Lev- -- Levy, taken by counsel for the Defendant in the matter of Melissa Suzette Arzu, individually and as the Administrator of the Estate of Krevin -- Kevin Greenidge, Deceased, versus American Airlines, Inc.

This case is filed in the United States District Court for the Northern District of Texas, Fort Worth Division, Case Number 4:24-cv-00433-P.

The location of the deposition is the offices of Burns Charest, located at 900 Jackson Street, Suite 500, Dallas, Texas 75202.



My name is Patrick Salvant, representing Veritext, and I'm the videographer. The court reporter is Mercedes Arellano, also from Veritext.

I am not authorized to administer an oath. I am not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance.

Counsel and all present, including remotely, will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MS. CROWE: Noticing attorney.

MS. WRIGHT: Shauna Wright on behalf of American Airlines, Incorporated.

MS. CROWE: Hannah Crowe on behalf of the Plaintiff.

MR. MAHAFFEY: Clayton Mahaffey on behalf of the Plaintiff.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness, and then Counsel may proceed.

RICHARD LEVY,

having been first duly sworn, testified as follows:

Page 82

summary, San Pedro Sula would be closer by 23 minutes.
And then 0006 UTC coordinates, 184 miles from San Pedro Sula, 352 nautical miles from Cancun. San Pedro Sula is closer by 168 nautical miles. Flying time, San Pedro Sula, 23 minutes; Cancun, 44 minutes. San Pedro Sula is closer by 21 minutes.
And then 0011 UTC, those are coordinates. This is San Pedro Sula is 224 nautical miles versus Cancun 312 nautical miles, 88 nautical miles closer to go to San Pedro Sula. Flying time to San Pedro Sula, 28 minutes versus Cancun, 39 minutes. San Pedro Sula is closer by 11 minutes
Q. Okay. Let's talk about the first column. It says: Time (UTC).
Do you see that?
A. I do.
Q. So all of those times right there in that first column, 0005, 0006, and 0011.
Do you see those?
A. I do.
Q. All of those are based upon the testimony you have given so far about how you determined when to calculate the time, correct?
MS. CROWE: Object to the form.
A. That is correct.

Page 83

Q. (BY MS. WRIGHT) Okay. So in order for this entire chart to be valid and reliable, the numbers in the first column have to be right, correct?
A. Correct.
Q. Because the rest of the chart is built off the assumptions in the first column, correct?
A. Correct.
Q. Okay. You would agree, wouldn't you, that -- well let me ask you this.
Your opinions in this chart about proximity of SAP is based on your opinion that the flight was closer to SAP in miles than it was to Cancun when she screamed, right?
A. Right.
Q. You would agree that the pilots did divert immediately once they knew of the emergency, correct?
A. Correct.
Q. And you would agree that they diverted to the closest airport at that time, right?
A. At that time, yes.
Q. Yes?
And that was Cancun, not SAP?
A. That was Cancun.
Q. Okay. You would also agree that Cancun was only 40 miles off the port side of the aircraft when

Page 84

they diverted?
A. I would agree with that.
Q. And after the emergency was declared, you would agree, based on what you've seen, that the pilots got the aircraft on the ground in 17 minutes?
A. I would agree. I don't remember exactly, but that sounds reasonable.
Q. And your opinion is simply that the flight crew should have alerted the flight deck sooner?
MS. CROWE: Object to the form. Misstates opinion.
A. Yes, the fl- -- the flight attendants, as part of the flight crew, should have notified the flight deck immediately.
Q. (BY MS. WRIGHT) Sooner than they did?
A. Yes.
Q. You have no opinion on the manner in which the flight diverted, correct?
MS. CROWE: Object to the form. Vague.
A. No objections to the way the flight diverted to Cancun.
Q. (BY MS. WRIGHT) You certainly don't hold the opinion that the diversion into Cancun was too slow, do you?
A. I do not hold that opinion.

Page 85

Q. And you have no opinion that it took too long to taxi to the gate where EMS was waiting, correct?
A. I have no opinion on that.
Q. You would agree that the evidence says it took three minutes, right?
A. I -- I would say yes.
Q. Okay. So you have no opinion on that either?
A. No.
Q. Okay. And you've testified that you are here as a pilot expert and not an expert on flight attendant policies, correct?
A. And I agree on that.
Q. And you are also not here as an expert on flight attendant reaction to emergency, correct?
MS. CROWE: Object to the form.
A. I'm -- I'm not a flight attendant expert, but I say that, as a pilot for almost 50 years, captain for a good part of that, as an instructor or check airman, when the crew is briefed to report to the flight deck any kind of emergency, any -- and includes a medical emergency, that gets done without hesitation.
Q. (BY MS. WRIGHT) So as soon as they're briefed on it, they need to tell you?
A. Briefed on it, notice it, and they have a shared mental model on it, they could tell somebody,

Page 118

the whole thing, but are you tracking?
A. I see that.
Q. Okay.
"Question: Well, if it had taken up to 15 minutes to remove Kevin to the aft galley to provide additional medical care, as the captain of your aircraft, would you hope that one of your flight attendants would notify you of a serious event like this as soon as possible?
"Answer: No comment."
Did I read that correctly?
A. You read that correctly.
Q. How did this testimony impact your opinion, if at all?
A. It did. I've never heard of a captain of any airline in the world not make a course change in the event of a serious event like this, immediately after consultation with the flight deck crew, air traffic control, and if necessary, the company, it depends, that there would be no comment. There is all kinds of comment.
MS. WRIGHT: Objection, nonresponsive.
Q. (BY MS. CROWE) You would have expected Captain Wingham to have a comment to that question?
A. I would expect him --

Page 119

MS. WRIGHT: Objection, calls for speculation. It's improper.
A. I would expect any captain, especially Captain Wingham, to have a clearcut three- or four-word answer diversion now.
Q. (BY MS. CROWE) Okay. Is it, in your experience as a pilot, reasonable to assume that no matter where you land, the faster you get on the ground, the faster the passenger can generally receive medical attention?
A. Yes.
MS. CROWE: Okay. Nothing further. We'll reserve the rest of ours for trial.
MS. WRIGHT: Thank you.
THE STENOGRAPHER: Do you need a copy of the transcript?
MS. CROWE: He'll read and sign.
THE VIDEOGRAPHER: We're off the record at 1:02 p.m.
This is the end of File Number 3.
(Deposition concluded at 1:02 p.m.)

Page 120

CHANGES AND SIGNATURE

WITNESS NAME: RICHARD LEVY DATE: JANUARY 24, 2025

PAGE LINE CHANGE REASON

______________________________________________
(lines 4–25 blank)

Job No. CS7064389

Page 121

I, RICHARD LEVY, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

______________________________
RICHARD LEVY

THE STATE OF __________)
COUNTY OF _____________)

Before me, ___________________________, on this day personally appeared RICHARD LEVY, known to me (or proved to me under oath or through ___________________________) (description of identity card or other document)) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this __________ day of ________________________, __________.

______________________________
NOTARY PUBLIC IN AND FOR
THE STATE OF ____________________
COMMISSION EXPIRES: _____________

Job No. CS7064389

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

MELISSA SUZETTE ARZU, )
Individually and as the )
Administrator of the )
Estate of KEVIN GREENIDGE, )
Deceased, )
)
Plaintiff, )
)
VS. ) CIVIL ACTION NO.
) 4:24-cv-00433-P
AMERICAN AIRLINES, INC., )
)
Defendant. )

-----------------------------------
ORAL AND VIDEO DEPOSITION OF
RICHARD LEVY
JANUARY 24, 2025
-----------------------------------

CERTIFIED STENOGRAPHIC

COURT REPORTER'S CERTIFICATE

I, Mercedes Arellano, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, RICHARD LEVY, was duly sworn by the officer and that the transcript of the oral



deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on ____________________ to the witness or to the attorney for the witness for examination, signature and return to me by ____________________;

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

FOR THE PLAINTIFF:
Hannah M. Crowe
and Clay Mahaffey
BURNS CHAREST LLP
900 Jackson Street
Suite 500
Dallas, Texas 75202
(469) 904-4550
hcrowe@burnscharest.com

FOR THE DEFENDANT:
Shauna Wright
KELLY HART & HALLMAN LLP
201 Main Street
Suite 2500
Fort Worth, Texas 76102
(817) 332-2500
shauna.wright@kellyhart.com



That $__________ is the deposition officer's charges to the Defendant for preparing the original deposition transcript and any copies of exhibits;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or ... hich this proceeding was ... not financially or ... outcome of the action.

... 13th day of February, 2025.



____________________________________
MERCEDES ARELLANO, Texas CSR 8395
Expiration Date: January 31, 2026
VERITEXT LEGAL SOLUTIONS
Firm No. 571
300 Throckmorton Street, Suite 1600
Fort Worth, Texas 76102
(817) 336-3042
(800) 336-4000



hcrowe@burnscharest.com
February 13, 2025
RE: Arzu, Melissa Suzette v. American Airlines, Inc, Et Al.
DEPOSITION OF: Captain Richard Levy 7064389

The above-referenced witness transcript is available for read and sign.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those on the attached Errata Sheet.

The witness should sign and notarize the attached Errata pages and return to Veritext at errata-tx@veritext.com.

According to applicable rules or agreements, if the witness fails to do so within the time allotted, a certified copy of the transcript may be used as if signed.

Yours,
Veritext Legal Solutions

# Exhibit M

***(Filed Under Seal)***

# Exhibit N

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| MELISSA SUZETTE ARZU, Individually and as the Administrator of the Estate of KEVIN GREENIDGE, Deceased,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN AIRLINES, INC.,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civ. No. 4:24-cv-00433-P |

**AMENDED COMPLAINT**

1. Plaintiff, Melissa Suzette Arzu, as an individual and as the Administrator of the Estate of Kevin Greenidge, Deceased ("Plaintiff"), by her undersigned counsel, brings her Amended Complaint against Defendant American Airlines, Inc. ("Defendant") and alleges as follows:

**INTRODUCTION**

2. This civil action arises out of personal injuries to and the wrongful death of 14-year-old Kevin Greenidge ("Greenidge"), who died following a series of accidents that occurred while he and his family were traveling internationally via American Airlines from Honduras to New York.

3. While in flight, Greenidge experienced a medical emergency and became unconscious. Greenidge's family immediately yelled out for assistance, but American Airlines' flight personnel delayed in responding to their cries for help and failed to render effective assistance.

4. American Airlines flight personnel failed to timely respond to Greenidge's medical emergency, failed to timely transfer Greenidge from his window seat to the back of the airplane where aid could be rendered, failed to timely request the assistance of medically trained passengers on board AA Flight 614, and failed to timely initiate automated external defibrillator ("AED") resuscitation on Greenidge.

5. When flight personnel eventually attempted to use the AED on Greenidge, they were either unable to properly operate the machine or the machine did not function properly. According to eyewitnesses, each time the AED gave a "clear" warning for people to step back from Greenidge's body so that a shock could be administered, a shock was not delivered. Instead, the machine simply kept advising that CPR should be continued.

6. The airline records discovered to date reveal that, in violation of federal law, American Airlines flight personnel were not trained to use the type of AED machine that was on board AA Flight 614.

7. The airline records discovered to date also reveal that, in violation of federal law, the contents of the airline emergency medical kit on board AA Flight 614 were unmarked.

8. Had AA Flight 614 been properly equipped with the necessary and functional medical equipment, had American Airlines properly trained its airline personnel for in-flight medical events, and had airline personnel timely responded to Greenidge's medical emergency and effectively implemented the skills learned in their training, Greenidge would not have experienced the intense physical and emotional pain he suffered on AA Flight 614.

9. Had AA Flight 614 been properly equipped with the necessary medical equipment—including but not limited to a medical kit with clearly marked contents and an operable AED machine—and had flight personnel been properly trained regarding the use of such equipment and effectively implemented the skills learned in their training, an operable AED machine would have been timely utilized on Greenidge, vastly increasing his chances for survival.

10. Tragically, and as a direct result of American Airlines' actions and failures outlined in this Amended Complaint, Greenidge passed away at the young age of 14 years old.

## PARTIES

11. Plaintiff Melissa Suzette Arzu and her son, Kevin Greenidge, Deceased, have been, at all relevant times, residents of the State of New York, residing in the County of The Bronx, and citizens of the United States of America.

12. Melissa Suzette Arzu ("Arzu") was appointed as the Administrator of the Estate of her minor son, Kevin Greenidge, Deceased ("Greenidge"), by the Bronx County Surrogate's Court on October 27, 2022 pursuant to Section 702(1) of the New York Surrogate Court Procedure Act.

