# Exhibit S

NIH Public Access
Author Manuscript
J Am Coll Cardiol. Author manuscript; available in PMC 2010 December 22.

Published in final edited form as:
*J Am Coll Cardiol*. 2010 April 20; 55(16): 1713–1720. doi:10.1016/j.jacc.2009.11.077.

# Survival After Application of Automatic External Defibrillators Before Arrival of the Emergency Medical System:

## Evaluation in the Resuscitation Outcomes Consortium Population of 21 Million

**Myron L. Weisfeldt, MD**[*], **Colleen M. Sitlani, MS**[†], **Joseph P. Ornato, MD**[‡], **Thomas Rea, MD**[†], **Tom P. Aufderheide, MD**[§], **Daniel Davis, MD**[||], **Jonathan Dreyer, MD**[¶], **Erik P. Hess, MD, MSc**[#], **Jonathan Jui, MD, MPH**[**], **Justin Maloney, MD**[††], **George Sopko, MD, MPH**[‡‡], **Judy Powell, BSN**[†], **Graham Nichol, MD, MPH**[†], and **Laurie J. Morrison, MD, MSc**[§§] **for the ROC Investigators**

[*] Johns Hopkins University, Baltimore, Maryland [†] University of Washington, Seattle, Washington [‡] Virginia Commonwealth University, Richmond, Virginia [§] Medical College of Wisconsin, Milwaukee, Wisconsin [||] University of California, San Diego, San Diego, California [¶] University of Western Ontario, London, Ontario, Canada [#] Mayo Clinic, Rochester, Minnesota [**] Oregon Health & Sciences University, Portland, Oregon [††] University of Ottawa, Ottawa, Ontario, Canada [‡‡] National Heart, Lung, and Blood Institute, National Institutes of Health, Bethesda, Maryland [§§] University of Toronto, Toronto, Ontario, Canada

## Abstract

**Objectives—**The purpose of this study was to assess the effectiveness of contemporary automatic external defibrillator (AED) use.

**Background—**In the PAD (Public Access Defibrillation) trial, survival was doubled by focused training of lay volunteers to use an AED in high-risk public settings.

**Methods—**We performed a population-based cohort study of persons with nontraumatic out-of-hospital cardiac arrest before emergency medical system (EMS) arrival at Resuscitation Outcomes Consortium (ROC) sites between December 2005 and May 2007. Multiple logistic regression was used to assess the independent association between AED application and survival to hospital discharge.

**Results—**Of 13,769 out-of-hospital cardiac arrests, 4,403 (32.0%) received bystander cardiopulmonary resuscitation but had no AED applied before EMS arrival, and 289 (2.1%) had an AED applied before EMS arrival. The AED was applied by health care workers (32%), lay volunteers (35%), police (26%), or unknown (7%). Overall survival to hospital discharge was 7%. Survival was 9% (382 of 4,403) with bystander cardiopulmonary resuscitation but no AED, 24% (69 of 289) with AED application, and 38% (64 of 170) with AED shock delivered. In multivariable analyses adjusting for: 1) age and sex; 2) bystander cardiopulmonary resuscitation performed; 3) location of arrest (public or private); 4) EMS response interval; 5) arrest witnessed; 6) initial shockable or not shockable rhythm; and 7) study site, AED application was associated with greater likelihood of survival (odds ratio: 1.75; 95% confidence interval: 1.23 to 2.50; $p < 0.002$). Extrapolating this greater survival from the ROC EMS population base (21 million) to the population of the U.S. and Canada (330 million), AED application by bystanders seems to save 474 lives/year.

Reprints requests and correspondence: Dr. Myron L. Weisfeldt, Johns Hopkins University, 1830 East Monument Street, Suite 9026, Baltimore, Maryland 21287. mlw5@jhmi.edu.

**Conclusions—**Application of an AED in communities is associated with nearly a doubling of survival after out-of-hospital cardiac arrest. These results reinforce the importance of strategically expanding community-based AED programs.

### Keywords

automatic external defibrillator; cardiac arrest; cardiopulmonary resuscitation; defibrillation; resuscitation

---

Currently more than 200,000 automated external defibrillators (AEDs) are sold yearly for public use in the U.S. (1). This expenditure totals approximately $500 million per year in equipment and training. Anecdotal reports document a high rate of survival after out-of-hospital cardiac arrest (OHCA) when trained persons with a job-related duty to respond use AEDs (2–4) or where health care professionals are in high concentration (5). This question was studied by the large, community-based, randomized PAD (Public Access Defibrillation) trial-trained volunteers (6,7) at both control and AED sites and showed a doubling the number of survivors (30 vs. 15; relative risk: 2.0; 95% confidence interval [CI]: 1.07 to 3.77; p = 0.03) at sites with AEDs compared with sites without AEDs.

There is little information about the clinical or public health impact of the ongoing investment in AEDs and training for the public at large. Several before-and-after comparisons of survival after implementation of PAD programs using AEDs showed favorable results (8–11), whereas others did not (12–14). These inconsistent findings have challenged the value of AED implementation as a community strategy to improve survival after cardiac arrest (15–23). In a randomized trial of private AED placement in homes of patients who have undergone myocardial infarction (24), survival was not improved in patients whose home was equipped with an AED and a family member trained to use an AED compared with patients with cardiopulmonary resuscitation (CPR) training and no AED.

In recent years, emergency medical services (EMS) recordings of initial cardiac arrest rhythms show a striking decline in the incidence of ventricular tachycardia (VT) or ventricular fibrillation (VF) that may benefit from AED use. Initial VT/VF rhythms accounted for 70% to 80% of cardiac arrests 20 years ago (25), but now constitute only 10% to 30% of arrests (8,25,26). Non-VT/VF arrests (asystole and pulseless electrical rhythms) do not benefit from AEDs, and furthermore, their use may delay life-saving measures such as bystander CPR in such patients.

Although an in-hospital registry of cardiac arrest and resuscitation exists in the U.S. (27), there have been no large registries of the out-of-hospital experience to assess the value of bystander AED. The Resuscitation Outcomes Consortium (ROC) (28) established a population-based registry for OHCA and resuscitation called the ROC Epistry Cardiac Arrest registry (26,29). In this report, we use this registry to test the hypothesis that despite the decreasing frequency of VT/VF as an initial rhythm and despite possible delays or errors associated with AED application, cardiac arrest patients who have an AED applied before EMS arrival experience better survival than those without an AED applied.

## Methods

### Design and setting

The ROC Epistry Cardiac Arrest registry is a prospective, multicenter, multiregional, population-based international cohort study of nontramatic OHCA (28,29). We report on patients treated by 1 or more of 215 ROC EMS agencies in 7 U.S. sites (Alabama, Dallas,



NIH-PA Author Manuscript NIH-PA Author Manuscript NIH-PA Author Manuscript

NIH-PA Author Manuscript NIH-PA Author Manuscript NIH-PA Author Manuscript

Iowa, Milwaukee, Pittsburgh, Portland, and Seattle-King County) and 3 Canadian sites (Ottawa-OPALS, Toronto, and British Columbia) between December 1, 2005, and April 30, 2007 (26). One ROC site, San Diego, did not participate and was omitted from this analysis (see Figure 1 for a map of the sites).

The ROC sites obtained institutional review board approval to conduct this research with a waiver of written consent under minimal risk criteria. The ROC Epistry Cardiac Arrest registry was approved by the Institutional Review Board of the University of Washington (Data Coordinating Center), 100 U.S. institutional review boards, and 34 Canadian research ethics boards.

## Inclusion and exclusion criteria

The current study included persons with nontraumatic OHCA regardless of the cause that occurred before EMS arrival who received attempts at external defibrillation (by lay responders or emergency personnel) or chest compressions by organized EMS personnel. We excluded both EMS-witnessed arrests because an AED would not be applied before EMS arrival in this group and arrests that occurred in healthcare facilities, because the intent in the current study was to evaluate whether randomized trial results from the PAD trial would translate broadly to a heterogeneous set of communities (Fig. 2). We also excluded persons if resuscitation was not attempted, for example, because the person had “do not resuscitate” status, terminal illness, or evidence of prolonged death such as rigor mortis. Finally, we excluded those subjects enrolled in the concurrent ROC CPR Feedback trial (n = 160) because those results have not yet been reported and more recent large scale trials (30,31).

## Data definitions

Details of data definitions, data collection, and quality assessment methods have been published previously (29). Information about each OHCA was collected using a uniform set of data definitions developed by the ROC investigators and derived from the Utstein data elements. The data elements included information about patient demographics, arrest circumstances, characteristics of care, and survival status. AED application before EMS arrival was defined as AED application (with or without delivery of a shock) by a person outside the EMS, whereas AED shock defined the subgroup in which the AED was applied before EMS arrival and delivered a shock. Shockable first rhythm was defined as either shock on application of AED by a bystander before EMS arrival or a first rhythm of VF/VT recorded by EMS. EMS response time was defined as the time from 911 call received at EMS dispatch to the first EMS vehicle arrival at the scene. Public location was defined as a street or highway, public building, place of recreation, industrial place, or other public property. Non-public location was defined to include a home residence, farm or ranch, residential institution, or other private property. Health care facilities, which include hospitals, medical clinics, and other healthcare institutions, but do not include nursing homes, were excluded from this analysis. The primary outcome was survival to hospital discharge as determined from available records (usually hospital records).

## Data analysis

Statistical analyses were conducted using R software, version 2.1.1 (R Foundation for Statistical Computing, Vienna, Austria). All tests were 2-sided with a significance level of 0.05.

Analyses determined the association between survival and AED application before EMS arrival. We focused on AED application because this application would reflect both the potential favorable effects of early shock on survival and the unfavorable effects of possible

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

delay in performing CPR or calling EMS because of an AED search and application. Because no single clinical group provides the ideal comparison, we stratified the data according to whether CPR was performed before EMS arrival and initial rhythm characteristics in descriptive analyses. We present arrest and outcome characteristics for non–EMS-witnessed subjects as 7 groups (Fig. 2, Table 1): Group 1, All EMS care, no EMS witnessed; Group 2, bystander CPR, no AED applied before EMS arrival; Group 3, AED application before EMS arrival; Group 4, AED application and AED shock before EMS arrival (subset of Group 3); Group 5, bystander CPR before EMS arrival, no AED application, and a shock delivered by EMS upon initial assessment (subset of Group 2); Group 6, public location arrests and Group 7, bystander-witnessed arrests (subset of Group 2).

In addition, multiple logistic regression analysis determined the association between survival and AED application before EMS arrival after accounting for potential confounding factors. The primary inferential analysis consisted of a multiple logistic regression analysis for the 11,370 of 13,769 Group 1 arrests with complete data (Fig. 2). Survival to hospital discharge was regressed on a binary indicator of whether an AED was applied before EMS arrival adjusting for: 1) age and gender; 2) bystander CPR performed; 3) location of arrest (public or private); 4) EMS response interval; 5) arrest witnessed; 6) initial rhythm shockable, not shockable, or unknown; and 7) ROC site. Adjustment for initial rhythm also was included because it is likely a surrogate for other unmeasured confounders. Secondary analyses investigated potential clustering by site via generalized estimating equations (32) and generalized linear mixed models (33). Interaction by site was investigated by adding interactions between site and all other covariates in the multiple regression model. This analytical approach is essentially equivalent to fitting the multivariate model separately in each site, but provides additional power via simultaneous estimation of coefficients. A likelihood ratio test was used to compare the model with and without interactions.

We also addressed potential confounding in the observed relationship between AED application and survival through a propensity analysis to account for a subject's probability of receiving bystander AED application (34). We estimated propensity scores as predicted probabilities from a logistic regression model with AED application as the outcome and the covariates discussed previously as predictors. We then created 6 strata based on the following quantiles of the score: 0.75, 0.90, 0.925, 0.95, and 0.975. These quantiles were chosen so that there were sufficient subjects in each stratum who both had an AED applied and survived. A Mantel-Haenszel chi-square test then was performed to estimate the odds ratio (OR) for survival with AED application versus without, stratified by propensity score.

We also addressed potential confounding by performing sensitivity analyses restricted to Groups 2 and 3—those who received bystander CPR but had no bystander AED applied, and those who had a bystander AED applied, because these 2 groups are least confounded with regard to the relationship between AED application and survival. Both the complete-case multiple regression model and the propensity score analysis were reproduced in this reduced population.

These complete-case analyses would provide a valid estimate of the association between AED application before EMS arrival and survival if data were missing completely at random (35), an assumption that cannot be tested fully. Hence, we used multiple imputations (36) of missing covariates to permit multivariate analysis of all 13,769 subjects who had known outcome status, addressing in part the limitation of missing covariate data. Analysis was carried out with the R mice package (The R Project for Statistical Computing) using 50 imputations.

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

Next, we also conducted a post hoc subgroup analysis to determine whether the OR for survival with AED applied versus not applied varied within subgroups of location (private or public). For this analysis, an interaction between AED application; and location was added to the original logistic regression model including all other covariates. Significance was determined via a likelihood ratio test comparing the model with interaction with the one without interaction.

Finally, we calculated the excess lives saved that were attributable to use of the bystander AED, then extrapolated this to the U.S. and Canada based on the ROC catchment area. The excess of lives saved was the difference between the observed number who survived when bystander AEDs were applied and the estimated number who would have survived had there not been bystander AEDs. The number who would have survived had there not been bystander AEDs was estimated by: 1) applying the estimated OR from the multivariate analysis to the observed odds among cases in which a bystander AED was applied to obtain the odds of survival had there not been bystander AED application; and 2) converting these odds back to a survival probability and multiplying by the number of patients who had an AED applied. We estimated the total population served to be approximately 21 million people by examining the census tracts of the EMS agencies. The extrapolation was based on the assumption that the ROC covers 21 million people and that the combined population of the U.S. and Canada is 330 million.

## Results

During the 17-month study period, 15,549 persons experienced a nontraumatic OHCA and were treated by EMS in the study regions, and of these, 15,099 (97.1%) had a known outcome status. Of these, 1,330 arrests were excluded because they were witnessed by EMS (Fig. 2). Thus, the final cohort included 13,769 individuals (Group 1), among whom 2.1% (289) had an AED applied before EMS arrival (Group 3) and constituted the primary subgroup for analysis. In this group, an AED was applied by healthcare workers (32%), lay volunteers (35%), police (26%), or unknown (7%).

Table 1 characterizes the 5 subgroups of non–EMS-witnessed cases (Groups 1 through 5). The same groups are identified in Figure 2. The entire cohort included only 438 individuals who were younger than 18 years. The EMS response interval was similar across all groups, with a median response interval of 5.3 minutes (interquartile range, 4.0 to 6.9) for all non–EMS-witnessed cardiac arrests. Public location and bystander-witnessed arrests before EMS arrival also are shown in Table 1 and were more common among those with placement of an AED before EMS arrival, especially among those who received an AED shock. In addition, the proportion of OHCA in which an AED was applied before EMS arrival varied across ROC sites, ranging from 1% to 7%.

### Overall survival and by subgroup

Table 1 shows the overall survival by subgroup. Overall survival was 7% among all EMS-treated OHCAs occurring before EMS arrival (Group 1; n = 13,769). Survival was 9% when CPR was performed before EMS arrival, but an AED was not applied (Group 2). Of the cases in which an AED was applied before EMS arrival (Group 3), 24% (69 of 289) survived, and of those who received a shock from an AED applied before EMS arrival (Group 4), 38% (64 of 170) survived. Survival was 40% with application of an AED by a lay person, 16% for health care workers, and 13% for police. Forty-one of the 289 AED applied arrests occurred in residential institutions where healthcare workers were present.

The survival of patients who had an AED applied before EMS arrival but no AED shock was 3.5%, and this rate was not different from the 2.3% (n = 2,887) survival among patients

NIH-PA Author Manuscript NIH-PA Author Manuscript NIH-PA Author Manuscript

who received bystander CPR without an AED applied and had a nonshockable rhythm at presentation ($p < 0.34$). The rates reported exclude those with an unknown initial rhythm. Controlling for the covariates included in the model for the primary analysis did not change this conclusion ($p < 0.60$).

### Logistic regression model

A logistic regression model was applied to all cases with complete information from Group 1 (n = 11,370). The unadjusted OR of survival associated with AED application before EMS arrival (with or without shock) was 4.74 (95% CI: 3.53 to 6.36). After adjusting for age, gender, bystander CPR performed, type of location, EMS response interval, witness status, initial rhythm, and ROC site, AED application before EMS arrival was associated with an OR of survival of 1.75 (95% CI: 1.23 to 2.50; $p < 0.002$). This OR was attenuated slightly to 1.62 (95% CI: 1.16 to 2.26; $p < 0.007$) when we used a stratified propensity score analysis to adjust for these covariates instead of multiple regression. In the reduced population that included only those who received treatment from a bystander, the complete-case OR was 1.68 (95% CI: 1.19 to 2.39; $p < 0.004$) and the propensity score OR was 1.73 (95% CI: 1.25 to 2.39; $p < 0.002$). Propensity score models predicted AED application well, with C statistics of 0.91 and 0.82, respectively, for the 2 models. Generalized estimating equation and generalized linear mixed model analyses that accounted for clustering by site produced similar estimates.

Of those cases with missing data (n = 2,399), 87% lacked witnessed status, bystander CPR status, or both (574 witnessed, 809 CPR, and 699 both). Thirty-six of the excluded cases were cases in which an AED was applied before EMS arrival. In the analysis of all 13,769 patients with survival data, using multiple imputation for missing covariate data, the OR of survival associated with an AED applied before EMS arrival was similar to that found in other analyses: 1.75 (95% CI: 1.27 to 2.41; $p < 0.001$).

### Site-specific analysis of bystander AED use

When multiple regression was performed on complete cases with stratification by site, nearly all of the site-specific OR estimates were more than 1, but many were not significantly different from 1, likely because of the number of subjects receiving bystander AED application at individual sites was small (Table 2). This stratified model fit the data better than the model not stratified by site ($p < 0.003$). However, it required that a large number of ORs be estimated using a limited amount of data on bystander AED application.

### Post hoc subgroup analysis of location of AED application

Table 3 presents survival by the type of location of the OHCA. Of the 288 OHCA in which AED application took place, 59% (171 of 288) occurred in public sites and 41% (117 of 288) occurred in private locations. Survival was 35% (59 of 171) among public location OHCAs with AED application, 20% (177 of 888) among public location OHCAs with bystander CPR but no AED application, 9% (10 of 117) among private location OHCAs with AED application, and 6% (204 of 3,510) among private location OHCAs with bystander CPR but no AED application. Although the absolute survival differences observed for AED application were greater in public settings than in private settings, the positive survival association of AED application did not differ significantly according to type of location (adjusted OR, 1.39 private and 1.86 public; $p = 0.53$ for interaction between AED and location).

NIH-PA Author Manuscript NIH-PA Author Manuscript NIH-PA Author Manuscript

### Extrapolated estimate of lives saved

We extrapolated survival in the approximately 21 million people in the ROC's covered area to the entire population of the U.S. and Canada (330 million). We estimate that currently, 474 lives are saved per year by bystander application of an AED to those who experience an OHCA.

## Discussion

This observational study, drawn from a large set of heterogeneous communities, provides strong evidence that AED application before EMS arrival is associated with improved survival after OHCA. Multiple analytical approaches designed to account for confounding consistently demonstrated a significant survival benefit of AED application with an OR of approximately 1.8. This OR is comparable with the 2-fold AED survival benefit demonstrated in the randomized and controlled PAD trial (6) in which volunteers received special training in AED use at high-risk AED-equipped sites.

In combination, the results underscore the critical importance of early defibrillation and continue to encourage innovative approaches to achieve this critical link in the chain of survival. Such approaches may include implanted monitors with electronic alert to a bystander and the EMS system. Another strategy includes mandatory registration of all public access defibrillators with local EMS dispatch. The dispatcher could coach 1 person to start CPR and another bystander to retrieve the closest AED. Also, placement of all AEDs may be guided by a model that considers health risk, population density, and rate of cardiac arrest in similar buildings.

The current investigation involves a catchment population of 21 million persons who reside in urban, suburban, and rural areas across North America and are served by more than 200 EMS agencies with a variety of operating models and training levels. Moreover, laypersons, persons with health care training, and police all provided AED application. Success of 40% by lay persons emphasizes that speed is more important than training. Thus, we believe the results of the current study provide the best information to date supporting the generalizability of the PAD trial (6), and so represent a meaningful community-based approach to improve survival after an OHCA.

In both the current study and the PAD trial, most of the survivors who received AED application experienced an OHCA in public as opposed to private locations in part because more AED application occurred in public sites, but primarily because survival was better in public locations. In contrast to the robust association in public sites, the PAD study and the current investigation did not observe this independent survival association in private locations. Similarly, a randomized trial evaluating home AED placement did not demonstrate survival benefit in part potentially because of the low OHCA event rate. Nonetheless, of 14 patients in the home AED trial where an AED shock was delivered, 26.8% survived, which is similar to the 38% in the current study. Taken together, the results highlight an established role in public settings and suggest a need for additional study to optimize private AED deployment, especially if resources are limited.

The primary analysis was performed for AED application rather than AED shock. This approach allowed for the possibility of adverse effects of AED application such as delay in performing CPR or in calling 911. Particularly for patients with non-VT/VF arrest, the AED offers no obvious benefit and the potential for delay in other important links in the chain of survival.

NIH-PA Author Manuscript NIH-PA Author Manuscript NIH-PA Author Manuscript

The results of the current study need to be viewed in light of existing data on meaningful survival after hospital discharge and long-term survival. Better resuscitation is associated with better survival (37), functional status (38), and health-related quality of life (39–41). It is reasonable to expect similar or better survival in the present study because defibrillation was provided earlier than if delivered by EMS.

A unique and important feature of this investigation is that it enables an assessment of how readily clinical trial evidence (from the PAD trial) has been translated into community-based practice. Given the observed survival benefits in the current investigation, AED application before EMS arrival provides a viable means to improve public health. In the current investigation, AED application before EMS arrival occurred in 2.1% of all OHCAs. However, use varied from 1% to 7% across the ROC network sites, a finding that offers a framework for efforts aimed at further implementation of AED programs. A recent study emphasized the importance of locating AEDs in places of high cardiac arrest frequency (42). This may be 1 contributor to site-specific differences in AED survival. Hence, an overall goal of 5% seems realistic, with some communities already exceeding this percentage of rapid AED use. Such an increase has the potential to double the population-attributable benefit (the number of lives saved) of early AED application. The 1,280 patients in Group 5, in which EMS shocked the patient, might have had even better survival than (22%) if a bystander had applied an AED. The survival of 38% with shock by a bystander using the AED should encourage broader awareness of the AED, which may prompt increased use by bystanders even for those lacking medical training.

The strengths of this report include: 1) the large and heterogeneous set of communities, EMS systems, and OHCA population base; 2) uniform data collection across multiple communities, enabling a multivariate analysis using the important clinical outcome of hospital survival; 3) the contemporary nature of the data and incidence of VT/VF; 4) the assessment of the survival association of AED application and whether a shock was delivered, a unique aspect of the current study; and 5) compared with other reports (2,3,5,6), the relatively large number of patients with AED applied (n = 289).

The study limitations include the lack of information regarding: 1) underlying health status before cardiac arrest; 2) long-term survival; 3) detailed neuropsychiatric assessment of survivors; 4) the extent and type of PAD programs within the network; 5) the training of lay volunteers and health care workers and placement of AEDs; 6) complete data for all cases; and 7) the findings from the AED-recorded electrocardiography records. An additional limitation of this analysis is the observational nature of the data. Because randomization was not used to determine which subjects received AED application, there is no guarantee that those who received it were comparable with those who did not. We tried to minimize this potential confounding by adjusting for all measured confounders in our multiple logistic regression model and by conducting propensity score analyses. However, there may have been other, unmeasured characteristics that also were confounders, such as the physical place of AEDs. Our inability to account for these leaves open the possibility that our results were biased.

## Conclusions

Cardiac arrest is a treatable condition. This investigation supports a significant and important beneficial impact of PAD programs in community-based settings. On average, early AED defibrillation before EMS arrival seems to nearly double a victim's odds of survival after OHCA. These results support strategic expansion of PAD programs particularly in public locations across the United States and Canada as a continuing major public health initiative.

NIH-PA Author Manuscript NIH-PA Author Manuscript NIH-PA Author Manuscript

## Acknowledgments

The Resuscitation Outcomes Consortium (ROC) is supported by a series of cooperative agreements to 10 regional clinical centers and 1 data coordinating center (5U01 HL077863, HL077881, HL077871 HL077872, HL077866, HL077908, HL077867, HL077885, HL077887, HL077873, and HL077865) from the National Heart, Lung and Blood Institute in partnership with the National Institute of Neurological Disorders and Stroke; the U.S. Army Medical Research & Material Command; The Canadian Institutes of Health Research (CIHR)–Institute of Circulatory and Respiratory Health; Defence Research and Development Canada; the American Heart Association; and the Heart and Stroke Foundation of Canada. Some ROC site emergency medical systems have received equipment or concessions from automatic external defibrillator manufacturers. The ROC coordinating center accepts support for receptions from corporations. Dr. Weisfeldt receives salary support from NIH via the ROC. Dr. Ornato is an unpaid Science Advisory Board member of Zoll. Dr. Rea received research support from Medtronic, Inc., and Philips, Inc. Dr. Aufderheide is a consultant for Medtronics, Inc., and JoLife, Inc. Dr. Nichol is a co-principal investigator of the ROC Data Coordinating Center (NHLBI); principal investigator of the randomized trial of hemofiltration after resuscitation from cardiac arrest (NHLBI); co-investigator of the randomized field trial of cold saline IV after resuscitation after cardiac arrest (NHLBI); principal investigator of the randomized trial of CPR training aid in community (Asmund S. Laerdal Foundation for Acute Medicine); has received travel expenses from Innercool Therapies Inc., Radiant Medical Inc., and the American Heart Association; and is a consultant for Triage Wireless.