13. Defendant American Airlines, Inc. ("American Airlines") is incorporated under the laws of the State of Delaware and headquartered in the State of Texas. American Airlines also does extensive business within the State of New York, including having two of its ten national hubs within the State of New York and conducting business from multiple airports in New York where Plaintiff resides.

14. On and before June 4, 2022, Defendant American Airlines was in the business of selling tickets for international carriage of passengers.

15. On and before June 4, 2022, Defendant American Airlines operated services for the carriage of passengers by air and conducted its business of carriage of passengers by air from premises leased or owned by American Airlines itself, or by another carrier with which it has a commercial agreement, at the Dallas Fort Worth International Airport in Dallas, Texas.

16. On and before June 4, 2022, Defendant American Airlines operated services for the carriage of passengers by air and conducted its business of carriage of passengers by air from premises leased or owned by American Airlines itself, or by another carrier with which it has a commercial agreement, at the John F. Kennedy International Airport in New York, New York and LaGuardia Airport in New York, New York.

## JURISDICTION

17. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because a federal question is presented pursuant to the Convention for the Unification of Certain Rules for International Carriage by Air done at Montreal on May 28, 1999 (hereinafter "Montreal Convention").

18. This Court has general personal jurisdiction over American Airlines because American Airlines is headquartered in Fort Worth, Texas.

19. Venue is proper in this District pursuant to Article 33 of the Montreal Convention because American Airlines is domiciled and has its principal place of business in Fort Worth, Texas.

## FACTUAL ALLEGATIONS

20. On June 4, 2022, Greenidge embarked on a flight itinerary under American Airlines Confirmation Number UDUZFG to fly internationally from Ramón Villeda Morales International Airport ("SAP") in Honduras to LaGuardia Airport ("LGA") in New York.

21. Greenidge's UDUZFG American Airlines itinerary included roundtrip travel on American Airlines from New York to Honduras on May 28, 2022 and June 4, 2022.

22. On May 28, 2022, Greenidge traveled via American Airlines from New York to Honduras on American Airlines Flight 1249 ("AA Flight 1249") from LGA to Miami International Airport ("MIA") and American Airlines Flight 1635 from MIA to SAP.

23. On June 4, 2022, the return portion of Greenidge's international itinerary included American Airlines Flight 614 ("AA Flight 614") from SAP to MIA, an approximate two-hour layover in MIA, and American Airlines Flight 1171 ("AA Flight 1171") from MIA to LGA.

24. Greenidge was a New York resident and a citizen of the United States of America.

25. The purchase of Greenidge's ticket to fly internationally via American Airlines roundtrip from New York to Honduras was made in New York.

26. A true and accurate copy of Greenidge's American Airlines itinerary is attached to Plaintiff's Amended Complaint as **Exhibit 1** and incorporated herein by reference.

27. At all relevant times, AA Flights 614 and 1171 were operated and controlled by Defendant American Airlines, acting by and through its authorized employees and/or agents.

28. With respect to Greenidge, Defendant American Airlines operated AA Flights 614 and 1171 as a single itinerary constituting same-day international carriage from Honduras to New York.

29. All transportation of passengers by American Airlines, including the transportation of Greenidge from Honduras to New York, is subject to the American Airlines Conditions of Carriage.

30. A true and accurate copy of the American Airlines Conditions of Carriage in effect in June 2022 is attached to Plaintiff's Amended Complaint as **Exhibit 2** and incorporated herein by reference.

31. A true and accurate copy of the "Liability for international flights" section of the American Airlines Conditions of Carriage regarding the Montreal Convention and in effect in June 2022 is attached to Plaintiff's Amended Complaint as **Exhibit 3** and incorporated herein by reference.

32. At all relevant times, the American Airlines Conditions of Carriage expressly incorporated the "American Airlines General Rules of the International Tariff."

33. A true and accurate copy of the American Airlines General Rules of the International Tariff in effect in June 2022 is attached to Plaintiff's Amended Complaint as **Exhibit 4** ("Tariff No. AA1") and incorporated herein by reference.

34. At all relevant times, the American Airlines Conditions of Carriage specified that, to the extent not preempted by federal law, Texas law applies to a passenger's contract with American Airlines and any dispute from a passenger's ticket purchase or travel on American Airlines.

35. Greenidge was a fare-paying passenger ticketed to travel aboard AA Flights 614 and 1171, which Defendant American Airlines "regarded as a single operation" under Rule 55(A) of Tariff No. AA1.

36. Greenidge was traveling from Honduras to New York with several members of his family.

37. On AA Flight 614 from Honduras to Miami, Greenidge and his family were seated at the back of the airplane in rows 31 and 32.

38. During AA Flight 614, Greenidge experienced a medical emergency.

39. Greenidge's family members immediately started yelling out for help.

40. Greenidge became unconscious and was unresponsive.

41. Greenidge's uncle began trying to transfer unconscious Greenidge from his window seat to the aisle.

42. After some delay, two flight attendants responded to Greenidge's family's urgent calls for help and came to the back of the airplane to assess the situation.

43. Airline personnel eventually assisted Greenidge's uncle in transferring unconscious Greenidge from his window seat to the aisle and to the back of the airplane.

44. At least one member of the airline personnel team was panicking and appeared to have no idea what to do during Greenidge's medical emergency.

45. A different member of the airline personnel team made an overhead announcement to ask if there were any doctors on board the airplane.

46. At least two medically-trained passengers came to the back of the airplane to render aid to Greenidge. One of these passengers began administering CPR to Greenidge.

47. After further additional delay, airline personnel brought out the automated external defibrillator ("AED") machine present on AA Flight 614.

48. Airline personnel struggled to figure out how to turn on and operate the AED machine.

49. After airline personnel eventually figured out how to turn on the AED machine and position the patches on Greenidge's chest, the machine advised that CPR should continue to be administered.

50. Each time the AED gave a "clear" warning for people to step back from Greenidge's body so that a shock could be administered, a shock was not delivered. Instead, the machine simply kept advising that CPR should be continued.

51. AA Flight 614 made an unscheduled, emergency landing in Cancun, Mexico. Greenidge was deplaned on a stretcher and transported to the hospital in an ambulance, where he was pronounced dead at the age of 14.

52. Upon information and belief, American Airlines has written policies and procedures that American Airlines personnel must follow if a passenger presents with a medical issue or emergency.

53. Upon information and belief, these policies and procedures are intended to ensure the safety of all passengers on board American Airlines flights.

54. Upon information and belief, the airline personnel on board AA Flight 614 did not adhere to American Airlines policies and procedures.

55. Contrary to American Airlines policies and procedures, the airline personnel on board AA Flight 614 did not timely respond to Greenidge's medical emergency.

56. Contrary to American Airlines policies and procedures, the airline personnel on board AA Flight 614 did not timely transfer Greenidge from his seat to the back of the airplane where aid could be rendered.

57. Contrary to American Airlines policies and procedures, the airline personnel on board AA Flight 614 did not timely request the assistance of medically trained passengers on board AA Flight 614.

58. Contrary to American Airlines policies and procedures, the airline personnel on board AA Flight 614 did not timely initiate AED resuscitation on Greenidge.

59. Contrary to American Airlines policies and procedures, the airline personnel on board AA Flight 614 did not effectively utilize the AED machine on board AA Flight 614 on Greenidge.

60. Upon information and belief, and in violation of federal law, American Airlines failed to equip AA Flight 614 with requisite medical equipment, including but not limited to a medical kit with clearly marked contents and an operable AED machine.

61. Upon information and belief, and in violation of federal law, American Airlines failed to regularly and sufficiently inspect the AED machine on board AA Flight 614 to ensure its readiness to perform during an emergency.

62. Upon information and belief, and in violation of federal law, American Airlines failed to provide sufficient training for in-flight medical emergencies to the flight personnel on board AA Flight 614, including but not limited to recurrent training in the proper use of AEDs and cardiopulmonary resuscitation.

63. Before traveling from New York to Honduras via American Airlines, 14-year-old Greenidge was an active eighth grader who enjoyed swimming at the YMCA, playing games with his friends, and spending time with his younger cousin.

64. After embarking on his American Airlines voyage, however, Greenidge's short life was tragically cut short.

65. Due to multiple accidents aboard AA Flight 614, each of which was the result of an act or omission by American Airlines personnel, Greenidge suffered a tragic death at the young age of 14. Each of these accidents was external to the medical emergency Greenidge suffered while on board AA Flight 614.

66. Arzu, as Greenidge's mother, has experienced and continues to experience excruciating pain and suffering as a result of the sudden loss of her young son.

67. On April 9, 2024, Plaintiff, through counsel, sent written correspondence to American Airlines regarding Plaintiff's significant pain and suffering associated with the loss of her 14-year-old son as well as the significant economic burden of preparing and internationally transporting Greenidge's remains from Mexico to New York.

68. On April 9, 2024, Plaintiff, also through counsel, demanded from American Airlines the full value of the 113,100 special drawing rights to which the Estate of Kevin Greenidge is entitled as an advance payment.

69. To date, Defendant has not tendered any advance payment to Plaintiff.

**<u>COUNT I – DEFENDANT'S LIABILITY UNDER THE MONTREAL CONVENTION</u>**

70. Greenidge was severely injured and died while he was flying internationally via American Airlines from Honduras to New York.

71. The return portion of Greenidge's international itinerary included AA Flight 614 from SAP to MIA, an approximate two-hour layover in MIA, and AA Flight 1171 from MIA to LGA.

72. With respect to Greenidge, Defendant American Airlines operated AA Flights 614 and 1171 as a single itinerary constituting international carriage from Honduras to New York.

Case 4:24-cv-00433-P Document 101-13 Filed 08/28/24 Page 10 of 121 PageID 841

73. Greenidge's American Airlines travel was subject to the American Airlines Conditions of Carriage incorporated into Greenidge's ticket.

74. At all relevant times, AA Flights 614 and 1171 were operated and controlled by Defendant American Airlines through its employees, agents, and/or servants.

75. At all relevant times, AA Flights 614 and 1171 were operated as common carriers engaged in the business of transporting fare paying passengers.

76. As a common carrier, American Airlines, including its agents, servants, and employees, owed the highest duty of care to its passengers, including Greenidge.

77. Federal regulations govern the conduct and procedures of common carriers like Defendant American Airlines.

78. For example, 14 C.F.R. § 121.801-805 requires airline vessels to be equipped with specific emergency medical equipment and requires airlines to provide crew members with specific emergency medical training.

79. Specifically, as of April 12, 2004, 14 C.F.R. § 121.803(c)(4) requires passenger-carrying vessels to be equipped with an approved automated external defibrillator ("AED") machine.

80. Pursuant to 14 C.F.R. § 121.803(b)(1), an aircraft's AED machine must be inspected regularly at specific inspection periods "<u>to ensure its condition for continued serviceability and immediate readiness to perform its intended emergency purposes</u>" (emphasis added).

81. Pursuant to 14 C.F.R. § 121.803(b)(2)-(4), an aircraft's AED machine must be readily accessible to the crew, clearly identified, marked to indicate its method of operation, and marked as to date of last inspection.

82. Pursuant to 14 C.F.R. § 121.805(b), airlines must provide crewmember training for in-flight medical emergencies, including instruction in emergency medical event procedures,

coordination among crewmembers, instruction in the location, function, and intended operation of medical emergency equipment, and instruction in the content of the emergency medical kit.

83. Specifically, each flight attendant must be trained "in the proper use of automated external defibrillators" and "cardiopulmonary resuscitation." This "recurrent training" is to "include performance drills . . . at least once every 24 months." *See* 14 C.F.R. § 121.805(b)(5)(i)-(iii).

84. In addition to the AED machine, 14 C.F.R. § 121.803(c)(1)-(3) also requires passenger-carrying vessels to be equipped with approved first-aid kits and emergency medical kits.

85. Pursuant to 14 C.F.R. § 121.803(b)(3), the contents of first-aid kits and emergency medical kits must be "clearly identified and clearly marked" (emphasis added).

86. Upon information and belief, American Airlines flight personnel have specific protocols they must follow when a passenger is experiencing a medical emergency or otherwise appears unwell or in need of medical assistance.

87. Upon information and belief, American Airlines flight personnel are trained on and required to follow specific American Airlines policies and procedures.

88. Upon information and belief, American Airlines policies and procedures instruct flight personnel to timely respond to medical emergencies, timely request assistance from medically-trained passengers in the event of a medical emergency, and timely initiate AED resuscitation in the event that a passenger is experiencing a medical emergency that requires such response.