## Abbreviations and Acronyms

| | |
|---|---|
| **AED** | automatic external defibrillator |
| **CPR** | cardiopulmonary resuscitation |
| **EMS** | emergency medical services |
| **OHCA** | out-of-hospital cardiac arrest |
| **OR** | odds ratio |
| **VF** | ventricular fibrillation |
| **VT** | ventricular tachycardia |

## References

1. Shah JS, Maisel WH. Recalls and safety alerts affecting automated external defibrillators. JAMA 2006;296:655–60. [PubMed: 16896108]
2. Valenzuela TD, Roe DJ, Nichol G, Clark LL, Spaite DW, Hardman RG. Outcomes of rapid defibrillation by security officers after cardiac arrest in casinos. N Engl J Med 2000;343:1206–9. [PubMed: 11071670]
3. Page RL, Joglar JA, Kowal RC, et al. Use of automated external defibrillators by a U.S. airline. N Engl J Med 2000;343:1210–6. [PubMed: 11071671]
4. White RD, Hankins DG, Bugliosi TF. Seven years' experience with early defibrillation by police and paramedics in an emergency medical services system. Resuscitation 1998;39:145–51. [PubMed: 10078803]
5. Caffrey SL, Willoughby PJ, Pepe PE, Becker LB. Public use of automated external defibrillators. N Engl J Med 2002;347:1242–7. [PubMed: 12393821]
6. PAD Investigators. Public-access defibrillation and survival after out-of-hospital cardiac arrest. N Engl J Med 2004;351:637–46. [PubMed: 15306665]
7. Christenson J, Nafziger S, Compton S, et al. The effect of time on CPR and automated external defibrillator skills in the public access defibrillation trial. Resuscitation 2007;74:52–62. [PubMed: 17303309]
8. Ko PC, Ma MH, Yen ZS, Shih CL, Chen WJ, Lin FY. Impact of community-wide deployment of biphasic waveform automated external defibrillators on out-of-hospital cardiac arrest in Taipei. Resuscitation 2004;63:167–74. [PubMed: 15531068]

9. Capucci A, Aschieri D, Piepoli MF. Out-of-hospital early defibrillation successfully challenges sudden cardiac arrest: the Piacenza Progetto Vita project. Ital Heart J 2002;3:721–5. [PubMed: 12611123]
10. Culley LL, Rea TD, Murray JA, et al. Public access defibrillation in out-of-hospital cardiac arrest. Circulation 2004;109:1859–63. [PubMed: 15023881]
11. Colquhoun MC, Chamberlain DA, Newcombe RG, et al. A national scheme for public access defibrillation in England and Wales: early results. Resuscitation 2008;78:275–80. [PubMed: 18562074]
12. Myerburg RJ, Fenster J, Velez M, et al. Impact of community-wide police car deployment of automated external defibrillators on survival from out-of-hospital cardiac arrest. Circulation 2002;106:1058–64. [PubMed: 12196329]
13. Pell JP, Sirel JM, Marsden AK, Ford I, Walker NL, Cobbe SM. Potential impact of public access defibrillators on survival after out of hospital cardiopulmonary arrest: retrospective cohort study. BMJ 2002;325:515. [PubMed: 12217989]
14. Groh WJ, Newman MM, Beal PE, Fineberg NS, Zipes DP. Limited response to cardiac arrest by police equipped with automated external defibrillators: lack of survival benefit in suburban and rural Indiana. The Police as Responder Automated Defibrillation Evaluation (PARADE). Acad Emerg Med 2001;8:324–30. [PubMed: 11282666]
15. Pell JP, Walker A, Cobbe SM. Cost-effectiveness of automated external defibrillators in public places: con. Curr Opin Cardiol 2007;22:5–10. [PubMed: 17143038]
16. Gold LS, Eisenberg M. Cost-effectiveness of automated external defibrillators in public places: pro. Curr Opin Cardiol 2007;22:1–4. [PubMed: 17143037]
17. Maisch S, Friederich P, Goetz AE. Public access defibrillation: limited use by trained first responders and laymen. Anaesthesist 2006;55:1281–90. [PubMed: 17021885]
18. Amit G, Zalzstein E, Ilia R, Katz A. Automatic external defibrillator (AED) and public access defibrillation (PAD). Harefuah 2006;145:375–9. [PubMed: 16805222]
19. Einav S, Weissman C, Kark J, Lotan C, Matot I. Future shock: automatic external defibrillators. Curr Opin Anaestesiol 2005;18:175–80.
20. Clare C. Do public access defibrillation (PAD) programmes lead to an increase of patients surviving to discharge from hospital following out of hospital cardiac arrest? A literature review. Int J Nurs Stud 2006;43:1057–62. [PubMed: 16423355]
21. Myers JB, French D, Webb W. Lack of integration of automated external defibrillators with EMS response may reduce lifesaving potential of public-access defibrillation. Prehosp Emerg Care 2005;9:339–43. [PubMed: 16147487]
22. Woollard MF. Public access defibrillators. BMJ 2003;326:162. [PubMed: 12531856]
23. Becker L, Gold LS, Eisenberg M, White L, Hearne T, Rea T. Ventricular fibrillation in King County, Washington: a 30-year perspective. Resuscitation 2008;79:22–7. [PubMed: 18687513]
24. Bardy GH, Lee KL, Mark DB, et al. Home use of automated external defibrillators for sudden cardiac arrest. N Engl J Med 2008;358:1793–804. [PubMed: 18381485]
25. Cobb LA, Fahrenbruch CE, Olsufka M, Copass MK. Changing incidence of out-of-hospital ventricular fibrillation. JAMA 2002;288:3008–13. [PubMed: 12479765]
26. Nichol G, Thomas E, Callaway CW, et al. Regional variation in out-of-hospital cardiac arrest incidence and outcome. JAMA 2008;300:1423–31. [PubMed: 18812533]
27. Peberdy MA, Kaye W, Ornato JP, et al. Cardiopulmonary resuscitation of adults in the hospital: a report of 14720 cardiac arrests from the National Registry of Cardiopulmonary Resuscitation. Resuscitation 2003;58:297–308. [PubMed: 12969608]
28. Davis DP, Garberson LA, Andrusiek DL, et al. A descriptive analysis of emergency medical service systems participating in the Resuscitation Outcomes Consortium (ROC) network. Prehospital Emergency Care 2007;11:369–82. [PubMed: 17907019]
29. Morrison LJ, Nichol G, Rea TD, et al. Rationale, development and implementation of the Resuscitation Outcomes Consortium epistry cardiac arrest. Resuscitation 2008;78:161–9. [PubMed: 18479802]

NIH-PA Author Manuscript NIH-PA Author Manuscript NIH-PA Author Manuscript

NIH-PA Author Manuscript
NIH-PA Author Manuscript
NIH-PA Author Manuscript

30. Aufderheide TP, Kudenchuk PJ, Hedges JR, et al. Resuscitation Outcomes Consortium (ROC) PRIMED cardiac arrest trial methods part 1: rationale and methodology for the impedance threshold device (ITD) protocol. Resuscitation 2008;78:179–85. [PubMed: 18487005]

31. Stiell IG, Callaway C, Davis D, et al. Resuscitation Outcomes Consortium (ROC) PRIMED cardiac arrest trial methods part 2: rationale and methodology for "analyze later vs. analyze early" protocol. Resuscitation 2008;78:186–95. [PubMed: 18487004]

32. Zeger SL, Liang K-Y. Longitudinal data analysis for discrete and continuous outcomes. Biometrics 1986;42:121–30. [PubMed: 3719049]

33. Stiratelli R, Laird N, Ware J. Random effects models for serial observations with binary responses. Biometrics 1984;40:961–71. [PubMed: 6534418]

34. Rosenbaum PR, Rubin DB. Reducing bias in observational studies using subclassification of the propensity score. J Am Statist Assoc 1984;386:516–24.

35. Rubin DB. Inference and missing data. Biometrika 1976;63:581–92.

36. Schafer JL. Multiple imputation: a primer. Statist Meth Med Res 1999;8:3–15.

37. Bunch TJ, White RD, Gersh BJ, et al. Long-term outcomes of out-of-hospital cardiac arrest after successful early defibrillation. N Engl J Med 2003;348:2626–33. [PubMed: 12826637]

38. Stiell IG, Wells GA, Field B, et al. Advanced cardiac life support in out-of-hospital cardiac arrest. N Engl J Med 2004;351:647–56. [PubMed: 15306666]

39. Stiell IG, Nichol G, Wells GA, De Maio VJ, Nesbitt L, Blackburn J, et al. Health related quality of life is better for cardiac arrest survivors who received citizen CPR. Circulation 2003;108:1939–44. [PubMed: 14530198]

40. Stiell IG, Nesbitt LP, Nichol G, et al. Comparison of the cerebral performance category score and the health utilities index for survivors of cardiac arrest. Ann Emerg Med 2009;53:241–8. [PubMed: 18450329]

41. van Alem AP, Waalewijn RA, Koster RW, de Vos R. Assessment of quality of life and cognitive function after out-of-hospital cardiac arrest with successful resuscitation. Am J Cardiol 2004;93:131–5. [PubMed: 14715335]

42. Folke F, Lippert FK, Nielsen SL, et al. Location of cardiac arrest in a city center: strategic placement of automated external defibrillators in public locations. Circulation 2009;120:510–7. [PubMed: 19635969]

NIH-PA Author Manuscript
NIH-PA Author Manuscript
NIH-PA Author Manuscript




**Figure 1. Map of Sites Contributing to the Resuscitation Outcomes Consortium Epistry Database**

San Diego was excluded from this analysis because of a lack of data. OPALS/B.C. = Ontario Prehospital Advanced Life Support/British Columbia; UWCTC = University of Washington Clinical Trials Center.

NIH-PA Author Manuscript
NIH-PA Author Manuscript
NIH-PA Author Manuscript




**Figure 2. Flow Chart of Patients by Group and Percent With Complete Data for the Logistic Regression Model**

Patients who arrested in a health care facility were excluded. **Complete cases were those with known data for all variables used in the multivariate analysis. AED = automatic external defibrillator; CPR = cardiopulmonary resuscitation; EMS = emergency medical services; OHCA = out-of-hospital cardiac arrest.

NIH-PA Author Manuscript NIH-PA Author Manuscript NIH-PA Author Manuscript

**Table 1**

Characterization of All EMS-Treated Victims and Various Subgroups of Interest

| | Group 1: EMS-Treated OHCA, Excluding EMS Witnessed | Group 2: Bystander CPR, No AED Applied Before EMS | Group 3: AED Applied Before EMS | Group 4: AED Shock Before EMS | Group 5: Bystander CPR, No AED, EMS Shocked | Group 6: Public Location Only | Group 7: Bystander Witnessed Only |
|---|---|---|---|---|---|---|---|
| n | 13,769 | 4,403 | 289 | 170 | 1,280 | 2,193 | 5,630 |
| Median age, yrs | 67 (26) | 65 (27) | 62 (24) | 60 (20) | 63 (22) | 60 (21) | 68 (24) |
| Gender | | | | | | | |
| Male | 8,826 (64%) | 2,838 (64%) | 212 (73%) | 141 (83%) | 987 (77%) | 1,814 (83%) | 3,783 (67%) |
| Unknown | 27 (0%) | 10 (0%) | 0 (0%) | 0 (0%) | 2 (0%) | 6 (0%) | 10 (0%) |
| Median EMS response time, min | 5.3 (2.9); 9 | 5.4 (2.8); 9.3 | 5.6 (3.4); 11 | 5.3 (3.2); 9.6 | 5.3 (2.7); 8.9 | 5 (3); 9 | 5.4 (3); 9.1 |
| Public location | 2,193 (16%) | 888 (20%) | 171 (59%) | 130 (76%) | 468 (37%) | 2,193 (100%) | 1,285 (23%) |
| Witnessed bystander | 5,630 (41%) | 2,278 (52%) | 180 (62%) | 130 (76%) | 980 (77%) | 1,285 (59%) | 5,630 (100%) |
| Unknown first rhythm | 1,273 (9%) | 278 (6%) | 25 (9%) | 13 (8%) | 42 (3%) | 156 (7%) | — |
| Shockable | 3,278 (24%) | 1,341 (30%) | 170 (59%) | 170 (100%) | 1,280 (100%) | 1,054 (48%) | 2,122 (38%) |
| Unknown | 808 (6%) | 175 (4%) | 5 (2%) | 0 (0%) | 0 (0%) | 118 (5%) | 229 (4%) |
| Transported to hospital | 8,106 (59%) | 2,553 (58%) | 224 (78%) | 146 (86%) | 999 (78%) | 1,746 (80%) | 3,861 (69%) |
| Survival to hospital discharge | 907 (7%) | 382 (9%) | 69 (24%) | 64 (38%) | 286 (22%) | 368 (17%) | 641 (11%) |

Values are n, n (interquartile range), n (%), and n (interquartile range); 90%. Group 1 = all patients receiving EMS care for presumed cardiac arrest, excluding EMS-witnessed arrests. Group 2 = all non–EMS-witnessed arrests in which a bystander performed CPR. No AED applied before EMS. Group 3 = all non–EMS-witnessed arrests in which an AED was applied before EMS arrival. This was the primary multivariate analysis group. Group 4 = all non–EMS-witnessed arrests in which an AED applied before EMS arrival provided a shock. Group 5 = all non–EMS-witnessed arrest in which a bystander performed CPR, but the first shock was provided by EMS. Group 6 = all non–EMS-witnessed cardiac arrests treated by EMS in a public location. Group 7 = all bystander-witnessed cardiac arrests (must be non–EMS-witnessed).

AED = automatic external defibrillator; CPR = cardiopulmonary resuscitation; EMS = emergency medical services; IQR = interquartile range; OHCA = out-of-hospital cardiac arrest.

NIH-PA Author Manuscript
NIH-PA Author Manuscript
NIH-PA Author Manuscript

**Table 2**

Multivariate Analysis of Survival by Site: Cases With Complete Data Only

| | n | AED Applied Before EMS | Adjusted OR* (95% CI) |
|---|---|---|---|
| Alabama | 119 | 5 | NA |
| Dallas, Texas | 423 | 8 | NA |
| Iowa | 452 | 32 | 0.69 (0.21–2.31) |
| Milwaukee, Wisconsin | 957 | 19 | 4.85 (1.58–14.84) |
| Ottawa, Ontario, Canada | 2,204 | 46 | 1.78 (0.66–4.81) |
| Pittsburgh, Pennsylvania | 440 | 38 | 1.21 (0.33–4.43) |
| Portland, Oregon | 548 | 17 | 1.72 (0.49–6.10) |
| Seattle/KC, Washington | 1,316 | 27 | 0.99 (0.38–2.57) |
| Toronto, Ontario, Canada | 3,010 | 41 | 3.65 (1.63–8.18) |
| Vancouver, British Columbia, Canada | 1,901 | 20 | 1.51 (0.55–4.19) |
| Overall | 11,370 | 253 | |

*Versus no AED applied.

CI = confidence interval; KC = King County; NA = not available; OR = odds ratio; other abbreviations as in Table 1.

NIH-PA Author Manuscript NIH-PA Author Manuscript NIH-PA Author Manuscript

## Table 3

Survival to Hospital Discharge by Type of Location

| | AED Applied Before EMS | Survival (%) | Bystander CPR, No AED Applied Before EMS | Survival (%) | Adjusted OR* (95% CI)† |
|---|---|---|---|---|---|
| Public | 171 | 35 | 888 | 20 | 1.86 (1.26–2.75) |
| Street/highway | 14 | 36 | 210 | 13 | |
| Public building | 48 | 38 | 169 | 21 | |
| Place of recreation | 41 | 49 | 135 | 24 | |
| Industrial place | 18 | 22 | 54 | 15 | |
| Other public place | 50 | 24 | 320 | 23 | |
| Private | 117 | 9 | 3,510 | 6 | 1.39 (0.62–3.09) |
| Home residence | 71 | 11 | 2,805 | 7 | |
| Farm/ranch | 1 | 0 | 7 | 0 | |
| Residential institution | 41 | 5 | 668 | 2 | |
| Other private place | 4 | 0 | 30 | 10 | |

* Versus no AED applied.

† $p = 0.75$ for interaction between AED applied and type of location. Subgroup data are unadjusted and provided for descriptive purposes. Conclusions are based on the multivariate analysis on the far right.

Abbreviations as in Tables 1 and 2.

# Exhibit T

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**MELISSA SUZETTE ARZU,**

Plaintiff,

v. **No. 4:24-cv-00433-P**

**AMERICAN AIRLINES, INC.,**

Defendant.

## OPINION & ORDER

Before the Court are two cross-motions for summary judgment: one filed by Melissa Suzette Arzu, the administrator of the estate of Kevin Greenidge, and another filed by American Airlines Inc. ("American Airlines"). ECF Nos. 49, 53. Having considered both Motions, other relevant docket filings, and the applicable law, the Court will **DENY** Arzu's Motion and **GRANT** American Airlines' Motion.

## BACKGROUND

This case follows the tragic death of fourteen-year-old Kevin Greenidge. On June 4, 2022, Kevin boarded American Airlines Flight 614 from San Pedro Sula, Honduras to Miami, Florida. Kevin flew with his aunt Anna, his uncle Leonard, Leonard's partner Janell, and Leonard and Janell's daughter. Leonard, Janell, and their daughter sat in row 31. Anna and Kevin sat in row 32. Kevin sat in the window seat and Anna in the aisle seat. Nobody sat in the seat between Kevin and Anna.

Following a multi-hour weather delay, Flight 614 departed. After takeoff, Kevin asked Anna for his asthma inhaler to help him breathe, which Anna provided. But Kevin's breathing only worsened. Shortly after reaching altitude, Kevin became unconscious. Anna began calling for help, and Leonard unsuccessfully attempted to lift Kevin from his window seat in row 32.

When the flight attendants responded to Anna's calls, they found Kevin unconscious and unresponsive and called a Code Red. The flight attendants made multiple announcements requesting assistance from medically trained passengers. The first passenger to respond was Karenna Thatcher, a nurse. The second passenger to respond was Rachel Amador, a general surgeon. When Thatcher saw Kevin, she indicated that Kevin needed to be placed on the floor. With the help of multiple people, Kevin was removed from his seat and placed on the ground.

Once Kevin was on the ground, Thatcher and Amador, with the help of one flight attendant, began administering CPR. Another flight attendant brought a medical kit and an automated external defibrillator ("AED"). Thatcher and Amador set up the AED and placed the pads on Kevin. The flight deck was then alerted of the medical emergency, and just over an hour into the flight, the pilots began an emergency descent into Cancún International Airport at 7:33 p.m. The plane arrived at the gate at 7:50 p.m. During the descent, Amador and Thatcher continued administering CPR and applying the AED machine. Emergency medical services were waiting at the gate to transport Kevin to Amerimed Hospital via ambulance. Kevin was pronounced dead at 8:45 p.m. At the time of the flight, Kevin weighed 319 pounds and suffered from a host of diagnosed health complications including asthma, obesity, sleep apnea, and type II diabetes.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact" and "is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" if the evidence presented would allow a reasonable jury to return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" when it might affect the outcome of a case. *Id.* Generally, the "substantive law will identify which facts are material," and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.*

When determining whether summary judgment is appropriate, the Court views the evidence in the light most favorable to the nonmovant. *First Am. Title Ins. Co. v. Cont'l Cas. Co.*, 709 F.3d 1170, 1173 (5th Cir. 2013). In conducting its evaluation, the Court may rely on any admissible evidence available in the record but need only consider those materials cited by the parties. FED. R. CIV. P. 56(c)(1)–(3). The Court need not sift through the record to find evidence in support of the nonmovant's opposition to summary judgment; the burden falls on the moving party to simply show a lack of evidence supporting the nonmovant's case. *See Malacara v. Garber*, 353 F.3d 393, 404–05 (5th Cir. 2003).

## ANALYSIS

American Airlines' Motion seeks summary judgment on all three of Arzu's claims: (1) the Montreal Convention claim; (2) the loss-of-consortium claim; and (3) the breach-of-contract claim. Arzu's Motion only seeks summary judgment on her first and third claims. The Court will address each claim in the order presented in American Airlines' Motion.

### A. Montreal Convention Claim

Known formally as the Convention for Unification of Certain Rules for International Carriage by Air, the Montreal Convention is an international treaty to which the United States is a signatory. The Montreal Convention "applies to all international carriage of persons, baggage or cargo performed by aircraft for reward."[1]

Article 17 provides a remedy to passengers for damages caused by "accidents" on international flights.[2] Strict liability is imposed against air carriers "for damage sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft or in the course of any of the

[1]Convention for the Unification of Certain Rules for International Carrier by Air, art. 1(1), May 28, 1999, reprinted in S. TREATY DOC. NO. 106–45 (2000), 1999 WL 33292734, at *33 (1999) (hereinafter "Montreal Convention").

[2]*See id.* art. 17.

operations of embarking or disembarking."[3] "Accident" is not defined anywhere in the Montreal Convention. However, in *Air France v. Saks*, the Supreme Court of the United States clarified that an "accident" is "an unexpected or unusual event or happening that is external to the passenger." 470 U.S. 392, 395 (1985).[4] The *Saks* Court determined that "accident" should "be flexibly applied after assessment of all the circumstances surrounding a passenger's injuries." *Id.* at 405. In addition to identifying an unusual or unexpected event, liability only arises if "a passenger's injury is caused by [the] . . . event." *Id.* at 392. The Court further recognized that "[a]ny injury is the product of a chain of causes." *Id.* at 406. Thus, when evaluating causation, a plaintiff need only show that "some link in the chain was an unusual or unexpected event external to the passenger." *Id.*

Roughly twenty years after *Saks*, another Supreme Court case considered an "accident" that occurred when an airline's crew refused to help a passenger three times. *See Olympic Airways v. Husain*, 540 U.S. 644 (2004). In *Husain*, two airline passengers, husband and wife, boarded a flight that allowed smoking. *See id.* at 646–47. The husband suffered from asthma and was sensitive to secondhand smoke. *Id.* at 647. Upon boarding, the husband and wife were seated "three rows in front of the economy-class smoking section." *Id.* The wife told a flight attendant about the husband's condition and asked to be moved, but the flight attendant refused, saying the plane was full and she was too busy. *See id.* Following two more refusals by the flight attendant to aid the husband, the husband moved to the front of the plane to get fresh air but soon after began struggling to breathe and passed away. *Id.* at 648. The lower court determined that "the flight attendant's conduct in three

---

[3] *Id.*

[4] *Air France v. Saks* considered a claim under the Warsaw Convention, which predated the Montreal Convention. In 1999, the Montreal Convention replaced the Warsaw Convention, and courts have found that interpretations of the Warsaw Convention, such as in *Saks,* apply to the Montreal Convention. *White v. Emirates Airlines*, Inc., 493 Fed. App'x 526 (5th Cir. 2012) (citations omitted) (The Montreal Convention replaces the "Warsaw Convention and all of its related instruments and . . . eliminate[s] the need for the patchwork of regulation and private voluntary agreements.").

times refusing to move [the husband] was unusual or unexpected" and therefore constituted an "accident." *Id.* at 652. The lower court's finding of an "accident" was not challenged on appeal. *Id.* As for causation, and despite the husband's pre-existing asthma condition, the Supreme Court found that the "flight attendant's refusal on three separate occasions to move [the husband]" was "a link in the chain of causes that led to [the husband's] death." *Id.* at 653 (quotations omitted). Thus, the plaintiffs also proved causation. *Id.*

On the other hand, courts have found that a flight crew's "imperfect" response to a passenger's medical emergency does not necessarily constitute an "accident." *See, e.g.*, *White v. Emirates Airlines, Inc.*, 493 Fed. App'x 526, 531 (5th Cir. 2012). For example, in *White*, a man and his mother traveled aboard an Emirates Airlines flight from Dubai to Houston. *Id.* at 527. As the plane began its descent, the mother used the lavatory, and five minutes later, a flight attendant found that the mother had collapsed. *Id.* The flight crew took the mother out of the lavatory, placed her on the ground, administered oxygen through a mask, and alerted the captain. *Id.* The plaintiff alleged that the flight crew's non-compliance with the man's request that the flight crew perform CPR or use a defibrillator constituted an "accident." *Id.* at 530–31. But the Fifth Circuit affirmed the district court's grant of summary judgment in the airline's favor because "a flight crew's arguably imperfect response to a passenger's medical emergency does not necessarily constitute an Article 17 'accident.'" *Id.* at 531.

Plaintiff alleges that the American Airlines crew's response to Kevin's emergency included four different "accidents": (1) failure to immediately notify the flight deck; (2) failure to immediately administer CPR; (3) failure to contact the physician on call; and (4) failure to establish and adhere to emergency team roles. ECF No. 55 at 22–28. All four relate to policies found in the American Airlines Inflight Manual.

For the first, the Inflight Manual requires that flight attendants contact the flight deck immediately in the event of a medical emergency. ECF No. 56, App. 045. Plaintiff argues that the evidence shows such notification did not occur immediately. *See* ECF No. 55 at 22. Rather, finding Kevin unconscious and unresponsive, the flight attendant

waited until Kevin was transferred from his seat to the galley, Thatcher and Amador began administering CPR, and the AED began analyzing Kevin's heart rhythm; only then was the flight deck notified. *Id.*

As for the alleged failure to immediately administer CPR, the Inflight Manual directs that CPR be "administered immediately" if an unconscious person is not breathing and there are no signs of life. ECF No. 56, App. 058. Plaintiff contends the flight crew did not immediately administer CPR. ECF No. 55 at 24. Instead, the flight attendants waited for medically trained passengers to arrive and for Kevin to be removed from his seat and placed in the galley. *Id.* At this time, Amador initiated CPR. *Id.*

Next, Arzu points out that the Inflight Manual states that when there is a "Code Red," the crew should contact the physician on call. ECF No. 56, App. 042. The physician on call is a doctor "specially trained in handling inflight medical emergencies and advising which diversion city is most capable of handling the ill/injured person's condition." *Id.* The flight crew never contacted the physician on call.