89. It is alleged that American Airlines, through its authorized employees and/or agents, failed to engage in the following activities:

a. Failure to equip AA Flight 614 with an operable AED machine in violation of 14 C.F.R. § 121.803(c)(4);

b. Failure to regularly and sufficiently inspect the AED machine on board AA Flight 614 "to ensure its condition for continued serviceability and

immediate readiness to perform its intended emergency purposes" in violation of 14 C.F.R. § 121.803(b)(1);

c. Failure to provide sufficient training for in-flight medical emergencies to the flight personnel on board AA Flight 614 in violation of 14 C.F.R. § 121.805(b);

d. Failure to provide sufficient, "recurrent training" "in the proper use of automated external defibrillators" and "cardiopulmonary resuscitation" to the flight personnel on board AA Flight 614 in violation of 14 C.F.R. § 121.805(b)(5);

e. Failure to incorporate "performance drills" regarding AED use and cardiopulmonary resuscitation into the training of the flight personnel on board AA Flight 614 in violation of 14 C.F.R. § 121.805(b)(5);

f. Failure to equip AA Flight 614 with a "clearly marked" first-aid and/or medical kit in violation of 14 C.F.R. § 121.803(c)(1)-(3);

g. Failure to follow established American Airlines protocol, including but not limited to the failure to timely respond to Greenidge's medical emergency, the failure to timely transfer unconscious Greenidge from his seat to the back of the airplane, the failure to timely request the assistance of medically-trained passengers on board AA Flight 614, and the failure to timely initiate AED resuscitation on Greenidge; and

h. Failure to effectively utilize the AED machine on board AA Flight 614 on unconscious minor Greenidge.

90. Had AA Flight 614 been properly equipped with the necessary and functional medical equipment as required by federal law (including but not limited to a medical kit with clearly

marked contents and an operable AED machine), had American Airlines properly trained the airline personnel on board AA Flight 614 for in-flight medical events as required by federal law, and had airline personnel timely responded to Greenidge's medical emergency and effectively implemented the skills learned in their required training, Greenidge would not have experienced intense physical and emotional pain and tragically died at the age of 14.

91. Pursuant to Article 17(1) of the Montreal Convention, American Airlines "is liable for damage sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or bodily injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

92. Under the provisions of Article 17 of the Montreal Convention, American Airlines' conduct, including but not limited to the acts and omissions set forth above, constitutes an accident, in that it was an unexpected or unusual event or happening external to the passenger, Greenidge, and was causally linked to Greenidge's bodily injuries and ultimate demise.

93. Under the provisions of Article 17 of the Montreal Convention, American Airlines is liable for damages sustained by both Plaintiff Arzu and by Greenidge in the bodily injury and death of Greenidge that occurred on AA Flight 614.

**Spoliation of Evidence Material to Plaintiff's Montreal Convention Claim:**

94. Plaintiff hereby alleges and incorporates all paragraphs in the preceding sections by reference herein.

95. Plaintiff also seeks from this Court a finding that Defendant spoliated material evidence and the eventual submission of a spoliation instruction to the jury.

96. As set forth in detail in the preceding paragraphs, the flight personnel on board AA Flight 614 attempted to utilize an AED machine on minor Greenidge, and the AED did not work properly. Plaintiff's counsel has made numerous attempts to inspect the AED machine prior to filing

Case 4:24-cv-00433-P Document 101-3 Filed 08/28/24 Page 147 of 212 PageID 845

this suit. Based on conversations with American Airlines' counsel and the airline's refusal to permit inspection of the AED machine, it appears the AED machine has either been destroyed or put back into service and "lost."

97. Upon information and belief, Defendant American Airlines either no longer retains possession of the AED machine (and associated data) utilized on minor Greenidge or does not know where the machine is located.

98. Defendant American Airlines knew or reasonably should have known that there was a substantial chance that a wrongful death claim would be filed following the death of 14-year-old Greenidge.

99. Defendant knew or reasonably should have known that the AED machine (and associated data) utilized on minor Greenidge on AA Flight 614 is both material and relevant to Plaintiff's wrongful death claim against the airline.

100. Defendant had a duty to reasonably preserve evidence in the form of the AED machine (and associated data) utilized on Greenidge.

101. Specifically, Defendant should have removed the AED machine from service, created a copy and/or backup of the data contained on the AED machine, and ensured that both the AED machine and the data backup were preserved and available for discovery in subsequent litigation.

102. Defendant either intentionally or negligently breached its preservation duty by failing to preserve the AED machine utilized on Greenidge and the data contained therein.

103. By failing to preserve the AED machine utilized on Greenidge and the data contained therein, Defendant American Airlines acted with the subjective purpose of concealing or destroying discoverable evidence that is material to Plaintiff's case.

104. The AED machine (and associated data) utilized on Greenidge is materially relevant to key issues in Plaintiff's case. Among other things, Plaintiff alleges that American Airlines wrongfully delayed in utilizing the AED machine on Greenidge, that American Airlines personnel were not properly trained to use the AED machine that was on board AA Flight 614, that American Airlines personnel incorrectly utilized the AED machine on board AA Flight 614 on Greenidge, and that the AED machine utilized on Greenidge did not function properly. The AED machine and the data contained therein are materially relevant to each and every one of these key allegations.

105. Among other things, the missing evidence would provide concrete proof of key details and contested facts such as the exact time that the AED machine was turned on and utilized on Greenidge, how long the AED machine was utilized on Greenidge, and whether or not the AED machine delivered a shock to Greenidge's body.

106. As a result of Defendant's intentional or negligent conduct in failing to preserve the AED machine and its associated data, Plaintiff does not have access to the primary source of evidence regarding key elements of her allegations.

107. Moreover, if the AED was "put back into service" and cannot now be located, this too is a violation of 14 C.F.R. § 121.803(b)(1), which requires AA to regularly inspect each AED machine "to ensure its condition for continued serviceability and immediate readiness to perform its intended emergency purposes."

108. The AED machine utilized on Greenidge and the data contained therein is the best evidence of the performance, functionality, and maintenance of the AED machine and is not cumulative of other competent evidence that may be used instead of the spoliated device and data.

109. By failing to preserve the AED machine utilized on Greenidge and the data contained therein, Defendant American Airlines acted with the subjective purpose of concealing or

Case 4:24-cv-00433-P Document 101-18 Filed 08/28/24 Page 16 of 22 PageID 847

destroying discoverable evidence that is material to Plaintiff's case, and Defendant did, in fact, conceal or destroy discoverable evidence that is material to Plaintiff's case.

110. As a result of Defendant's spoliation of the AED machine utilized on minor Greenidge and the data contained therein, Arzu is entitled to a finding by this Court that Defendant spoliated material evidence, the submission of a spoliation instruction to the jury, and the prohibition of American submitting evidence or argument to the jury that the AED machine was properly maintained and in working order.

**COUNT II – LOSS OF CONSORTIUM UNDER MONTREAL CONVENTION**

111. Plaintiff hereby alleges and incorporates all paragraphs in the preceding section by reference herein.

112. Pursuant to Article 29 of the Montreal Convention, domestic law controls the issue of whether loss of consortium is cognizable.

113. Texas law permits a parent's loss of consortium claim resulting from the death of a minor child.

114. At all relevant times, Greenidge was the minor son of Arzu.

115. As alleged herein, Greenidge was seriously injured and ultimately died from a series of accidents that occurred while he was traveling internationally from Honduras to New York via American Airlines.

116. As a direct result of Greenidge's death caused by the accidents that occurred during Greenidge's international travel via American Airlines, Arzu has suffered a loss of consortium.

117. Pursuant to the pass-through provisions of Article 29 of the Montreal Convention and Texas law, American Airlines is liable for Arzu's loss of consortium.

**MONTREAL CONVENTION DAMAGES**

118. Plaintiff hereby alleges and incorporates all paragraphs in the preceding sections by reference herein.

119. As a direct and proximate result of the aforesaid accidents, Greenidge was seriously injured and died.

120. As a direct and proximate result of the aforesaid accidents, Arzu and Greenidge were both caused to suffer great pain, distress, agony, and mental anguish.

121. As a direct and proximate result of the aforesaid accidents, Arzu and Greenidge were both caused to suffer great economic loss and, in the future, shall continue to suffer great economic loss.

122. As a direct and proximate result of the aforesaid accidents, Arzu and Greenidge were forced to expend great sums of money on medical treatment, transportation of Greenidge's remains, and funeral expenses.

123. As a direct and proximate result of the aforesaid accidents, Greenidge was caused to suffer the complete loss of all future income.

124. As a direct and proximate result of the aforesaid accidents, Arzu, as the administrator of Greenidge's estate, is entitled to compensation for the wrongful death of Greenidge, past and future lost earnings, past and future lost accumulations, past and future medical expenses, and mental anguish and suffering.

125. As a direct and proximate result of the aforesaid accident, Arzu, as an individual, is entitled to compensation for past and future loss of services, comfort, society, companionship, moral support, loss of consortium, and mental anguish and suffering.

**COUNT III – BREACH OF CONTRACT UNDER TEXAS LAW**

126. Plaintiff hereby alleges and incorporates all paragraphs in the preceding section by reference herein.

127. In addition to Plaintiff's claims under the Montreal Convention, there is a binding and enforceable contract between Greenidge and Defendant American Airlines, as set forth in Exhibits 1 – 4, attached to this Amended Complaint (the "AA Contract").

128. The AA Contract specifies that "[t]o the extent not preempted by federal law, Texas law applies to this contract and any dispute from your ticket purchase or travel on American Airlines without regard to conflict of law principles." See Exhibit 2 at 2.

129. Through the AA Contract's incorporation of Tariff No. AA1 and its "Rule 55 Liability of Carriers" provision (Exhibit 4 at 55-6), American Airlines altered the terms defining its liability and made contractual commitments to Greenidge (and his next of kin) that are separate and apart of its liability under the Montreal Convention. These changes include:

a. American Airlines limits its liability under the Convention.

Specifically, for cases of bodily injury under Article 17 of the Convention, the AA Contract limits a passenger's special drawing rights to 113,100. Rule 55(C)(1)(a). Under the Convention, however, injured passengers are entitled to 128,821 in special drawing rights. *See* 85 FR 3104.

b. American Airlines waives its exoneration defense.

Specifically, American agrees to "not invoke" its article 20 (exoneration) defense "in a manner inconsistent" with its commitment in paragraph 55(C)(1)(a) that it "shall not be able to exclude or limit its

liability for damages not exceeding 113,100 special drawing rights for each passenger." Rule 55(C)(1)(c).

c. American Airlines agrees to make advance payments.

Specifically, the AA Contract provides American Airlines "shall make an advance payment" up to the special drawing rights of 113,100 where American Airlines "determines it is necessary to meet the immediate economic needs of, and hardship suffered by" the passenger. Rule 55(C)(2). It further agreed to make this payment "without delay" for "an amount or amounts determined by the carrier in its sole discretion." Rule 55(C)(2)(a). These payments were to be made "as an advance against . . . liability" and subject to American Airlines' claimed rights to contest liability, seek contribution or indemnity from third parties, and/or to recover the advance payment. Rule 55(C)(2)(b)-(e).

d. In the event of passenger death, American Airlines must make a payment of at least 16,000 Special Drawing Rights to the deceased passenger's next of kin.

The AA Contract further states that "[i]n the event of death of a Passenger, the amount of the payment shall not be less than 16,000 Special Drawing Rights." Rule 55(C)(2)(a).

130. On April 9, 2024, Defendant was provided with notice of Plaintiff's significant pain, suffering, immediate economic needs, and general hardship associated with the loss of her minor son, Greenidge, entitling Plaintiff to at least 16,000 (and up to 113,100) in special drawing rights from American Airlines as an advance payment.

131. Defendant American Airlines was provided with notice establishing that the full value of the special drawing rights was necessary to meet the significant "hardship suffered by" Plaintiff as a result of the loss of her minor son, Kevin Greenidge.

132. The expenses associated with the preparation and international transportation of Kevin Greenidge's remains from Mexico to New York and his funeral expenses, alone, exceed the 16,000 Special Drawing Rights minimum owed by Defendant in the event of the death of a passenger.

133. Under the AA Contract, American Airlines was required to (1) make a determination of the "immediate economic needs of, and hardship suffered by" Plaintiff, (2) to make "as an advance" a payment sufficient to meet those needs, up to the contractual limit of 113,100 in special drawing rights, (3) because this had been an event involving the death of a passenger, make an advance payment of at least 16,000 in special drawing rights, and (4) to do the above "without delay" and without waiver of any defenses it may assert.