Lastly, the Inflight Manual requires that flight attendants establish and adhere to certain roles during an inflight emergency. ECF No. 56, App. 057. Those roles include establishing a communicator, responder, and runner. *Id.* Arzu asserts that such roles were not clearly established by the flight crew. ECF No. 55 at 26. For example, one flight attendant was acting as both the runner and the communicator. *Id.*

Even under Arzu's version of the facts, the American Airlines crew's response to Kevin's emergency does not amount to an "accident" under the Montreal Convention.[5] This case is unlike other cases in which

---

[5] In reaching this holding, the Court notes its agreement with Judge Edward C. Burks of the Supreme Court of Virginia, who in 1878, and writing in an equally heartrending opinion, stated: "The unhappy condition of the appellee excites my commiseration; but courts of justice are not allowed to be controlled in their decisions by considerations of that character. 'Compassion,' said an eminent Virginia chancellor, 'ought not to influence a judge, in whom, acting officially, apathy is less a vice than sympathy.'" *Harris v. Harris*, 72 Va. 31 Gratt. 13, 32 (1878) (quoting Chancellor George Wythe, Commentary on *Field's Ex'x v. Harrison & wife, in* Wythe's Reports 282 (Minor's Ed. 1794)).

courts have found an "accident." For example, the facts here are not analogous to those in *Husain*, where the flight crew's multiple refusals to move the husband from the smoking section constituted an "accident." To the contrary, the four instances highlighted by Arzu reflect concerted efforts by the crew to provide emergency assistance to Kevin.

Moreover, courts have found that a departure from an airline's policy does not necessarily mean that an "accident" occurred. *See Blansett v. Cont'l Airlines, Inc.*, 379 F.3d 177, 182 (5th Cir. 2004). In *Blansett*, the Fifth Circuit held that there is *no per se* rule that any deviation from an airline's policy would constitute an "accident." *Id.* Instead, any departure from policy must still undergo the "unexpected or unusual" analysis. *See id.* at 181–82.

For this reason, this case more closely resembles *White*, in which the Fifth Circuit determined no accident occurred. *White*, 493 Fed. App'x. at 535. Just as in *White*, here it is "undisputed . . . that the [American Airlines] flight crew responded to [Kevin's family's] request for medical assistance." *Id.* at 531. The Court accepts Arzu's contentions that there may have been reactionary delays, confusion of roles, and departures from policy, such as the failure to contact the physician on call. Notwithstanding all of that, the flight crew "took action to assist" Kevin in multiple ways. *Id.* at 531. The flight attendants sought medical assistance from other passengers, provided a medical kit and AED machine, and alerted the flight deck to facilitate a diversion to Cancún for quicker medical attention. The Court has little doubt that the American Airlines crew could have done *more* to aid Kevin.[6] In fact, there is rarely, if ever, a perfect response to a medical emergency. But ultimately, even accepting Arzu's recitation of the facts, the failure of American Airlines to follow all relevant procedures, "when evaluated in context . . . was not unusual or unexpected." *Id.* at 534.

Kevin's underlying conditions also suggest that the flight crew's response was not unusual or unexpected. Again, the unusual and unexpected inquiry must be applied "flexibly" after "assessment of all

---

[6]The same argument was made in *White*. *See White*, 493 Fed. App'x at 531 ("[Plaintiff] faults the flight crew for failing to do more.").

the circumstances surrounding a passenger's injuries." *Saks*, 470 U.S. at 405. The Court finds that Kevin's pre-existing conditions including asthma, obesity, sleep apnea, and diabetes complicated the flight crew's emergency response efforts. Indeed, amid the various emergency protocols, the crew also navigated the unexpected difficulty of removing Kevin from his seat, which required assistance from multiple passengers. As a consequence, CPR could not be administered immediately because Kevin needed to be placed on the floor first, as Amador and Thatcher directed. This complication also likely contributed to the delay in alerting the flight deck of the emergency. Any deficiency in following the protocol can, at least to some extent, be attributed to unique challenges presented in this situation.

For these reasons, the Court finds that American Airlines' response to Kevin's medical emergency does not constitute an "accident" under the Montreal Convention and will therefore grant summary judgment in favor of American Airlines on this claim.[7]

### B. Loss-of-Consortium Claim

Under Texas law, a loss-of-consortium claim is a derivative claim. *See, e.g.*, *Brewerton v. Dalrymple*, 997 S.W.2d 212, 217 (Tex. 1999). Arzu's loss-of-consortium claim is derivative of her Montreal Convention claim. Accordingly, given the Court's ruling on Arzu's Montreal Convention claim that there was no "accident," American Airlines is also entitled to summary judgment on the loss-of-consortium claim.

### C. Breach-of-Contract Claim

Both Parties move for summary judgment on Arzu's breach-of-contract claim. American Airlines makes two arguments: (1) that Arzu's breach-of-contract claim is preempted by the Montreal Convention; and (2) that American Airlines' decision to make a payment was merely discretionary under the terms of the contract and therefore the claim

---

[7]Given the Court's ruling, it need not determine whether American Airlines was the "cause" of Kevin's death. And as a result, American Airlines' Motion for Leave to File Reply Appendix concerning expert opinion on the cause of Kevin's death is unnecessary. ECF No. 72.

fails as a matter of law. Arzu disputes both contentions and argues that there is no genuine dispute of material fact that American Airlines owes Arzu 16,000 Special Drawing Rights ("SDR")[8] as a mandatory, minimum payment. The Court will first discuss whether the breach-of-contract claim is preempted by the Montreal Convention before determining whether the agreement required a discretionary or mandatory payment from American Airlines.

1. <u>Preemption by the Montreal Convention</u>

As discussed above, the Montreal Convention applies to "accidents" that occur during the course of an international flight.[9] Generally, the Montreal Convention provides an exclusive remedy to address injuries under its purview.[10] This is true even if "a passenger['s] . . . injury is not compensable under the Convention," as the Court has found here. *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 160 (1999); *see also Best v. BWIA W. Indie Airways Ltd.*, 581 F. Supp. 2d 359, 362 (E.D.N.Y. 2008) (citations omitted) ("By its own terms, the [Montreal Convention], where applicable, preempts the remedies of a signatory's domestic law, whether or not the application of the [Montreal] Convention will result in recovery in a particular case.").

Nonetheless, as cited by Arzu, there are instances where the Montreal Convention does not preempt contractual claims based on *nonperformance*. *See Nankin v. Cont'l Airlines, Inc.*, No. CV-09-07851, 2010 WL 342632, at *7 (C.D. Cal. Jan. 29, 2010) (finding the Montreal Convention not applicable to plaintiffs' claims because airlines refused to perform the contract); *Mullaney v. Delta Air Lines, Inc.*, No. 08-civ-7324, 2009 WL 1584899, at *3 (S.D.N.Y. June 3, 2009) (same); *In re Nigeria Charter Flights Contract Litig.*, 520 F. Supp. 2d 447, 455 (E.D.N.Y. 2007) (same); *Weiss v. El Al Israel Airlines, Ltd.*, 433 F. Supp.

[8]Approximately $21,000 USD.

[9]*See* Montreal Convention, art. 17.

[10]*Id.* art. 29 ("In the carriage of passengers . . . any action for damages, however founded, whether under this Convention or in contract or in tort or otherwise, can only be brought subject to the conditions and such limits as are set out in this Convention . . . .").

2d 361, 369 (S.D.N.Y. 2006) (same). In each of these cases, the plaintiff's contract claim dealt with an airline failing to transport a passenger. The court in each case concluded that such nonperformance by the airline was not preempted by the Montreal Convention because such "claims [do] not fall within the scope of the Montreal Convention." *See, e.g.*, *Nankin*, 2010 WL 342632, at *7 (citations omitted). Arzu contends that, like these cases, American Airlines failed to perform its contractual obligations by not tendering an advance payment of at least 16,000 SDR following Kevin's death on Flight 614.

But unlike the cases Arzu cites, her claim of nonperformance does not deal with an airline failing to transport Kevin. This distinction is important because in *Nankin*, for example, the court reasoned that the Montreal Convention would preempt passengers' claims for "delays" but not nonperformance of transportation. *Id.* And "courts scrutinize the facts to determine whether the claim" actually related to a refusal to transport or just a delay. *Id.* Thus, the cases cited by Arzu do not suggest that *all* suits involving nonperformance of contracts avoid preemption by the Montreal Convention. Rather, they stand for the proposition that an airline's nonperformance of *transportation* is not preempted because such claims fall outside the scope of the Montreal Convention.

For this reason, if the Court concluded that Arzu's nonperformance claim of the advance payment was not preempted by the convention, such a holding would expand the preemption exceptions set forth in Arzu's cases. The Court is further wary of making such a determination given that the nonperformance of the advance payment is directly tied to Kevin's death on Flight 614, and the death of a passenger on an international flight is indisputably covered by the Montreal Convention.

Nonetheless, the Court need not decide whether the breach-of-contract claim was preempted by the Montreal Convention because the Conditions of Carriage are unambiguous and merely provide for a discretionary payment by American Airlines. Therefore, the Court declines to rule on whether Arzu's breach-of-contract claim is preempted by the Montreal Convention.

2. <u>Mandatory vs. Discretionary Nature of Contract</u>

As discussed above, the Conditions of Carriage are unambiguous and do not require any mandatory payment by the "carrier": American Airlines. The Conditions of Carriage provides in relevant part:

> (2) In cases of bodily injury or death, the Carrier shall make an advance payment where [American] determines it is necessary to meet the economic needs of, and hardship suffered by, a Passenger as provided under the following paragraphs:
>
> (a) Unless a dispute arises over the identity of the person to whom an advance payment shall be made, [American] shall, without delay, make the advance payment to the Passenger in an amount or amounts determined by the Carrier in its sole discretion. In the event of death of a Passenger, the amount of the advance shall not be less than 16,000 Special Drawing Rights, which shall be paid to a representative of the Passenger's next of kin eligible to receive such advance payment as determined by [American] in its sole discretion.

ECF No. 18-3 ¶ 2.

The plain language of the Conditions of Carriage suggests that American Airlines' advance payment in the event of a passenger's death was non-mandatory. As a threshold to making an advance payment for bodily injury or death of a passenger, American Airlines must "determine[] it is necessary to meet the immediate economic needs of, and hardship suffered by, a Passenger . . . ." *Id.* Subparagraph (a) then says that, "in the event of death of a Passenger, the amount of the advance payment shall not be less than 16,000 Special Drawing Rights . . . ." *Id.* ¶ 2(a). Thus, American Airlines must *first* determine that such an advance payment is necessary to meet the needs of a Passenger, and *second*, if such a determination is made, and a death of a passenger occurred, the payment must not be less than 16,000 SDR. Given this threshold requirement, American Airlines was not obligated to make any advance payment. And failure to make a discretionary payment

Case 4:24-cv-00433-P Document 81 Filed 05/08/25 Page 12 of 12 PageID 3362

does not constitute a breach of contract under Texas law. *See, e.g.*, *Farmer v. Ben E. Keith Co.*, 919 S.W.2d 171, 177 (Tex. App.—Fort Worth 1996, no writ) (employer's failure to make a discretionary payment to employee did not constitute breach of contract).[11]

For these reasons, the Court finds there is no genuine dispute of material fact that American Airlines did not breach any agreement, and summary judgment should be entered on behalf of American Airlines.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Arzu's Motion. ECF No. 53. The Court **GRANTS** American Airlines' Motion and **ENTERS** summary judgment in American Airlines' favor on all three counts. ECF No. 49. Given the Court's rulings, the Court further finds that American Airlines' Motion for Leave to File Reply Appendix is **MOOT**. ECF No. 72.

**SO ORDERED** on this **8th day of May 2025.**



**MARK T. PITTMAN**
UNITED STATES DISTRICT JUDGE

[11]The Parties make various contentions about the origin of the contractual language. American Airlines argues that the Conditions of Carriage originate from the Montreal Convention itself, further confirming that its provisions are potentially preempted by the Convention. Arzu argues that the language is taken from an order by the Department of Transportation ("DOT") and that American Airlines is estopped from making its argument that the advance payment is discretionary given previous arguments made by American Airlines' representative trade organization before DOT. Regardless, "[i]f a contract is unambiguous on its face, the contract's meaning and intent of the parties must be sought within the four corners of the document and cannot be explained or contradicted by extrinsic evidence." *Shocklee v. Mass. Mut. Ins. Co.*, 369 F.3d 437, 439–40 (5th Cir. 2004). A determination of the origin of the Conditions of Carriage is therefore unnecessary for this Court because the language of the agreement is clear—the advance payment was non-mandatory.

# Exhibit U

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| MELISSA SUZETTE ARZU, Individually and as the Administrator of the Estate of KEVIN GREENIDGE, Deceased, | § | |
| Plaintiff, | § | CIVIL ACTION NO. 4:24-cv-00433-P |
| v. | § | Plaintiff's Sur-Reply to Defendant's Reply and Brief in Support of its Motion for Summary Judgment |
| AMERICAN AIRLINES, INC., | § | |
| Defendant. | § | |

**PLAINTIFF'S SUR-REPLY TO DEFENDANT'S REPLY**
**<u>AND BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiff Melissa Suzette Arzu, Individually and as the Administrator of the Estate of Kevin Greenidge, deceased ("Plaintiff"), submits this Sur-Reply to Defendant American Airlines, Inc.'s ("Defendant" or "American") Reply and Brief in Support of its Motion for Summary Judgment. Plaintiff respectfully shows the Court as follows:

## INTRODUCTION

Notwithstanding the new evidence and arguments American advances in its Reply, American's Motion for Summary Judgment still fails. American's new evidence and arguments are premised entirely on the airline's misstatement of the relevant Montreal Convention "accident" inquiry and persistent misrepresentation of what a plaintiff must demonstrate to survive a summary judgment challenge. American also grossly mischaracterizes Dr. Warmink's expert testimony, while failing to proffer <u>any</u> expert evidence of its own.

**A. The Relevant Montreal Convention "Accident" Inquiry is Whether an Unusual or Unexpected Event Occurred on Flight 614.**

American moved for summary judgment on the basis that no "accident" occurred on Flight 614 that would give rise to liability under the Montreal Convention. As explained by the Supreme Court, an "accident" under the Convention is an "unexpected or unusual event or happening that is external to the passenger." *Olympic Airways v. Husain*, 540 U.S. 644, 646, (2004) (emphasis added)[1]; *see* Dkt. 50 at 6. American did not move for summary judgment on the separate issue of "negligence," where American carries the burden of proof. Montreal Convention, art. 21(2) ("The carrier shall not be liable . . . if the carrier proves that: (a) such damage was not due to the negligence or other wrongful act or omission of the carrier or its servants or agents; or (b) such damage was solely due to the negligence or other wrongful act or omission of a third party.") (emphasis added); *see, e.g.*, *Delgado v. Delta Air Lines, Inc.*, 2013 WL 9838339, at *4 (S.D. Fla. Oct. 31, 2013) (confirming the airline carrier bears the burden of proof on liability); *Mansour v. British Airways PLC*, 2020 WL 1847750, at *3 (W.D. Wash. Apr. 13, 2020) ("[t]he burden of proving non-negligence is on Defendants").

In its Reply, American cites to "survivability statistics" at "hospital discharge" and argues for the first time that "the relevant inquiry is whether, within a reasonable degree of medical certainty, Kevin would have survived the medical event—not whether he would have survived transportation to the hospital." Dkt. 74 at 5. Not surprisingly, American's Reply cites no case to support this new proposition. Proving a plaintiff would survive "at hospital discharge" is not, and has never been, the test for whether an "accident" giving rise to liability under the Montreal Convention occurred on an international flight. On the contrary, at trial a Plaintiff "need only prove

[1] American is correct that Plaintiff "relies heavily on *Husain*" [Dkt. 75 at 6; *see also* Dkt. 63-1 at 19]. *Husain* is one of the two seminal Supreme Court cases on the Convention's "accident" inquiry.

that some link in the chain was an unusual or unexpected event" external to Kevin, not that Kevin "would have survived at hospital discharge" or at any other point in the future. *Husain*, 540 U.S. at 644–45 (emphasis added) (internal quotations omitted).[2]

**B. Plaintiff Need Not Prove "Proximate Cause" to Defeat American's Motion for Summary Judgment.**

More fundamentally, American's Reply misstates the summary judgment standard and argues that Plaintiff must prove "the complained of accident ***proximately caused*** Kevin's injury or death." Dkt. 74 at 2 (emphasis in original). This is the wrong summary judgment standard.

Under the Montreal Convention, at summary judgment a Plaintiff need only "present evidence sufficient to create a triable issue of fact . . . that [a passenger's] injuries would have been in any way reduced had the flight crew acted differently." *Dizon v. Asiana Airlines, Inc.*, 240 F. Supp. 3d 1036, 1045 (C.D. Cal. 2017) (emphasis added). In responding to Defendant's motion, Plaintiff need only "present evidence sufficient to create a triable issue of fact that Defendant's conduct was a link in the causal chain of [Kevin's death]." *Id.* at 1045 (emphasis added). Plaintiff has more than done so here. *See, e.g.*, Dkt. 54, Appx. 197, 201, Ex. 32, Warmink Report ("[T]he delay in initiation of cardiopulmonary resuscitation coupled with the delayed and ineffectual automatic external defibrillator usage contributed to Kevin Greendige not surviving this event."); Appx. 001, 003, Ex. 17, Warmink Dec. ¶ 5 ("[I]t is my opinion . . . Kevin Greendige ("Kevin") more likely than not would have survived his cardiac arrest on Flight 614 had the American flight

[2] American's invention of survival "**at hospital discharge**" as the "relevant inquiry" is bizarre and at odds with the plain text of the Convention. Dkt. 74 at 5 (emphasis in original). An international carrier's duty is to transport passengers from one country to another. Accordingly, the benefits and burdens of the Convention begin at boarding and end at deplaning. Montreal Convention, art. 17(1) ("The carrier is liable for damage sustained in the case of death . . . t[aking] place on board the aircraft or in the course of any of the operations of embarking or disembarking.") (emphasis added).

crew promptly initiated cardiopulmonary resuscitation (CPR) and effectively utilized a functional automatic external defibrillator (AED)."); *see also*, *Parnass v. Brit. Airways, PLC*, 2021 WL 4311342, at *7 (S.D.N.Y. Sept. 21, 2021) ("The report alone raises questions of material fact related to causation sufficient to overcome summary judgment; that is, Plaintiff's expert suggests that Plaintiff's injury was at least related to the events on the May 29 flight, while Defendant suggests that the injury entirely predated it. *See, e.g.*, Report of Robert Meislin, M.D. [ECF No. 98-2] ("I conclude that his left knee injury relates to flight of May 29, 2017."). This disputed issue of fact must be resolved by a jury.") (emphasis added).

Plaintiff need not "prove" anything to defeat American's Motion for Summary Judgment. Plaintiff need only present evidence demonstrating a "genuine dispute of material fact." *Golatt v. Perot Museum of Nature and Science*, 659 F. Supp. 3d 745, 750 (N.D. Tex. 2023) (stating nonmoving party "must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact").[3] Plaintiff has done so here.

**C. American Mischaracterizes Dr. Warmink's Opinion and Supporting Materials.**

American's Reply argues that "Plaintiff has not adduced competent medical expert opinion to support a finding that any of the flight crew's complained-of actions or inactions caused Kevin's death." Dkt. 74 at 3. American's Reply also directly attacks Dr. Warmink, arguing that "Dr. Warmink has ***never*** opined that Kevin would have survived his cardiac arrest," that Dr. Warmink "materially misrepresent[s] [the Menant] study's findings" and that Dr. Warmink "conce[ded]" that the Weisfeldt Study "is inapplicable to the case at hand." Dkt. 74 at 3–4. All of this is simply wrong.

[3] The conflicting record regarding who operated the onboard AED, whether the machine delivered a shock (and if so, how many), and what these "shocks" looked like more than raises triable issues of fact sufficient to defeat American's Motion for Summary Judgment. Dkt. 66-1 at 7–9.

First, Dr. Warmink's opinion that "**Kevin more likely than not would have survived his cardiac arrest on Flight 614 had the American flight crew promptly initiated cardiopulmonary resuscitation (CPR) and effectively utilized a functional automatic external defibrillator (AED)**" [Appx. 001, 003, Ex. 17, Warmink Dec. ¶ 5–6] is informed not only by the Menant Study, but also by the Weisfeldt Study, other scholarly articles, Kevin's medical records, Kevin's autopsy report, and Dr. Warmink's own specialized knowledge and extensive experience as the Medical Director of the Emergency Department and Chief Clinical Officer at Cook Children's. *See, e.g.*, Dkt. 66-1 at 4–5, 15–16. While American may disagree with Dr. Warmink's opinions, they are by definition "triable issues of fact" that defeat American's Motion for Summary Judgment.

Second, Dr. Warmink did not "disclaim the [Weisfeldt] study providing the 86% chance of survival because it evaluated only adult patients, not pediatric patients." Dkt. 72 at 3–4. Dr. Warmink also did not testify that the Weisfeldt Study is "not applicable to Kevin." *Id.* at 4. Rather, Dr. Warmink stated (correctly) that the Weisfeldt Study participants were not "equivalent" to those in the Menant Study because the Weisfeldt Study included adults, while the Menant Study included only pediatric patients. *See* Dkt. 72 at 4 (quoting Dr. Warmink's deposition testimony). Dr. Warmink properly relied on the Weisfeldt Study and listed it as a source in his January 2025 Report. *See* Dkt. 54, Appx. 194, 195, Ex. 31, January 2025 Warmink Report; *see also* Appx. 001, 003, Ex. 17, Warmink Dec. ¶ 6.

Third, American's Reply attempts to obfuscate Dr. Warmink's overall opinion by directly attacking the Menant Study. Putting aside the fact that American proffers no expert testimony to address the Menant Study or otherwise support its Motion for Summary Judgment or Reply, its citation to the Menant Study's "hospital discharge" statistic is irrelevant. Dkt. 74 at 4–5. The

"accident" inquiry under the Convention is whether American unexpectedly or unusually deviated from airline protocol, and if that deviation served as a "link in the chain" of events **resulting in Kevin's death on Flight 614**. *Husain*, 540 U.S. at 645. Conjecture about what would have happened to Kevin had he not died on the flight has no bearing on the inquiry of whether an "accident" happened on the flight that was a "link in the chain" of events that caused Kevin's death on the flight. Notably, American did not question Dr. Warmink about these conclusions during his deposition. Had Dr. Warmink been asked about the 34.3% survival at hospital discharge statistic in the Menant Study, Dr. Warmink would have testified that the discharge statistic is inapplicable to Kevin because it "did not exclude children who suffered cardiac arrest as a result of severe trauma, congenital heart defects, and terminal illnesses, which Kevin did not have." Appx. 001, 003, Ex. 17, Warmink Dec. ¶ 7. Dr Warmink's review of Kevin's medical records and post-mortem autopsy report revealed that Kevin suffered from none of these conditions. *Id.* Moreover, Dr. Warmink's review of the medical evidence revealed that "Kevin did not have a condition that precluded him from being resuscitated or from surviving following resuscitation." *Id.* at ¶ 8.

Fourth, American's footnote citation to the 3.52% survivability of patients with an initial non-shockable rhythm is likewise irrelevant. Dkt. 74 at 5. A primary allegation in Plaintiff's case—borne out by the evidence—is that American unusually and unexpectedly delayed in providing basic life support to Kevin in explicit violation of the American Airlines Inflight Manual and flight attendant training. *See, e.g.*, Dkt. 54, Appx. 131, 135–36, Ex. 24, Amador Dep. 19:20–20:1 (testifying that "nothing was really being done" by the time Dr. Amador arrived at Kevin's row after responding to a second overhead request for passenger assistance). As Dr. Warmink testified, the AED data American produced demonstrates Kevin "got [] back to shockable rhythm" during Flight 614 and that "his heart probably was initially in a shockable rhythm" before the delay in

getting him treatment. Dkt. 54, Appx. 114, 148, Ex. 27, Warmink Dep. 57:6–8; *see also id.* at 70:19–23 ("So to say like, "Oh, hey, he was in a non-shockable rhythm when we put on the AED," it's like, well, yeah, he was probably in a non-shockable rhythm because it took quite some time to get him on to that AED.").

**D. American Has No Countervailing Expert Evidence.**

Finally, and most importantly, American's focus on Dr. Warmink's opinions underscores the fact that American's Motion for Summary Judgment and Reply are <u>unsupported by any expert opinion at all</u>. To attack the expert opinion offered by Dr. Warmink, the Chief Clinical Officer at Cook Children's, American's Motion and Reply offers nothing more than the *ipse dixit* of its own lawyers. This is not evidence, much less a basis to ignore the opinions of Dr. Warmink and grant summary judgment.

## CONCLUSION

The Court should deny American's Motion for Summary Judgment.

Dated: April 10, 2025

Respectfully submitted:

*/s/ Hannah M. Crowe*
Darren P. Nicholson
State Bar No. 24032789
Hannah M. Crowe
State Bar No. 24131156
Clay R. Mahaffey (*pro hac vice*)
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, TX 75202
Telephone: (469) 904-4550
dnicholson@burnscharest.com
hcrowe@burnscharest.com
cmahaffey@burnscharest.com

ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

On April 10, 2025, this Motion was served on Defendant, in compliance with Federal Rule of Civil Procedure 5(b)(1), (2)(E), by filing it with the Court's electronic-filing system.

*/s/ Hannah M. Crowe*
Hannah M. Crowe

# Exhibit V

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| MELISSA SUZETTE ARZU, Individually and as the Administrator of the Estate of KEVIN GREENIDGE, Deceased, | § | |
| Plaintiff, | § | |
| v. | § | Civ. No. 4:24-cv-00433-P |
| AMERICAN AIRLINES, INC., | § | |
| Defendant. | § | |

**SECOND AMENDED COMPLAINT**

In accordance with the Court's June 23, 2026, Order [Dkt No. 96], Plaintiff Melissa Suzette Arzu, as an individual and as the Administrator of the Estate of Kevin Greenidge, Deceased ("Plaintiff"), by her undersigned counsel, brings her Second Amended Complaint[1] against Defendant American Airlines, Inc. ("Defendant") and alleges as follows:

**INTRODUCTION**

1. This civil action arises out of personal injuries to and the wrongful death of 14-year-old Kevin Greenidge ("Greenidge"), who died following an accident that occurred while he and his family were traveling internationally via American Airlines from Honduras to New York.