134. Upon information and belief, American Airlines has no written policy, procedure or guidance regarding the implementation of its contractual obligation to make advance payments under Rule 55(C)(2) of Tariff No. AA1.

135. Upon information and belief, American Airlines has no written policy, procedure or guidance regarding its obligation to make a determination of "the immediate economic needs of, and hardship suffered by" a passenger claiming bodily injury under Rule 55(C)(2) of Tariff No. AA1.

136. Upon information and belief, Defendant American Airlines has never made an advance payment to any injured passenger or the family of a deceased passenger.

137. Accordingly, Defendant breached the AA Contract by failing to perform.

138. Despite knowledge of passenger Greenidge's death and receipt of Plaintiff's demand for advance payment, Defendant did not tender the 16,000 Special Drawing Rights minimum owed by Defendant to Greenidge's next of kin under the terms of the AA Contract.

139. As of the date of this filing, Defendant has not tendered any advance payment to Plaintiff.

## CONTRACT DAMAGES

140. Defendant's breaches caused Plaintiff to suffer damages by depriving her of her contractual right to advance payment.

141. As a result of Defendant's breaches of the AA Contract, Plaintiff has incurred and continues to suffer damages in the form of financial hardship, increased costs and expenses, and attorney's fees.

142. Plaintiff seeks and demand is hereby made for attorney's fees for Defendant's breach of the AA Contract pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code.

## DEMAND FOR JUDGMENT

143. Plaintiff Arzu, as an Individual and as the Administrator of the Estate of Kevin Greenidge, Deceased, hereby demands judgment against Defendant American Airlines, Inc. in an amount to be determined at trial, together with attorney's fees pursuant to Tex. Civ. Prac. & Rem. Code § 38.001, *et seq*., interest, costs, and disbursements of this action.

## DEMAND FOR JURY TRIAL

144. Pursuant to Federal Rules of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims and issues so triable.

Case 4:24-cv-00433-P Document 1-3 Filed 08/28/24 Page 23 of 121 PageID 853

Dated: August 26, 2024

Respectfully submitted:

*/s/ Darren P. Nicholson*

Darren P. Nicholson
State Bar No. 24032789
Hannah M. Crowe
State Bar No. 24131156
Clay R. Mahaffey (*pro hac vice*)
Wyoming Bar No. 6-3355
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, TX 75202
Telephone: (469) 904-4550
dnicholson@burnscharest.com
hcrowe@burnscharest.com
cmahaffey@burnscharest.com

ATTORNEYS FOR PLAINTIFF

# Exhibit O

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| MELISSA SUZETTE ARZU, Individually and as the Administrator of the Estate of KEVIN GREENIDGE, Deceased, | § § § § | |
| Plaintiff, | § | CIVIL ACTION NO. 4:24-cv-00433-P |
| v. | § § § | |
| AMERICAN AIRLINES, INC., | § § | |
| Defendant. | § | |

**PLAINTIFF MELISSA SUZETTE ARZU'S RULE 26(a)(2) EXPERT DISCLOSURES**

Plaintiff Melissa Suzette Arzu, Individually and as the Administrator of the Estate of Kevin Greenidge, deceased ("Plaintiff") hereby furnishes the following information pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure.

**Rule 26(a)(2)(B): The following witnesses are ones retained or specially employed to provide expert testimony in this case or one whose duties as the party's employee regularly involve giving expert testimony. A written report accompanies this disclosure for each.**

1. Bonnie Hayes
   6015 King Road
   Double Oak, Texas 75077-7308
   Area of expertise: Air Carrier Access Act and airline policy and procedures for passengers with disabilities

2. Richard Lazar, Esq.
   Readiness Systems, LLC
   19215 SE 34th Street, #106-236
   Camas, Washington 98607
   Area of expertise: emergency medical services and automated external defibrillator

3. Captain (Ret.) Richard J. Levy
   Aviation Expert Consulting
   5105 River Hill Drive
   Flower Mound, Texas 75022
   Area of expertise: aviation

4. Kathleen Lord-Jones
Robson Forensic
1999 South Bascom Avenue, Ste. 700
Campbell, California
Area of expertise: aviation cabin safety

5. Thomas Roney
Eric Lang Ph.D.
Thomas Roney, LLC
PO Box 2152
Coppell, Texas 75019
Area of expertise: economist

6. E. Lawrence Vincent, Esq.
Burns Charest LLP
900 Jackson Street, Suite 500
Dallas, Texas 75202
Area of expertise: attorney's fees

7. Corwin Warmink, MD
4521 Cloudview Road
Fort Worth, Texas 76109
Area of expertise: pediatric emergency medicine

Dated: November 2, 2024

Respectfully submitted:

*/s/ Hannah M. Crowe*

Darren P. Nicholson
State Bar No. 24032789
Hannah M. Crowe
State Bar No. 24131156
Clay R. Mahaffey (admitted *pro hac vice*)
**BURNS CHAREST LLP**
900 Jackson Street, Suite 500
Dallas, TX 75202
Telephone: (469) 904-4550
dnicholson@burnscharest.com
hcrowe@burnscharest.com
cmahaffey@burnscharest.com

ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

I hereby certify that on November 2, 2024 the foregoing document was served electronically to all counsel of record pursuant to the Federal Rules of Civil Procedure.

*/s/ Hannah M. Crowe*
Hannah M. Crowe

# Exhibit P

January 21, 2025

Burns Charest LLP
900 Jackson Street
Suite 500
Dallas, Texas 75202

Dear Ms. Crowe,

I am a licensed physician in the state of Texas and have been practicing Pediatric Emergency Medicine continuously since 2003. I am board certified in General Pediatrics and Pediatric Emergency Medicine by the American Board of Pediatrics. I practiced as an Attending Physician in the Cook Children's Medical Center Emergency Department prior to being named Medical Director of the Emergency Department in 2014. I served in that role for nine years and was directly involved in all Emergency Department quality reviews and served on multiple committees related to quality improvement, chart reviews and root cause analysis. Currently, I am the Chief Clinical Officer of the Cook Children's Physician Network.

I have reviewed the reports provided by Dr. Vasilki Vivian Dimas and Dr. Proshad Nemati Efune in the case of Arzu vs American Airlines. In addition to the materials listed in my October 31, 2024 report, I have also reviewed the deposition transcripts of flight attendant Judy Gilbert-Blanchard and Karenna Thatcher. I have also reviewed the literature cited by Dr. Dimas and Dr. Efune along with the relevant literature below.

Menant E, Lavignasse D, Ménétré S, et al. Automated External Defibrillator: Rhythm Analysis and Defibrillation on Paediatric Out-of-Hospital Cardiac Arrest, Resuscitation Plus. 2025 Jan:100873

Weisfeldt ML, Sitlani CM, Ornato JP, et al. Survival After Application of Automatic External Defibrillators Before Arrival of the Emergency Medical System. Journal American College of Cardiology. 2010 Apr 20;55(16):1713-20

My responses to the Dimas and Efune reports follow below:

Dimas Opinion #1: The witness reports regarding the function of the AED are not consistent and in many occasions are directly contradictory. The flight attendant witnesses recall a varying number of shocks and disagree on who pressed the shock button. Multiple witnesses state there was confusion about if the AED was operating correctly and various difficulties with preparing it and utilizing it. The Physician witness with multiple years of trauma training and actual clinical experience in administering CPR who was directly involved in the resuscitation signed a sworn declaration stating that no shock was actually delivered to Kevin. The nurse involved in the resuscitation recalls the AED stating a shock was indicated but does not report any remembrance or evidence of it being actually delivered to Kevin. Indication of the AED rhythm strip that a shock was

reported and then CPR continued does not prove that said shock was actually administered to Kevin's body.

Dimas Opinion #2: There is irrefutable evidence that prompt administering of CPR and AED usage dramatically increases survivability in cardiac arrest. Dr. Dimas cites an article that states patient survival decreases by up to 10% for each minute in delay of CPR and defibrillation. Cardiac arrest in pediatric patients is not equivalent to those in adult patients, and a study recently released in 2025 on pediatric patients reported a 71.4% survival rate to hospital admission for patients that receive a shock from an AED in out of hospital arrests and another reported 86% of patients surviving transport to the hospital. Multiple other studies support the fact that Kevin's conversion to a shockable rhythm during CPR, as indicated by the airline's AED strip, increased Kevin's likely survival by several times when compared to patients that never return to a shockable rhythm. Kevin's return to a shockable rhythm also indicates that if he had received CPR in a more timely fashion his likelihood of survival would have been dramatically increased as it would have increased the likelihood of him beginning in a shockable rhythm when the AED was attached.

Dimas Opinion #3: The statements of multiple witnesses directly refute this assertion. There can be no doubt that there was a clinically significant delay from the time the alert was sounded that Kevin had collapsed to the time CPR was initiated and the AED was utilized. Every minute delay in this situation is directly correlated to a dramatic decrease in survivability.

Dimas Opinion #4: Agree.

Efune Opinion: There is no medical or logical justification to the statement that within a reasonable degree of medical certainty Kevin would not have survived regardless of rescue efforts provided. All medical literature, including that cited by Dr. Efune, supports the fact that prompt administration of CPR and appropriate AED usage results in survival for a significant percentage of patients. As cited above, the most recent literature on this subject reported a 71.4% survival rate to hospital admission for pediatric patients that receive a shock from an AED in out of hospital arrests and another reported an 86% survival rate.

Discovery in this case is ongoing, and I reserve the right to modify my opinions based upon new information that is provided to me.

MD

Corwin Warmink, MD

# Exhibit Q

***(Filed Under Seal)***

# Exhibit R

Journal Pre-proofs




Clinical paper

# Automated external defibrillator: rhythm analysis and defibrillation on paediatric out-of-hospital cardiac arrest

Emma Menant, Delphine Lavignasse, Sarah Ménétré, Jean-Philippe Didon, Xavier Jouven

PII: S2666-5204(25)00010-4
DOI: https://doi.org/10.1016/j.resplu.2025.100873
Reference: RESPLU 100873

To appear in: *Resuscitation Plus*

Received Date: 26 November 2024
Revised Date: 10 January 2025
Accepted Date: 12 January 2025

Please cite this article as: E. Menant, D. Lavignasse, S. Ménétré, J-P. Didon, X. Jouven, Automated external defibrillator: rhythm analysis and defibrillation on paediatric out-of-hospital cardiac arrest, *Resuscitation Plus* (2025), doi: https://doi.org/10.1016/j.resplu.2025.100873

This is a PDF file of an article that has undergone enhancements after acceptance, such as the addition of a cover page and metadata, and formatting for readability, but it is not yet the definitive version of record. This version will undergo additional copyediting, typesetting and review before it is published in its final form, but we are providing this version to give early visibility of the article. Please note that, during the production process, errors may be discovered which could affect the content, and all legal disclaimers that apply to the journal pertain.

© 2025 Published by Elsevier B.V.

Journal Pre-proofs

TITLE PAGE

# Automated external defibrillator: rhythm analysis and defibrillation on paediatric out-of-hospital cardiac arrest

Emma Menant[a*], Delphine Lavignasse[a], Sarah Ménétré[b], Jean-Philippe Didon[b], Xavier Jouven[a]

Affiliations:

[a] Université Paris Cité, INSERM U970, Paris Cardiovascular Research Centre (PARCC), Integrative Epidemiology of Cardiovascular Disease, 56 rue Leblanc, Paris 75015, France

[b] Schiller Médical SAS, 4 rue L. Pasteur, 67160 Wissembourg, France

* Corresponding author:

E-mail address: emma.menant@inserm.fr (Emma Menant)

Journal Pre-proofs

Abstract word count: **199** words

Paper word count (excluding abstract, figures, tables and reference list): **2987** words

Number of tables and figures: **6**

Number of references: **46**

## Abstract

**Objective:** This study aims to quantify the reliability of automated external defibrillators (AED) in paediatric out-of-hospital cardiac arrests (pOHCA) by evaluating the defibrillation

and the shock advisory system efficacy. Furthermore, the relationship between the initial energy dose and patient outcomes is analysed.

**Methods:** We studied data from all pOHCA cases (age <18 years) treated by the Paris Fire Brigade between January 2010 and December 2018, limited to those with available AED signals. The efficacy of shocks is the primary outcome. The secondary outcomes are the shock advisory system performance, pre-hospital return of a spontaneous circulation (ROSC), survival and energy dose. Energy dose, weight and age are compared using a Wilcoxon test according to the outcome's values.