2. While in flight, Greenidge experienced a medical emergency and became unconscious. Greenidge's family immediately yelled out for assistance, but American Airlines' flight personnel delayed in responding to their cries for help and failed to render effective aid.

---

[1] Plaintiff files this Amended Complaint without waiver of any right to appeal the Fifth Circuit's affirmance of the dismissal of certain claims.

3. Among other things, American Airlines was required by federal law to equip AA Flight 614 with an automated external defibrillator ("AED"). But when medically trained passengers attempted to use the onboard AED on Greenidge, the machine did not function properly.

4. Had AA Flight 614 been properly equipped with a functioning AED machine as required by federal law, Greenidge would not have experienced the intense physical and emotional pain he suffered on AA Flight 614, and he more likely than not would have survived.

5. Tragically, and as a direct result of American Airlines' failures outlined in this Amended Complaint, Greenidge passed away at the young age of 14 years old.

## PARTIES

6. Plaintiff Melissa Suzette Arzu and her son, Kevin Greenidge, Deceased, have been, at all relevant times, residents of the State of New York, residing in the County of The Bronx, and citizens of the United States of America.

7. Melissa Suzette Arzu ("Arzu") was appointed as the Administrator of the Estate of her minor son, Kevin Greenidge, Deceased ("Greenidge"), by the Bronx County Surrogate's Court on October 27, 2022 pursuant to Section 702(1) of the New York Surrogate's Court Procedure Act.

8. Defendant American Airlines, Inc. ("American Airlines") is incorporated under the laws of the State of Delaware and headquartered in the State of Texas.

9. On and before June 4, 2022, Defendant American Airlines was in the business of selling tickets for international carriage of passengers.

10. On and before June 4, 2022, Defendant American Airlines operated services for the carriage of passengers by air and conducted its business of carriage of passengers by air from

premises leased or owned by American Airlines itself, or by another carrier with which it has a commercial agreement, at the Dallas Fort Worth International Airport in Texas.

**JURISDICTION**

11. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because a federal question is presented pursuant to the Convention for the Unification of Certain Rules for International Carriage by Air done at Montreal on May 28, 1999 (hereinafter "Montreal Convention").

12. This Court has general personal jurisdiction over American Airlines because American Airlines is headquartered in Fort Worth, Texas.

13. Jurisdiction and venue are proper in this District pursuant to Article 33(1) of the Montreal Convention and 28 U.S.C. § 1391(b) because American Airlines is domiciled and has its principal place of business in Fort Worth, Texas.

**FACTUAL ALLEGATIONS**

14. On June 4, 2022, Greenidge embarked on a flight itinerary under American Airlines Confirmation Number UDUZFG to fly internationally from Ramón Villeda Morales International Airport ("SAP") in Honduras to LaGuardia Airport ("LGA") in New York.

15. Greenidge's UDUZFG American Airlines itinerary included roundtrip travel on American Airlines from New York to Honduras on May 28, 2022 and June 4, 2022.

16. On May 28, 2022, Greenidge traveled via American Airlines from New York to Honduras on American Airlines Flight 1249 ("AA Flight 1249") from LGA to Miami International Airport ("MIA") and American Airlines Flight 1635 from MIA to SAP.

17. On June 4, 2022, the return portion of Greenidge's international itinerary included American Airlines Flight 614 ("AA Flight 614") from SAP to MIA, an approximate two-hour layover in MIA, and American Airlines Flight 1171 ("AA Flight 1171") from MIA to LGA.

18. Greenidge was a New York resident and a citizen of the United States of America.

19. A true and accurate copy of Greenidge's American Airlines itinerary is attached to this Second Amended Complaint as **Exhibit 1** and incorporated herein by reference.

20. At all relevant times, AA Flights 614 and 1171 were operated and controlled by Defendant American Airlines, acting by and through its authorized employees and/or agents.

21. Greenidge was traveling from Honduras to New York with several members of his family.

22. On AA Flight 614 from Honduras to Miami, Greenidge and his family were seated at the back of the airplane in rows 31 and 32.

23. During AA Flight 614, Greenidge experienced a medical emergency.

24. Greenidge's family members immediately started yelling out for help.

25. Greenidge became unconscious and was unresponsive.

26. Greenidge's uncle began trying to transfer unconscious Greenidge from his window seat to the aisle.

27. After some delay, two flight attendants responded to Greenidge's family's urgent calls for help and came to the back of the airplane to assess the situation.

28. At least one member of the airline personnel team was panicking and appeared to have no idea what to do during Greenidge's medical emergency.

29. Multiple overhead announcements were made requesting the assistance of any medical personnel on board the airplane.

30. A doctor and a nurse came to Greenidge's row to render aid.

31. The doctor took control of the chaotic situation and organized the response to Greenidge.

32. Greenidge was eventually transferred from his window seat to the back of the airplane.

33. The doctor and nurse then began to administer CPR to Greenidge.

34. The doctor and nurse turned on the AED machine and positioned the pads on Greenidge's chest.

35. The AED's pads initially had difficulty adhering to Greenidge's chest. Upon analyzing Greenidge's heart rhythm, the AED first advised that CPR be continued. Approximately eight minutes after the AED was activated, however, the AED detected a shockable rhythm and advised that a shock be administered. Although the AED's shock button was pressed and the AED's internal data recorded that a shock was attempted, no shock was actually delivered to Greenidge.

36. The doctor and nurse saw no indication that a shock was ever delivered to Greenidge.

37. Because no shock was delivered when Greenidge had a shockable rhythm, the AED machine was unable to revive Greenidge and he died on the flight.

38. According to Flight Attendant De Fitzpatrick, while the AED machine was being used on Greenidge, "he opened his eyes" and "grabbed my hand."

39. According to Flight Attendant Judy Blanchard, while the AED machine was being used on Greenidge, "his eyes opened, and he looked at us."

40. AA Flight 614 made an unscheduled, emergency landing in Cancún, Mexico. Greenidge was deplaned on a stretcher and transported to the hospital in an ambulance, where he was pronounced dead at the age of 14.

41. In violation of federal law, American Airlines failed to equip AA Flight 614 with requisite medical equipment, including but not limited to an operable AED machine.

42. In violation of federal law, American Airlines failed to regularly and sufficiently inspect the AED machine onboard AA Flight 614 to ensure its readiness to perform during an emergency.

43. Before traveling from New York to Honduras via American Airlines, 14-year-old Greenidge was an active eighth grader who enjoyed swimming at the YMCA, playing games with his friends, and spending time with his younger cousin.

44. After embarking on his American Airlines voyage, however, Greenidge's short life was tragically cut short.

45. Due to the accident that occurred during AA Flight 614, namely the malfunction of the AED aboard the aircraft, Greenidge suffered a tragic death at the young age of 14. The malfunction of the AED aboard AA Flight 614 was an unexpected and unusual event external to Greenidge within the meaning of Article 17(1) of the Montreal Convention.

46. Arzu, as Greenidge's mother, has experienced and continues to experience excruciating pain and suffering as a result of the sudden loss of her young son.

## DEFENDANT'S LIABILITY UNDER THE MONTREAL CONVENTION

47. Greenidge was severely injured and died while he was flying internationally via American Airlines from Honduras to New York.

48. The return portion of Greenidge's international itinerary included AA Flight 614 from SAP to MIA, an approximate two-hour layover in MIA, and AA Flight 1171 from MIA to LGA.

49. At all relevant times, AA Flight 614 was operated and controlled by Defendant American Airlines through its employees, agents, and/or servants.

50. At all relevant times, AA Flight 614 was operated as a common carrier engaged in the business of transporting fare paying passengers.

51. As a common carrier, American Airlines, including its agents, servants, and employees, owed the highest duty of care to its passengers, including Greenidge.

52. Federal regulations govern the conduct and procedures of common carriers like Defendant American Airlines.

53. For example, 14 C.F.R. §§ 121.801–121.805 require passenger-carrying airplanes to be equipped with specific emergency medical equipment and requires airlines to provide crew members with specific emergency medical training.

54. Specifically, as of April 12, 2004, 14 C.F.R. § 121.803(c)(4) requires passenger-carrying airplanes to be equipped with an approved automated external defibrillator ("AED") machine.

55. Pursuant to 14 C.F.R. § 121.803(b)(1), an aircraft's AED machine must be inspected regularly at specific inspection periods "to ensure its condition for continued serviceability and immediate readiness to perform its intended emergency purposes" (emphasis added).

56. Pursuant to 14 C.F.R. § 121.803(b)(2)-(4), an aircraft's AED machine must be readily accessible to the crew, clearly identified, marked to indicate its method of operation, and marked as to date of last inspection.

57. It is alleged that American Airlines, through its authorized employees and/or agents, failed to engage in the following activities:

a. Failure to equip AA Flight 614 with an operable AED machine in violation of 14 C.F.R. § 121.803(c)(4); and

b. Failure to regularly and sufficiently inspect the AED machine on board AA Flight 614 "to ensure its condition for continued serviceability and immediate readiness to perform its intended emergency purposes" in violation of 14 C.F.R. § 121.803(b)(1).

58. Had AA Flight 614 been properly equipped with an operable AED machine as required by federal law, Greenidge would not have experienced intense physical and emotional pain and tragically died at the age of 14.

59. Pursuant to Article 17(1) of the Montreal Convention, American Airlines "is liable for damage sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking."

60. Under the provisions of Article 17 of the Montreal Convention, American Airlines' failure to equip AA Flight 614 with a functional AED as required by 14 C.F.R. § 121.803(c) as set forth above, constitutes an accident, in that it was an unexpected or unusual event or happening external to the passenger, Greenidge, and was causally linked to Greenidge's bodily injuries and ultimate demise.

61. Under the provisions of Article 17 of the Montreal Convention, American Airlines is liable for damages sustained by both Plaintiff Arzu and by Greenidge in the bodily injury and death of Greenidge that occurred on AA Flight 614.

**COUNT I – WRONGFUL DEATH**

62. Plaintiff hereby alleges and incorporates all paragraphs in the preceding section by reference herein.

63. Pursuant to Article 29 of the Montreal Convention, Plaintiff pleads an action for Wrongful Death under Chapter 71, Subchapter A, of Tex. Civ. Prac. & Rem. Code §§ 71.001-71.012.

64. As a direct and proximate result of the accident aboard AA Flight 614—American Airlines' failure to equip the aircraft with a functional AED—Greenidge died. Plaintiff Melissa Suzette Arzu is the mother of Kevin Greenidge and a statutory wrongful-death beneficiary under Tex. Civ. Prac. & Rem. Code § 71.004. As a direct and proximate result of the accident, Plaintiff has sustained the following damages:

a. Pecuniary loss. Plaintiff has suffered the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value that she would, in reasonable probability, have received from Greenidge had he lived.

b. Loss of companionship and society. Plaintiff has suffered, and will continue to suffer, the loss of the positive benefits flowing from the love, comfort, companionship, society, and guidance that she would, in reasonable probability, have received from Greenidge had he lived. Fourteen years old at his death, Greenidge shared a close, loving, and day-to-day relationship with his mother.

c. Mental anguish. Plaintiff has suffered, and will continue to suffer, the emotional pain, torment, and mental anguish resulting from the death of her son. The circumstances of Greenidge's death—including his conscious respiratory and cardiac distress and the failure of the onboard

Case 4:24-cv-00433-P Document 19-4 Filed 07/29/24 Page 50 of 87 PageID 346

AED to deliver a life-saving shock after it detected a shockable rhythm—have deepened and aggravated Plaintiff's grief and mental anguish.

d. Loss of inheritance. Plaintiff has suffered the loss of the present value of the assets that Greenidge, in reasonable probability, would have added to his estate and left to Plaintiff had he lived a natural life.

e. Funeral and burial expenses. Plaintiff and/or the Estate incurred reasonable funeral and burial expenses, and the expense of transporting and repatriating Greenidge's remains from Cancún, Mexico, as a result of his death.

65. Plaintiff's damages for wrongful death are not limited under Article 21 of the Montreal Convention—because American Airlines cannot prove, under Article 21(2), that the damage was not due to its negligence or other wrongful act or omission—and Plaintiff's damages exceed the limit set forth in Article 21(1).

**COUNT II – SURVIVAL**

66. Plaintiff hereby alleges and incorporates all paragraphs in the preceding section by reference herein.

67. Pursuant to Article 29 of the Montreal Convention, Plaintiff pleads an action for Survival under Chapter 71, Subchapter B, of Tex. Civ. Prac. & Rem. Code §§ 71.021-71.022.

68. The cause of action for the personal injuries Greenidge sustained aboard AA Flight 614 survived his death and is prosecuted by Plaintiff, as Administrator of his Estate, under Tex. Civ. Prac. & Rem. Code § 71.021. As a direct and proximate result of the accident—American Airlines' failure to equip AA Flight 614 with a functional AED—the Estate of Kevin Greenidge has sustained conscious pain and suffering and mental anguish. Between the onset of his medical emergency and his death, Greenidge endured conscious physical pain and suffering

and mental anguish, including the distress of his respiratory and cardiac emergency and the failure of the onboard AED to deliver a life-saving shock when he presented a shockable rhythm.

69. Plaintiff's damages for survival are not limited under Article 21 of the Montreal Convention—because American Airlines cannot prove, under Article 21(2), that the damage was not due to its negligence or other wrongful act or omission—and Plaintiff's damages exceed the limit set forth in Article 21(1).

**DEMAND FOR JUDGMENT**

70. Plaintiff Arzu, as an Individual and as the Administrator of the Estate of Kevin Greenidge, Deceased, hereby demands judgment against Defendant American Airlines, Inc. in an amount to be determined at trial, prejudgment interest, post-judgment interest, costs, and disbursements of this action.

**DEMAND FOR JURY TRIAL**

71. Pursuant to Federal Rules of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims and issues so triable.

Dated: July 17, 2026

Respectfully submitted:

*/s/ Hannah M. Crowe*

Darren P. Nicholson
State Bar No. 24032789
Hannah M. Crowe
State Bar No. 24131156
Anna Katherine Benedict
State Bar No. 24143946
Clay R. Mahaffey (*pro hac vice*)
Wyoming Bar No. 6-3355
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, TX 75202
Telephone: (469) 904-4550
dnicholson@burnscharest.com
hcrowe@burnscharest.com
abenedict@burnscharest.com
cmahaffey@burnscharest.com

ATTORNEYS FOR PLAINTIFF

# Exhibit W

Available online at ScienceDirect
Resuscitation
journal homepage: www.elsevier.com/locate/resuscitation
EUROPEAN RESUSCITATION COUNCIL

Review

# Incidence and outcomes of out-of-hospital cardiac arrest from initial asystole: a systematic review and meta-analysis

*Dhiraj Bhatia Dwivedi* [a,b,*], *Jocasta Ball* [a,c], *Karen Smith* [a,d,e,f,g], *Ziad Nehme* [a,c,d]

**Abstract**

**Aim:** To examine global variation in the incidence and outcomes of Emergency Medical Services (EMS) attended and treated out-of-hospital cardiac arrest (OHCA) from initial asystole.

**Data sources:** We systematically reviewed electronic databases for studies between 1990 and August 2024 reporting EMS-attended or treated asystolic OHCA populations. The primary outcome was survival to hospital discharge or 30-days. Random-effects models were used to pool primary and secondary outcomes and meta-regression was used to examine sources of heterogeneity. Study quality was assessed using the Joanna Briggs Institute critical appraisal tool for prevalence studies.

**Results:** The search returned 4464 articles, of which 82 studies were eligible for inclusion encompassing 540,054 EMS-treated patients across 35 countries. Five studies reported on EMS attended populations ($n$ = 35,561). The studies included in the review had high clinical and statistical heterogeneity. The pooled proportion of EMS-treated initial asystolic OHCA was 53.0% (95% CI: 49.0%, 58.0%; $I^2$ = 100%). The overall pooled proportion of survivors to hospital discharge or 30-days was 1.5% (95% CI: 1.2%, 1.8%, $I^2$ = 97%). The pooled proportion of event survivors was 11.6% (95% CI 6.5%, 17.8%, $I^2$ = 99%), the pooled proportion of prehospital ROSC was 16.0% (95% CI 14.0%, 17.0%, $I^2$ = 100%) and the pooled proportion of neurologically favourable survival at longest follow-up was 0.6% (95% CI 0.5%, 0.8%, $I^2$ = 100%). The overall pooled incidence of EMS-treated asystolic OHCA was 11.0 cases per 100,000 person-years (95% CI: 10.5, 11.5, $I^2$ = 100%). In stratified analysis of survival to hospital discharge or 30-days, population type, study duration, study design and aetiology were the only variables that were significantly associated with survival to hospital discharge or 30-days. In adjusted analysis, population type, study duration, highest EMS skill level and region were significantly associated with the primary outcome. In the multivariable analysis of incidence, study region, arrest aetiology, sample size, year of publication, study population, study duration and study quality significantly explained variation in incidence across studies.

**Conclusion:** Initial asystolic OHCA made up 53% of all EMS-treated patients and pooled survival rates were extremely poor. Research efforts in this population should focus on developing prevention strategies as well as adherence to termination or withholding of resuscitation guidelines for asystolic OHCA.

**Keywords:** Cardiac arrest, Asystole, Cardiopulmonary resuscitation, Emergency medical services, Outcomes, Systematic review

## Introduction

Out-of-hospital cardiac arrest (OHCA) is a leading cause of global mortality,[1] claiming millions of lives worldwide each year.[2] Overall survival remains low after OHCA, with previous systematic reviews indicating a pooled survival rate of 7.6% to 8.8%.[3–6] OHCA can present with shockable, Ventricular Tachycardia (VT) or Ventricular Fibrillation (VF) as well as non-shockable rhythms, pulseless electrical activity (PEA) or asystole, and survival rates vary significantly across these rhythms.[4,6]

Historically, efforts to increase survival from OHCA have focussed primarily on patients presenting in shockable rhythms.[7,8] However, the reported incidence of shockable OHCA has declined in recent years, and an increasing proportion of treated OHCA patients are presenting in asystole.[2] In fact, initial asystolic OHCA

* Corresponding author at: Monash Medical Centre, 246 Clayton Road, Clayton, 3168, Victoria, Australia.
E-mail address: dhiraj.bhatia@monash.edu (D.B. Dwivedi).

https://doi.org/10.1016/j.resuscitation.2025.110629
Received 14 February 2025; Received in Revised form 19 April 2025; Accepted 26 April 2025

0300-9572/© 2025 The Authors. Published by Elsevier B.V. This is an open access article under the CC BY license (http://creativecommons.org/licenses/by/4.0/).

makes up between 38.9% and 59.6% of all OHCA cases across developed countries.[9–11] Importantly, survival outcomes for asystolic OHCA patients do not appear to have changed significantly over time, and existing evidence suggests that long-term favourable neurological recovery is also considerably poorer for patients who present in asystole.[12,13]

To date, there has been a lack of synthesised data on the short-term and long-term survival and neurological outcomes of initial asystolic OHCA, and factors associated with survival. Although current guidelines recommend attempting resuscitation for asystolic OHCA, some studies have suggested the practice may be futile and costly,[14] or associated with poorer long-term neurological outcomes and life expectancy.[2,15,16] Hence, there is a need to examine global variation in survival and incidence, long-term neurological outcomes and factors associated with survival in asystolic OHCA.[15] The findings may help guide recommendations for current resuscitation guidelines.[17]

In this study, we systematically reviewed the literature on patients with asystolic OHCA to determine global pooled outcomes, incidence rates and factors associated with survival.

## Methodology

This systematic review follows the Preferred Reporting Items for Systematic Reviews and Meta-Analysis (PRISMA) reporting guideline.[18] Prior to its commencement, review methodology was registered in the International Prospective Register of Systematic Reviews (PROSPERO no. CRD42021265916). A preliminary literature search conducted through the Cochrane and Joanna Briggs Institute (JBI) databases of systematic reviews and PROSPERO did not identify any other completed or ongoing systematic review on this topic.

### *Data sources and search strategy*

A systematic literature search was conducted using major electronic databases: Ovid MEDLINE, EMBASE, EMCARE, CINAHL, EBM and Cochrane reviews. The search was carried out on studies published between 1st January 1990 to 2nd August 2024. We chose 1990 as the start of our inclusion period as it aligned to the publication of the original Utstein template which sought to reduce variability in the reporting of OHCA.[19]

A health information specialist was consulted to construct and execute the search strategy, which incorporated subject headings and keywords. The initial search strategy was executed in Ovid MEDLINE before replication in the additional databases. The final optimised search strategies for Medline and Embase are presented in Tables S1 and S2 in the supplementary appendix.

### *Study selection and eligibility*

Shortlisted studies from all electronic databases were imported into the Covidence online systematic review management tool and duplicates were removed. Two reviewers (DD and ZN) independently screened titles and abstracts for relevant eligibility criteria. Any discrepancies between the two reviewers were resolved through discussion.

Interventional and observational studies were eligible for inclusion if they reported an EMS attended or treated OHCA population, had a documented initial cardiac rhythm of asystole, and provided sufficient data to calculate the primary outcome of survival to hospital discharge or 30-days. We excluded articles if they were reviews, news, case reports, letters, opinions, conference abstracts or animal studies. We also excluded studies if they excluded patients who died on scene, such as those investigating admitted patients or patients with return of spontaneous circulation (ROSC) only. Where multiple studies presented significantly overlapping populations, we retained the study with the most representative sample for that region and timeframe. When reviewing articles, we adopted standard definitions as recommended in the Utstein guidelines.[20,21] An EMS treated OHCA case was defined as a patient with absent signs of circulation who received any attempt at cardiopulmonary resuscitation (CPR) or defibrillation by a member of an organised EMS agency.

### *Outcomes*

The primary outcome was the pooled rate of survival to hospital discharge or 30-days. Secondary outcomes included the pooled proportion of event survivors, the pooled proportion of patients achieving ROSC, the pooled proportion of survivors with good neurological outcome at longest-follow-up, and pooled incidence of EMS-attended or EMS-treated cases per 100,000 person-years.

### *Data extraction and quality assessment*

A minimum of two reviewers (DD with ZN/JB) reviewed the full text of eligible studies, extracted study data and performed quality assessments. A standardised data extraction form was developed, tested and refined comprising the following study variables: lead author, study setting, country, region, study design (e.g. observational, experimental), registry-based data collection, inclusion criteria, exclusion criteria, age definition, EMS personnel type, publication year, study duration, number of patients (EMS-attended and EMS-treated), serviceable population, arrest characteristics (age, proportion of male sex, proportion of asystole, presumed cardiac aetiology, witnessed by EMS or bystander, location of the arrest, bystander CPR, endotracheal intubation, intravenous/intraosseous (IV/IO) epinephrine administration, EMS response time and EMS transport time to hospital and study outcomes.

The JBI critical appraisal tool for studies reporting prevalence data was used to assess the quality of the included studies across nine domains[22] including: sample frame, recruitment of study participants, sample size, study subjects and setting, coverage of the identified sample, validity of the methods used in the assessment of the condition, standardised and reliable measuring of the condition, appropriateness of statistical analysis and the adequacy of response rate. Reviewers answered yes or no/unclear to each of the nine domains, and the total sum of yes responses was used to define study quality (0–3 points = high risk of bias, 4–6 points = moderate risk of bias, or 7–9 points = low risk of bias). Any disagreements were resolved through discussion.

### *Data synthesis*

All data were analysed using Stata statistical software version 18 (Statacorp, College Station, Texas, USA). All statistical tests used a two-sided p-value $< 0.05$. The primary outcome of survival to hospital discharge or 30-days was calculated by dividing the total number of survivors over the total number of EMS-treated cases with known outcome. A similar approach was used for the remaining patient outcomes such as event survival, prehospital return of spontaneous circulation (ROSC), and neurologically favourable survival. To calculate the incidence rate, we used the number of EMS attended or treated cases divided by population and study time in years, where population refers to the study's serviceable population.

If the serviceable population was not reported, we used national online sources to estimate the resident population for that region and time. The 95% confidence intervals for the incidence rate were then estimated assuming a Poisson distribution. The measurement of neurological outcome was based on the tool used by individual studies.

As significant heterogeneity was expected when pooling the incidence and outcomes of initial asystolic OHCA populations, we used DerSimonian & Laird random-effects models to calculate the pooled primary and secondary outcomes. For patient outcomes, we pooled proportions using a Freeman-Tukey double arcsine transformation procedure to allow for the inclusion of studies whose survival proportions are clustered or close to zero.[23] Heterogeneity for all meta-analyses were assessed using the $I^2$ statistic. The $I^2$ values of 25%, 50% and 75% indicate low, moderate and high heterogeneity, respectively. Publication bias was assessed by visually inspecting a funnel plot of the log odds of the proportion of survivors to hospital discharge or 30 days against the inverse standard error. For studies with zero events, where the log odds and its standard error were undefined, we added 0.5 to the number of survivors and 1 to the study size to enable inclusion in the funnel plot.[24]

To identify potential sources of heterogeneity in the primary outcome, we performed stratified analyses and unadjusted and adjusted meta-regression, examining for interactions between survival and the following variables: year of publication, sample size, study duration, study design, registry-based data collection, highest EMS skill level, region, aetiology, and study quality. In the subgroup of studies with sufficient data, we also examined the impact of baseline characteristics such as the mean/median age, the proportion of male sex, presumed cardiac aetiology, any witness, EMS-witness, bystander witness, bystander CPR, public location, endotracheal intubation, IV/IO epinephrine administration, EMS response and EMS transport time to hospital. These characteristics were categorised into approximately equal tertiles for analysis.

We also explored variation in event survival and the incidence of EMS-treated OHCA per 100,000 person-years using the same approach.

## Results

### Study selection

The study selection flow chart is shown in Fig. 1. The search strategy returned 4464 titles, of which 2162 were duplicates, leaving 2302 studies for title and abstract screening. A total of 456 potentially relevant articles underwent full-text review, which resulted in 82 studies being included in the quantitative synthesis.