**Results:** A total of 1,990 electrocardiogram strips extracted from 349 pOHCA cases were included in the study. Shock advisory system had a sensitivity of 89.4% and a specificity of 99.8% for the detection of shockable rhythms. Shock efficacy observed for all patients who received a shock was 83.1% and first shock efficacy for patients in initial ventricular fibrillation was 96%. Patients who received a shock had a pre-hospital ROSC rate of 74.3%, a survival rate at hospital admission of 71.4% and 34.3% at hospital discharge.

**Conclusion:** This study shows that AED detect shockable rhythm with a good sensitivity and specificity and that shocks are associated with a very high rates of termination of shockable rhythms in pOHCA.

## Clinical Trial Registration:

Not applicable

## Keywords:

Paediatric out-of-hospital cardiac arrest, automated external defibrillator, shock efficacy, shock advisory system, survival, energy dose

## Glossary

AED Automated External Defibrillator

AHA American Heart Association

CPR Cardiopulmonary Resuscitation

ECG Electrocardiogram

Journal Pre-proofs

| | |
|---|---|
| ERC | European Resuscitation Council |
| IHCA | In-Hospital Cardiac Arrest |
| ILCOR | International Liaison Committee on Resuscitation |
| IQR | Interquartile Range |
| iVF | initial Ventricular Fibrillation |
| OHCA | Out-of-Hospital Cardiac Arrest |
| pOHCA | pediatric Out-of-Hospital Cardiac Arrest |
| ROOR | Return Of Organized Rhythm |
| ROSC | Return Of Spontaneous Circulation |
| Se | Sensitivity |
| Sp | Specificity |
| VF | Ventricular Fibrillation |
| VT | Ventricular Tachycardia |

Journal Pre-proofs

## 1. Introduction

Paediatric out-of-hospital cardiac arrest (pOHCA) is a family disaster and still occurs at a rate of 4 to 9 per 100,000 people annually in industrialized countries. [1]-[2] Since 1979, Automated External Defibrillators (AED) have been instrumental in providing critical care during such emergencies. Initially tailored for adults, AED analyse cardiac rhythms and deliver an electric shock to restore spontaneous circulation in cases of ventricular fibrillation (VF) or rapid ventricular tachycardia (VT). The International Liaison Committee on Resuscitation (ILCOR), the American Heart Association (AHA) and the European

Journal Pre-proofs

Resuscitation Council (ERC), have recommended and approved AED use for all children. [3]-[5]

A key consideration in paediatric use of AED is the efficacy of shock and the adjustment of energy doses. [6] ILCOR recommends an initial energy dose of 2-4J/kg and subsequent doses can be increased up to 10J/kg. [7]

Another key consideration is the shock advisory system that must be assessed using paediatric arrhythmia signals. [8] Studies have demonstrated reliable accuracy in rhythm detection when tested on paediatric rhythms obtained mainly from in-hospital cardiac arrest (IHCA) cases. [9]-[13] However, these devices must be rigorously tested in paediatric settings to ensure their reliability and efficacy.

This study aims to bridge the knowledge gaps in paediatric defibrillation regarding defibrillation efficacy, rhythm detection, survival, and optimal energy dose. This study will evaluate the reliability of AED used in Paris by the Paris Fire Brigade. It will also evaluate patient outcomes. This observational study is a prerequisite to a future improvement of paediatric defibrillation practices, ultimately aiming at enhancing survival rates and clinical outcomes in paediatric emergency care.

## 2. Materials and methods

### *2.1. Study design*

This is an observational study, reviewing all the paediatric cardiac arrests (age<18 years) treated by Paris Fire Brigade from January 2010 to December 2018. The firefighters serve Paris and its suburbs, which represent a population of 6,754,300 people including 1,250,000 children under 14 years (INSEE 2014). [14]-[17]

The study features a two-tiered physician-manned emergency system. Firefighter's Basic Life Support teams are the first responders. They manage pOHCA according to the current European Resuscitation Council guidelines. [18] Advance Life Support teams follow within minutes and provide medical care on the field.

The firefighters use AED (DGT7® or Fred Easy®, Schiller Medical, Wissembourg, France) that record events during resuscitation including electrocardiograms (ECG) and transthoracic impedance signals. Both DGT7® and Fred Easy® deliver a biphasic truncated exponential waveform with a pulsed energy (Multipulse Biowave®).

Two types of defibrillation pads are available: adult and child pads. Child pads are applied on patients under 8 years old or weighing less than 25kg. The patient weight was estimated by the BLS team or measured at the hospital, if the patient was admitted. The energy delivered with child pads is 30J for the first shock and 50J for the other, while with adult pads it is 150J for the first shock and 200J for the others.

The epidemiologic and survival data of the patients were collected prospectively and extensively by the Paris Sudden Death Expertise Centre. All pOHCA data in Paris and its suburbs are provided by the hospitals and recorded according to Utstein registry. [19] The

Journal Pre-proofs

appropriate review boards approved the study (CNIL approval #912309 and CCTIRS approval #12336).

### *2.2. Data annotation*

The ECG strips (i.e. AED analysis/shock periods) were annotated in 2 categories: shockable and non-shockable rhythm. The annotated rhythms are VF, fine-VF and rapid-VT for shockable rhythm; asystole, normal sinus rhythm, and other non-shockable rhythm for non-shockable rhythm. If the first annotation is VF, the pOHCA is categorized as initial VF (iVF) patient, else it is categorized as non-iVF patient. Pre-shock rhythms were annotated 5s before the shock as either shockable or non-shockable rhythm. Post-shock rhythms were annotated at 5s, 15s, 30s, 60s and 120s after shock as organized rhythm, VF or asystole. Time to refibrillation (recurrence of VF) was measured. Additionally, return of organized rhythm (ROOR) is annotated at 60 seconds post-shock. [20] The presence of artifacts or pacemaker were notified.

Two emergency physicians (DJ, BF) with experience in cardiac arrests cardiology from Paris Fire Brigade and one cardiologist (XJ) from Paris Sudden Death Expertise Centre visually revised 10 seconds ECG strip (lead II) and associated transthoracic impedance. Their annotations were made blinded to the outcomes. A consensus decision was required in cases of annotation disagreement. Without consensus, the rhythm was annotated as undefined and excluded. ECG strips with a rhythm transition or with an analysis interrupted by chest compressions were also excluded.

Inclusions are specified at the end of each analysis paragraph below.

### *2.3. Analysis*

#### 2.3.1. Primary outcome: Shock efficacy

The shock efficacy is defined as the cessation of shockable rhythm 5 seconds after shock delivery whether rhythm is asystole, pulseless electrical activity or organized rhythm. AHA and ERC do not provide target efficacy for shocks. We chose a target efficacy of 80% for first shock of iVF patients (see supp file Goal Justification). [21]-[30]

Refibrillation appearing less than 5 seconds after the shock is defined as persistent VF. Analyses of refibrillation and persistent VF provide complementary insights into the primary outcome.

The ECG strips included in the shock efficacy analysis were those corresponding to an AED analysis with shock advice, where a shock was delivered and the pre-shock rhythm was annotated as shockable.

#### 2.3.2. Secondary outcomes

##### *2.3.2.1. Shock Advisory System*

Journal Pre-proofs

Shock advisory system performance was evaluated for both sensitivity and specificity. Currently, all the recommendations concern general out-of-hospital cardiac arrest (OHCA), and no rules are yet established specifically for paediatrics. By default, we used those for the general population. The performance goals recommended in absence of artifact and pacemaker by Kerber *al.* and the International Electrotechnical Commission standard are described in supplementary file (Table A). [5], [31] They chose the one-sided 90% lower confidence limit as the threshold for statistical significancy.

The ECG strips included in the shock advisory system assessment were those without artifact and without pacemaker.

*2.3.2.2. Survival rate*

The defibrillation shock should be able to increase the chance of survival. We evaluated the survival rate on the outcomes: prehospital return of spontaneous circulation (ROSC), survival at hospital admission and survival at hospital discharge.

The pOHCA patients included in the analysis of survival were those for whom the AED recommended a shock, a shock was delivered, the pre-shock rhythm was annotated as shockable, and patient data was available.

*2.3.2.3. Energy dose*

We compared the energy dose, weight and age between patients with favourable and poor outcomes. The outcomes were the shock success, ROOR at 60 seconds post-shock, prehospital ROSC, survival at hospital admission and survival at hospital discharge. For both pad types (child/adult), the energy delivered at the first shock was compared according to the outcome's value (failure or success). A similar analysis was conducted considering all shocks. For prehospital ROSC, survival at hospital admission and survival at hospital discharge that may occur after multiple shocks, the median energy dose delivered during the intervention was used.

The ECG strips included in the energy dose analysis were those from iVF patients corresponding to AED analyses with shock advice, where a shock was delivered, the pre-shock rhythm was annotated as shockable and patient data was available.

All statistics are conducted using R (Version 3.6.2). When the data are normally distributed, a t-test is used, otherwise a Wilcoxon test is used.

## 3. Results

All the pOHCA that occurred between January 2010 and December 2018 were recorded. In the study, 1,990 ECG strips extracted from 349 pOHCA were included. The flow chart in Figure 1 describes the ECG strips and corresponding pOHCA included: 77 strips (38

pOHCA) were eligible for shock efficacy survey and 1,600 strips (328 pOHCA) for shock advisory system performance survey. Three patients did not have available medical data, thus the survival analysis have been limited to 35 patients including 22 iVF patients. The energy dose analysis focused on the 22 iVF patients and their 51 strips. Due to age disparity, different types of pads were used. In our cohort, 60.0% (21/35) were treated with adult pads and 40.0% (14/35) with child pads. The baseline characteristics of the patients are described in Table 1.

### *3.1. Primary outcome: Shock efficacy*

The global efficacy of the first shock for all patients was 89.5% (34/38) (Table 2A). The global shock efficacy observed for all patients was 83.1% (64/77) (Table 2B). Among 38 patients who received a shock, iVF patients represented 65.8% (25/38). The first shock efficacy for iVF patients was 96% (24/25). Finally, the first shock efficacy for non-iVF patients was more limited with 76.9% (10/13).

Figure 2 represents the rhythm in the first two minutes after the first shock of iVF patients. 36% of the first shocks of iVF patients were followed by a refibrillation beyond 5s post-shock (Table 2).

### *3.2. Secondary outcomes*

#### 3.2.1. Shock Advisory System

We analysed 1,600 ECG strips among which 85 annotated shockable and 1,515 annotated non-shockable (Figure 1). VF was the most frequent shockable rhythm whereas asystole was the most frequent non-shockable rhythm. Table 3 summarizes the annotated rhythms and the performances of the shock advisory system.

Among 85 shockable rhythms, 9 (10.6%) rhythms were wrongly detected as non-shockable by the algorithm. The 9 rhythms were from 7 different patients. Of them, five achieved a prehospital ROSC and survived hospital admission, while one did not. Two survived at hospital discharge whereas four did not. Data is missing for one patient.

Among 1,515 non-shockable rhythms, 3 (0.2%) rhythms were wrongly detected as shockable by the algorithm. The 3 rhythms were from 3 different patients. Two achieved a prehospital ROSC and survived hospital admission, and one survived at hospital discharge.

#### 3.2.2. Survival

Over the whole paediatric population (N=349), 91/290 patients achieved a prehospital ROSC (31.4%). The survival rate at hospital admission was 43.6% (82/188) and the survival rate at hospital discharge was 7.22% (21/291) (Table 1).

In this cohort, 38 patients with a shockable rhythm were shocked and patient data were available for 35. Among them, 26 achieved a prehospital ROSC (74.3%). The survival rate at hospital admission was 71.4% (25/35) and the survival rate at hospital discharge was 34.3%





Journal Pre-proofs

Journal Pre-proofs

(12/35) (Table 1). The survival rate at hospital discharge for non-shockable patients was 3.52% (9/256).

Among 22 iVF patients, 17 (77.3%) achieved prehospital ROSC. The survival rate at hospital admission was 72.7% (16/22) and the survival rate at hospital discharge was 40.9% (9/22).

Among 13 non-iVF patients, 9 (69.2%) achieved a prehospital ROSC. The survival rate at hospital admission was 69.2% (9/13) and the survival rate at hospital discharge is 23.1% (3/13).