### Study characteristics

The characteristics of the 82 included studies are presented in Table 1. A total of 540,054 EMS-treated patients across 35 countries from all continents except Africa and Antarctica were included. The pooled rate of initial asystole in the included populations was 53.0% (95% CI: 49.0%, 58.0%; $I^2$ = 100%). Only 5 of these studies reported on EMS-attended populations (i.e. populations with both treated and untreated patients), totalling 35,561 patients across 3 countries. Thirty-six studies examined both paediatric and adult populations, while 39 studies examined adult populations only. The remaining 7 studies examined paediatric populations. Publication dates for all studies ranged between 1990 and 2024 and the length of studies ranged from 2 months to 27 years. The majority of studies were retrospective cohort studies (75.6%). Registry-based methods of data collection were reported in thirty (36.5%) studies. Patients with all OHCA aetiologies were included in 38 (46.3%) studies, while the others involved either presumed cardiac ($n$ = 29), non-traumatic ($n$ = 5) or traumatic ($n$ = 6) aetiologies only. Among the five studies where both EMS-attended and EMS-treated data were available, two each were from Australia and Europe, and one from Korea. Specifically, the EMS attempted resuscitation rate in these studies ranged between 30% and 53%, with the highest rate observed in the Korean study.

The baseline characteristics of the included populations were infrequently reported. The mean/median age was reported in 21.9% studies and ranged between 1 and 79 years. Among the adult-only cohorts, different age thresholds were reported with the median or mean age ranging between 58 years and 79 years. The proportion of males was reported in 25.6% of studies and the proportion of presumed cardiac aetiology was reported in 57.3% of studies. The proportion of bystander witnessed status, the proportion of bystander CPR status and the proportion of any witnessed status was reported in 29.2%, 29.2% and 39.0% of the studies respectively. The proportion of EMS-witnessed status and the proportion of public location of arrest was reported in 28.0% and 7.3% of studies respectively. The proportion of patients who had endotracheal intubation and IV/IO epinephrine administration was reported in 7.0% of studies. EMS response time and transport time to hospital was reported in 17.0% and 5.0% of studies respectively.

### Quality assessment

The quality assessment results are shown in Table 1 and Fig. 2. The median score according to JBI criteria was 6 out of a possible 9 points (interquartile range [IQR], 2–7), and only 5 studies (6.1%) were deemed to be at high risk of bias (≤3 points). The most significant issues identified were related to the level of detail describing the study subjects and the setting, the definitions used to identify EMS-treated OHCA patients, lack of validity of methods for identification and lack of consistent and reliable measurement of initial rhythm. The sample frame was impacted by significant patient exclusions (e.g. non-cardiac aetiologies) or involved the collection of data from limited geographical regions (e.g. single-centre studies) and timeframes. The majority of EMS-treated asystolic OHCA were reported as a subgroup of a broader population (e.g. all EMS-treated patients) and the documentation of baseline characteristics were poor. Very few of the included studies reported methods of verifying the initial arrest rhythm or the criteria used to define initial asystole.

### Survival to hospital discharge or 30 days

All 82 studies included sufficient data to calculate the primary outcome. In these studies, survival to hospital discharge or 30-days ranged between 0% and 23.0% with the crude survival rate being 1.9% (9931 survivors from 531,049 EMS treated patients with known outcome). The overall pooled proportion of survivors to hospital discharge or 30-days was 1.5% (95% CI: 1.2%, 1.8%, $I^2$ = 97%).

The results of the stratified and meta-regression analysis for survival to hospital discharge or 30-days is shown in Table 2. In the unadjusted analysis, population, study duration, study design and aetiology were the only variables that were significantly associated with survival to hospital discharge or 30-days. In adjusted analysis, population, study duration, highest EMS skill level and region were significantly associated with the primary outcome.




**Fig. 1 – PRISMA chart.**

### *Event survival and prehospital ROSC*

The results of the stratified and meta-regression analysis for event survival is shown in Table 3. Twenty four (n = 24) studies reported rates of event survival, ranging between 0% and 60.0%, with the crude rate being 5.3% (3273 patients who survived the event from 62,213 EMS-treated patients with known outcome). The pooled rate of event survival was 11.6% (95% CI 6.5%, 17.8%, $I^2$ = 99%). For the unadjusted analysis, study design and aetiology were the only factors that were significantly associated with event survival. For the adjusted analysis, there were no variables that significantly explained the heterogenity in event survival.

Thirty eight (n = 38) studies reported rates of prehospital ROSC, ranging between 1.0% and 67.0% with the crude rate being 4.8% (20,178 patients who had prehospital ROSC from 421,078

**Table 1 – Summary of study and patient characteristics.**

| | All studies | By Population | | |
|---|---|---|---|---|
| | | All ages | Adults only | Paediatrics only |
| Total studies, n | 82 | 36 | 39 | 7 |
| Cumulative EMS-treated patients, n | 540,054 | 107,640 | 415,888 | 16,526 |
| Year of publication, n (%) | | | | |
| 1990–99 | 16 (19.5) | 9 (5.0) | 6 (15.3) | 1 (14.2) |
| 2000–09 | 25 (30.4) | 13 (36.1) | 11 (28.2) | 1 (14.2) |
| 2010–19 | 33 (40.2) | 10 (27.7) | 19 (48.7) | 4 (57.1) |
| 2020+ | 8 (9.7) | 4 (11.1) | 3 (7.6) | 1 (14.1) |
| EMS-treated sample, n (%) | | | | |
| <100 patients | 19 (23.1) | 12 (33.3) | 3 (7.6) | 4 (57.1) |
| 100–1000 patients | 37(45.1) | 14 (38.8) | 21 (53.8) | 2 (28.5) |
| >1000 patients | 26 (31.7) | 10 (27.7) | 15 (38.4) | 1 (14.2) |
| Study duration, n (%) | | | | |
| <1 year | 13 (15.8) | 9 (25.0) | 4 (10.2) | 0 |
| 1–5 years | 41 (50.0) | 17 (47.2) | 22 (56.4) | 2 (28.5) |
| >5 years | 28 (34.1) | 10 (27.7) | 13 (33.3) | 5 (71.4) |
| Study design, n (%) | | | | |
| Prospective cohort | 17 (20.7) | 5 (13.8) | 9 (23.0) | 3 (42.8) |
| Retrospective cohort | 62 (75.6) | 31 (86.1) | 27 (69.2) | 4 (57.1) |
| Secondary Analysis | 3 (3.7) | 0 | 3 (7.7) | 0 |
| Registry-based data, n (%) | 30 (36.5) | 10 (27.7) | 17 (43.5) | 3 (42.8) |
| Highest EMS skill level, n (%) | | | | |
| Physician | 34 (41.4) | 17 (47.2) | 13 (33.3) | 4 (57.1) |
| Paramedic | 44 (53.6) | 15 (41.6) | 26 (66.7) | 3 (42.9) |
| EMT | 1 (1.2) | 1 (2.7) | 0 | 0 |
| Nurse | 3 (3.6) | 3 (8.3) | 0 | 0 |
| Region, n (%) | | | | |
| Asia | 12 (14.6) | 5 (13.8) | 6 (15.3) | 1 (14.2) |
| Australasia | 10 (12.2) | 2 (5.5) | 5 (12.8) | 3 (42.8) |
| Europe | 36 (43.9) | 22 (61.1) | 13 (33.3) | 1 (14.2) |
| North America | 23 (28.0) | 6 (16.6) | 15 (38.4) | 2 (28.0) |
| Other | 1(1.2) | 1(2.8) | 0 | 0 |
| Aetiologies included, n (%) | | | | |
| All aetiologies | 38 (46.3) | 18 (50.0) | 17 (43.5) | 3 (42.8) |
| Non-traumatic | 5 (6.1) | 0 | 4 (10.2) | 1 (14.2) |
| Other | 4 (4.8) | 2 (5.5) | 1 (2.5) | 1 (14.2) |
| Presumed Cardiac | 29 (35.3) | 14 (38.8) | 15 (38.4) | 0 |
| Traumatic | 6 (7.3) | 2 (5.5) | 2 (5.1) | 2 (28.5) |
| Patient Characteristics, WM (95% CI) | | | | |
| Age in Years | 70.3 (62.9,77.7) | 67.9 (66.9,68.9) | 73.3 (70.5,76.2) | 1.0 (NA[+]) |
| Proportion Male | 58 (57,60) | 61 (58,64) | 58 (57,60) | 61 (NA[+]) |
| Proportion Presumed Cardiac Aetiology | 59 (54,65) | 96 (89,100) | 58 (51,65) | 30 (23,38) |
| Study quality, n (%) [§] | | | | |
| High risk of bias (<3 points) | 5 (6.1) | 2 (5.5) | 2 (5.1) | 1 (14.2) |
| Moderate risk of bias (4–6 points) | 53 (64.6) | 26 (72.2) | 23 (58.9) | 4 (57.1) |
| Low risk of bias (≥7 points) | 24 (29.2) | 8 (22.2) | 14 (35.9) | 2 (28.5) |
| Bystander witness | | | | |
| ≤28% | 10 (41.7) | 2 (22.2) | 7 (50.0) | 1 (100.0) |
| 29–51% | 7 (29.1) | 3 (33.3) | 4 (28.5) | NA[+] |
| >51% | 7 (29.1) | 4 (44.4) | 3 (21.4) | NA[+] |
| Any witness | | | | |
| ≤32% | 11 (34.3) | 3 (20.0) | 7 (43.7) | 1 (100.0) |
| 33–51% | 11 (34.3) | 7 (46.7) | 4 (25.0) | 0 |
| >51% | 10 (31.2) | 5 (33.3) | 5 (31.2) | 0 |
| EMS witness | | | | |
| ≤18% | 7 (30.4) | 4 (36.3) | 3 (25.0) | NA[+] |
| 19–63% | 9 (39.1) | 3 (27.2) | 6 (50.0) | NA[+] |
| >63% | 7 (30.4) | 4 (36.3) | 3 (25.0) | NA[+] |
| Public Location | | | | |
| ≤8% | 3 (50.0) | 0 | 3 (60.0) | NA[+] |
| 9–13% | 1 (16.7) | 0 | 1 (20.0) | NA[+] |
| >13% | 2 (33.3) | 1 (100.0) | 1 (20.0) | NA[+] |

(continued on next page)

| Table 1 (continued) | | | | |
|---|---|---|---|---|
| | All studies | By Population | | |
| | | All ages | Adults only | Paediatrics only |
| Bystander CPR | | | | |
| ≤22% | 10 (41.7) | 6 (60.0) | 4 (30.7) | 0 |
| 23–31% | 7 (29.1) | 2 (20.0) | 5 (38.4) | 0 |
| >31% | 7 (29.1) | 2 (20.0) | 4 (30.7) | 1 (100.0) |
| Endotracheal intubation | | | | |
| <24% | 2 (33.3) | NA | 1 (20.0) | 1 (100.0) |
| 24–65% | 2 (33.3) | NA | 2 (40.0) | 0 |
| >65% | 2 (33.3) | NA | 2 (40.0) | 0 |
| IV/IO Epinephrine administration | | | | |
| <15% | 2 (33.3) | NA | 1 (20.0) | 1 (100.0) |
| 15–63% | 2 (33.3) | NA | 2 (40.0) | 0 |
| >63% | 2 (33.3) | NA | 2 (40.0) | 0 |
| EMS response time | | | | |
| <6.1 min | 4 (28.6) | 1 (50.0) | 3 (27.3) | 0 |
| 6.1–6.9 min | 2 (14.3) | 0 | 2 (18.2) | 0 |
| >6.9 min | 8 (57.1) | 1 (50.0) | 6 (54.5) | 1 (100.0) |
| EMS transport time | | | | |
| <26.8 min | 1 (25.0) | 1 (33.3) | 0 | 0 |
| 26.8–31.6 min | 2 (50.0) | 1 (33.3) | 1 (100.0) | 0 |
| >31.6 min | 1 (25.0) | 1 (33.3) | 0 | 0 |

WM Weighted Mean.

EMS denotes emergency medical service, WM weighted mean, CI confidence interval.

Age- Estimated from 18 studies, involving 404,103 patients.

Proportion of male Sex estimated from 20 studies, involving 394,963 patients.

Proportion of cardiac aetiology estimated from 46 studies involving 416,263 patients.

§ Graded on a 9-point scale using the Joanna Briggs Institute critical appraisal tool for studies reporting prevalence data.




**Fig. 2 – Assessment of study quality using the Joanna Briggs Institute critical appraisal tool for studies reporting prevalence and incidence data.**

EMS-treated patients with known outcome). The pooled rate of pre-hospital ROSC was 16.0% (95% CI 14.0%, 17.0%, $I^2$ = 100%).

### *Favourable neurological survival*

Twenty six (n = 26) studies reported neurologically favourable survival at longest follow-up, ranging in definitions from a Cerebral Performance Category ≤ 2 at hospital discharge or 30 days (*n* = 19), Modified Rankin Scale ≤ 3 at discharge (*n* = 2), Overall Performance Category 1–2 at discharge (*n* = 1), Paediatric Cerebral Performance Category 1 at 18 months (*n* = 1), Bloom category 1/2 at 12 months (*n* = 1), alive at one year (*n* = 1) or unspecified (*n* = 1). Among these studies, neurologically favourable survival at longest follow-up ranged between 0% and 15%, with the crude rate being 0.4% (1927 patients with favourable neurological outcome from 446,213

**Table 2 – Stratified analysis and meta regression of survival to hospital discharge or 30 days among EMS treated OHCA with initial asystole.**

| | Number of studies | Pooled proportion of survivors (95% CI) | $I^2$ | P value for interaction (unadjusted) | P Value for interaction (adjusted) |
|---|---|---|---|---|---|
| Total studies, n | 82 | 1.5 (1.2, 1.8) | 98% | – | – |
| Population | | | | | |
| All ages | 36 | 1.4 (0.8, 2.2) | 96% | Ref | Ref |
| Adults only | 39 | 1.4 (1.1, 1.8) | 98% | 0.567 | 0.556 |
| Paediatrics only | 7 | 3.4 (1.4, 6.2) | 84% | <0.001 | 0.012 |
| Year of publication, n (%) | | | | | |
| 1990–99 | 16 | 1.1 (0.5, 2.0) | 69% | Ref | Ref |
| 2000–09 | 25 | 2.1 (1.3, 2.9) | 90% | 0.813 | 0.943 |
| 2010–19 | 33 | 0.9 (0.5, 1.3) | 98% | 0.921 | 0.831 |
| 2020+ | 8 | 2.8 (1.1, 5.2) | 99% | 0.220 | 0.618 |
| EMS-treated sample | | | | | |
| <100 patients | 19 | 3.3 (1.4, 5.8) | 51% | Ref | Ref |
| 100–1000 patients | 37 | 1.9 (1.3, 2.7) | 82% | 0.547 | 0.944 |
| >1000 patients | 26 | 1.4 (1.0, 1.8) | 99% | 0.477 | 0.755 |
| Study duration | | | | | |
| <1 year | 13 | 1.2 (0.0, 3.5) | 90% | Ref | Ref |
| 1–5 years | 41 | 1.3 (1.0,1.6) | 80% | <0.001 | 0.006 |
| >5 years | 28 | 1.7 (1.1, 2.3) | 99% | <0.001 | 0.008 |
| Study design, n (%) | | | | | |
| Retrospective cohort | 62 | 1.3 (0.9,1.6) | 98% | Ref | Ref |
| Prospective cohort | 17 | 2.1 (0.9, 3.6) | 92% | 0.011 | 0.111 |
| Secondary Analysis | 3 | 1.9 (1.1, 2.9) | NA+ | 0.959 | 0.263 |
| Registry-based data | 30 | 1.7 (1.2, 2.2) | 99% | 0.526 | 0.732 |
| Highest EMS skill level | | | | | |
| Physician | 34 | 1.8 (1.3, 2.4) | 97% | Ref | Ref |
| Paramedic | 44 | 1.2 (0.8, 1.6) | 97% | 0.279 | 0.032 |
| EMT | 1 | 2.8 (1.3, 5.3) | NA+ | 0.846 | 0.641 |
| Nurse | 3 | 4.8 (1.5, 9.5) | NA+ | 0.692 | 0.849 |
| Region | | | | | |
| North America | 23 | 1.4 (0.7, 2.3) | 97% | Ref | Ref |
| Europe | 36 | 1.6 (1.1, 2.1) | 85% | 0.386 | 0.531 |
| Asia | 12 | 1.3 (0.6, 2.3) | 99% | 0.958 | 0.042 |
| Australasia | 10 | 1.7 (0.3, 3.8) | 92% | 0.609 | 0.721 |
| Other | 1 | 1.8 (0.5, 4.5) | NA+ | 0.954 | 0.955 |
| All aetiologies | | | | | |
| All aetiologies | 39 | 1.2 (0.7, 1.9) | 97% | Ref | Ref |
| Presumed cardiac | 28 | 1.2 (0.7, 1.9) | 98% | 0.003 | 0.751 |
| Non-traumatic | 5 | 1.9 (1.3, 2.7) | 86% | 0.569 | 0.767 |
| Traumatic | 6 | 1.0 (0.5, 1.5) | 24% | 0.882 | 0.203 |
| Other* | 4 | 7.0 (0.0, 22.2) | 88% | 0.931 | 0.525 |
| Study quality, n (%) | | | | | |
| High risk of bias | 5 | 7.7 (1.2, 17.6) | 67% | Ref | Ref |
| Moderate risk of bias | 53 | 1.3 (1.0,1.7) | 97% | 0.529 | 0.575 |
| Low risk of bias | 24 | 1.9 (1.1, 2.9) | 98% | 0.688 | 0.649 |
| Age in years | | | | | |
| <66 | 7 | 1.1 (0.0, 3.3) | 98% | Ref | NA+ |
| 66–69 | 4 | 1.7 (0.1, 4.8) | 98% | 0.836 | NA+ |
| >69 | 6 | 1.3 (0.5, 2.3) | 99% | 0.350 | NA+ |
| Male | | | | | |
| <58% | 6 | 0.8 (0.0, 2.1) | 99% | Ref | NA+ |
| 58–62% | 8 | 1.7 (0.6, 3.4) | 98% | NA+ | NA+ |
| >62% | 6 | 1.0 (0.7, 1.4) | 77% | NA+ | NA+ |
| EMS witnessed | | | | | |
| <18% | 7 | 0.5 (0.1,1.1) | 44% | Ref | Ref |
| 18–63% | 9 | 1.5 (0.6, 2.9) | 99% | 0.429 | 0.358 |
| >63% | 7 | 4.5 (2.9, 6.4) | 91% | 0.214 | 0.713 |
| Any witnessed | | | | | |
| <32% | 11 | 1.5 (0.4, 3.1) | 99% | Ref | Ref |
| 32–51% | 11 | 0.9 (0.5, 1.5) | 79% | 0.311 | 0.212 |
| >51% | 10 | 3.0 (1.8, 4.3) | 98% | 0.996 | 0.437 |

(*continued on next page*)

**Table 2 (continued)**

| | Number of studies | Pooled proportion of survivors (95% CI) | $I^2$ | P value for interaction (unadjusted) | P Value for interaction (adjusted) |
|---|---|---|---|---|---|
| Bystander witnessed | | | | | |
| <28% | 10 | 1.3 (0.5, 2.4) | 99% | Ref | Ref |
| 28-51% | 7 | 0.5 (0.2, 0.9) | 77% | 0.417 | 0.848 |
| >51% | 7 | 2.7 (2.6, 2.8) | 0% | 0.367 | 0.946 |
| Bystander CPR | | | | | |
| <22% | 10 | 1.5 (0.4, 3.3) | 99% | Ref | Ref |
| 22–32% | 7 | 0.9 (0.4,1.5) | 69% | 0.419 | 0.875 |
| >32% | 7 | 1.9 (1.0, 3.1) | 99% | 0.801 | 0.778 |
| Public location | | | | | |
| <8% | 3 | 1.4 (1.0, 1.9) | NA+ | Ref | NA+ |
| 8–13% | 1 | 1.8 (0.8, 3.6) | NA+ | 0.934 | NA+ |
| >13% | 2 | 0.9 (0.7, 1.1) | NA+ | 0.726 | NA+ |
| Endotracheal intubation | | | | | |
| <24% | 2 | 1.2 (1.1, 1.2) | NA+ | Ref | NA+ |
| 24–65% | 2 | 1.5 (1.2, 1.8) | NA+ | 0.372 | NA+ |
| >65% | 2 | 2.5 (2.4, 2.6) | NA+ | 0.613 | NA+ |
| IV/IO Epinephrine administration | | | | | |
| <15% | 2 | 3.2 (3.1, 3.3) | NA+ | Ref | NA+ |
| 15–63% | 2 | 0.9 (0.9, 1.0) | NA+ | 0.50 | NA+ |
| >63% | 2 | 1.2 (1.1, 1.3) | NA+ | 0.126 | NA+ |
| EMS response time | | | | | |
| <6.1 min | 4 | 1.5 (1.2, 1.9) | 73% | Ref | NA+ |
| 6.1–6.9 min | 2 | 1.1 (0.4, 2.0) | 99% | 0.933 | NA+ |
| >6.9 min | 8 | 1.7 (0.8, 3.0) | NA+ | 0.467 | NA+ |
| EMS transport time | | | | | |
| <26.8 min | 1 | 1.7 (1.5, 2.0) | NA+ | Ref | NA+ |
| 26.8–31.6 min | 2 | 1.2 (1.1, 1.2) | NA+ | 0.711 | NA+ |
| >31.6 min | 1 | 3.0 (2.9, 3.0) | NA+ | 0.796 | NA+ |

NA+- not available (calculation not possible).
*Other Aetiologies – Drowning, Hanging.

EMS-treated patients with long term follow up). The pooled rate of neurologically favourable survival at longest follow-up was 0.6% (95% CI 0.5%, 0.8%, $I^2$ = 100%).

### *Incidence*

Table 4 shows the pooled incidence of EMS-treated cases across the 82 studies and stratifications. The overall pooled incidence of EMS-treated asystolic cases was 11.0 cases per 100,000 person-years (95% CI: 10.5, 11.5, $I^2$ = 100%). In the unadjusted analysis, study population, year of publication, number of patients treated, study design, highest EMS skill level, region, aetiology and study quality explained the variation in the incidence. In the multivariable analysis, all variables except highest EMS skill level remained significantly associated with incidence across studies.

### *Publication bias*

A funnel plot for the primary outcome of survival to hospital discharge or 30 day survival is shown in Fig. 3. Visual inspection of the funnel plot shows some evidence of asymmetry.

## Discussion

We conducted a systematic review and meta-analysis of 82 studies, including over 540,000 EMS-treated asystolic OHCA patients from 35 countries. Survival to hospital discharge or 30 days was 1.5% (*n* = 9931), with 0.6% achieving favourable neurological outcomes at the longest follow-up. Our analysis identified study population, study duration, highest EMS skill level, and study continent as the only variables significantly associated with survival to hospital discharge or 30 days. No variables were significantly associated with event survival. Predictors such as bystander-witnessed arrest, any witnessed arrest, bystander CPR, arrest location, endotracheal intubation, IV/IO epinephrine administration, EMS response time and EMS transport time to hospital showed no significant association with survival to hospital discharge or 30-days. However, our review was limited by the clinical and statistical heterogeneity of included studies, and this should be considered when interpreting the results of our pooled estimates.