### 3.2.3. Energy dose

Among the 35 patients, 22 were iVF patients. Regarding child pads, the delivered energy dose of first shock was lower for any of the following outcomes in case of success (Table 4A), but the differences did not reach statistical significancy: ROOR at 60 seconds post-shock (1.11 [0.97-1.55] vs 4.19 [3.74-4.63] J/kg, p=0.095), prehospital ROSC (1.33 [1.00-2.17] vs 5.08 J/kg), survival at hospital admission (1.11 [0.97-1.55] vs 4.19 [3.74-4.63] J/kg, p=0.095) and survival at hospital discharge (1.04 [1.00-1.07] vs 2.38 [1.55-3.30] J/kg, p=0.381). For patients who had child pads applied, those with ROOR at 60 seconds post-shock and survival had higher weight (28.0 [20.0-30.0] vs 7.35 [6.63-8.07] kg, p=0.079) and age (8.73 [8.66-10.0] vs 0.33 [0.30-0.36] years, p=0.095) compared with those with no ROOR at 60 seconds post-shock or survival but the differences did not reach statistical significancy (Table 4B, C). Similar results were found considering all shocks of iVF patients (Table B).

No difference was observed in energy dose for adult pads between failure and success. No test was carried out on shock success and prehospital ROSC due to a too small sample size.

## 4. Discussion

The aim of this study was to evaluate the reliability of AED in paediatric use. The results showed effectiveness of defibrillation shocks using Fred Easy® and DGT7® defibrillators. The shock advisory system exceeded recommendations for specificity and sensitivity in all but one category (rapid-VT). In addition, the survival rate is higher for patients with shockable rhythms than for those with non-shockable rhythms. Although no statistically significant differences were reached, among patients with child pads, a trend suggests that better outcomes are associated with lower shock doses as well as greater weight and age.

### *4.1. Primary outcome: Shock efficacy*

Shock efficacy target of 80% was reached for first shocks delivered to iVF patients (96.0%). Efficacy of first shocks delivered to non-iVF patients was 76.9%. Concerning all shocks delivered to both iVF and non-iVF patients, similar efficacies were found, respectively 82.1% and 85.7%. We observed an earlier refibrillation for non-iVF patients compared to iVF patients (p=0.011).

A few studies suggest that resumption of chest compressions is associated with refibrillation. [32]-[33] Despite satisfactory efficacy results, 33.8% of shocks were followed by a refibrillation beyond 5s post-shock (Table 2). However, the proportion of refibrillation in our study is much lower than what is typically found in the literature for adults (61%). [34] As cardiac causes are more likely to lead to refibrillation, the difference in aetiology, with a higher proportion of non-medical and non-cardiac causes in paediatric patients, may explain the lower refibrillation rates compared to adults. [35]-[36]

### *4.2. Secondary outcomes*

#### 4.2.1. Shock Advisory System

Specificity for non-shockable rhythms was 100% for normal sinus rhythm and over 99% for other rhythms. Sensitivity for VF exceeded the recommended levels (94%). However, the minimum sample size was not always met, with only 73 VF cases, 6 rapid-VT and 6 fine-VF. Since all guidelines pertain to general OHCA and no specific rules exist for paediatric cases, we followed the recommendations for the general population. [5], [31]

From 7 different patients, 9 false negatives were detected. The possible reasons are 1) heart rate just under the algorithm VT threshold (150 bpm) for shock/no-shock decision, 2) very high heart rate for VF (>500bpm) which is akin to myogram noise, 3) wide ventricular complex supraventricular tachycardia that was considered shockable by the annotators and 4) fine-VF.

False positives were detected in 3 strips, from 3 different patients that present very large T-wave amplitudes that lead to double counting of the complexes.

Rhythms that result in false positives and false negatives detections are more frequent in pOHCA. However, the sensitivity and specificity of the shock advisory system are comparable to those observed in adult OHCA. Krasteva *et al.* also noted that the differences between paediatric and adult rhythms do not necessarily cause a decrease in shock advisory system accuracy. [13]

#### 4.2.2. Survival

The survival rates are influenced by factors such as initial rhythm, duration of pulselessness, emergency response time, presence of witness, bystander cardiopulmonary resuscitation and quality of post-resuscitation care. [37]

Numerous initiatives enhanced survival rates for paediatric IHCA, with an increase from 14% to 43% over a decade, without a corresponding rise in severe disability among the survivors. [38] While statistics from Australia/New Zealand, Denmark, and North America did not show enhanced survival rates of pOHCA, recent figures from Sweden reveal a

positive trend: the 30-day survival rate for children aged 0-21 years climbed from 6% during 1992–1998 to 14% between 2007 and 2012. [1], [39]-[41]

In our study, we observed a survival rate at hospital discharge of 36.1% for shockable patients, against 3.52% for non-shockable patients. Among shockable patients, survival rate at hospital discharge is 40.9% for iVF patients and 28.6% for non-iVF patients. These results highlight the importance of early VF/VT recognition and are in accordance with those mentioned by Atkins and Kenney who reported a survival of 38%. [42]

#### 4.2.3. Energy dose

For iVF patients with child pads, we observed that successful outcomes are possibly related to lower energy dose, although the differences did not reach statistical significancy. For adult pads, we did not observe any difference in energy dose between failure and success.

Our results suggest a trend indicating that patients with ROOR at 60 seconds post-shock may have been treated with a lower energy dose compared to those without ROOR at 60 seconds post-shock, although this difference did not reach statistical significance. The same trend was found for survival at hospital admission. These results are consistent with Hoyme *et al.* who associated higher survival at hospital discharge with an energy dose range of 1.7-2.5J/kg. [43] Unfortunately, deeper analysis is limited by the small number of patients (N=7) in our study. The lack of data was also the main limitation of the other studies that focused on both IHCA and OHCA or only on small sample size OHCA. [44]-[47]

As our study concerns AED, the delivered energy is identical for every patient with child pads (30J), thus the delivered energy dose reflects the patient's weight. Moreover, for paediatric patients, weight is strongly correlated with age. Consequently, if an outcome is related to lower doses, it is not possible to conclude that it is higher age, lower doses or both that is associated with the outcome.

## 5. Study limitations

We did not reach the AHA sample size targets for shockable rhythms that are difficult to reach for paediatric patients. Indeed, during the current study in Paris and its suburbs (over 6.5 million people), 349 pOHCA were included in 9 years: 38 were shocked (10.9%), 25 were iVF patients (7.16%). Which leads to the estimation of about 4 shockable pOHCA managed by Paris Fire Brigade per year.

In the same context, about 400 shockable OHCA was managed by Paris Fire Brigade per year from January 2010 to January 2014. [32]

Compared to adults, paediatric VF/VT is rare as occurrence of shockable pOHCA is 1% (4/400) of occurrence of shockable OHCA.

One limitation of our study is the decision to exclude all ECG strips presenting artifacts (Figure 1). An alternative approach would have been to include strips where it was possible for a human to analyse the rhythm. Incorporating such rhythms and challenging cases





Journal Pre-proofs

could have provided a more representative picture of AED performance in a clinical setting, accounting for the obstacles that complicate analysis for both humans and machines. However, as numerous of these ECG strips are unreadable and therefore non-annotable, we chose to exclude them all to avoid introducing selection bias, even at the expense of reduced statistical significancy. This choice of exclusion criteria also facilitates reproducibility of the study.

Another key limitation of this study is the absence of data on neurological outcomes and long-term survival, which restricts our ability to fully assess patient recovery.

Additionally, the study only evaluated one type of AED, raising questions about the generalizability of the results to other AED brands. Further research is needed to determine whether similar outcomes would be observed with different devices.

Finally, some degree of information bias regarding weight cannot be ruled out, as it was estimated by BLS teams in certain cases.

## 6. Conclusions

This study shows that shocks from one type of AED are associated with a very high rates of termination of shockable rhythms in pOHCA. The efficiency of defibrillation shocks is higher for the first shock of iVF patients, reaching more than 95%, using a pulsed biphasic truncated exponential waveform.

The study also shows that the AED detect shockable rhythm with a good sensitivity and specificity. The shock advisory system dedicated to diagnosing paediatric patient rhythms met the sensitivity and specificity criteria required by the AHA for general population.

## Funding

This study did not receive any specific grant from funding agencies in the public, commercial, or not-for-profit sectors, but was a part of a thesis funded by a grant.

## Conflict of Interest

Jean-Philippe Didon and Sarah Ménétré are employees of Schiller Medical, Wissembourg, France.

Emma Menant and Delphine Lavignasse received research support from Schiller Medical SAS.

Xavier Jouven received funds for scientific consulting from Schiller Medical SAS.





Journal Pre-proofs

Journal Pre-proofs

## Acknowledgements

The authors are grateful to Paris Fire Brigade - Basic Life Support teams for their life-saving actions on behalf of the Greater Paris population, and for their involvement in the ongoing action against sudden death.

Authors wish to thank Drs Daniel Jost (DJ) and Benoît Frattini (BF) who annotated the ECG signals recorded from Paris Fire Brigade.

## References

[1] E. L. Fink et al., "Unchanged pediatric out-of-hospital cardiac arrest incidence and survival rates with regional variation in North America," Resuscitation, vol. 107, pp. 121–128, Oct. 2016, doi: 10.1016/j.resuscitation.2016.07.244.

[2] I. K. Kelpanides et al., "Out-of-hospital cardiac arrest in children in Norway: A national cohort study, 2016–2021," Resuscitation Plus, vol. 18, p. 100662, Jun. 2024, doi: 10.1016/j.resplu.2024.100662.

[3] I. K. Maconochie et al., "ILCOR CoSTR Part 6: Pediatric basic life support and pediatric advanced life support," Resuscitation, vol. 95, pp. e147–e168, Oct. 2015, doi: 10.1016/j.resuscitation.2015.07.044.

[4] I. K. Maconochie et al., "European Resuscitation Council Guidelines for Resuscitation 2015," Resuscitation, vol. 95, pp. 223–248, Oct. 2015, doi: 10.1016/j.resuscitation.2015.07.028.

[5] R. E. Kerber et al., "Automatic external defibrillators for public access defibrillation: recommendations for specifying and reporting arrhythmia analysis algorithm performance, incorporating new waveforms, and enhancing safety. A statement for health professionals from the American Heart Association Task Force on Automatic External Defibrillation, Subcommittee on AED Safety and Efficacy," Circulation, vol. 95, no. 6, pp. 1677–1682, Mar. 1997.

[6] J. Lopez-Herce, J. D. Castillo, and A. Rodriguez-Nunez, "Optimal paediatric defibrillation dosage for children. We need a randomized clinical trial!," Resuscitation, vol. 158, pp. 289–290, Jan. 2021, doi: 10.1016/j.resuscitation.2020.10.044.

[7] A. R. Panchal et al., "Part 3: Adult Basic and Advanced Life Support: 2020 American Heart Association Guidelines for Cardiopulmonary Resuscitation and Emergency Cardiovascular Care," Circulation, vol. 142, no. 16_suppl_2, pp. S366–S468, Oct. 2020, doi: 10.1161/CIR.0000000000000916.

[8] R. A. Samson, R. A. Berg, for the American Heart Association, R. Bingham, and for the European Resuscitation Council, "Use of Automated External Defibrillators for Children: An Update--An Advisory Statement From the Pediatric Advanced Life Support Task Force, International Liaison Committee on Resuscitation," PEDIATRICS, vol. 112, no. 1, pp. 163–168, Jul. 2003, doi: 10.1542/peds.112.1.163.

[9] D. L. Atkins et al., "Sensitivity and specificity of an automated external defibrillator algorithm designed for pediatric patients.," Resuscitation, vol. 76, no. 2, pp. 168–174, Feb. 2008, doi: 10.1016/j.resuscitation.2007.06.032.

[10] E. Atkinson et al., "Specificity and sensitivity of automated external defibrillator rhythm analysis in infants and children.," Ann Emerg Med, vol. 42, no. 2, pp. 185–196, Aug. 2003, doi: 10.1067/mem.2003.287.

[11] F. Cecchin et al., "Is arrhythmia detection by automatic external defibrillator accurate for children?: sensitivity and specificity of an automatic external defibrillator algorithm in 696 pediatric arrhythmias.," Circulation, vol. 103, no. 20, pp. 2483–2488, May 2001, doi: 10.1161/01.cir.103.20.2483.

[12] J.-P. Didon, I. Jekova, and V. Krasteva, "Evaluation of a Shock Advisory System with Non-Shockable Pediatric Rhythms," p. 4, 2010.

[13] V. Krasteva et al., "Comparison of Pediatric and Adult ECG Rhythm Analysis by Automated External Defibrillators During Out-of-Hospital Cardiac Arrest," Dec. 2018. doi: 10.22489/CinC.2018.159.