The incidence of EMS-treated asystolic OHCA varies globally, with a higher incidence in Asia compared to North America and Europe.[2,6,25] This disparity may be attributed to regional policies limiting the withholding of resuscitation in the field.[2,6,25] However, due to limited data on EMS-attended populations, we were unable to quantify the full incidence of asystolic OHCA cases assessed by EMS, which is likely higher than the reported EMS-treated cases. Our findings align with a previous systematic review by Sasson et al (2010), which analysed studies from 1950 to 2008.[3] Forty studies included data on asystolic arrest. The review reported a pooled survival rate of 0.2% (95% CI: 0%–0.3%) in EMS systems with low baseline survival and 4.7% (95% CI: 1.0%–8.4%) in systems with high baseline survival.[3] These results suggest that survival rates for asystolic OHCA remain persistently poor and have not improved significantly

**Table 3 – Stratified analysis and meta regression of event survival for EMS-treated asystolic OHCA.**

| | Number of studies | Pooled proportion of survivors (95% CI) | I² | P value for interaction (unadjusted) | P value for interaction (adjusted) |
|---|---|---|---|---|---|
| Total studies, n | 24 | 11.6 (6.5, 17.8) | 99% | – | – |
| Population | | | | | |
| All ages | 9 | 11.8 (6.0, 18.9) | 93% | Ref | Ref |
| Adults only | 13 | 9.7 (3.9, 17.6) | 99% | 0.814 | 0.707 |
| Paediatrics only | 2 | 10.5 (8.2, 13.0) | NA+ | 0.755 | 0.894 |
| Year of publication | | | | | |
| 1990–99 | 4 | 13.0 (4.1, 25.8) | 98% | Ref | Ref |
| 2000–09 | 10 | 11.6 (5.1, 20.1) | 98% | 0.753 | 0.813 |
| 2010–19 | 8 | 12.1 (3.3, 24.9) | 99% | 0.724 | 0.640 |
| 2020+ | 2 | 9.8 (6.6, 13.5) | NA+ | 0.830 | 0.698 |
| EMS-treated sample | | | | | |
| <100 patients | 7 | 17.2 (4.9, 34.1) | 91% | Ref | Ref |
| 100–1000 patients | 10 | 9.4 (6.1, 13.4) | 91% | 0.526 | 0.791 |
| >1000 patients | 7 | 11.1 (3.1, 23.0) | 99% | 0.751 | 0.716 |
| Study duration | | | | | |
| <1 year | 6 | 10.4 (4.7, 18.0) | 91% | Ref | Ref |
| 1–5 years | 8 | 8.7 (3.3, 16.3) | 97% | 0.989 | 0.626 |
| >5 years | 10 | 14.8 (6.4, 25.7) | 99% | 0.886 | 0.680 |
| Study design | | | | | |
| Retrospective cohort | 18 | 11.7 (5.4, 19.9) | 99% | Ref | Ref |
| Prospective cohort | 5 | 10.4 (3.1, 21.0) | 98% | 0.039 | 0.220 |
| Secondary Analysis | 1 | 15.9 (11.1, 21.9) | NA+ | 0.769 | 0.346 |
| Registry-based data | 6 | 7.9 (0.9, 20.6) | 99% | 0.613 | 0.651 |
| Highest EMS skill level | | | | | |
| Physician | 5 | 17.2 (12.2, 22.7) | 90% | Ref | Ref |
| Paramedic | 16 | 8.5 (3.7, 15.0) | 99% | 0.147 | 0.943 |
| EMT | 1 | 13.4 (9.8, 17.7) | NA+ | 0.676 | 0.781 |
| Nurse | 2 | 17.1 (10.4, 25.0) | NA+ | 0.897 | 0.805 |
| Region | | | | | |
| North America | 7 | 16.1 (6.2, 29.4) | 99% | Ref | Ref |
| Europe | 9 | 9.6 (1.8, 22.0) | 99% | 0.555 | 0.599 |
| Asia | 3 | 7.3 (1.4, 17.1) | NA+ | 0.629 | 0.622 |
| Australasia | 5 | 11.1 (6.7, 16.3) | 90% | 0.841 | 0.679 |
| Other | 0 | NA+ | NA+ | NA+ | NA+ |
| Aetiologies included | | | | | |
| All aetiologies | 14 | 14.0 (10.9, 17.5) | 95% | Ref | Ref |
| Presumed cardiac | 6 | 2.7 (0.8, 5.4) | 97% | <0.001 | 0.390 |
| Non-traumatic | 2 | 13.0 (11.5, 14.6) | NA+ | 0.372 | 0.735 |
| Traumatic | 1 | 13.4 (9.8, 17.7) | NA+ | 0.680 | NA+ |
| Other* | 1 | 53.8 (25.1, 80.7) | NA+ | 0.170 | 0.540 |
| Study quality | | | | | |
| High risk of bias | 1 | 53.8 (25.1, 80.7) | NA+ | Ref | |
| Moderate risk of bias | 19 | 10.8 (5.0, 18.3) | 99% | 0.154 | NA+ |
| Low risk of bias | 4 | 10.6 (1.5, 26.1) | 99% | 0.155 | NA+ |
| Other variables | | | | | |
| Age in years | | | | | |
| <66 | 3 | 11.4 (5.3, 19.5) | NA+ | Ref | NA+ |
| 66–69 | 2 | 0.4 (0.3, 0.4) | NA+ | 0.063 | NA+ |
| >69 | 1 | 1.7 (1.3, 2.1) | NA+ | 0.058 | NA+ |
| Male | | | | | |
| <58% | 5 | 6.6 (1.0, 16.3) | 99% | NA+ | NA+ |
| 58–62% | 0 | NA+ | NA+ | NA+ | NA+ |
| >62% | 0 | NA+ | NA+ | NA+ | NA+ |
| Any witness | | | | | |
| <32% | 10 | 12.0 (2.9, 25.4) | 97% | Ref | NA+ |
| 32–51% | 11 | 12.8 (9.3, 16.8) | NA+ | 0.745 | NA+ |
| >51% | 10 | 11.0 (0.6, 31.1) | 100% | 0.748 | NA+ |
| EMS witnessed | | | | | |
| <18% | 1 | 10.6 (7.3, 14.7) | NA+ | Ref | NA+ |
| 18–63% | 3 | 2.6 (0.5, 5.8) | NA+ | 0.117 | NA+ |
| >63% | 3 | 17.5 (13.6, 21.8) | NA+ | 0.259 | NA+ |

(*continued on next page*)

**Table 3 (continued)**

| | Number of studies | Pooled proportion of survivors (95% CI) | $I^2$ | P value for interaction (unadjusted) | P value for interaction (adjusted) |
|---|---|---|---|---|---|
| Bystander witnessed | | | | | |
| <28% | 2 | 1.2 (0.8, 1.6) | NA+ | Ref | NA+ |
| 28–51% | 3 | 6.9 (0.0, 25.8) | NA+ | 0.496 | NA+ |
| >51% | 3 | 17.5 (13.6, 21.8) | NA+ | 0.153 | NA+ |
| Bystander CPR | | | | | NA+ |
| <22% | 5 | 13.6 (3.9, 27.4) | 99% | Ref | |
| 22%–32% | 1 | 15.9 (11.1, 21.9) | NA+ | 0.704 | NA+ |
| >32% | 1 | 0.4 (0.4, 0.5) | NA+ | 0.307 | NA+ |
| Public location | | | NA+ | NA+ | |
| <8% | 1 | 15.3 (14.5, 16.1) | NA+ | NA+ | NA+ |
| 8%–13% | 0 | NA+ | NA+ | NA+ | NA+ |
| >13% | 0 | NA+ | NA+ | NA+ | NA+ |
| Endotracheal intubation | | | | | |
| <24% | 0 | NA+ | NA+ | NA+ | NA+ |
| 24–65% | 1 | 0.4 (0.4, 0.5) | NA+ | NA+ | NA+ |
| 65% | 0 | NA+ | NA+ | NA+ | NA+ |
| IV/IO Epinephrine administration | | | | | |
| <15% | 0 | NA+ | NA+ | NA+ | NA+ |
| 15–63% | 0 | NA+ | NA+ | NA+ | NA+ |
| 63% | 1 | 0.4 (0.4. 0.5) | NA+ | NA+ | NA+ |
| EMS response time | | | | | |
| <6.1 | 0 | NA+ | NA+ | NA+ | NA+ |
| 6.1–6.9 | 0 | NA+ | NA+ | NA+ | NA+ |
| >6.9 | 4 | 15.3 (13.0, 17.8) | NA+ | NA+ | NA+ |
| EMS transport time | | | | | |
| <26.8% | 0 | NA+ | NA+ | NA+ | NA+ |
| 26.8–31.6% | 0 | NA+ | NA+ | NA+ | NA+ |
| >31.6% | 0 | NA+ | NA+ | NA+ | NA+ |

NA+ – Not Possible.

* Other Aetiologies p– Drowning, Hanging.

over recent decades. Additionally, our findings indicate that over half of the survivors of asystolic OHCA either die or suffer significant neurological impairment at follow-up.

Given the extremely low survival and poor neurological outcomes, prevention should be prioritised. Efforts should focus on early detection and interventions to prevent the degradation of shockable rhythms (VF/VT) to asystole. This may be achieved through prompt CPR and early rhythm analysis with defibrillation not only by EMS personnel but also by citizen responders.[26] Primary prevention strategies should enhance public education on cardiac symptoms and encourage timely medical care, with mass media campaigns aimed at recognising and responding to symptoms of heart attack demonstrating a positive impact on OHCA incidence.[27] Secondary prevention should involve the use of implantable cardioverter-defibrillators (ICDs) for high-risk patients.[28]

Alongside preventive measures, improved implementation of termination of resuscitation (TOR) protocols for asystolic OHCA is essential.[29] The 2020 International Consensus on Cardiopulmonary Resuscitation and Emergency Cardiovascular Care also conditionally recommends the use of termination of resuscitation (TOR) rules to guide clinicians in deciding whether to discontinue out-of-hospital resuscitation efforts or continue CPR during transport, based on very low-certainty evidence.[30] It recognises that identifying futile cases is complex and typically relies on a combination of clinical guidelines and clinician judgement.[30] The International Liaison Committee on Resuscitation (ILCOR) task force emphasises that decisions should not rely solely on TOR rules but should also consider factors such as the patient's prior wishes, pre existing comorbidities, and quality of life, in addition to clinical guidelines and clinician judgment.[30] In situations where prehospital TOR is not feasible due to legal, cultural, or logistical factors, continuing CPR and transporting the patient to the hospital may be preferred.[30] However, adherence to these guidelines is inconsistent, leading to futile resuscitation attempts with poor survival and neurological outcomes.[12] Strengthening compliance with TOR guidelines could give clear guidance to EMS personnel about resuscitation in the field and could reduce unnecessary hospital transports and optimise resource allocation.[31]

TOR criteria have demonstrated high specificity and predictive value for mortality.[31,32] A systematic review by Smyth et al (2024) reported that the Universal Termination of Resuscitation (UTOR) rule has a 1% missed survival rate when the likelihood of survival is 8%.[29] Given our findings of 1.5% survival (0.6% neurologically favourable), treating asystolic OHCA cases that meet TOR criteria may be futile in most cases. Some argue that medical futility is defined by a <1% survival rate, supporting TOR rule application.[33] However, the European Resuscitation Council maintains that even <1% survival justifies resuscitation,[34] highlighting ongoing debate regarding futility in OHCA. Ardagh (2000) suggests avoiding the term "futile" in resuscitation decisions and instead evaluating the balance of benefits and harms from the patient's perspective.[35]

Despite their potential benefits, TOR rules face significant implementation barriers. A multicentre trial by Morrison et al (2014) found that 21% of eligible patients were transported despite meeting TOR criteria, with no survivors.[36] Reasons for noncompliance included

**Table 4 – Stratified analyses and meta-regression of the incidence of EMS-treated asystolic OHCA per 100,000 person years.**

| | Number of studies | Pooled incidence per 100,000 person-years (95% CI) | $I^2$ | P value for interaction (Unadjusted) | P value for interaction (adjusted) |
|---|---|---|---|---|---|
| Total studies, n | 82 | 11.0 (10.5, 11.5) | 100% | – | – |
| Population | | | | | |
| All ages | 36 | 12.8 (11.9, 13.8) | 100% | Ref | Ref |
| Adults only | 39 | 12.2 (11.1, 13.3) | 100% | 0.014 | <0.001 |
| Paediatrics only | 7 | 3.0 (0.6, 5.4) | 100% | <0.001 | 0.294 |
| Year of publication | | | | | |
| 1990–99 | 16 | 10.8 (7.5, 14.1) | 100% | Ref | Ref |
| 2000–09 | 25 | 15.6 (12.4, 18.9) | 100% | <0.001 | 0.912 |
| 2010–19 | 33 | 9.1 (7.7, 10.4) | 100% | 0.224 | 0.728 |
| 2020+ | 8 | 35.7 (31.8, 39.6) | 100% | <0.001 | <0.001 |
| EMS-treated sample | | | | | |
| <100 patients | 19 | 2.0 (1.7, 2.4) | 97% | Ref | Ref |
| 100–1000 patients | 37 | 4.3 (4.1, 4.5) | 100% | <0.001 | 0.262 |
| >1000 patients | 26 | 29.5 (26.1, 32.9) | 100% | <0.001 | <0.001 |
| Study duration | | | | | |
| <1 year | 13 | 58.5 (49.8, 67.2) | 100% | Ref | Ref |
| 1–5 years | 41 | 8.7 (8.3, 9.0) | 100% | <0.001 | <0.001 |
| >5 years | 28 | 10.6 (8.0, 13.2) | 100% | <0.001 | <0.001 |
| Study design, n (%) | | | | | |
| Retrospective cohort | 62 | 11.0 (10.4, 11.5) | 99% | Ref | Ref |
| Prospective cohort | 17 | 12.3 (9.7, 14.9) | 99% | 0.039 | 0.280 |
| Secondary Analysis | 3 | 9.3 (8.2, 10.5) | 69% | 0.769 | 0.398 |
| Registry-based data | 30 | 11.7 (10.8, 12.7) | 99% | 0.361 | 0.023 |
| Highest EMS skill level | | | | | |
| Physician | 34 | 11.1 (9.5, 12.6) | 99% | Ref | Ref |
| Paramedic | 44 | 13.9 (12.8, 15.1) | 99% | <0.001 | 0.0 |
| EMT | 1 | 0.0 (0.0, 0.1) | NA+ | <0.001 | 0.682 |
| Nurse | 3 | 16.6 (10.2, 23.0) | 80% | 0.035 | 0.789 |
| Region | | | | | |
| North America | 23 | 12.0 (11.1, 12.9) | 100% | Ref | Ref |
| Europe | 36 | 12.1 (11.3, 13.0) | 100% | <0.001 | 0.016 |
| Asia | 12 | 13.5 (8.9, 18.1) | 100% | 0.017 | <0.001 |
| Australasia | 10 | 5.3 (3.3, 7.3) | 100% | <0.001 | 0.021 |
| Other | 1 | 3.6 (3.1, 4.1) | NA+ | 0.002 | 0.402 |
| Aetiologies included | | | | | |
| All aeitologies | 39 | 12.9 (11.9, 14.0) | 100% | Ref | Ref |
| Presumed cardiac | 28 | 24.2 (20.9, 27.4) | 100% | 0.127 | 0.272 |
| Non-traumatic | 5 | 17.2 (9.0, 25.4) | 100% | 0.005 | 0.727 |
| Traumatic | 6 | 1.5 (0.9, 2.1) | 100% | <0.001 | 0.005 |
| Other | 4 | 0.3 (0.2, 0.5) | 100% | <0.001 | <0.001 |
| Study quality | | | | | |
| High risk of bias | 5 | 1.4 (0.8, 2.0) | 98% | Ref | ref |
| Moderate risk of bias | 53 | 10.7 (10.2, 11.3) | 100% | <0.001 | <0.001 |
| Low risk of bias | 24 | 20.7 (18.4, 22.9) | 100% | <0.001 | 0.015 |

location of arrest, family distress, patient age, and perceived short transport times.[36] Additional barriers include EMS provider training gaps, cultural and ethical concerns, challenges in family communication, regional guideline discrepancies, and legal uncertainties.[29,37]

Our review reinforces the persistently poor prognosis of asystolic OHCA and underscores the need for enhanced preventive strategies, adherence to TOR guidelines, and a nuanced approach to defining futility in resuscitation efforts. Addressing legal, ethical, and educational barriers will be critical in ensuring the effective implementation of TOR protocols across EMS systems.

### *Limitations*

This review has several limitations. Population characteristics were frequently unreported, limiting our ability to analyse these factors comprehensively. Key variables such as CPR duration were not included, despite its potential impact on survival outcomes. Our search strategy may have missed studies where asystolic OHCA was not explicitly mentioned in the title or abstract or where primary outcome data were not reported. While we included studies from multiple regions, no studies from Africa or Antarctica were identified. Many studies lacked details on initial rhythm, confirmation or the cri-




**Fig. 3 – Funnel plot for the log odds of the proportion of survivors to hospital discharge or 30 day survival among EMS treated asystole studies.**

teria used to define asystole. Additionally, missing outcome data was common, reducing the reliability of pooled estimates. Although our funnel plot suggested some asymmetry, this may not necessarily indicate publication bias, as funnel plots in single-group proportional meta-analyses have limited interpretability compared to interventional studies.[38]

## Conclusion

This systematic review and meta-analysis highlights significant variability in outcomes for EMS-treated patients across a global cohort. With a pooled proportion of 53.0% of patients with asystolic OHCA, the overall survival rate to hospital discharge or 30-days was low at 1.5%. Additionally, the proportion of survivors to event, prehospital return of spontaneous circulation (ROSC), and neurologically favourable survival were relatively modest, with proportions of 11.6%, 16.0%, and 0.6%, respectively. These pooled results should be interpreted with caution, given the high clinical and statistical heterogeneity observed across the 82 studies included in the review. Further research in this population could consider novel preventive strategies for this population and the role of TOR guidelines.

## Disclosures

No relevant disclosures.

## Sources of funding

ZN is supported by fellowships from the National Heart Foundation (#105690) and the National Health and Medical Research Council (#2034615).

## CRediT authorship contribution statement

**Dhiraj Bhatia Dwivedi:** Writing – review & editing, Writing – original draft, Visualization, Validation, Software, Resources, Project administration, Methodology, Investigation, Formal analysis, Data curation, Conceptualization. **Jocasta Ball:** Writing – review & editing, Visualization, Validation, Supervision, Resources, Project administration, Methodology, Investigation, Data curation, Conceptualization. **Karen Smith:** Writing – review & editing, Visualization, Validation, Supervision, Resources, Project administration, Methodology, Investigation, Conceptualization. **Ziad Nehme:** Writing – review & editing, Writing – original draft, Visualization, Validation, Supervision, Software, Resources, Project administration, Methodology, Investigation, Funding acquisition, Formal analysis, Data curation, Conceptualization.

## Declaration of competing interest

The authors declare that they have no known competing financial interests or personal relationships that could have appeared to influence the work reported in this paper.

## Acknowledgements

We acknowledge the support from the Monash Health Library team who supported the development of the search strategy.

## Appendix A. Supplementary material

Supplementary data to this article can be found online at https://doi.org/10.1016/j.resuscitation.2025.110629.

## Author details

[a]School of Public Health and Preventive Medicine, Monash University, Prahran, Melbourne, Victoria, Australia [b]Critical Care and Perioperative Medicine, Monash Health, Clayton, Victoria, Australia [c]Centre for Research and Evaluation, Ambulance Victoria, Blackburn North, Victoria, Australia [d]Department of Paramedicine, Monash University, Frankston, Victoria, Australia [e]Research and Innovation, Silverchain Group, Melbourne, Australia [f]School of Population Health, Curtin University, Perth, Australia [g]School of Nursing, Queensland University of Technology, Brisbane, Australia

REFERENCES

1. Myat A, Song K-J, Rea T. Out-of-hospital cardiac arrest: current concepts. Lancet 2018;391:970–9.
2. Berdowski J, Berg RA, Tijssen JG, Koster RW. Global incidences of out-of-hospital cardiac arrest and survival rates: systematic review of 67 prospective studies. Resuscitation 2010;81:1479–87.
3. Sasson C, Rogers MA, Dahl J, Kellermann AL. Predictors of survival from out-of-hospital cardiac arrest: a systematic review and meta-analysis. Circ Cardiovasc Qual Outcomes 2010;3:63–81.
4. Wissenberg M, Lippert FK, Folke F, et al. Association of national initiatives to improve cardiac arrest management with rates of bystander intervention and patient survival after out-of-hospital cardiac arrest. JAMA 2013;310:1377–84.
5. Fothergill RT, Watson LR, Chamberlain D, Virdi GK, Moore FP, Whitbread M. Increases in survival from out-of-hospital cardiac arrest: a five year study. Resuscitation 2013;84:1089–92.
6. Kitamura T, Iwami T, Kawamura T, et al. Nationwide improvements in survival from out-of-hospital cardiac arrest in Japan. Circulation 2012;126:2834–43.
7. Schneider T, Martens PR, Paschen H, et al. Multicenter, randomized, controlled trial of 150-J biphasic shocks compared with 200- to 360-J monophasic shocks in the resuscitation of out-of-hospital cardiac arrest victims. Optimized Response to Cardiac Arrest (ORCA) Investigators. Circulation 2000;102:1780–7.
8. Bernard SA, Smith K, Cameron P, et al. Induction of therapeutic hypothermia by paramedics after resuscitation from out-of-hospital ventricular fibrillation cardiac arrest: a randomized controlled trial. Circulation 2010;122:737–42.
9. Nehme E, Anderson D, Salathiel R, et al. Out-of-hospital cardiac arrests in Victoria, 2003–2022: retrospective analysis of Victorian Ambulance Cardiac Arrest Registry data. Med J Aust 2024;221:603–11.
10. McNally B, Robb R, Mehta M, et al. Out-of-Hospital Cardiac Arrest Surveillance — Cardiac Arrest Registry to Enhance Survival (CARES), United States, October 1, 2005–December 31, 2010. MMWR Surveill Summ 2011;60:1–19.
11. Hawkes C, Booth S, Ji C, et al. Epidemiology and outcomes from out-of-hospital cardiac arrests in England. Resuscitation 2017;110:133–40.
12. Andrew E, Nehme Z, Lijovic M, Bernard S, Smith K. Outcomes following out-of-hospital cardiac arrest with an initial cardiac rhythm of asystole or pulseless electrical activity in Victoria, Australia. Resuscitation 2014;85:1633–9.
13. Ishii J, Nishikimi M, Kikutani K, et al. Resuscitation attempt and outcomes in patients with asystole out-of-hospital cardiac arrest. JAMA Netw Open 2024;7:e2445543.
14. Meyer ADM, Bernard S, Smith KL, McNeil JJ, Cameron PA. Asystolic cardiac arrest in Melbourne, Australia. Emerg Med 2001;13:186–9.
15. Fukuda T, Yasunaga H, Horiguchi H, et al. Health care costs related to out-of-hospital cardiopulmonary arrest in Japan. Resuscitation 2013;84:964–9.
16. Kim Y-J, Ahn S, Sohn CH, et al. Long-term neurological outcomes in patients after out-of-hospital cardiac arrest. Resuscitation 2016;101:1–5.
17. Nehme Z, Bernard S, Cameron P, et al. Using a cardiac arrest registry to measure the quality of emergency medical service care: decade of findings from the Victorian Ambulance Cardiac Arrest Registry. Circ Cardiovasc Qual Outcomes 2015;8:56–66.
18. Page MJ, McKenzie JE, Bossuyt PM, et al. The PRISMA 2020 statement: an updated guideline for reporting systematic reviews. BMJ 2021;372.
19. Cummins RO, Chamberlain DA, Abramson NS, et al. Recommended guidelines for uniform reporting of data from out-of-hospital cardiac arrest: the Utstein Style. A Statement for Health Professionals from a Task Force of the American Heart Association, the European Resuscitation Council, the Heart and Stroke Foundation of Canada, and the Australian Resuscitation Council. Circulation (New York NY) 1991;84:960–75.
20. Jacobs I, Nadkarni V, Bahr J, et al. Cardiac arrest and cardiopulmonary resuscitation outcome reports: update and simplification of the Utstein templates for resuscitation registries. A statement for healthcare professionals from a task force of the international liaison committee on resuscitation (American Heart Association, European Resuscitation Council, Australian Resuscitation Council, New Zealand Resuscitation Council, Heart and Stroke Foundation of Canada, InterAmerican Heart Foundation, Resuscitation Council of Southern Africa). Resuscitation 2004;63:233–49.
21. Perkins GD, Jacobs IG, Nadkarni VM, et al. Cardiac Arrest and Cardiopulmonary Resuscitation Outcome Reports: Update of the Utstein Resuscitation Registry Templates for Out-of-Hospital Cardiac Arrest: A Statement for Healthcare Professionals From a Task Force of the International Liaison Committee on Resuscitation (American Heart Association, European Resuscitation Council, Australian and New Zealand Council on Resuscitation, Heart and Stroke Foundation of Canada, InterAmerican Heart Foundation, Resuscitation Council of Southern Africa, Resuscitation Council of Asia); and the American Heart Association Emergency Cardiovascular Care Committee and the Council on Cardiopulmonary, Critical Care, Perioperative and Resuscitation. Resuscitation 2015;96:328–40.
22. Munn Z, Moola S, Lisy K, Riitano D, Tufanaru C. Methodological guidance for systematic reviews of observational epidemiological studies reporting prevalence and cumulative incidence data. Int J Evid Based Healthc 2015;13:147–53.
23. Nyaga VN, Arbyn M, Aerts M. Metaprop: a Stata Command to Perform Meta-Analysis of Binomial Data. Archives of Public Health = Archives belges de santé publique 2014;72:39.
24. Hunter JP, Saratzis A, Sutton AJ, Boucher RH, Sayers RD, Bown MJ. In meta-analyses of proportion studies, funnel plots were found to be an inaccurate method of assessing publication bias. J Clin Epidemiol 2014;67:897–903.
25. Ahn KO, Shin SD, Suh GJ, et al. Epidemiology and outcomes from non-traumatic out-of-hospital cardiac arrest in Korea: A nationwide observational study. Resuscitation 2010;81:974–81.
26. CPR and rapid defibrillation increase survival rates in people with out-of-hospital cardiac arrests. Evidence-based Healthcare Public Health 2005;9(1):42–3.
27. Nehme Z, Andrew E, Bernard S, et al. Impact of a public awareness campaign on out-of-hospital cardiac arrest incidence and mortality rates. Eur Heart J 2017;38:1666–73.
28. Virani SS, Alonso A, Aparicio HJ, et al. Heart Disease and Stroke Statistics-2021 Update a report from the American Heart Association. Circulation (new York, NY) 2021;143:e254–743.
29. Smyth MA, Gunson I, Coppola A, et al. Termination of resuscitation rules and survival among patients with out-of-hospital cardiac arrest: a systematic review and meta-analysis. JAMA Netw Open 2024;7: e2420040.
30. Greif R, Bhanji F, Bigham BL, et al. Education, Implementation, and Teams: 2020 International Consensus on Cardiopulmonary

Resuscitation and Emergency Cardiovascular Care Science With Treatment Recommendations. Resuscitation 2020;156:A188–239.
31. Goto Y, Funada A, Maeda T, Okada H, Goto Y. Field termination-of-resuscitation rule for refractory out-of-hospital cardiac arrests in Japan. J Cardiol 2019;73:240–6.
32. Yoon JC, Kim Y-J, Ahn S, et al. Factors for modifying the termination of resuscitation rule in out-of-hospital cardiac arrest. Am Heart J 2019;213:73–80.
33. Schneiderman LJ, Jecker NS, Jonsen AR. Medical futility: Its meaning and ethical implications. Ann Intern Med 1990;112:949–54.
34. Mentzelopoulos SD, Couper K, Voorde PV, et al. Ethics of resuscitation and end of life decisions. Resuscitation 2021;2021:408–32.
35. Ardagh M. Futility has no utility in resuscitation medicine. J Med Ethics 2000;26:396–9.
36. Morrison LJ, Eby D, Veigas PV, et al. Implementation trial of the basic life support termination of resuscitation rule: Reducing the transport of futile out-of-hospital cardiac arrests. Resuscitation 2014;85:486–91.
37. Cardiology; Reports Summarize Heart Attack Study Results from Yokohama City University (Applying the termination of resuscitation rules to out-of-hospital cardiac arrests of both cardiac and non-cardiac etiologies: a prospective cohort study). Obesity, Fitness & Wellness Week. 2016:3178.
38. Barker TH, Migliavaca CB, Stein C, et al. Conducting proportional meta-analysis in different types of systematic reviews: a guide for synthesisers of evidence. BMC Med Res Method 2021;21:1–189.