[14] "INSEE Population Hauts-de-Seine (92)." Accessed: May 16, 2024. [Online]. Available: https://www.insee.fr/fr/statistiques/2011101?geo=DEP-92

[15] "INSEE Population Seine-Saint-Denis (93)." Accessed: May 16, 2024. [Online]. Available: https://www.insee.fr/fr/statistiques/2011101?geo=DEP-93

[16] "INSEE Population Val-de-Marne (94)." Accessed: May 16, 2024. [Online]. Available: https://www.insee.fr/fr/statistiques/2011101?geo=DEP-94

[17] "INSEE Population Paris (75)." Accessed: May 16, 2024. [Online]. Available: https://www.insee.fr/fr/statistiques/2011101?geo=DEP-75

[18] P. Van de Voorde et al., "European Resuscitation Council Guidelines 2021: Paediatric Life Support," Resuscitation, vol. 161, pp. 327–387, Apr. 2021, doi: 10.1016/j.resuscitation.2021.02.015.

[19] G. D. Perkins et al., "Cardiac Arrest and Cardiopulmonary Resuscitation Outcome Reports: Update of the Utstein Resuscitation Registry Templates for Out-of-Hospital Cardiac Arrest: A Statement for Healthcare Professionals From a Task Force of the International Liaison Committee on Resuscitation (American Heart Association, European Resuscitation Council, Australian and New Zealand Council on Resuscitation, Heart and Stroke Foundation of Canada, InterAmerican Heart Foundation, Resuscitation Council of Southern Africa, Resuscitation Council of Asia); and the American Heart Association Emergency Cardiovascular Care Committee and the Council on Cardiopulmonary, Critical Care, Perioperative and Resuscitation," Resuscitation, vol. 96, pp. 328–340, Nov. 2015, doi: 10.1016/j.resuscitation.2014.11.002.

Journal Pre-proofs

[20] R. W. Koster, R. G. Walker, and A. P. Van Alem, "Definition of successful defibrillation:," Critical Care Medicine, vol. 34, no. Suppl, pp. S423–S426, Dec. 2006, doi: 10.1097/01.CCM.0000246008.95156.78.

[21] J. Soar et al., "ILCOR CoSTR Part 4: Advanced life support," Resuscitation, vol. 95, pp. e71–e120, Oct. 2015, doi: 10.1016/j.resuscitation.2015.07.042.

[22] C. W. Callaway et al., "Part 4: Advanced Life Support: 2015 International Consensus on Cardiopulmonary Resuscitation and Emergency Cardiovascular Care Science With Treatment Recommendations," Circulation, vol. 132, no. 16 suppl 1, pp. S84–S145, Oct. 2015, doi: 10.1161/CIR.0000000000000273.

[23] W. D. Weaver, L. A. Cobb, M. K. Copass, and A. P. Hallstrom, "Ventricular Defibrillation — A Comparative Trial Using 175-J and 320-J Shocks," New England Journal of Medicine, vol. 307, no. 18, pp. 1101–1106, Oct. 1982, doi: 10.1056/NEJM198210283071801.

[24] D. Lavignasse et al., "First shock efficacy of out-of-hospital cardiac arrest defibrillation," Resuscitation, vol. 142, no. S1, pp. e28–e114, 2019, doi: doi:10.1016/j.resuscitation.2019.06.114.

[25] P. J. Kudenchuk, L. A. Cobb, M. K. Copass, M. Olsufka, C. Maynard, and G. Nichol, "Transthoracic Incremental Monophasic Versus Biphasic Defibrillation by Emergency Responders (TIMBER): A Randomized Comparison of Monophasic With Biphasic Waveform Ascending Energy Defibrillation for the Resuscitation of Out-of-Hospital Cardiac Arrest due to Ventricular Fibrillation," Circulation, vol. 114, no. 19, pp. 2010–2018, Nov. 2006, doi: 10.1161/CIRCULATIONAHA.106.636506.

[26] B. E. Gliner and R. D. White, "Electrocardiographic evaluation of defibrillation shocks delivered to out-of-hospital sudden cardiac arrest patients," Resuscitation, vol. 41, no. 2, pp. 133–144, Jul. 1999, doi: 10.1016/s0300-9572(99)00040-4.

[27] E. P. Hess, D. Agarwal, L. A. Myers, E. J. Atkinson, and R. D. White, "Performance of a rectilinear biphasic waveform in defibrillation of presenting and recurrent ventricular fibrillation: a prospective multicenter study," Resuscitation, vol. 82, no. 6, pp. 685–689, Jun. 2011, doi: 10.1016/j.resuscitation.2011.02.008.

[28] T. Schneider et al., "Multicenter, randomized, controlled trial of 150-J biphasic shocks compared with 200- to 360-J monophasic shocks in the resuscitation of out-of-hospital cardiac arrest victims. Optimized Response to Cardiac Arrest (ORCA) Investigators.," Circulation, vol. 102, no. 15, pp. 1780–1787, Oct. 2000, doi: 10.1161/01.cir.102.15.1780.

[29] J.-P. Didon, G. Fontaine, R. D. White, I. Jekova, J.-J. Schmid, and A. Cansell, "Clinical experience with a low-energy pulsed biphasic waveform in out-of-hospital cardiac arrest," Resuscitation, vol. 76, no. 3, pp. 350–353, Mar. 2008, doi: 10.1016/j.resuscitation.2007.08.010.

[30] A. P. van Alem, F. W. Chapman, P. Lank, A. A. M. Hart, and R. W. Koster, "A prospective, randomised and blinded comparison of first shock success of monophasic and biphasic waveforms in out-of-hospital cardiac arrest," Resuscitation, vol. 58, no. 1, pp. 17–24, Jul. 2003, doi: 10.1016/S0300-9572(03)00106-0.

Journal Pre-proofs

Journal Pre-proofs

[31] International Electrotechnical Commission, "IEC 60601-2-4:2010+AMD1:2018." Accessed: Jan. 13, 2020. [Online]. Available: https://webstore.iec.ch/publication/62752

[32] D. Jost et al., "Contributing factors to early recurrence of ventricular fibrillation during out-of-hospital cardiac arrest: An observational retrospective study," Resuscitation, vol. 154, pp. 19–24, Sep. 2020, doi: 10.1016/j.resuscitation.2020.06.030.

[33] J. Berdowski, J. G. P. Tijssen, and R. W. Koster, "Chest compressions cause recurrence of ventricular fibrillation after the first successful conversion by defibrillation in out-of-hospital cardiac arrest," Circ Arrhythm Electrophysiol, vol. 3, no. 1, pp. 72–78, Feb. 2010, doi: 10.1161/CIRCEP.109.902114.

[34] R. D. White and J. K. Russell, "Refibrillation, resuscitation and survival in out-of-hospital sudden cardiac arrest victims treated with biphasic automated external defibrillators," Resuscitation, vol. 55, no. 1, pp. 17–23, Oct. 2002, doi: 10.1016/S0300-9572(02)00194-6.

[35] R. Tanner et al., "Out-of-hospital cardiac arrests in the young population; a 6-year review of the Irish out-of-hospital cardiac arrest register," Postgrad Med J, p. postgradmedj-2020-137597, May 2020, doi: 10.1136/postgradmedj-2020-137597.

[36] G. Fond et al., "Disparities in suicide mortality trends between United States of America and 25 European countries: retrospective analysis of WHO mortality database," Scientific Reports, vol. 6, 2016, doi: 10.1038/srep20256.

[37] F. W. Moler et al., "Multicenter cohort study of out-of-hospital pediatric cardiac arrest*:," Critical Care Medicine, vol. 39, no. 1, pp. 141–149, Jan. 2011, doi: 10.1097/CCM.0b013e3181fa3c17.

[38] S. Girotra, J. A. Spertus, Y. Li, V. M. Nadkarni, and P. S. Chan, "Survival Trends in Pediatric In-Hospital Cardiac Arrests: An Analysis from Get With The Guidelines-Resuscitation," 2014.

[39] S. Rajan et al., "Out-of-hospital cardiac arrests in children and adolescents: Incidences, outcomes, and household socioeconomic status," Resuscitation, vol. 88, pp. 12–19, Mar. 2015, doi: 10.1016/j.resuscitation.2014.11.025.

[40] L. D. Straney et al., "Trends in PICU Admission and Survival Rates in Children in Australia and New Zealand Following Cardiac Arrest*:," Pediatric Critical Care Medicine, vol. 16, no. 7, pp. 613–620, Sep. 2015, doi: 10.1097/PCC.0000000000000425.

[41] J. Gelberg et al., "Improving Survival and Neurologic Function for Younger Age Groups After Out-of-Hospital Cardiac Arrest in Sweden: A 20-Year Comparison*," Pediatric Critical Care Medicine, vol. 16, no. 8, pp. 750–757, Oct. 2015, doi: 10.1097/PCC.0000000000000503.

[42] D. L. Atkins and M. A. Kenney, "Automated external defibrillators: safety and efficacy in children and adolescents.," Pediatr Clin North Am, vol. 51, no. 5, pp. 1443–1462, Oct. 2004, doi: 10.1016/j.pcl.2004.04.006.

[43] D. B. Hoyme et al., "Improved survival to hospital discharge in pediatric in-hospital cardiac arrest using 2 Joules/kilogram as first defibrillation dose for initial pulseless

Journal Pre-proofs

ventricular arrhythmia," Resuscitation, vol. 153, pp. 88–96, Aug. 2020, doi: 10.1016/j.resuscitation.2020.05.048.

[44] J. Tibballs, B. Carter, N. J. Kiraly, P. Ragg, and M. Clifford, "External and internal biphasic direct current shock doses for pediatric ventricular fibrillation and pulseless ventricular tachycardia*:," Pediatric Critical Care Medicine, vol. 12, no. 1, pp. 14–20, Jan. 2011, doi: 10.1097/PCC.0b013e3181dbb4fc.

[45] A. Rodríguez-Núñez, J. López-Herce, C. García, P. Domínguez, A. Carrillo, and J. M. Bellón, "Pediatric defibrillation after cardiac arrest: initial response and outcome," Crit Care, vol. 10, no. 4, p. R113, 2006, doi: 10.1186/cc5005.

[46] M. D. Berg, R. A. Samson, R. J. Meyer, L. L. Clark, T. D. Valenzuela, and R. A. Berg, "Pediatric defibrillation doses often fail to terminate prolonged out-of-hospital ventricular fibrillation in children," Resuscitation, vol. 67, no. 1, pp. 63–67, Oct. 2005, doi: 10.1016/j.resuscitation.2005.04.018.

[47] D. Lavignasse, S. Lemoine, S. Menetre, J.-P. Didon, D. Jost, and X. Jouven, "Improved survival to hospital discharge in paediatric in-hospital cardiac arrest using 2 Joules/kilogram as first defibrillation dose for initial pulseless ventricular arrhythmia," Resuscitation, vol. 158, pp. 291–292, Jan. 2021, doi: 10.1016/j.resuscitation.2020.09.042.

## Legends to figures

### Table 1.

Baseline characteristics of all 349 patients and 38 patients who received a shock with electrical signal available. Column Value represents the patients with available data.

VF: Ventricular Fibrillation; OHCA: Out-of-hospital Cardiac Arrest; CPR: Cardiopulmonary resuscitation; ROSC: Return of a Spontaneous Circulation.

### Table 2.

Shock efficacy and refibrillation for first shocks in panel (A) and all shocks in panel (B).

VF: Ventricular Fibrillation; iVF: initial VF

### Table 3.

Sensitivity (Se) and specificity (Sp) considering artifact free ECG strips according to Kerber and standard recommendations. [5]

Note: *due to the small size of this subgroup, no measure of dispersion.

VF: Ventricular Fibrillation; VT: Ventricular Tachycardia; LCL: Lower Confidence Limit.

**Table 4.**

Comparison of energy doses (J/kg) on panel (A), weights (kg) on panel (B) and ages (years) on panel (C) using a Wilcoxon test for each outcomes considering first shocks of initial VF patients. Median [IQR] dose for failure and success of each outcome is presented.

ROOR: Return of Organized Rhythm; ROSC: Return of Spontaneous Circulation; IQR : Interquartile Range

**Fig.1.**

Flow chart of pOHCA shock and rhythm analysis (with n the number of strips and N the number of patients).

OHCA: Out-of-hospital cardiac arrest; AED: Automated External Defibrillator; ECG: Electrocardiogram; CC: Chest Compressions; VF: Ventricular Fibrillation; VT: Ventricular Tachycardia; iVF: initial VF

**Fig.2.**

Rhythm in the first two minutes after the first shock of iVF patients. Rhythm annotations were done at 5, 15, 30, 60 and 120 seconds after the first shock. Annotations before 5 seconds was not possible because of shock artifacts and unstable electrocardiographic baseline.