# Exhibit X

NIH Public Access
Author Manuscript
*Resuscitation*. Author manuscript; available in PMC 2014 September 01.

Published in final edited form as:
*Resuscitation*. 2013 September ; 84(9): 1261–1266. doi:10.1016/j.resuscitation.2013.02.016.

# Survival in Out-of-Hospital Cardiac Arrests with Initial Asystole or Pulseless Electrical Activity and Subsequent Shockable Rhythms

**Andrew Thomas, MPH, NREMT-P**[a], **Craig Newgard, MD, MPH**[b,c], **Rongwei Fu, PhD**[a,b,c], **Dana Zive, MPH**[c], and **Mohamud Daya, MD, MS**[b]

[a]Department of Public Health & Preventive Medicine, Oregon Health & Science University, Portland, OR

[b]Department of Emergency Medicine, Oregon Health & Science University, Portland, OR

[c]Center for Policy and Research in Emergency Medicine, Oregon Health & Science University, Portland, OR

## Abstract

**Background—**Non-shockable arrest rhythms (Pulseless Electrical Activity and Asystole) represent an increasing proportion of reported cases of out-of-hospital cardiac arrest (OHCA). The prognostic significance of conversion from non-shockable to shockable rhythms during the course of resuscitation remains unclear.

**Objective—**To evaluate whether out-of-hospital cardiac arrest survival with initially non-shockable arrest rhythms is improved with subsequent conversion to shockable rhythms.

**Methods—**Secondary analysis of data in Epistry – Cardiac Arrest, an epidemiologic registry maintained by the Resuscitation Outcomes Consortium (ROC). This analysis includes OHCA events from December 1, 2005 through May 31, 2007 contributed by six US and two Canadian sites. For all EMS-treated adult (18 and older) cardiac arrest patients who presented with non-shockable cardiac arrest, we compared survival to hospital discharge between patients who did develop a shockable rhythm and those who did not based on receipt of subsequent defibrillation. Missing data were handled using multiple imputation. Multivariable logistic regression was used to adjust for potentially confounding variables.

**Results—**A total of 6,556 EMS treated adult cardiac arrest cases presented in non-shockable rhythms. Survival to discharge in patients who converted to a shockable rhythm was 2.77% while

© 2013 Elsevier Ireland Ltd. All rights reserved.

Corresponding Author: Andrew Thomas, School of Medicine, Mail Code: L341, Oregon Health & Science University, 3101 SW Sam Jackson Park Rd, Portland, OR 97239.

**Statement of Participation**
Each of the above-named authors made substantial contributions to the design, analysis, and interpretation of this study and participated in the drafting of this manuscript.

**Reprints not available from the authors**
Presented at the Society of Academic Emergency Medicine Annual Meeting, May 10, 2012, Chicago, IL

**Conflict of Interest**
None of the authors had potential conflicts of interest pertaining to the subjects of this manuscript.

**Publisher's Disclaimer:** This is a PDF file of an unedited manuscript that has been accepted for publication. As a service to our customers we are providing this early version of the manuscript. The manuscript will undergo copyediting, typesetting, and review of the resulting proof before it is published in its final citable form. Please note that during the production process errors may be discovered which could affect the content, and all legal disclaimers that apply to the journal pertain.

NIH-PA Author Manuscript NIH-PA Author Manuscript NIH-PA Author Manuscript

NIH-PA Author Manuscript NIH-PA Author Manuscript NIH-PA Author Manuscript

survival in those who did not was 2.72% ($p = 0.92$). After adjusting for confounders, conversion to a shockable rhythm was not associated with improved survival (OR 0.88, 95% CI: 0.60–1.30).

**Conclusion—**For OHCA patients presenting in PEA/Asystole, survival to hospital discharge was not associated with conversion to a shockable rhythm during EMS resuscitation efforts.

**Keywords**

Out-of-Hospital; Cardiac Arrest; Non-shockable Rhythms; Survival

## Introduction

Every year it is estimated there are over 155,000 out-of-hospital cardiac arrests (OHCA) in the United States. (1) Historically, the relative success of defibrillation at correcting shockable forms of cardiac arrest has resulted in a strong emphasis on the treatment of patients with both ventricular fibrillation (VF) and pulseless ventricular tachycardia (VT). In contrast, due to their poor prognoses both pulseless electrical activity (PEA) and asystole are often considered non-survivable rhythms. (1–5)

The nature of cardiac care and resuscitation has been shifting over the last 50 years and EMS systems have observed a steady decrease in the incidence of shockable rhythms (VF and pulseless VT) in cardiac arrest. As this decreasing incidence has not been consistently observed in bystander-treated cardiac arrest, the exact cause remains unclear. However, it may be related to changing risk factors for sudden cardiac arrest (SCA) as well as earlier recognition and intervention for acute coronary syndromes (ACS). (6–13)

In recent years, as increased emphasis has been placed on the delivery of high-quality cardiopulmonary resuscitation (CPR), gradually improving survival from non-shockable rhythms (PEA and asystole) has been observed. (14–16) Current practice suggests that treatment of non-shockable rhythms should focus on increasing cardiac muscle perfusion and myocardial tissue excitability with CPR to encourage fibrillation which has a reasonably effective treatment – defibrillation. Similarly it is believed that converting from non-shockable rhythms to shockable rhythms represents a favorable improvement in patient condition resulting in an increased probability of survival. (17)

Critical scientific evaluation has raised the question of whether or not current strategies for treatment are based upon a correct understanding of the underlying pathophysiology. In 2007, Hallstrom *et al.* noted a decreased odds ratio for survival of 0.18 ($p = 0.036$) for patients with subsequently shockable rhythms relative to those who did not convert to shockable rhythms. (18) Three subsequent studies of OHCA however reported contrary findings, all noting improved survival of patients who converted to shockable rhythms after initially presenting with non-shockable rhythms. (19–21) More recently, an in-hospital cardiac arrest study reported findings similar to those reported by Hallstrom *et al.* with higher survival in both PEA and asystole patients who never converted to shockable rhythms. (22)

This study was conducted to determine if survival to hospital discharge was improved by conversion to shockable rhythms among OHCA victims initially found in non-shockable rhythms within this population. Definitively answering this question will enable us to better understand the significance of rhythm conversions for patient prognosis and treatment planning in cardiac arrest.

NIH-PA Author Manuscript

## Methods

### Setting

The Resuscitation Outcomes Consortium (ROC) is a cooperative network of ten North American resuscitation research centers designed primarily to conduct large-scale randomized controlled trials in cardiac and trauma resuscitation.

The data for this analysis were drawn from the Epidemiologic Registry ("Epistry") of cardiac arrests collected prospectively by the ROC network prior to initiation of any clinical trials. The participating sites for our analysis include five metropolitan regions within the United States (Birmingham, Alabama; Dallas-Fort Worth, Texas; Milwaukee, Wisconsin; Pittsburgh, Pennsylvania; and Portland, Oregon/Vancouver, Washington) as well as one statewide network (based in Falls City, Iowa) and two Canadian provincial networks (based in Vancouver, British Columbia and Ottawa, Ontario). Two ROC member sites (Seattle, Washington; and Toronto, Ontario) opted not to release their data for secondary analyses. (23–25)

### Study Design

This study protocol was approved by the Institutional Review Board at the Oregon Health & Science University.

This study is a secondary analysis of prospectively collected data. All adult (aged 18 and up) patients of cardiac arrest who were treated by participating EMS response agencies in the above-described geographic areas between December 1, 2005 and May 31, 2007 were considered for this study. (23)

The investigational cohorts are classified with regard to their initial EMS-assessed cardiac arrest rhythm. AED-assessed non-shockable rhythm was combined with EMS monitor-identified asystole and pulseless electrical activity to form the non-shockable rhythm group which was subdivided into two observational cohorts.

Those patients converting to shockable rhythms were identified by the delivery of one or more shocks later in the course of EMS resuscitation and were assigned to the SHOCK cohort. The delivery of one or more shocks was used as a surrogate marker for conversion to a ventricular fibrillation or pulseless ventricular tachycardia rhythm. Conversely, the NO SHOCK cohort was composed of those cases remaining in non-shockable rhythms (i.e., aystole or pulseless electrical activity) defined as having received no subsequent shocks during the course of their resuscitation.

We excluded initial rhythms of AED-assessed shockable rhythm along with monitor-identified VF and VT from the analysis. Cases were also excluded if they were known to be related to serious traumatic injury or asphyxiation or if resuscitation was terminated prematurely due to family request or discovery of a Do Not Attempt Resuscitation (DNAR) order.

### Variables & Measurements

The primary outcome of interest was survival to hospital discharge. Variables considered in the multivariable analysis included age, gender, public location of arrest, bystander witnessed arrests, bystander CPR, EMS witnessed arrests, and EMS response time. Because these important measurable confounders have been established by prior research they were included in the multivariable model *a priori* and variable selection methods were not

Case 4:24-cv-00433-P Document 101-4 Filed 08/28/26 Page 72 of 87 PageID 3704


NIH-PA Author Manuscript

employed. (3, 10, 18–21, 26–28) We also included ROC site as a confounding variable to account for the regional variation in survival that has been previously reported. (24, 25, 29)

### Statistical Analysis

Patient characteristics were summarized to compare the SHOCK and NO SHOCK groups. These comparisons and univariate associations between predictor variables and survival were determined using simple logistic regression.

To address missing data we used multiple imputation, which has been shown to produce less-biased estimates and preserve study power better than analysis of complete cases alone. (30–33) Ten imputations were performed, as this has been demonstrated to achieve a high degree of statistical efficiency in datasets with low proportions of missing values such as ours. (34) Imputations were performed using the SAS MI procedure. Additionally, a complete case analysis was performed as a sensitivity analysis of our imputation model.

Multiple logistic regression analysis was used to assess the relationship between conversion to a subsequent shockable rhythm and survival to hospital discharge after adjusting for confounding variables. Both univariate and multivariable analyses were performed for each imputed data set. These results were then analyzed using the SAS MIANALYZE procedure to create combined point estimates and confidence intervals that appropriately accounted for the variance within and between imputed datasets. All p-values were 2-sided and an alpha of 0.05 was used for determining statistical significance. All statistical analyses were conducted using SAS V 9.22 (SAS Institute Inc., Cary, NC, USA.).

## Results

Figure 1 displays the derivation of the study sample illustrating how the cohort selection was made. There were a total of 6,556 cases meeting our inclusion criteria of which 1,238 were subsequently shocked and assigned to the SHOCK cohort while 5,318 received no shocks and were assigned to the NO SHOCK cohort. Survival outcomes were known for 1,228 of 1,238 of the SHOCK cohort and 5,260 of the 5,318 NO SHOCK cohort leaving an unknown outcome in 68 (1%) cases. Overall unadjusted survival in both groups was nearly identical at 2.77% and 2.72% respectively ($p = 0.92$). Table 1 displays the covariates and their respective distributions within each cohort. The leftmost column of this table also illustrates the proportion of missing values for each of the covariates in the study group. In total, 29% of the observations had one or more missing values and overall 4.5% of the variable values were missing.

Results of the univariate analyses of the covariates from the imputed as well as complete cases analyses are highlighted in Table 2. Receipt of subsequent shocks was not associated with unadjusted survival from cardiac arrest (OR: 1.01, 95% CI: 0.70–1.47). Public location of arrest, bystander witnessed arrest, EMS witnessed arrests and shorter EMS response intervals were associated with improved survival. Univariate analyses were suggestive of an association between survival and ROC site within this population however the association did not remain after controlling for other confounders.

The results from the multivariable analyses are displayed in Table 3 for both the imputed and complete cases. After controlling for confounders, receipt of subsequent shocks was not associated with survival from cardiac arrest (OR: 0.88, 95% CI: 0.60–1.30). Public location of arrest, bystander witnessed arrests, and EMS witnessed arrests remained independent predictors associated with improved survival. After controlling for confounders there was no longer an association between EMS response intervals and survival.

NIH-PA Author Manuscript
NIH-PA Author Manuscript

The sensitivity analysis by complete case analysis revealed marginal shifts of the point estimates for several confounding relationships with the inclusion of incomplete cases by multiple imputation. With the exception of a subtle adjustment and loss of statistical significance for ROC site 8, none of these shifts resulted in substantive changes of direction or statistical significance to the calculated associations.

## Discussion

We found no statistically significant relationship between conversion from initially non-shockable rhythms to subsequent shockable rhythms and survival to hospital discharge. These findings remained unchanged whether the analysis was limited to only complete cases or broadened to include all eligible cases by using multiple imputation to handle missing values. The addition of multiple covariates to the model, known from prior studies to be significant confounders, also had no significant impact on our estimate of the effect of subsequent rhythm conversion on survival to hospital discharge. (18–21)

As mentioned earlier, other researchers have previously examined the probability of survival as it relates to rhythm conversion. Figure 2 compares our unadjusted results with those of the previous 5 papers published on the subject. This figure does not represent a formal meta-analysis but is provided to allow visual comparison of related findings. In 2007, Hallstrom *et al.* conducted a retrospective analysis of data collected during the ASPIRE trial in the US and Canada. Their findings contradicted the previously held belief that conversion to shockable rhythms represented an improved probability of survival. (18) Two subsequent studies published independently in 2008 by Herlitz *et al.* (19) (conducted in Sweden) and Kajino *et al.* (conducted in Japan) (20) demonstrated findings contrary to those reported by Hallstrom. (19, 20) The following year, Olasveengen *et al.* published an account of a study conducted in Norway. They also found that the chances for survival improved significantly for patients who converted to shockable rhythms. (21) Adding to the debate, in 2010, Meaney *et. al.* published their findings from a cohort of in-hospital cardiac arrests and found a considerably higher survival in both PEA and asystole patients who never converted to shockable rhythms. This study also examined multiple outcomes and found consistent results whether the outcome measured was return of spontaneous circulation (ROSC), 24-hour survival, survival to hospital discharge, or favorable neurologic outcome. (22)

The lead authors on these four OHCA papers (Herlitz, Kajino, Olasveengen, and Hallstrom) subsequently collaborated in 2010 on a commentary published in the journal Resuscitation to discuss their conflicting findings. They agreed that for a variety of reasons, “the ’true’ rates probably lie somewhere in between and will likely be center specific due to differing criteria for attempting CPR, different treatment protocols and response time differentials, and possibly due to different community practices such as use of beta-blockade”. (35) Our findings appear consistent with this proposition. Despite a relatively large sample size and multiple imputation to allow complete case ascertainment in our analyses, we were unable to detect any statistically significant difference in outcome between the two cohorts. One potential explanation may simply be that not all non-shockable arrests are alike. While some non-shockable arrest etiologies may benefit from conversion to a shockable rhythm, other etiologies may actually be harmed by this development. This hypothesis deserves further study.

One potential explanation for our findings may simply be that not all non-shockable arrests are alike. While some non-shockable arrest etiologies may benefit from conversion to a shockable rhythm, other etiologies may actually be harmed by this development.

NIH-PA Author Manuscript NIH-PA Author Manuscript NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

Bystander CPR was not predictive of survival to hospital discharge in this study. Past studies have identified this as an important factor for survival although very few studies have examined this question exclusively in the non-shockable subset of cardiac arrests. Bystander CPR is an important predictor of survival when VF is the presenting rhythm. It may be less important when PEA and asystole are the presenting rhythms. (19, 36) This finding warrants further study so that we can better understand the underlying mechanisms and pathophysiology.

While the prognosis from non-shockable rhythms is not as positive as it is for initially shockable rhythms, patients presenting with these rhythms can be successfully resuscitated as noted in this study. Moreover, it does not appear that converting to shockable cardiac arrest rhythms is a reliable indicator of improving status, nor is the lack of this conversion a marker of poor prognosis. We suggest that it is important to give every patient found in nonshockable rhythms (barring extenuating circumstances) the benefit of the doubt and aggressively perform CPR and attempt resuscitation until reasonable ACLS care options have been exhausted. Conversion to shockable rhythms alone is not a strong enough indicator upon which to base treatment recommendations.

## Limitations

Discussion of the limitations in the ROC Epistry data have been previously published. (6, 23–25, 29, 37–40) This dataset is believed to be a near-complete census of all conforming cardiac arrests however any cases missing from the record are not believed to affect differential ascertainment. An additional limitation was the possibility that EMS crews could have provided shocks to patients who never converted to shockable rhythms as a "last ditch" effort before terminating resuscitation or when as a "benefit of the doubt" when identification of the rhythm was in question. Without continuous ECG Rhythm analysis (unavailable in these data) we were unable to accurately quantify the magnitude of this potential misclassification bias. However, this bias is not anticipated to systematically raise or lower adjusted survival. Additionally, this form of bias would presumably also exist in the prior studies that also used subsequent shocks as a surrogate for rhythm conversion.

Another limitation of this study is that our survival data were limited to survival to hospital discharge. The ROC epistry did not collect information on neurologic status at the time of discharge, and thus it is possible that neurologic status differed between the two groups but was not detected by this study.

An important strength of our study is the diversity of the communities and EMS systems involved including differences in geography, EMS structure, and patient population characteristics. These features make our results comparable to the original Hallstrom paper.

## Conclusions

We found no evidence to support the belief that conversion from non-shockable to shockable rhythms during the course of resuscitation from out-of-hospital cardiac arrest is associated with improved survival to hospital discharge. The prognostic implications of conversion to a shockable rhythm remain unclear and are in need of further study.

## Acknowledgments

The ROC is supported by a series of cooperative agreements to 10 regional clinical centers and one Data Coordinating Center (5U01 HL077863 - University of Washington Data Coordinating Center, HL077865 - University of Iowa, HL077866 -Medical College of Wisconsin, HL077871 - University of Pittsburgh, HL077873 - Oregon Health and Science University, HL077881 - University of Alabama at Birmingham, HL077885 - Ottawa Health Research Institute, HL077887 - University of Texas SW Medical Ctr/Dallas) from the National Heart, Lung

and Blood Institute in partnership with the National Institute of Neurological Disorders and Stroke, U.S. Army Medical Research & Material Command, The Canadian Institutes of Health Research (CIHR) – Institute of Circulatory and Respiratory Health, Defence Research and Development Canada and the Heart, Stroke Foundation of Canada and the American Heart Association.

These analyses were carried out by the investigators. Neither the Clinical Trials Center nor the Publications Committee of ROC take responsibility for the analyses and interpretation of results. The content is solely the responsibility of the authors and does not necessarily represent the official views of the National Heart, Lung and Blood Institute or the National Institutes of Health.

## References

1. Rea TD, Eisenberg MS, Sinibaldi G, White RD. Incidence of EMS-treated out-of-hospital cardiac arrest in the united states. Resuscitation. 2004; 63(1):17–24. [PubMed: 15451582]
2. Hostler D, Roth RN. Pulseless electrical activity: Sign of life, or terminal rhythm? Prehosp Emerg Care. 2003; 7(2):286–90. [PubMed: 12710794]
3. Kämäräinen A, Virkkunen I, Yli-Hankala A, Silfvast T. Presumed futility in paramedic-treated out-of-hospital cardiac arrest: An utstein style analysis in tampere, finland. Resuscitation. 2007; 75(2): 235–43. [PubMed: 17553611]
4. Kuisma M, Jaara K. Unwitnessed out-of-hospital cardiac arrest: Is resuscitation worthwhile? Ann Emerg Med. 1997; 30(1):69–75. [PubMed: 9209229]
5. Vayrynen T, Kuisma M, Maatta T, Boyd J. Who survives from out-of-hospital pulseless electrical activity? Resuscitation. 2008; 76(2):207–13. [PubMed: 17804144]
6. Brooks SC, Schmicker RH, Rea TD, Aufderheide TP, Davis DP, Morrison LJ, et al. Out-of-hospital cardiac arrest frequency and survival: Evidence for temporal variability. Resuscitation. 2010; 81(2): 175–81. [PubMed: 19942338]
7. Bunch TJ, White RD. Trends in treated ventricular fibrillation in out-of-hospital cardiac arrest: Ischemic compared to non-ischemic heart disease. Resuscitation. 2005; 67(1):51–4. [PubMed: 16146670]
8. Caffrey SL, Willoughby PJ, Pepe PE, Becker LB. Public use of automated external defibrillators. New England Journal of Medicine. 2002; 347(16):1242–7. [PubMed: 12393821]
9. Cobb LA, Fahrenbruch CE, Olsufka M, Copass MK. Changing incidence of out-of-hospital ventricular fibrillation, 1980–2000. JAMA: the journal of the American Medical Association. 2002; 288(23):3008–13. [PubMed: 12479765]
10. Kuisma M, Maatta T. Out-of-hospital cardiac arrests in helsinki: Utstein style reporting. Heart. 1996; 76(1):18–23. [PubMed: 8774321]
11. Parish DC, Chandra KMD, Dane FC. Success changes the problem: Why ventricular fibrillation is declining, why pulseless electrical activity is emerging, and what to do about it. Resuscitation. 2003; 58(1):31–5. [PubMed: 12867307]
12. Rea TD, Eisenberg MS, Becker LJ, Murray JA, Hearne T. Temporal trends in sudden cardiac arrest: A 25-year emergency medical services perspective. Circulation. 2003; 107(22):2780–5. [PubMed: 12756155]
13. Valenzuela TD, Roe DJ, Nichol G, Clark LL, Spaite DW, Hardman RG. Outcomes of rapid defibrillation by security officers after cardiac arrest in casinos. New England Journal of Medicine. 2000; 343(17):1206–9. [PubMed: 11071670]
14. Brooks SC, Schmicker RH, Rea TD, Aufderheide TP, Davis DP, Morrison LJ, et al. Out-of-hospital cardiac arrest frequency and survival: Evidence for temporal variability. Resuscitation. 2010; 81(2):175–81. [PubMed: 19942338]
15. Walters JH, Morley PT, Nolan JP. The role of hypothermia in post-cardiac arrest patients with return of spontaneous circulation: A systematic review. Resuscitation. 2011; 82(5):508–16. [PubMed: 21367510]
16. Grmec S, Strnad M, Podgorsek D. Comparison of the characteristics and outcome among patients suffering from out-of-hospital primary cardiac arrest and drowning victims in cardiac arrest. International journal of emergency medicine. 2009; 2(1):7–12. [PubMed: 19390911]

NIH-PA Author Manuscript
NIH-PA Author Manuscript
NIH-PA Author Manuscript

NIH-PA Author Manuscript NIH-PA Author Manuscript NIH-PA Author Manuscript

17. Leng CT, Berger RD, Calkins H, Lardo AC, Paradis NA, Halperin HR. Electrical induction of ventricular fibrillation for resuscitation from postcountershock pulseless and asystolic cardiac arrests. Circulation. 2001; 104(6):723–8. [PubMed: 11489782]
18. Hallstrom A, Rea TD, Mosesso VN Jr, Cobb LA, Anton AR, Van Ottingham L, et al. The relationship between shocks and survival in out-of-hospital cardiac arrest patients initially found in PEA or asystole. Resuscitation. 2007; 74(3):418–26. [PubMed: 17452069]
19. Herlitz J, Svensson L, Engdahl J, Silfverstolpe J. Characteristics and outcome in out-of-hospital cardiac arrest when patients are found in a non-shockable rhythm. Resuscitation. 2008; 76(1):31–6. [PubMed: 17709164]
20. Kajino K, Iwami T, Daya M, Nishiuchi T, Hayashi Y, Ikeuchi H, et al. Subsequent ventricular fibrillation and survival in out-of-hospital cardiac arrests presenting with PEA or asystole. Resuscitation. 2008; 79(1):34–40. [PubMed: 18678438]
21. Olasveengen TM, Samdal M, Steen PA, Wik L, Sunde K. Progressing from initial non-shockable rhythms to a shockable rhythm is associated with improved outcome after out-of-hospital cardiac arrest. Resuscitation. 2009; 80(1):24–9. [PubMed: 19081664]
22. Meaney PA, Nadkarni VM, Kern KB, Indik JH, Halperin HR, Berg RA. Rhythms and outcomes of adult in-hospital cardiac arrest. Crit Care Med. 2010; 38(1):101–8. [PubMed: 19770741]
23. Morrison LJ, Nichol G, Rea TD, Christenson J, Callaway CW, Stephens S, et al. Rationale, development and implementation of the resuscitation outcomes consortium epistry-cardiac arrest. Resuscitation. 2008; 78(2):161–9. [PubMed: 18479802]
24. Nichol G, Thomas E, Callaway CW, Hedges J, Powell JL, Aufderheide TP, et al. Regional variation in out-of-hospital cardiac arrest incidence and outcome. JAMA: the journal of the American Medical Association. 2008; 300(12):1423–31. [PubMed: 18812533]
25. Zive D, Koprowicz K, Schmidt T, Stiell I, Sears G, Van Ottingham L, et al. Variation in out-of-hospital cardiac arrest resuscitation and transport practices in the resuscitation outcomes consortium: ROC epistry-cardiac arrest. Resuscitation. 2011; 82(3):277–84. [PubMed: 21159416]
26. Cummins RO, Chamberlain DA, Abramson NS, Allen M, Baskett PJ, Becker L, et al. Recommended guidelines for uniform reporting of data from out-of-hospital cardiac arrest: The utstein style. Circulation. 1991; 84(2):960–75. [PubMed: 1860248]
27. Jacobs I, Nadkarni V, Bahr J, Berg RA, Billi JE, Bossaert L, et al. Cardiac arrest and cardiopulmonary resuscitation outcome reports: Update and simplification of the utstein templates for resuscitation registries. Circulation. 2004; 110:3385–97. [PubMed: 15557386]
28. Roger VL, Go AS, Lloyd-Jones DM, Adams RJ, Berry JD, Brown TM, et al. Heart disease and stroke statistics--2011 update: A report from the american heart association. Circulation. 2011; 123(4):18–209.
29. Callaway CW, Schmicker R, Kampmeyer M, Powell J, Rea TD, Daya MR, et al. Receiving hospital characteristics associated with survival after out-of-hospital cardiac arrest. Resuscitation. 2010; 81(5):523–8.
30. van der Heijden, Geert JMG, Donders ART, Stijnen T, Moons KGM. Imputation of missing values is superior to complete case analysis and the missing-indicator method in multivariable diagnostic research: A clinical example. J Clin Epidemiol. 2006; 59(10):1102–9. [PubMed: 16980151]
31. Koopman L, van der Heijden, Geert JMG, Grobbee DE, Rovers MM. Comparison of methods of handling missing data in individual patient data meta-analyses: An empirical example on antibiotics in children with acute otitis media. Am J Epidemiol. 2008; 167(5):540–5. [PubMed: 18184640]
32. Collins LM, Schafer JL, Kam C. A comparison of inclusive and restrictive strategies in modern missing data procedures. Psychol Methods. 2001; 6(4):330–51. [PubMed: 11778676]
33. Newgard CD, Haukoos JS. Advanced statistics: Missing data in clinical research -- part 2: Multiple imputation. Acad Emerg Med. 2007; 14(7):669–78. [PubMed: 17595237]
34. Schafer J, Olsen M. Multiple imputation for multivariate missing-data problems: A data analyst's perspective. Multivariate Behavioral Research. 1998; 33(4):545–71.
35. Hallstrom AP, Herlitz J, Kajino K, Olasveengen TM. Treatment of asystole and PEA. Resuscitation. 2009; 80(9):975–6. [PubMed: 19581035]

NIH-PA Author Manuscript NIH-PA Author Manuscript NIH-PA Author Manuscript

36. Sasson C, Rogers MAM, Dahl J, Kellermann AL. Predictors of survival from out-of-hospital cardiac arrest: A systematic review and meta-analysis. Circulation: Cardiovascular Quality and Outcomes. 2010; 3(1):63–81. [PubMed: 20123673]

37. Bradley SM, Gabriel EE, Aufderheide TP, Barnes R, Christenson J, Davis DP, et al. Survival increases with CPR by emergency medical services before defibrillation of out-of-hospital ventricular fibrillation or ventricular tachycardia: Observations from the resuscitation outcomes consortium. Resuscitation. 2010; 81(2):155–62. [PubMed: 19969407]

38. Cheskes S, Schmicker RH, Christenson J, Salcido DD, Rea T, Powell J, et al. Perishock pause: An independent predictor of survival from out-of-hospital shockable cardiac arrest. Circulation. 2011; 124(1):58–66. [PubMed: 21690495]

39. Hostler D, Thomas EG, Emerson SS, Christenson J, Stiell IG, Rittenberger JC, et al. Increased survival after EMS witnessed cardiac arrest. observations from the resuscitation outcomes consortium (ROC) epistry cardiac arrest. Resuscitation. 2010; 81(7):826–30. [PubMed: 20403656]

40. Rea TD, Cook AJ, Stiell IG, Powell J, Bigham B, Callaway CW, et al. Predicting survival after out-of-hospital cardiac arrest: Role of the utstein data elements. Ann Emerg Med. 2010; 55(3): 249–57. [PubMed: 19944488]

NIH-PA Author Manuscript
NIH-PA Author Manuscript
NIH-PA Author Manuscript




**Figure 1. Process of selection of cases for inclusion in analysis**

Resuscitation attempted includes cases for which EMS personnel provided life support treatment and did not terminate their resuscitation for reasons of DNAR order or family request. Initial non-shockable rhythms include PEA and asystole. Subsequent shocks were a surrogate for conversion to secondary VF/VT. Final exclusions were made for age < 18, traumatic arrest, or arrest secondary to asphyxiation (drug overdose, drowning, hanging, etc.). n = number fitting each category; bold values indicate proportion of each parent category; parenthetical values indicate proportion of all cases.