Indeterminate: unreadable post-shock rhythm due to presence of chest compressions

Journal Pre-proofs

**Table 1.**

Baseline characteristics of all 349 patients and 38 patients who received a shock with electrical signal available. Column Value represents the patients with available data.

VF: Ventricular Fibrillation; OHCA: Out-of-hospital Cardiac Arrest; CPR: Cardiopulmonary resuscitation; ROSC: Return of a Spontaneous Circulation.

| | **All patients (N=349)** | **Patients with shock (N=38)** |
|---|---|---|

Journal Pre-proofs

| Characteristics | Value | Missing data | Value | Missing data |
|---|---|---|---|---|
| **Male**, *n (%)* | 168 (56.4 %) | 51 | 20 (58.8 %) | 4 |
| **Age (years)**, *median [IQR]* | 5.18 [0.74-13.8] | 50 | 12.4 [8.71-15.6] | 2 |
| **Weight (kg)**, *median [IQR]* | 12.0 [6.57-30.0] | 192 | 33.7 [26.3-43.6] | 2 |
| **Arrest during sport**, *n (%)* | 11 (3.69 %) | 51 | 7 (20.6 %) | 4 |
| **Initial VF**, *n (%)* | 31 (9.09 %) | 8 | 25 (65.8 %) | 0 |
| **Shock delivered**, *n (%)* | 43 (14.7 %) | 57 | 38 (100 %) | 0 |
| **Public location**, *n (%)* | 87 (29.3 %) | 52 | 17 (50.0 %) | 4 |
| **Witnessed OHCA**, *n (%)* | 145 (49.0 %) | 53 | 28 (82.4 %) | 4 |
| **Bystander CPR**, *n (%)* | 74 (25.0 %) | 53 | 16 (47.1 %) | 4 |
| **Prehospital ROSC**, *n (%)* | 91 (31.4 %) | 59 | 26 (74.3 %) | 3 |
| **Survival at hospital admission**, *n (%)* | 82 (43.6 %) | 161 | 25 (71.4 %) | 3 |
| **Survival at hospital discharge**, *n (%)* | 21 (7.22 %) | 58 | 12 (34.3 %) | 3 |

Journal Pre-proofs

**Table 2.**

Shock efficacy and refibrillation for first shocks in panel (A) and all shocks in panel (B).

VF: Ventricular Fibrillation; iVF: initial VF

Journal Pre-proofs

A.

| | | All patients with shock | iVF patients | Non-iVF patients |
|---|---|---|---|---|
| **First Shock** | N | 38 | 25 | 13 |
| | Successful | 34 (89.5%) | 24 (96.0%) | 10 (76.9%) |
| | Unsuccessful | 4 (10.5%) | 1 (4.0%) | 3 (23.1%) |
| Refibrillation | N | 38 | 25 | 13 |
| | Persistent VF | 4 (10.5%) | 1 (4%) | 3 (23.1%) |
| | Refibrillation | 12 (31.6%) | 9 (36%) | 3 (23.1%) |
| | No refibrillation | 21 (55.3%) | 15 (60%) | 6 (46.1%) |
| | Undefined | 1 (2.6%) | 0 (0%) | 1 (7.7%) |
| Time to refibrillation (s) | N | 12 | 9 | 3 |
| | Median | 24.75 | 25.00 | 10.90 |
| | [IQR] | [15.33 - 35.47] | [20.10 - 37.50] | [8.70 - 21.60] |

B.

| | | All patients with shock | iVF patients | Non-iVF patients |
|---|---|---|---|---|
| **All Shock** | N | 77 | 56 | 21 |
| | Successful | 64 (83.1%) | 46 (82.1%) | 18 (85.7%) |
| | Unsuccessful | 13 (16.9%) | 10 (17.9%) | 3 (14.3%) |
| Refibrillation | N | 77 | 56 | 21 |

Journal Pre-proofs

Journal Pre-proofs

| | | | | |
|---|---|---|---|---|
| | Persistent VF | 13 (16.9%) | 10 (17.9%) | 3 (14.3%) |
| | Refibrillation | 26 (33.8%) | 18 (32.1%) | 8 (38.1%) |
| | No refibrillation | 36 (46.7%) | 28 (50.0%) | 8 (38.1%) |
| | Undefined | 2 (2.6%) | 0 (0.0%) | 2 (9.5%) |
| Time to refibrillation (s) | N | 26 | 18 | 8 |
| | Median | 20.50 | 24.15 | 9.75 |
| | [IQR] | [11.15 – 30.65] | [20.18 - 34.47] | [6.18 - 15.95] |

**Table 3.**

Sensitivity (Se) and specificity (Sp) considering artifact free ECG strips according to Kerber and standard recommendations. [5]

Note: *due to the small size of this subgroup, no measure of dispersion.

VF: Ventricular Fibrillation; VT: Ventricular Tachycardia; LCL: Lower Confidence Limit.

| Rhythm | Sample Size | Shock advised | No shock advised | Performances (Se/Sp) | 90% 1-sided LCL |
|---|---|---|---|---|---|
| VF | 73 | 71 | 2 | 97 % | 94 % |
| Fine VF | 6 | 3 | 3 | 50 %* | * |
| Rapid-VT | 6 | 2 | 4 | 33 %* | * |

Journal Pre-proofs

Journal Pre-proofs

| | | | | | |
|---|---|---|---|---|---|
| Asystole | 985 | 0 | 985 | 100 % | 100 % |
| Normal Sinus Rhythm | 114 | 0 | 114 | 100 % | 100 % |
| Other Non-shockable Rhythm | 416 | 3 | 413 | 99 % | 98 % |

**Table 4.**

Comparison of energy doses (J/kg) on panel (A), weights (kg) on panel (B) and ages (years) on panel (C) using a Wilcoxon test for each outcomes considering first shocks of initial VF patients. Median [IQR] dose for failure and success of each outcome is presented.

ROOR: Return of Organized Rhythm; ROSC: Return of Spontaneous Circulation; IQR : Interquartile Range

A.

| | **Dose with adult pads (J/kg)** | | | **Dose with child pads (J/kg)** | | |
|---|---|---|---|---|---|---|
| **Outcomes** | **Failure** | **Success** | **p-val** | **Failure** | **Success** | **p-val** |
| Shock success | (N=0) | 3.52 [2.61-4.24] (N=15) | - | (N=0) | 1.55 [1.04-2.84] (N=7) | - |
| ROOR at 60s | 3.72 [2.42-4.50] (N=8) | 3.52 [3.05-3.74] (N=7) | 0.955 | 4.19 [3.74-4.63] (N=2) | 1.11 [0.97-1.55] (N=5) | 0.095 |
| ROSC | 4.24 [3.84-5.26] (N=4) | 3.47 [2.55-3.74] (N=11) | 0.104 | 5.08 (N=1) | 1.33 [1.00-2.17] (N=6) | - |


Journal Pre-proofs

Journal Pre-proofs

| | | | | | | |
|---|---|---|---|---|---|---|
| Survival at hospital admission | 3.88 [3.70-4.85] (N=4) | 3.47 [2.55-4.10] (N=11) | 0.226 | 4.19 [3.74-4.63] (N=2) | 1.11 [0.97-1.55] (N=5) | 0.095 |
| Survival at hospital discharge | 3.65 [3.24-4.11] (N=8) | 3.47 [2.58-4.10] (N=7) | 0.613 | 2.38 [1.55-3.30] (N=5) | 1.04 [1.00-1.07] (N=2) | 0.381 |

B.

| | **Weight of patients with adult pads (kg)** | | | **Weight of patients with child pads (kg)** | | |
|---|---|---|---|---|---|---|
| **Outcomes** | **Failure** | **Success** | **p-val** | **Failure** | **Success** | **p-val** |
| Shock success | (N=0) | 41.9 [33.7-51.0] (N=15) | - | (N=0) | 20.0 [10.7-29.0] (N=7) | - |
| ROOR at 60s | 39.8 [30.1-48.8] (N=8) | 43.5 [40.9-50.5] (N=7) | 0.487 | 7.35 [6.63-8.07] (N=2) | 28.0 [20.0-30.0] (N=5) | 0.079 |
| ROSC | 36.5 [30.1-40.6] (N=4) | 43.5 [37.0-58.5] (N=11) | 0.214 | 5.91 (N=1) | 24.0 [14.4-29.5] (N=6) | - |
| Survival at hospital admission | 39.7 [34.6-41.0] (N=4) | 43.5 [33.7-58.5] (N=11) | 0.396 | 7.35 [6.63-8.07] (N=2) | 28.0 [20.0-30.0] (N=5) | 0.079 |
| Survival at hospital discharge | 39.7 [30.1-43.6] (N=8) | 45.0 [37.9-58.5] (N=7) | 0.203 | 12.6 [8.79-20.0] (N=5) | 29.0 [28.5-29.5] (N=2) | 0.241 |

C.

| | **Age of patients with adult pads (years)** | **Age of patients with child pads (years)** |
|---|---|---|

Journal Pre-proofs

| Outcomes | Failure | Success | p-val | Failure | Success | p-val |
|---|---|---|---|---|---|---|
| Shock success | (N=0) | 14.0 [11.7-15.9] (N=15) | - | (N=0) | 8.66 [1.35-9.38] (N=7) | - |
| ROOR at 60s | 13.1 [8.57-14.1] (N=8) | 16.0 [14.6-16.7] (N=7) | 0.029 | 0.33 [0.30-0.36] (N=2) | 8.73 [8.66-10.0] (N=5) | 0.095 |
| ROSC | 14.2 [11.1-15.9] (N=4) | 14.0 [12.1-15.7] (N=11) | 0.949 | 0.27 (N=1) | 8.69 [3.89-9.71] (N=6) | - |
| Survival at hospital admission | 15.9 [13.3-16.1] (N=4) | 13.9 [11.7-15.0] (N=11) | 0.489 | 0.33 [0.30-0.36] (N=2) | 8.73 [8.66-10.0] (N=5) | 0.095 |
| Survival at hospital discharge | 14.9 [11.1-16.1] (N=8) | 13.9 [12.1-15.0] (N=7) | 0.779 | 2.30 [0.40-8.66] (N=5) | 9.38 [9.06-9.71] (N=2) | 0.381 |

**CRediT Author Statement**

The CRediT Author Statement below approves that all authors have made substantial contributions to all of the following: (1) the conception and design of the study, or acquisition of data, or analysis and interpretation of data, (2) drafting the article or revising it critically for important intellectual content, (3) final approval of the version to be submitted and (4) agreement to be accountable for all aspects of the work.

- **Emma Menant**: Validation, Formal analysis, Data curation, Writing - Original Draft, Writing - Review & Editing, Visualization
- **Delphine Lavignasse**: Conceptualization, Methodology, Software, Validation, Formal analysis, Investigation, Resources, Data Curation, Writing – Review & Editing
- **Sarah Ménétré**: Conceptualization, Methodology, Software, Validation, Formal analysis, Resources, Writing - Review & Editing, Supervision

- **Jean-Philippe Didon**: Conceptualization, Writing - Review & Editing, Supervision

- **Xavier Jouven**: Conceptualization, Formal analysis, Writing - Review & Editing, Supervision, Project administration, Funding acquisition








Journal Pre-proofs

Journal Pre-proofs




**Declaration of Interest Statement**

☐ The authors declare that they have no known competing financial interests or personal relationships that could have appeared to influence the work reported in this paper.

☐ The author is an Editorial Board Member/Editor-in-Chief/Associate Editor/Guest Editor for this journal and was not involved in the editorial review or the decision to publish this article.



Journal Pre-proofs

☒ The authors declare the following financial interests/personal relationships which may be considered as potential competing interests:

Emma Menant reports a relationship with SCHILLER Médical, Wissembourg, France that includes: receiving research support.
Delphine Lavignasse reports a relationship with SCHILLER Médical, Wissembourg, France that includes: receiving research support.
Sarah Ménétré reports a relationship with SCHILLER Médical, Wissembourg, France that includes: employment.
Jean-Philippe Didon reports a relationship with SCHILLER Médical, Wissembourg, France that includes: employment.
Xavier Jouven reports a relationship with SCHILLER Médical, Wissembourg, France that includes: receiving funds for scientific consulting.
If there are other authors, they declare that they have no known competing financial interests or personal relationships that could have appeared to influence the work reported in this paper.

Journal Pre-proofs