**Figure 2. Forest plot comparing these results to prior studies**

Comparison of univariate point estimates and confidence intervals for related prior studies. Hallstrom et al., Olasveengen et al., Meaney et al., and Thomas et al. studied survival to hospital discharge as an end point. Herlitz et al. studied the outcome of 1-month survival and Kajino et al. studied neurologically intact survival to hospital discharge as an end point. Meaney et al. was a study on in-hospital cardiac arrest.



NIH-PA Author Manuscript
NIH-PA Author Manuscript
NIH-PA Author Manuscript

NIH-PA Author Manuscript
NIH-PA Author Manuscript
NIH-PA Author Manuscript

## Table 1

Population characteristics

| Covariates (Missing Proportion) | Shock n (%) | No Shock n (%) | p-value |
|---|---|---|---|
| **Gender (0.1%)** | | | |
| Male | 813 (65.7%) | 3,167 (59.6%) | <0.001* |
| Female | 425 (34.3%) | 2,145 (40.4%) | <0.001* |
| **Age (0.0%)** | | | |
| 18–39 | 86 (6.9%) | 462 (8.7%) | 0.046* |
| 40–59 | 371 (30.0%) | 1,511 (28.4%) | 0.276 |
| 60–79 | 516 (41.7%) | 2,210 (41.6%) | 0.937 |
| 80+ | 265 (21.4%) | 1,135 (21.3%) | 0.961 |
| **Setting Characteristics** | | | |
| Public Location (0.1%) | 187 (15.1%) | 538 (10.1%) | <0.001* |
| Bystander Witnessed (20.0%) | 526 (51.8%) | 1,578 (37.3%) | <0.001* |
| Bystander Resuscitation (12.6%) | 371 (33.8%) | 1,497 (32.3%) | 0.360 |
| **EMS System Characteristics** | | | |
| EMS Witnessed (0.0%) | 103 (8.2%) | 490 (9.2%) | 0.323 |
| Response | 597 (49.9%) | 2,722 (52.6%) | 0.094 |
| **Survival to Discharge (1.0%)** | 34 (2.8%) | 143 (2.7%) | 0.923 |

Population characteristics of cases conforming to inclusion and exclusion criteria. Values are quantity and proportions with p-values generated by simple logistic regression. Parenthetical values in column 1 describe the proportion of observations in each group (n = 1,238 for SHOCK and 5,318 for NO SHOCK) who were missing each covariate.

* Indicates statistically significant differences between the populations.

NIH-PA Author Manuscript
NIH-PA Author Manuscript
NIH-PA Author Manuscript

## Table 2

Results from univariate comparisons

| | Imputed Cases OR (95% CI) | Complete Cases OR (95% CI) |
|---|---|---|
| **Shocks Delivered** | 1.01 (0.70–1.47) | 1.02 (0.69–1.49) |
| **Male Gender** | 0.95 (0.69–1.30) | 0.94 (0.69–1.27) |
| **Age (10 Years)** | 0.93 (0.85–1.02) | 0.93 (0.85 –1.02) |
| **Bystander** | | |
| Public Location | 1.89 (1.30–2.75) | 2.19 (1.51–3.17) |
| Bystander Witnessed | 2.13 (1.55–2.92) | 2.64 (1.83–3.81) |
| Bystander Resuscitation | 1.05 (0.73–1.50) | 1.08 (0.76–1.52) |
| **EMS-Witnessed** | 2.64 (1.77–3.92) | 2.89 (2.00–4.18) |
| **Response Interval (1 Minute)** | 0.94 (0.91–0.98) | 0.88 (0.83–0.94) |

Odds ratios for survival to hospital discharge in subsequently shocked versus not shocked cases generated by univariate logistic regression. Imputed cases included all adult cases of out-of-hospital cardiac arrest which were resuscitated by EMS without premature cessation of efforts or evidence of traumatic or asphyxiant etiology of arrest. Complete cases were those for which the value of all studied variables were known.

NIH-PA Author Manuscript
NIH-PA Author Manuscript
NIH-PA Author Manuscript

**Table 3**

Results from the multivariable analysis.

| | Imputed Cases OR (95% CI) | Complete Cases OR (95% CI) |
|---|---|---|
| **Shocks Delivered** | 0.88 (0.60–1.30) | 0.89 (0.55–1.45) |
| **Male Gender** | 0.4 (0.68–1.29) | 0.71 (0.48–1.07) |
| **Age (10 Years)** | 0.93 (0.85–1.02) | 0.95 (0.84–1.07) |
| **Bystander** | | |
| Public Location | 1.65 (1.12–2.45) | 2.99 (1.89–4.73) |
| Bystander Witnessed | 1.86 (1.35–2.55) | 2.70 (1.76–4.15) |
| Bystander Resuscitation | 1.07 (0.72–1.59) | 1.18 (0.78–1.78) |
| **EMS-Witnessed** | 1.94 (0.96–3.92) | 2.89 (2.00–4.18) |
| **Response Interval (1 Minute)** | 0.98 (0.93–1.03) | 0.98 (0.92–1.05) |
| **ROC Sites** | | |
| Site 1 (reference) | 1.00 | 1.00 |
| Site 2 | 1.30 (0.71–2.38) | 1.48 (0.68–3.24) |
| Site 3 | 0.95 (0.51–1.79) | 0.94 (0.43–2.08) |
| Site 4 | 0.41 (0.12–1.46) | 0.30 (0.04–2.37) |
| Site 5 | 0.87 (0.45–1.69) | 0.66 (0.23–1.85) |
| Site 6 | 0.65 (0.36–1.17) | 0.63 (0.29–1.33) |
| Site 7 | 0.89 (0.38–2.07) | 0.61 (0.20–1.83) |
| Site 8 | 0.63 (0.34–1.16) | 0.44 (0.20–0.97) |

Odds ratios for survival to hospital discharge in subsequently shocked versus not shocked cases generated by multivariable logistic regression. Imputed cases included all adult cases of out-of-hospital cardiac arrest which were resuscitated by EMS without premature cessation of efforts or evidence of traumatic or asphyxiant etiology of arrest. Complete cases were those for which the value of all studied variables were known.

# Exhibit Y

Journal of the American Heart Association

BRIEF COMMUNICATION

# Incidence, Mechanism, and Outcomes of On-Plane Versus Off-Plane Cardiac Arrest in Air Travelers

Neal A. Chatterjee, MD, MSc; Kosuke Kume, BS; Christopher Drucker, PhD; Peter J. Kudenchuk, MD; Thomas D. Rea, MD, MPH

**BACKGROUND:** Air travel affords an opportunity to evaluate resuscitation performance and outcome in a setting where automated external defibrillators (AEDs) are readily available.

**METHODS AND RESULTS:** The study cohort included people aged ≥18 years with out of hospital cardiac arrest (OHCA) traveling through Seattle-Tacoma International Airport between January 1, 2004 and December 31, 2019 treated by emergency medical services (EMS). The primary outcomes were pre-EMS therapies (cardiopulmonary resuscitation, application of AED), return of spontaneous circulation, and survival to hospital discharge. Over the 16-year study period, there were 143 OHCA occurring before EMS arrival, 34 (24%) on-plane and 109 (76%) off-plane. Cardiac etiology (81%) was the most common mechanism of arrest. The majority of arrests were bystander-witnessed and presented with a shockable rhythm; these characteristics were more common in off-plane OHCA compared with on-plane (witnessed: 89% versus 74% and shockable: 72% versus 50%). Pre-EMS therapies including cardiopulmonary resuscitation and AED application were common regardless of arrest location. Compared with on-plane OHCA, off-plane OHCA was associated with greater rates of return of spontaneous circulation (68% versus 44%) and 3-fold higher rate of survival to hospital discharge (44% versus 15%). All survivors of on-plane OHCA had AED application with defibrillation before EMS arrival.

**CONCLUSIONS:** When applied to air travel volumes, we estimate 350 air travel-associated OHCA occur in the United States and 2000 OHCA worldwide each year, nearly a quarter of which happen on-plane. These events are survivable when early arrest interventions including rapid arrest recognition, AED application, and CPR are deployed.

**Key Words:** automatic external defibrillator ■ cardiac arrest ■ cardiopulmonary resuscitation

Each year, ≈5 billion people travel on commercial airlines worldwide.[1] Air travel has been associated with high-risk cardiovascular events through a range of mechanisms including increased cardiopulmonary stress, perturbations of autonomic function, and induced alterations in blood hemostasis.[2–6] For individuals who sustain an out-of-hospital cardiac arrest (OHCA) successful resuscitation requires an integrated chain of actions including early arrest recognition, timely cardiopulmonary resuscitation (CPR), and defibrillation, expert advanced life support and post-resuscitation care.[7] Air travel is distinguished by circumstances which could impact resuscitation outcome. Favorable characteristics of public setting, multiple bystanders, and the availability of automated external defibrillators (AEDs) are balanced against the logistic challenges of access and expedient therapy, particularly in the on-plane location. Indeed, air travel has been considered an opportunity to implement and innovate resuscitation guidelines to better achieve early CPR and defibrillation.[8] Resuscitation strategies have been reinforced by legislation featured in the 2004 requirement of the Federal Aviation Authority that all United States commercial airlines be equipped with AEDs.[9] Yet little is known about the incidence, care, or outcomes of on-plane OHCA characteristics and

Correspondence to: Neal A. Chatterjee, MD, MSc, University of Washington, 1959 NE Pacific Street, Seattle, WA 98195. E-mail: nchatter@uw.edu

For Sources of Funding and Disclosures, see page 4.

© 2021 The Authors. Published on behalf of the American Heart Association, Inc., by Wiley. This is an open access article under the terms of the Creative Commons Attribution-NonCommercial-NoDerivs License, which permits use and distribution in any medium, provided the original work is properly cited, the use is non-commercial and no modifications or adaptations are made.

*JAHA* is available at: www.ahajournals.org/journal/jaha

**Table. Characteristics, Mechanism, and Outcomes of On-Plane and Off-Plane Cardiac Arrests Between 2004 to 2019**

| Baseline characteristic | On-plane | | | Off-plane | | |
|---|---|---|---|---|---|---|
| | Overall | Shockable | Non-shockable | Overall | Shockable | Non-shockable |
| Group size, n (%) | 34 | 17 (50) | 17 (50) | 109 | 78 (72) | 31 (28) |
| Age, y | 65±21 | 70±19 | 64±22 | 65±16 | 65±14 | 65±18 |
| Male sex, n (%) | 27 (79) | 15 (88) | 12 (71) | 90 (83) | 68 (87) | 22 (71) |
| Etiology of arrest, cardiac,* n (%) | 26 (76) | 16 (94) | 10 (59) | 90 (83) | 74 (95) | 16 (52) |
| Traveler status, n (%) | | | | | | |
| Inbound | 22 (65) | 7 (41) | 15 (88) | 37 (34) | 23 (29) | 14 (45) |
| Outbound | 9 (26) | 7 (41) | 2 (12) | 19 (17) | 13 (17) | 6 (19) |
| Unknown | 3 (9) | 3 (18) | 0 (0) | 53 (49) | 42 (54) | 11 (35) |
| Arrest witnessed, n (%) | 25 (74) | 14 (82) | 11 (65) | 97 (89) | 73 (94) | 24 (77) |
| Therapies before EMS, n (%) | | | | | | |
| Bystander CPR | 30 (88) | 16 (94) | 14 (82) | 85 (78) | 63 (81) | 22 (71) |
| AED applied | 24 (71)† | 15 (88) | 9 (53) | 60 (55) | 48 (62) | 12 (39) |
| AED shock, if applied | 13 (54) | 13 (87) | 0 (0) | 42 (70) | 41 (85) | 1 (8) |
| Intravenous access | 2 (6) | 1 (6) | 1 (6) | 0 (0) | 0 (0) | 0 (0) |
| Oxygen | 4 (12) | 1 (6) | 3 (18) | 0 (0) | 0 (0) | 0 (0) |
| Epinephrine | 4 (12)‡ | 2 (12) | 2 (12) | 0 (0) | 0 (0) | 0 (0) |
| Other medications§ | 2 (6) | 1 (6) | 1 (6) | 1 (1) | 1 (1) | 0 (0) |
| Return of spontaneous circulation at end of EMS care, n (%) | 15 (44) | 9 (53) | 6 (35) | 74 (68) | 57 (73) | 17 (55) |
| Admitted to hospital | 15 (44) | 9 (53) | 6 (35) | 73 (67) | 56 (72) | 17 (55) |
| Hospital care, n (% of admitted) | | | | | | |
| TTM | 8 (53) | 3 (33) | 5 (83) | 29 (40) | 23 (41) | 6 (35) |
| Coronary angiogram | 7 (47) | 6 (67) | 1 (17) | 45 (62) | 43 (77) | 2 (12) |
| PCI | 2 (13) | 2 (22) | 0 (0) | 17 (23) | 17 (30) | 0 (0) |
| Survival to discharge, n (%) | 5 (15) | 5 (29) | 0 (0) | 48 (44) | 42 (54) | 6 (19) |
| Favorable neurological status at discharge (CPC 1 or 2)‖, n (% of those discharged) | 5 (100) | 5 (100) | … | 45 (94) | 40 (95) | 5 (83) |

AED indicates automatic external defibrillator; CPC, Cerebral Performance Category; CPR, cardiopulmonary resuscitation; EMS, emergency medical services; PCI, percutaneous coronary intervention; and TTM, targeted temperature managemnet.

*Arrest etiology was adjudicated following review of dispatch transcripts, EMS records, and hospital records.

†AED application for all on-plane arrests used an on-aircraft AED.

‡Of 4 individuals who received epinephrine, 2 received epinephrine via intravenous access the other 2 via intramuscular delivery.

§Other medications included atropine, sodium bicarbonate, dextrose, and nitroglycerin.

‖In the Cerebral Performance Category classification, category 1 represents good cerebral performance; 2, moderate cerebral disability; 3, severe cerebral disability; 4, coma or vegetative state; and 5, death.

outcomes since this federal requirement. In this study, we evaluated on-plane and off-plane OHCA over a 16-year period following the 2004 federal requirement with focus on arrest etiology, onboard care, and clinical outcomes.

The study cohort was comprised of people aged ≥18 years with non-traumatic OHCA on and off airplanes traveling through Seattle-Tacoma International Airport between January 1, 2004 and December 31, 2019 who were treated by emergency medical services (EMS). The data that support the findings of this study are available from the corresponding author upon reasonable request. Although the focus was on those who arrested on-plane, we report the presentation, care, and outcome among those who arrested off-plane in the airport for clinical context since these patients are drawn from the same traveler population. The EMS system maintains a registry of all EMS-treated OHCA in the study community including all OHCA treated at Seattle-Tacoma International Airport. EMS care includes basic life support provided by emergency medical technician-trained firefighters equipped with AEDs and advanced life support provided by paramedics who are trained in rhythm recognition, manual defibrillation, intubation, and administration of intravenous medications. Patients who achieve return of circulation are transported to hospitals equipped with coronary

Appx. 271

catheterization and intensive care services, including availability of targeted temperature management.

Data on patient demographics, circumstances, presenting arrest rhythm (as reflected by earliest rhythm adjudication by public access defibrillator application or EMS), arrest etiology, clinical care, and outcome were collected using dispatch reports, EMS patient care reports, hospital records, and death certificates. Clinical outcomes included survival to hospital admission, survival to hospital discharge, and Cerebral Performance Category at hospital discharge. We estimated the incidence of OHCA overall and according to on-plane versus off-plane location using official traveler counts for Seattle-Tacoma International Airport and extrapolated the airport-specific rate to national and global traveler volumes. The study was approved by the University of Washington and Public Health—Seattle and King County review boards. The requirement for informed consent was waived.

Over the 16-year study period, there were 34 individuals with on-plane OHCA and 109 people with off-plane OHCA occurring before EMS arrival at an airport with 25 million travelers annually.[1] Table presents on-plane and off-plane arrests with each location group stratified by initial rhythm. Overall, average age was 65 years; 82% were men. A cardiac etiology was the most common underlying mechanism for both on-plane (76%) and off-plane (83%) arrests. Compared with off-plane OHCA, on-plane OHCA was less likely to be witnessed (74% versus 89%) and less likely to present with a shockable rhythm (50% versus 72%).

Bystander CPR and AED application were common in both on- and off-plane OHCA (Table). For on-plane OHCA, an onboard AED was applied in 24 of 34 individuals (71%) before EMS arrival, including 15 of 17 (88%) of those found to have a shockable rhythm. For off-plane OHCA, a public access defibrillator was applied in 60 of 109 arrests (55%), with the majority of public access defibrillator application by a lay person (35 of 60) and the remainder by on-site law enforcement (25 of 60). Following EMS care, return of spontaneous circulation was more common in off-plane OHCA compared with on-plane OHCA (68% versus 44%).

Among 88 patients admitted to the hospital, there were no differences in post-arrest care including targeted temperature management, coronary angiography, and percutaneous coronary intervention between off-plane and on-plane OHCA (Table). Overall, survival to hospital discharge was 3-fold higher in those who sustained off-plane OHCA compared with on-plane OHCA (44% versus 15%). Among on-plane OHCA, survival to hospital discharge was only observed in those with a shockable rhythm who received bystander-initiated CPR and AED application with defibrillation before EMS arrival.

This 16-year evaluation of a major US airport provides an opportunity to estimate the public health toll of OHCA related to air travel. Extrapolating the study results to national and global air travel volumes,[1] we estimate that each year there are ≈350 OHCA in the United States and 2000 OHCA globally, a quarter of which occur on-plane. Most air travelers manifested an initial shockable OHCA rhythm of ventricular fibrillation, underscoring the primary cardiac mechanism in this population.[10]

This study highlights the potential for the early links in the chain to achieve survival.[7] The majority of air travelers with OHCA received CPR and AED application before EMS arrival. Importantly, bystander CPR and AED shock were uniform actions among on-plane OHCA survivors, suggesting that survival in this special circumstance may be especially reliant on these fundamental treatments. Conversely, prompt recognition of cardiac arrest was less common on-plane than off-plane, as was a shockable rhythm presentation. These factors, along with the more confined quarters for performing adequate CPR on-plane (potentially further compromised by interruption of CPR during extrication) may account for some of the differences in survival between the 2 groups. A minority of individuals did not receive AED application, highlighting a potential opportunity to improve care in light of the availability of AEDs in the air travel setting. Given the measurable on-plane incidence, the primary mechanism of arrest, and observed survival, the study results support the legislative and programmatic efforts to equip aircraft with AEDs and train flight crew in resuscitation skills.[9] Put simply, on-plane-OHCA does occur and is survivable.

Study limitations include assessment of OHCA at a single international airport in a region with high-quality resuscitation infrastructure, which may limit generalizability. Details about the resuscitation training of airline and airport employees were lacking, as were specific explanations for lack of AED application. Finally, for on-plane arrests, details on flight characteristics including whether a flight was redirected were not prespecified in EMS records.

The current investigation suggests that OHCA is responsible for thousands of air traveler deaths annually worldwide, nearly a quarter of these occurring on-plane. For on-plane OHCA, early CPR and AED defibrillation were uniform components of successful resuscitation and should be emphasized in this unique and challenging circumstance.

## ARTICLE INFORMATION

Received February 22, 2021; accepted July 13, 2021.

### Affiliations

Electrophysiology Section, Cardiology Division, University of Washington, Seattle, WA (N.A.C., P.J.K.); Division of Emergency Medical Services, Public

Health – Seattle & King County, Seattle, WA (K.K., C.D., T.D.R.); and Division of General Internal Medicine, University of Washington, Seattle, WA (T.D.R.).

## Acknowledgments

We wish to acknowledge Public Health-Seattle and King County and the telecommunicators and EMS professionals of Seattle and greater King County.

## Sources of Funding

None.

## Disclosures

None.

## REFERENCES

1. Commercial Service Airports (Rank Order) based on Calendar Year 2019. Available at: https://www.faa.gov/airports/planning_capacity/passenger_allcargo_stats/passenger/media/cy19-commercial-service-enplanements.pdf. Accessed November 25, 2020.
2. Hammadah M, Kindya BR, Allard-Ratick MP, Jazbeh S, Eapen D, Wilson Tang WH, Sperling L. Navigating air travel and cardiovascular concerns: is the sky the limit? *Clin Cardiol*. 2017;40:660–666. DOI: 10.1002/clc.22741.
3. Nable JV, Tupe CL, Gehle BD, Brady WJ. In-flight medical emergencies during commercial travel. *N Engl J Med*. 2015;373:939–945. DOI: 10.1056/NEJMra1409213.
4. Kupchak BR. Exercise and air-travel-induced alterations in blood hemostasis. *Semin Thromb Hemost*. 2018;44:756–764. DOI: 10.1055/s-0038-1670640.
5. Meyer MJ, Mordukhovich I, Wellenius GA, Mittleman MA, McCracken JP, Coull BA, McNeely E. Changes in heart rate and rhythm during a crossover study of simulated commercial flight in older and vulnerable participants. *Front Physiol*. 2019;10:1339. DOI: 10.3389/fphys.2019.01339.
6. Oliveira-Silva I, Leicht AS, Moraes MR, Simoes HG, Del Rosso S, Cordova C, Boullosa DA. Heart rate and cardiovascular responses to commercial flights: relationships with physical fitness. *Front Physiol*. 2016;7:648. DOI: 10.3389/fphys.2016.00648.
7. Myat A, Song KJ, Rea T. Out-of-hospital cardiac arrest: current concepts. *Lancet*. 2018;391:970–979. DOI: 10.1016/S0140-6736(18)30472-0.
8. Travers AH, Perkins GD, Berg RA, Castren M, Considine J, Escalante R, Gazmuri RJ, Koster RW, Lim SH, Nation KJ, et al. Part 3: adult basic life support and automated external defibrillation: 2015 international consensus on cardiopulmonary resuscitation and emergency cardiovascular care science with treatment recommendations. *Circulation*. 2015;132:S51–S83. DOI: 10.1161/CIR.0000000000000272.
9. Department of Transportation Federal Aviation Administration 14 CFR Parts 121 and 135 Emergency Medical Equipment; Final Rule. Available at: https://www.federalregister.gov/documents/2001/04/12/01-8932/emergency-medical-equipment. Accessed January 18, 2020.
10. Weisfeldt ML, Everson-Stewart S, Sitlani C, Rea T, Aufderheide TP, Atkins DL, Bigham B, Brooks SC, Foerster C, Gray R, et al. Ventricular tachyarrhythmias after cardiac arrest in public versus at home. *N Engl J Med*. 2011;364:313–321. DOI: 10.1056/NEJMoa1010663.