**FILED**
**September 14, 2026**
KAREN MITCHELL
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **MELISSA SUZETTE ARZU, Individually and as the Administrator of the Estate of KEVIN GREENIDGE, Deceased,** | § | |
| **Plaintiff,** | § | **CIVIL ACTION NO. 4:24-cv-00433-P** |
| **v.** | § | |
| **AMERICAN AIRLINES, INC.,** | § | |
| **Defendant.** | § | |

**APPENDIX TO DEFENDANT AMERICAN AIRLINES, INC.'S SECOND MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

In support of Defendant American Airlines, Inc.'s ("American") *Second Motion for Summary Judgment and Brief in Support*, American submits the following materials:

| **EX.** | **DESCRIPTION** | **PAGE NOS.** |
|---|---|---|
| A | Affidavit of Meredith Knudsen | Appx. 001–006 |
| A-1 | Excerpts of the deposition of De M. Fitzpatrick taken in the above-referenced matter on October 30, 2024 **(Filed Under Seal)** | Appx. 007–015 |
| A-2 | Excerpts of the deposition of Judy Gilbert-Blanchard taken in the above-referenced matter on October 29, 2024 **(Filed Under Seal)** | Appx. 016–025 |
| A-3 | Expert report of Dr. Corwin Warmink | Appx. 026–034 |
| A-4 | Excerpts of the deposition of Dr. Corwin Warmink taken in the above-referenced matter on January 22, 2025 | Appx. 035–042 |
| A-5 | Excerpts of the deposition of Matthew Wingham taken in the above-referenced matter on October 24, 2024 **(Filed Under Seal)** | Appx. 043–046 |

| EX. | DESCRIPTION | PAGE NOS. |
|---|---|---|
| A-6 | Excerpts of the deposition of Richard Levy taken in the above-referenced matter on January 24, 2025 | Appx. 047–052 |
| A-7 | Plaintiff's Amended Complaint filed August 8, 2024 | Appx. 053–075 |
| A-8 | Plaintiff's Rule 26(a)(2) Expert Disclosures dated November 2, 2024 | Appx. 076–079 |
| A-9 | Declaration of Leonard Ismael Arzu, dated April 5, 2024 **(Filed Under Seal)** | Appx. 080–082 |
| A-10 | Court's Opinion & Order granting American Summary Judgment, dated May 8, 2025 | Appx. 083–095 |
| A-11 | Plaintiff's Sur-Reply to Defendant's Reply and Brief in Support of its Motion for Summary Judgment filed on April 10, 2025 | Appx. 096–104 |
| A-12 | Plaintiff's Second Amended Complaint filed July 17, 2026 | Appx. 105–117 |
| B | Declaration of Debra Shaffer | Appx. 118–121 |
| B-1 | Medical Emergency Information Sheet (Bates labeled AA000040) | Appx. 122–123 |
| B-2 | Flight Record (Bates labeled AA 000001-8) | Appx. 124–132 |
| B-3 | Flight History (Bates labeled AA 000051) **(Filed Under Seal)** | Appx. 133–134 |
| B-4 | CERS Report (Bates labeled AA 000018-19) **(Filed Under Seal)** | Appx. 135–137 |
| B-5 | Aircraft Routing Delay Report (Bates labeled AA000252) **(Filed Under Seal)** | Appx. 138–139 |
| B-6 | Untitled AED Record (Bates labeled AA000211-251) **(Filed Under Seal)** | Appx. 140–181 |

Dated: September 10, 2026

Respectfully submitted,

*/s/ Meredith Knudsen* __________
Shauna J. Wright
State Bar No. 24052054
shauna.wright@kellyhart.com
(817) 878-3587
Meredith W. Knudsen
State Bar No. 24088617
meredith.knudsen@kellyhart.com
(817) 878-3578
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Ft. Worth, Texas 76102

**ATTORNEYS FOR DEFENDANT AMERICAN AIRLINES, INC.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 10, 2026, a copy of the foregoing was served via the ECF system on all counsel of record.

/s/ *Meredith Knudsen*
Meredith Knudsen

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **MELISSA SUZETTE ARZU, Individually and as the Administrator of the Estate of KEVIN GREENIDGE, Deceased,** | § | |
| | § | |
| **Plaintiff,** | § | **CIVIL ACTION NO. 4:24-cv-00433-P** |
| | § | |
| **v.** | § | |
| | § | |
| **AMERICAN AIRLINES, INC.,** | § | |
| | § | |
| **Defendant.** | § | |

**<u>AFFIDAVIT OF MEREDITH KNUDSEN</u>**

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TARRANT | § |

BEFORE ME, the undersigned authority, on this day personally appeared Meredith Knudsen, who is personally known to me, and first being duly sworn according to law, on her oath deposed and stated:

1. "My name is Meredith Knudsen. I am over twenty-one years of age, and I am of sound mind. I have never been convicted of any crime or offense that would disqualify me from making this Affidavit. I have personal knowledge of the statements made herein and they are all true and correct. I am fully competent to testify to the matters stated herein. I am a licensed attorney in the State of Texas and am currently a partner with the law firm of Kelly Hart & Hallman LLP. I represent American Airlines, Inc. ('American') in connection with the above-styled matter.

2. "This affidavit is offered in support of American's *Second Motion for Summary Judgment* and *Brief in Support of Second Motion for Summary Judgment*.

3. "Attached hereto as **Exhibit A-1** is a true and correct copy of excerpts of the deposition of De M. Fitzpatrick taken in the above-referenced matter on October 30, 2024. A portion of these excerpts were previously filed under seal in this cause on March 24, 2025 and was requested to be filed under seal on August 28, 2026. [*See* ECF 63-2 and ECF 102-2]. All excerpts are the original or exact duplicates of the original.

4. "Attached hereto as **Exhibit A-2** is a true and correct copy of excerpts of the deposition of Judy Gilbert-Blanchard taken in the above-referenced matter on October 29, 2024 and previously filed under seal in this cause on March 24, 2025 and requested to be filed under seal on August 28, 2026. [*See* ECF 63-3 and ECF 102-2]. These excerpts are the original or exact duplicates of the original.

5. "Attached hereto as **Exhibit A-3** is a true and correct copy of the expert report of Dr. Corwin Warmink, previously filed in this cause on March 3, 2025 and August 28, 2026. [*See* ECFs 51, 51-1; *see* ECF 101-3].

6. "Attached hereto as **Exhibit A-4** is a true and correct copy of excerpts of the deposition of Dr. Corwin Warmink taken in the above-referenced matter on January 22, 2025 previously filed in this cause on August 28, 2026. [*See* ECF 101-3]. These excerpts are the original or exact duplicates of the original.

7. "Attached hereto as **Exhibit A-5** is a true and correct copy of excerpts of the deposition of Matthew Wingham taken in the above-referenced matter on October 24, 2024 and previously filed under seal in this cause on March 3, 2025 and requested to be filed under seal on

August 28, 2026. [*See* ECF 52-1 and ECF 102-2]. These excerpts are the original or exact duplicates of the original.

8. Attached hereto as **Exhibit A-6** is a true and correct copy of excerpts of the deposition of Richard Levy taken in the above-referenced matter on January 24, 2025 and previously filed in this cause on March 24, 2025 and August 28, 2026. These excerpts are the original or exact duplicates of the original.

9. "Attached hereto as **Exhibit A-7** is a true and correct copy of Plaintiff, Melissa Suzette Arzu, as an individual and as the Administrator of the Estate of Kevin Greenidge, Deceased's ('Plaintiff' or 'Arzu') *Amended Complaint* filed in this cause on August 8, 2024.

10. "Attached hereto as **Exhibit A-8** is a true and correct copy of Plaintiff's Rule 26(a)(2) Expert Disclosures, served in this matter on November 2, 2024.

11. "Attached hereto as **Exhibit A-9** is a true and correct copy of the Declaration of Leonard Ismael Arzu, dated April 5, 2024 and previously filed under seal in this cause on August 20, 2024 and requested to be filed under seal on August 28, 2026. [*See* ECF 14; *see* ECF 29; *see* ECF 102-2].

12. "Attached hereto as **Exhibit A-10** is a true and correct copy of this *Court's Opinion & Order* granting American's *Motion for Summary Judgment*, dated May 8, 2025. [ECF 82].

13. "Attached hereto as **Exhibit A-11** is a true and correct copy of *Plaintiff's Sur-Reply to Defendant's Reply and Brief in Support of its Motion for Summary Judgment*, filed in this cause on April 10, 2025. [ECF 80-1].

14. "Attached hereto as **Exhibit A-12** is a true and correct copy of *Plaintiff's Second Amended Complaint*, filed in this cause on July 17, 2026. [ECF 99].

15. "Attached hereto as **Exhibit B** is a true and correct copy of the declaration of Debra Shaffer filed in the cause on March 3, 2025 and August 28, 2026. [*See* ECFs 51, 51-1; ECF 101-2].

16. "Attached hereto as **Exhibit B-1** is a true and correct copy of a document produced in this matter by American with the Bates label AA000040, previously filed in this cause on March 3, 2025 as Exhibit C-2 to the declaration of Debra Shaffer. [*See* ECF 51; *see* ECF 51-1]. That declaration is attached hereto as **Exhibit B**. This exhibit was also previously filed in this matter on August 28, 2026. [ECF 101-3].

17. "Attached hereto as **Exhibit B-2** is a true and correct copy of a document produced in this matter by American with the Bates labels AA000001-AA000008, previously filed in this cause on March 3, 2025 as Exhibit C-4 to the declaration of Debra Shaffer. [*See* ECF 51; s*ee* ECF 51-1]. That declaration is attached hereto as **Exhibit B**. This exhibit was also previously filed in this matter on August 28, 2026. [ECF 101-3].

18. "Attached hereto as **Exhibit B-3** is a true and correct copy of a document produced in this matter by American with the Bates label AA000051, previously filed under seal in this cause on March 3, 2025 as Exhibit C-1 to the declaration of Debra Shaffer. [*See* ECF 51; s*ee* ECF 52-1]. That declaration is attached hereto as **Exhibit B**. This exhibit was also previously requested to be filed under seal in this matter on August 28, 2026. [ECF 101-3; ECFs 102, 102-2].

19. "Attached hereto as **Exhibit B-4** is a true and correct copy of a document produced in this matter by American with the Bates labels AA000018-AA000019, previously filed under seal in this cause on March 3, 2025 as Exhibit C-6 to the declaration of Debra Shaffer. [*See* ECF 51; s*ee* ECF 52-1]. That declaration is attached hereto as **Exhibit B**. This exhibit was also

previously requested to be filed under seal in this matter on August 28, 2026. [ECF 101-3; ECFs 102, 102-2].

20. "Attached hereto as **Exhibit B-5** is a true and correct copy of a document produced in this matter by American with the Bates label AA000252, previously filed under seal in this cause on March 3, 2025 as Exhibit C-3 to the declaration of Debra Shaffer. [*See* ECF 52-1]. That declaration is attached hereto as **Exhibit B**. This exhibit was also previously requested to be filed under seal in this matter on August 28, 2026. [ECF 101-3; ECFs 102, 102-2].

21. "Attached hereto as **Exhibit B-6** is a true and correct copy of a document produced in this matter by American with the Bates labels AA000211-AA000251, previously filed under seal in this cause on March 3, 2025 as Exhibit C-11 to the declaration of Debra Shaffer. [*See* ECF 51; *see* ECF 52-2]. That declaration is attached hereto as **Exhibit B**. This exhibit was also previously requested to be filed under seal in this matter on August 28, 2026. [ECF 101-3; ECFs 102, 102-2].

"FURTHER AFFIANT SAYETH NAUGHT."

[signature]
Meredith Knudsen

SUBSCRIBED AND SWORN TO BEFORE ME on the 10th day Sept., 2026, to certify which witness my hand and official seal.

JUDY COLLINS
Notary Public
STATE OF TEXAS
Notary ID # 126950548
My Comm. Exp. July 2, 2029

[signature]
Notary Public in and for the State of Texas

# Exhibit A-1

***(Filed Under Seal)***

# Exhibit A-2

***(Filed Under Seal)***

# Exhibit A-3

Burns Charest LLP
900 Jackson Street
Suite 500
Dallas, Texas 75202

Dear Ms. Crowe,

I am a licensed physician in the state of Texas and have been practicing Pediatric Emergency Medicine continuously since 2003. I am board certified in General Pediatrics and Pediatric Emergency Medicine by the American Board of Pediatrics. I practiced as an Attending Physician in the Cook Children's Medical Center Emergency Department prior to being named Medical Director of the Emergency Department in 2014. I served in that role for nine years and was directly involved in all Emergency Department quality reviews and served on multiple committees related to quality improvement, chart reviews and root cause analysis. Currently, I am the Chief Clinical Officer of the Cook Children's Physician Network.

I have reviewed the following discovery records, data and literature to formulate my opinion on the case of Arzu vs American Airlines:

1. Montefiore Health System Medical Records for Kevin Greenidge
2. Report 2206401306, Hernandez
3. Report 2206401998, Gilbert-Blanchard
4. Report 2206401414, Anderson
5. Report 2206401796, Tran
6. Report 2206402554, Wingham
7. Report 2206401968, Fitzpatrick
8. Declaration of Anna Victoria Arzu
9. Declaration of Janell Nicole Zachary
10. Declaration of Leonard Ismael Arzu
11. Declaration of Dr. Rachael Amador
12. Declaration of Judy Blanchard
13. Declaration of Passenger in seat 32B
14. Medical Emergency Information Sheet, Dr. Rachael Amador
15. Medical Emergency Information Sheet, Karenna Thatcher, RN
16. Medical Emergency Information Sheet, Judy Blanchard
17. AED Event Capture S/N-13C00424577
18. Amerimed Hospital Emergency Note
19. Amerimed Hospital Notice to Public Ministry
20. Death Certificate and Certification Documents
21. Brooke Anderson Deposition Transcript
22. De Fitzpatrick Deposition Transcript

Medical Literature reviewed:


1. Nguyen DD, Spertus JA, Kennedy KF, et al. Association Between Delays in Time to Bystander CPR and Survival for Witnessed Cardiac Arrest in the United States. Circulation: Cardiovascular Quality and Outcomes. 2024 Feb; 17(2):e010116
2. Hasselqvist-Ax I, Riva G, Herlitz J, et al. Early Cardiopulmonary Resuscitation in Out-of-Hospital Cardiac Arrest. New England Journal of Medicine. 2015;372:2307-35

3. Ibrahim WH. Recent Advances and Controversies in Adult Cardiopulmonary Resuscitation. Postgraduate Medical Journal. 2007 Oct;83(984):649–654
4. DeLuca LA, Simpson A, Beskind D, et al. Analysis of Automated External Defibrillator Device Failures Reported to the Food and Drug Administration. Annals of Emergency Medicine. 2012;59(2):103-111
5. Weisfeldt ML, Sitlani CM, Ornato JP, et al. Survival After Application of Automatic External Defibrillators Before Arrival of the Emergency Medical System. Journal American College of Cardiology. 2010 Apr 20;55(16):1713-20
6. Baekgaard JS, Viereck S, Moller TP, et al. The Effects of Public Access Defibrillation on Survival After Out-of-Hospital Cardiac Arrest. Circulation. 2017 Sep;136(10):954-965


Summary of Kevin Greenidge's Clinical Course:

Kevin was a fourteen year old male with a history of obesity, asthma, Type 2 diabetes, atopic dermatitis and obstructive sleep apnea. Other than a hospitalization in 2020, Kevin's medical conditions were controlled with basic outpatient medication and treatment. On June 4, 2022, he was scheduled to fly from San Pedro Sula, Honduras to Miami, Florida on American Airlines flight 614 along with multiple family members (with a connecting flight from Miami to New York City). Flight 614 was significantly delayed and he and his family spent several hours waiting in the San Pedro Sula airport prior to departure. Once in flight, Kevin began experiencing difficulty breathing and requested his asthma inhaler. He acutely decompensated and was noted to be unresponsive but still breathing by his family. Flight staff was alerted and came to assess the situation where he was noted to be unconscious but breathing. Flight staff then made an announcement for any on board medically trained personnel to respond. A nurse initially responded and after a second overhead request a physician also responded. Kevin was still in his seat when the physician arrived. After this, it took several minutes for Kevin to be moved from his seat to the rear galley. Aggregating all the reports and declarations, it appears that at least ten to fifteen minutes passed before Kevin started to receive any treatment. At this point cardiopulmonary resuscitation was begun under the direction of the physician. A medical kit was produced but there was reported to be difficulty in breaking the seal and finding items since they were not labeled. An automatic external defibrillator was brought to the back of the airplane but various statements indicate confusion by the flight staff on the operation of the defibrillator and if it was functioning properly. The defibrillator pads were placed on Kevin but it was noted to be very difficult to adhere them to his body since he was noted to be diaphoretic. Cardiopulmonary resuscitation was continued while the automatic external defibrillator was active. The automatic external defibrillator report produced by American Airlines shows a defibrillation shock was required and this was recorded by the machine. However, the physician present specifically reported that no shock was administered to Kevin at any time. The plane was diverted to Cancun while cardiopulmonary resuscitation continued. Cardiopulmonary resuscitation was reported to have been performed for approximately forty-five minutes on the airplane and Kevin was given two injectable doses of epinephrine with no response. At some point during the flight, Kevin's body released multiple bodily fluids and it became apparent to all involved, including the physician at the scene, that he was deceased. Upon arrival in Cancun, Kevin was transported to emergency services for transfer to a local hospital. He was noted to have no vital signs at this time. Upon arrival to the emergency department he was noted to have no vital signs, a temperature of 34.0 C and a capillary blood glucose of 35. He was intubated, given a glucose infusion and treated with epinephrine. Treatment in the emergency department was brief as it was clear Kevin was deceased upon arrival and further treatment would be futile.

Assessment:

This is a tragic case of death in a fourteen-year-old child during a flight. It is clear that Kevin died during flight AA614 and prior to arrival in Cancun. Statements from the flight attendants, nurse, and physician involved in the resuscitation attempt declare that Kevin died on the airplane. Upon transfer to EMS, witness statements clearly state Kevin had no vital signs. Upon arrival to the emergency department in Cancun Kevin had no vital signs and a temperature of 34.0 C (93.2 F). This directly supports death having occurred on the airplane well before arrival of EMS and transfer to the emergency department.

The emergency medicine physician diagnosed Kevin with asystole, severe hypoglycemia, and cardiac arrest. While hypoglycemia is not an accurate predictor of time of death, the hypoglycemia upon arrival to the emergency department is more consistent with pre and post-mortem metabolism than being clinically significant to the cause of death. The emergency medicine physician noted nothing that would support a neurological event. The Mexican Death Certificate lists Myocardial Infarction, Hemorrhagic Cerebral Vascular Event, and Diabetes Mellitus. This is confounding information as there is zero evidence to support a cerebral vascular event or diabetes being associated with his demise. Kevin had acute difficulty breathing which rapidly progressed to cardiopulmonary arrest. There was zero symptomatology of a cerebral event or diabetic crisis and this appears to be pure conjecture by the Mexican authorities or simply a listing of a common causes of death when it is not specified by the terminally treating physician.

Prompt administration of cardiopulmonary resuscitation has been shown to dramatically increase survival rates in cardiopulmonary arrests. The chance of survival diminishes by 7% to 10% for every minute that passes without intervention in a witnessed cardiac arrest. There was a significant delay in initiation of cardiopulmonary resuscitation in this case. The reports and declarations obtained do not directly correlate with each other, but even estimating conservatively there was a significant delay from the time the alert was sounded that Kevin had collapsed and the initiation of cardiopulmonary resuscitation. This delay was definitely significant enough to critically decrease Kevin's chance of survival.

Automatic external defibrillator usage has also been proven to be a powerful tool to increase survival in out of hospital cardiac arrests. Survivability when utilizing an automatic external defibrillator is also directly time dependent. In this case, there was a significant delay in initiation of cardiopulmonary resuscitation but also a delay in preparing and attaching the automatic external defibrillator. The automatic external defibrillator report produced by American Airlines shows that, once engaged, the automatic external defibrillator did detect a rhythm and determined Kevin Greenidge would benefit from a defibrillation shock. Detection of this rhythm supports that if cardiopulmonary resuscitation and automatic external defibrillation had been initiated without a significant delay that Kevin's survival would have been several times more likely. The automatic external defibrillator record that was produced by American Airlines indicates that a defibrillation shock was delivered by the defibrillator, but it is unclear that this defibrillation ever actually reached Kevin. Failed defibrillation attempts from automatic external defibrillator devices is not uncommon. Pads and connections are the most common cause of these failures. Witness statements show there was considerable difficulty in adhering the pads to Kevin. The physician present during the resuscitation also states very clearly that no defibrillation shock was administered. This physician is well trained in cardiopulmonary resuscitation and automatic external defibrillator use, and is by far the most reliable witness in regards to what occurred during the resuscitation. By contrast, members of the flight crew report medically improbable occurrences. Specifically, the shock of an AED machine will not cause an "entire body" to

"lift off the ground" or "come off the galley floor" as reported by Flight Attendants Anderson and Fitzpatrick.

It is my opinion based upon my education, experience, and training that, within a reasonable degree of medical certainty, the delay in initiation of cardiopulmonary resuscitation coupled with the delayed and ineffectual automatic external defibrillator usage contributed to Kevin Greenidge not surviving this event.

Discovery in this case is ongoing, and I reserve the right to modify my opinions based upon new information that is provided to me.

Corwin Warmink, MD
Chief Clinical Officer
Cook Children's Physician Network
Fort Worth, Texas

# Corwin A. Warmink, MD

4521 Cloudview Road
Fort Worth, Texas 76109
cwarmink@att.net
(214) 284-5901

## EDUCATION

**Pediatric Emergency Medicine Fellowship**
University of Texas Southwestern Medical Center
Dallas, Texas
2000-2003

**Pediatric Residency**
University of Texas Southwestern Medical Center
Dallas, Texas
1997-2000

**Doctor of Medicine**
University of Texas Southwestern Medical School
Dallas, Texas
1993-1997

**Bachelor of Arts**
Baylor University
Waco, Texas
1989-1993
*University Scholar*
*Magna Cum Laude*
*Phi Beta Kappa*

## CERTIFICATION AND LICENSURE

- Pediatric Emergency Medicine Certificate #1283
  American Board of Pediatrics
- General Pediatrics Certificate #71555
  American Board of Pediatrics
- Texas Medical License #K7939

**PROFESSIONAL EXPERIENCE**

**Chief Clinical Officer**

Cook Children's Physician Network

Fort Worth, Texas

2022-present

**Medical Director of Emergency Department**

Cook Children's Medical Center

Fort Worth, Texas

2015-2022

**Assistant Medical Director of Emergency Department**

Cook Children's Medical Center

Fort Worth, Texas

2013-2015

**Emergency Department Attending Physician**

Cook Children's Medical Center

Fort Worth, Texas

2003-2013

**Cook Committee Experience**

Cook Children's Physician Network Board of Directors
Quality Committee-Chairman
Joint Credentials Committee
Emergency Management Committee
Clinical Excellence Committee
Diversion Committee
Sepsis Committee
Pharmacy & Therapeutics Committee
Lab Stewardship Committee
Covid-19 Command Center Task Force

## PUBLICATIONS/PRESENTATIONS

Warmink, C., Ryan, L., DePiero, A., Sadow, K., Chamberlain, J., Teach, S., and Johns, C. "Recognition and Management of Pediatric Fractures by Pediatric Residents." The Journal of Pediatrics December 2004, 114 (6) 1530-1533.

Warmink, C., Miller, E., Yeh, A., Bentley, M., and Limo, R. "A Collaborative Practice Agreement for Pharmacist Triage of Medication Related Calls Following Patient Discharge from a Pediatric Emergency Department" Journal of Pediatric Pharmacy and Therapeutics. 2016 May-Jun; 21(3): 263–303.

Warmink, C., Gammons, H., Graichen-Keffer, M. "Advocating for Best Practices: Using Process and Quality Improvement Methods to Drastically Decrease False-Positive Blood Cultures in a Pediatric Emergency Department" *Society of Pediatric Nurses, Washington D.C., 2019.*

**Corwin A. Warmink, MD**
4521 Cloudview Road
Fort Worth, Texas 76109
cwarmink@att.net
(214) 284-5901

**Attorney Fee Schedule**

The fee for consultation on legal cases is $600/hour. This fee includes initial records review, phone, video conference and face-to-face consultation regarding the case with Dr. Warmink, deposition preparation, and production of a written report, if required. There is a 4 hour minimum retainer of $2,400 that must be prepaid in full before services are rendered, credited to the services below, and non-refundable once services have commenced.

If a deposition is needed, there is a minimum fee of $2,000 for up to 2 hours and $750/hour thereafter. Payment of the $2,000 must be paid 7 days in advance or the deposition will be cancelled.

If a trial date is set and Dr. Warmink is expected to witness, a fee of $1000 will be due with the notice that a date has been set. The $1000 is non-refundable if the case is settled, but will be applied to the fee for court testimony if there are no changes.

If testimony is required at trial, a fee of $4,000 for ½ day (Up to 4 hours) and a fee of $8,000 for a full day (8 hours) are required.

Travel time and expenses will be added to these hourly calculations.

With the exception of hourly fees, fees are to paid one week in advance of the service to be rendered and are non-refundable.

Accepted Yes___________ No___________

______________________________ _______________
Signature Date

______________________________
Printed Name

______________________________
Law Firm

______________________________ _______________
Corwin Warmink, MD Date

# Exhibit A-4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| MELISSA SUZETTE ARZU, | § | |
| Individually and as the | § | |
| Administrator of the | § | |
| Estate of KEVIN GREENIDGE, | § | |
| Deceased, | § | |
| | § | CIVIL ACTION NO. |
| Plaintiff, | § | 4:24-cv-00433-P |
| | § | |
| v. | § | |
| | § | |
| AMERICAN AIRLINES, INC., | § | |
| | § | |
| Defendant. | § | |

---

ORAL AND VIDEOTAPED DEPOSITION OF

DR. CORWIN WARMINK

January 22, 2025

---

ORAL AND VIDEOTAPED DEPOSITION OF DR. CORWIN WARMINK, produced as a witness at the instance of the Plaintiff, and duly sworn, taken in the above-styled and numbered cause on January 22, 2025, from 10:05 a.m. to 2:11 p.m., before Joseph D. Hendrick, Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand, at the offices of Burns Charest LLP, 900 Jackson Street, Suite 500, Dallas, Texas, pursuant to Notice and the Federal Rules of Civil Procedure and any provisions stated on the record or attached hereto.

Job No. CS7124620

APPEARANCES

FOR THE PLAINTIFF:
Hannah Crowe
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, TX 75202
Telephone 469-904-4550
hcrowe@burnscharest.com
Clay Mahaffey
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, TX 75202
Telephone 469-904-4550
cmahaffey@burnscharest.com

FOR THE DEFENDANT:
Meredith W. Knudsen
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone (817) 332-2500
meredith.knudsen@kellyhart.com

THE VIDEOGRAPHER:
Patrick Salvant, Legal Video Specialist



INDEX


Appearances .................................. 2
DR. CORWIN WARMINK
EXAMINATION BY MS. KNUDSEN ............... 5
Signature and Changes .........................163
Reporter's Certification ......................165


EXHIBITS


| NO. | DESCRIPTION | PAGE(S) |
|---|---|---|
| EXHIBIT 1 | Expert Report of Corwin Warmink, MD | 10 |
| EXHIBIT 2 | Corwin Warmink, MD, Invoice #104 | 24 |
| EXHIBIT 3 | Terms of Engagement | 32 |
| EXHIBIT 4 | Rebuttal Report | 37 |
| EXHIBIT 5 | AED readout/rhythm strip | 89 |
| EXHIBIT 6 | Certificado de Conservacion | 123 |




THE VIDEOGRAPHER: Good morning. We are going on the record at 10:05 a.m. on January 22nd, 2025. Please note that this deposition is being conducted virtually as well as in-person. Quality of recording depends on the quality of camera and Internet connection of participants. What is seen from the witness and heard on screen is what will be recorded. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit 1 of the video-recorded deposition of Dr. Corwin Warmink taken by counsel for the defendant in the matter of Melissa Suzette Arzu individually and as the administrator of the estate of Kevin Greenidge deceased versus American Airlines Inc. Filed in the United States District Court for the Northern District of Texas, Fort Worth division, Case Number 4:24-cv-00433-P. Location of the deposition is the offices of Burns Charest located at 900 Jackson Street, Suite 500, Dallas, Texas 75202.

My name is Patrick Salvant representing Veritext and I'm the videographer. The court reporter is Joe Hendrick also from Veritext. I am not authorized to administer an oath. I am not related to any party in this action nor am I financially interested in the outcome. If there are any objections



to proceeding, please state them at the time of your appearance.

Counsel and all present, including remotely, will now state their appearances and affiliations for the record beginning with the noticing attorney.

MS. KNUDSEN: Meredith Knudsen for the defendant American Airlines Inc.

MS. CROWE: Hannah Crowe on behalf of the plaintiff.

MR. MAHAFFEY: Clay Mahaffey on behalf of plaintiff.

THE VIDEOGRAPHER: Would the court reporter please swear in the witness and then counsel may proceed.

THE REPORTER: Would you raise your right hand, please.

THE WITNESS: (Complied)

THE REPORTER: Do you swear or affirm that the testimony you're about to give in this case will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

DR. CORWIN WARMINK
having been duly sworn, testified as follows:
EXAMINATION

-- you tried to find the closest corollary to this case?
A. Correct.
Q. And that study didn't have to do with cardiac arrest on an airplane, right?
A. Correct. There is not a study that I know that exists of pediatric patients' arrests on airplanes. It doesn't exist.
Q. Are you familiar with studies that do consider cardiac arrests on airplanes?
A. Yes.
Q. Did you review those in connection with your opinions?
A. Everything I reviewed is in either your -- kind of what I put here, and I did review your experts'.
Q. The study you're referring to also doesn't concern patients with a non-shockable initial rhythm?
A. Oh, it absolutely does.
Q. It does?
A. Mm-hmm. Actual and a non-shockable initial rhythm survive, but it's pretty much the exact same rate, about 70 percent. So the difference between a non-shockable initial and shockable initial in that study, there's no differentiation.



Q. No differentiation in the study that you cite to?
A. It's like 1 percent.
Q. And the study that you cite to also concerns EMS coming within a matter of minutes, correct?
A. No. The study actually is based on bystanders providing an AED shock, and that those rates are better, actually, than EMS coming. Bystanders do better because it's temporally related, right? So if you wait until an EMS arrives and they provide the shock, the survival is actually worse. So when I say I got the exact corollary as close as possible, I got the exact corollary as close as possible; bystanders, non-medically trained personnel, out-of-hospital arrests in a pediatric patient.
Q. And it's your testimony that whether the initial rhythm is shockable or non-shockable is totally immaterial to the survival rate?
MS. CROWE: Object to the form.
A. No, that's not what I said. You -- you referenced my specific study, and in that study, it didn't, right? There definitely is literature that states if someone is in a non-shockable rhythm versus a shockable rhythm when you start the AED, survival is



worse for someone that is in a non-shockable rhythm.
BY MS. KNUDSEN:
Q. And you understand that Kevin Greenidge was in a non-shockable rhythm when this AED started?
A. Right. By the time he was brought back, after the delay, by the time they put him on the AED, he was in a non-shockable rhythm. But they did get him back to a shockable rhythm, which also in multiple studies has shown to greatly improve your chances of survival by multiple fold. It could be tenfold. So the fact that he was able to get back in that shockable rhythm points to the fact that he probably was in it to begin with before the delay.
Q. Is it your opinion that that shockable rhythm was a normal heart rate?
A. No. No -- an AED won't shock if you're in a normal heart rate. Like if -- if you put an AED on me, it's not going to shock me, right, because I'm just beating along, right?
Q. Right.
A. You -- he was, I believe, to be in ventricular fibrillation, then it reads that and then it shocks that.
Q. So earlier when you referenced showing the EKG to your boss to confirm whether Kevin was in



ventricular fibrillation, was that just prior to him receiving a shock?
A. You're -- you're asking me the -- you thought -- if I thought he was in V-fib before he received a shock?
Q. At what point was Kevin in V-fib?
MS. CROWE: Object to the form.
A. Right. So throughout the tracing -- you know, tracings on an AED are very muddy because there's CPR going on too, so a lot of times you see the CPR, so we don't know what he was in during that. He's in like kind of PEA, pulseless electrical activity, at times, but there's a fine gradation kind of between that and can be like a fine V-fib or V-tach, ventricular tachycardia. But for the shockable rhythm that he presented in -- like at a certain time within the AED, I believe was when ventricular fibrillation, yes, before, like, American provided us as the rhythm strip indicated that a shock was indicated.
BY MS. KNUDSEN:
Q. And what basis do you have for your opinion that the fact that he, in your opinion, reached V-fib at some point means that he was likely in V-fib prior to CPR being administered?
A. Right. So in general, when someone has a

that we just looked at is somehow unreliable, is it?
A. I mean, it was produced by American. We -- I'm working under the assumption that this is the strip from Kevin, but I'm not saying the strip itself is unreliable, no.
Q. How many heart attacks in children have you seen that present as cardiac arrest?
A. Heart attacks have I personally seen?
Q. Correct.
A. Oh, jeez. So you're saying like the diagnosis is heart attack?
Q. Yes.
A. Or are you just saying cardiac arrest?
Q. How many heart attacks -- how many --
A. Heart attack? Like, we don't use the word "heart attack" in that sense. So like define what you mean by "heart attack."
Q. Well, how many cardiac --
A. People that had cardiac arrests?
Q. How many cardiac arrests have you seen in children?
A. I would say more than 50, less than 100, but -- well, maybe more than 100 actually. Cardiac arrest where a child arrests? Yeah, that's actually dozens. There may be more than a hundred.



Q. Okay. So more than 50, less -- sorry. What's the --
A. Let -- let me say approximately 100 -- 100 to 150 I would guess. Gosh, I'd have to do the math on that. I've been in practice a long time, so it may be more actually. Over 100. How about that?
Q. Okay. And what was the mechanism of Kevin's myocardial infarction?
MS. CROWE: Object to the form.
A. One, we don't know that he had a myocardial infarction, right? Like, so that is what a layperson would call a heart attack and I have no idea of knowing that.
BY MS. KNUDSEN:
Q. You have no idea of knowing if he had a heart attack?
A. Correct. But like a heart attack being -- like when -- you need to define what you're saying by "heart attack." He had a cardiac arrest, but that's not the same thing. Those two terms aren't equivalent.
Q. What's the cause of death, in your opinion?
A. I'm not here to opine on his cause of death. He had cardiopulmonary arrest. He died because his heart stopped and he stopped breathing, but I can't make an opinion on what caused that to happen.



Q. But you say it's not myocardial infarction?
A. No, that's definitely one of the -- I mean, there's probably 10 different things that could have done it. You said, "What causes myocardial infarction?" We don't know it was a myocardial infarction, right? You're -- a myocardial infarction is like a -- you -- like you don't get blood to your heart so it stops, right? A heart attack. We know he had his heart stopped but that could have been by various different causes that aren't a, quote, heart attack. You understand what I'm saying?
Q. And you have no opinion as to what the cause was?
A. No, I mean, I -- no.
Q. So it's not your opinion that it wasn't a myocardial infarction, it's just that you don't know whether or not it was a myocardial infarction?
A. You got it. Exactly. Right. No, he definitely could have had a myocardial infarction, but I don't know that. No one can know that.
Q. Have you seen any cases of children with a myocardial infarction?
A. Absolutely.
Q. How many?
A. I can't give you a number exactly. I mean,



gosh, you know, the same thing happens with us, right? Like if you come into the ER and your heart stops, we don't diagnose you at that point like you had a heart attack, right? We know that your heart stopped for whatever purpose. So I can't give you a number that states exactly how many were myocardial infarctions.
MS. CROWE: Okay, Meredith, we've been going about an hour. Can we take a break?
MS. KNUDSEN: Sure.
THE VIDEOGRAPHER: We're off the record at 12:24 p.m. This is the end of file number 2.
(Break from 12:25 p.m. until 12:40 p.m.)
THE VIDEOGRAPHER: We are back on the record at 12:40 p.m. This is the beginning of file number 3.
BY MS. KNUDSEN:
Q. Okay, Dr. Warmink, we took a short break. Do you understand you're still under oath?
A. Yes, ma'am.
Q. We were looking earlier at the AED strip from the flight marked as Deposition Exhibit 5. You would agree with me that the initial rhythm is one of asystole, correct?
A. Pulseless electrical activity maybe.
Q. On page 213?

Page 106

A. Yeah, it's -- it's hard to say if that's asystole or pulseless electrical activity.
Q. You can't be certain which it is?
A. No, because it's hard to know exactly where it begins, right? And so, you know, I would say there's a portion that's -- that's PEA and a portion that's asystole, I would guess.
Q. Which portion is pulseless electrical activity?
A. It's at the very beginning there. I don't know if that's residual or that's him, you know. On the line two, I don't know if that's like him starting in PEA and then going to asystole or not.
Q. Okay. And for the record, you're referring to the time that's marked between 50 and 55 seconds --
A. Yes.
Q. -- those are the graphics you're looking at?
A. Yeah, I don't know exactly what that represents.
Q. Okay.
A. I -- yeah.
Q. After that blip or --
A. Right. From 55 to the next page, that does look like asystole, I believe.

Page 107

Q. Okay.
A. Yeah.
Q. And what are some causes of asystole?
A. Like -- like your heart stops, right? So a heart attack like you talked about or do you want a list of how many ways your heart might stop?
Q. Well, is low oxygen a cause of asystole?
A. So -- of asystole? So like of your heart stopping? It -- it can, yes. Sure. Yes.
Q. Okay. And stroke could be a cause of asystole?
A. Yes.
Q. What causes of cardiac arrest result in ventricular fibrillation or tachycardia?
A. I mean, anything that causes asystole can also do that, theoretically. I mean, like your heart kind of stops and it will go into certain rhythms as it's like either trying to come back or just slowly going into decline. So it's not like there's any particular like this thing causes you to do one or the other - you know what I'm saying - in my mind.
Q. It could be any number of things?
A. Correct.
Q. Including a cerebral hemorrhage?
A. Yes.

Page 108

Q. Or a pulmonary embolus?
A. Those are one of the options, yes.
Q. Your report says that the delays which we've previously talked about contributed to Kevin not surviving the event, and we've talked some about contributed to one extent. And I believe your testimony is - and correct me if I'm wrong - that your opinion is based on the fact that the chance of survival diminishes for every minute that passes; is that correct?
A. Right. I think -- I can't give you an exact number of what his survivability was at any point, but we do know that time is of the essence and that decreases your chance of survival.
Q. And in your report you cite, "diminishes survival by 7 to 10 percent." Which article did those numbers come from?
A. Actually, your -- I think Dimas's article that she cited had that in there.
Q. Okay. You had not reviewed Dimas's article at the time you wrote this Deposition Exhibit 1?
A. Correct. Where I do say 7 to 10 percent?
Q. It's on page 3.
A. Page 3. Okay. Maybe that's in one of my journal articles. I'd have to look at which one.

Page 109

MS. CROWE: Where are you looking at?
BY MS. KNUDSEN:
Q. Let me find it on the page. Okay. It's the second full paragraph --
MS. CROWE: I got it.
BY MS. KNUDSEN:
Q. -- halfway down the page, "The chance of survival diminishes by 7 to 10 percent" --
A. Right.
Q. -- "for every minute that passes."
A. Yeah. It's in one of -- obviously in one of these journal articles that I cited. I can't tell you exactly which one. Probably number 3, I would guess, Ibrahim, because the Weisfeldt one's about defibrillators. Yeah. It's in one of these articles. And actually her article maybe references one of these art -- you know, but it's all very self-referential at a point with references. And so, yeah, it's in one of these. It's either, I would say, 2 -- 1, 2 or 3 probably, but I can't tell you the exact one. Sorry.
Q. Okay. It's in one of these articles?
A. Yeah, yeah. I wouldn't -- that wasn't just off the top of my head. I promise you that. That came from one of these articles.
Q. You would agree with me that the resources

Page 162

(Break from 2:05 p.m. until 2:10 p.m.)

THE VIDEOGRAPHER: We're back on the record at 2:10 p.m.

MS. KNUDSEN: Okay. At this time, I'll pass the witness. Thank you very much, Dr. Warmink.

THE WITNESS: Thank you.

MS. CROWE: And we will reserve ours for trial.

THE VIDEOGRAPHER: We're off the record at 2:10 p.m. This is the end of file number 4.

(Time noted: 2:11 p.m.)

-o0o-

Page 163

CHANGES AND SIGNATURE

WITNESS: DR. CORWIN WARMINK

DATE: January 22, 2025

| Page/Line | Change | Reason |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Page 164

I, DR. CORWIN WARMINK, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____________________________

DR. CORWIN WARMINK

STATE OF __________)

COUNTY OF __________)

Before me _________________ on this day personally appeared DR. CORWIN WARMINK, known to me (or proved to me on the oath of _________________ or through _________________ (description of identity card or other document)) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this ______ day of _____________, _______.

_____________________________

Notary Public in and for the

State of ___________

Page 165

REPORTER'S CERTIFICATION

DEPOSITION OF DR. CORWIN WARMINK

January 22, 2025

I, Joseph D. Hendrick, Notary Public and Certified Shorthand Reporter in the State of Texas, hereby certify to the following:

That the Witness, DR. CORWIN WARMINK, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

I further certify that pursuant to FRCP Rule 30(f)(1) the signature of the deponent:

X was requested by the deponent or a party before the completion of the deposition and is to be returned within 30 days from date of receipt of the transcript;

___________ was not requested by the deponent or a party before the completion of the deposition;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken;

Further, I am not a relative or employee of any attorney of record, nor am I financially or

Page 166

otherwise interested in the outcome of the action.

Subscribed and sworn to on this date:

February 4, 2025.

Joseph D. Hendrick, CSR #947
Expiration Date: 04/30/2025
Notary Comm. Exp. 02/13/27
Veritext Legal Solutions
Firm Registration No. 571
300 Throckmorton Street, Ste. 1600
Fort Worth, TX 76102
Telephone (800) 336-4000

Attorney Times:
Meredith W. Knudsen - 03:26:03
All Other Counsel - 00:00:00

Page 167

Hannah Crowe, Esq.
hcrowe@burnscharest.com

February 4, 2025

RE: Arzu, Melissa Suzette v. American Airlines, Inc
1/22/2025, Dr. Corwin Warmink (#7124620)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at (Erratas-CS@veritext.com).

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions

# Exhibit A-5

***(Filed Under Seal)***

# Exhibit A-6

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

MELISSA SUZETTE ARZU, )
Individually and as the )
Administrator of the )
Estate of KEVIN GREENIDGE, )
Deceased, )
)
Plaintiff, )
)
VS. ) CIVIL ACTION NO.
) 4:24-cv-00433-P
AMERICAN AIRLINES, INC., )
)
Defendant. )

-----------------------------------

ORAL AND VIDEO DEPOSITION OF
RICHARD LEVY
JANUARY 24, 2025

-----------------------------------

ORAL AND VIDEO DEPOSITION OF RICHARD LEVY, produced as a witness at the instance of the DEFENDANT, and duly sworn, was taken in the above-styled and -numbered cause on January 24, 2025, from 10:16 a.m. to 1:02 p.m., before Mercedes Arellano, CSR in and for the State of Texas, reported by machine shorthand, at the law offices of BURNS CHAREST, LLP, 900 Jackson Street, Suite 500, Dallas, Texas, pursuant to the Federal Rules of Civil Procedure.

Job No. CS7064389

APPEARANCES

FOR THE PLAINTIFF:
Hannah M. Crowe
and Clay Mahaffey
BURNS CHAREST LLP
900 Jackson Street
Suite 500
Dallas, Texas 75202
(469) 904-4550
hcrowe@burnscharest.com

FOR THE DEFENDANT:
Shauna Wright
KELLY HART & HALLMAN LLP
201 Main Street
Suite 2500
Fort Worth, Texas 76102
(817) 332-2500
shauna.wright@kellyhart.com

ALSO PRESENT:
William Blalock, Via Zoom
Anna Kate Benedict, Via Zoom
Patrick Salvant, Videographer



INDEX


| | PAGE |
| --- | --- |
| Appearances | 2 |
| Proceedings | 4 |
| RICHARD LEVY | |
| Examination by Shauna Wright | 6 |
| Examination by Hannah M. Crowe | 114 |
| Signature and Changes | 120 |
| Reporter's Certificate | 123 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| 1 | Richard J. Levy's expert report | 18 |
| 2 | Flight Operations Manual Bates AA000064 | 39 |
| 3 | Medical Emergencies Bates AA000065 and AA000066 | 41 |
| 4 | Declaration of Dr. Rachael Amador | 54 |
| 5 | Declaration of Miguel Diaz Rosales | 63 |




PROCEEDINGS

THE VIDEOGRAPHER: Good morning. We are going on the record at 10:16 a.m., on January 24th, 2025.

Please note that this deposition is being conducted virtually, as well as in person. Quality of recording depends on the quality of camera and Internet connection of participants. What is seen from the witness and heard on screen is what will be recorded.

Audio and video recording will continue to take place unless all parties agree to go off the rec- -- record.

This is Media Unit 1 of the video recorded deposition of Captain Richard Lev- -- Levy, taken by counsel for the Defendant in the matter of Melissa Suzette Arzu, individually and as the Administrator of the Estate of Krevin -- Kevin Greenidge, Deceased, versus American Airlines, Inc.

This case is filed in the United States District Court for the Northern District of Texas, Fort Worth Division, Case Number 4:24-cv-00433-P.

The location of the deposition is the offices of Burns Charest, located at 900 Jackson Street, Suite 500, Dallas, Texas 75202.



My name is Patrick Salvant, representing Veritext, and I'm the videographer. The court reporter is Mercedes Arellano, also from Veritext.

I am not authorized to administer an oath. I am not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance.

Counsel and all present, including remotely, will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MS. CROWE: Noticing attorney.

MS. WRIGHT: Shauna Wright on behalf of American Airlines, Incorporated.

MS. CROWE: Hannah Crowe on behalf of the Plaintiff.

MR. MAHAFFEY: Clayton Mahaffey on behalf of the Plaintiff.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness, and then Counsel may proceed.

RICHARD LEVY,

having been first duly sworn, testified as follows:

Page 82

summary, San Pedro Sula would be closer by 23 minutes.
And then 0006 UTC coordinates, 184 miles from San Pedro Sula, 352 nautical miles from Cancun. San Pedro Sula is closer by 168 nautical miles. Flying time, San Pedro Sula, 23 minutes; Cancun, 44 minutes. San Pedro Sula is closer by 21 minutes.
And then 0011 UTC, those are coordinates. This is San Pedro Sula is 224 nautical miles versus Cancun 312 nautical miles, 88 nautical miles closer to go to San Pedro Sula. Flying time to San Pedro Sula, 28 minutes versus Cancun, 39 minutes. San Pedro Sula is closer by 11 minutes
Q. Okay. Let's talk about the first column. It says: Time (UTC).
Do you see that?
A. I do.
Q. So all of those times right there in that first column, 0005, 0006, and 0011.
Do you see those?
A. I do.
Q. All of those are based upon the testimony you have given so far about how you determined when to calculate the time, correct?
MS. CROWE: Object to the form.
A. That is correct.

Page 83

Q. (BY MS. WRIGHT) Okay. So in order for this entire chart to be valid and reliable, the numbers in the first column have to be right, correct?
A. Correct.
Q. Because the rest of the chart is built off the assumptions in the first column, correct?
A. Correct.
Q. Okay. You would agree, wouldn't you, that -- well let me ask you this.
Your opinions in this chart about proximity of SAP is based on your opinion that the flight was closer to SAP in miles than it was to Cancun when she screamed, right?
A. Right.
Q. You would agree that the pilots did divert immediately once they knew of the emergency, correct?
A. Correct.
Q. And you would agree that they diverted to the closest airport at that time, right?
A. At that time, yes.
Q. Yes?
And that was Cancun, not SAP?
A. That was Cancun.
Q. Okay. You would also agree that Cancun was only 40 miles off the port side of the aircraft when

Page 84

they diverted?
A. I would agree with that.
Q. And after the emergency was declared, you would agree, based on what you've seen, that the pilots got the aircraft on the ground in 17 minutes?
A. I would agree. I don't remember exactly, but that sounds reasonable.
Q. And your opinion is simply that the flight crew should have alerted the flight deck sooner?
MS. CROWE: Object to the form. Misstates opinion.
A. Yes, the fl- -- the flight attendants, as part of the flight crew, should have notified the flight deck immediately.
Q. (BY MS. WRIGHT) Sooner than they did?
A. Yes.
Q. You have no opinion on the manner in which the flight diverted, correct?
MS. CROWE: Object to the form. Vague.
A. No objections to the way the flight diverted to Cancun.
Q. (BY MS. WRIGHT) You certainly don't hold the opinion that the diversion into Cancun was too slow, do you?
A. I do not hold that opinion.

Page 85

Q. And you have no opinion that it took too long to taxi to the gate where EMS was waiting, correct?
A. I have no opinion on that.
Q. You would agree that the evidence says it took three minutes, right?
A. I -- I would say yes.
Q. Okay. So you have no opinion on that either?
A. No.
Q. Okay. And you've testified that you are here as a pilot expert and not an expert on flight attendant policies, correct?
A. And I agree on that.
Q. And you are also not here as an expert on flight attendant reaction to emergency, correct?
MS. CROWE: Object to the form.
A. I'm -- I'm not a flight attendant expert, but I say that, as a pilot for almost 50 years, captain for a good part of that, as an instructor or check airman, when the crew is briefed to report to the flight deck any kind of emergency, any -- and includes a medical emergency, that gets done without hesitation.
Q. (BY MS. WRIGHT) So as soon as they're briefed on it, they need to tell you?
A. Briefed on it, notice it, and they have a shared mental model on it, they could tell somebody,

Page 118

the whole thing, but are you tracking?
A. I see that.
Q. Okay.
"Question: Well, if it had taken up to 15 minutes to remove Kevin to the aft galley to provide additional medical care, as the captain of your aircraft, would you hope that one of your flight attendants would notify you of a serious event like this as soon as possible?
"Answer: No comment."
Did I read that correctly?
A. You read that correctly.
Q. How did this testimony impact your opinion, if at all?
A. It did. I've never heard of a captain of any airline in the world not make a course change in the event of a serious event like this, immediately after consultation with the flight deck crew, air traffic control, and if necessary, the company, it depends, that there would be no comment. There is all kinds of comment.
MS. WRIGHT: Objection, nonresponsive.
Q. (BY MS. CROWE) You would have expected Captain Wingham to have a comment to that question?
A. I would expect him --

Page 119

MS. WRIGHT: Objection, calls for speculation. It's improper.
A. I would expect any captain, especially Captain Wingham, to have a clearcut three- or four-word answer diversion now.
Q. (BY MS. CROWE) Okay. Is it, in your experience as a pilot, reasonable to assume that no matter where you land, the faster you get on the ground, the faster the passenger can generally receive medical attention?
A. Yes.
MS. CROWE: Okay. Nothing further. We'll reserve the rest of ours for trial.
MS. WRIGHT: Thank you.
THE STENOGRAPHER: Do you need a copy of the transcript?
MS. CROWE: He'll read and sign.
THE VIDEOGRAPHER: We're off the record at 1:02 p.m.
This is the end of File Number 3.
(Deposition concluded at 1:02 p.m.)

Page 120

CHANGES AND SIGNATURE

WITNESS NAME: RICHARD LEVY DATE: JANUARY 24, 2025

PAGE LINE CHANGE REASON

Job No. CS7064389

Page 121

I, RICHARD LEVY, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

____________________________
RICHARD LEVY

THE STATE OF __________)
COUNTY OF _____________)

Before me, _________________________, on this day personally appeared RICHARD LEVY, known to me (or proved to me under oath or through _________________________) (description of identity card or other document)) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this __________ day of _______________________, __________.

____________________________
NOTARY PUBLIC IN AND FOR
THE STATE OF ___________________
COMMISSION EXPIRES: _____________

Job No. CS7064389

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

MELISSA SUZETTE ARZU, )
Individually and as the )
Administrator of the )
Estate of KEVIN GREENIDGE, )
Deceased, )
)
Plaintiff, )
)
VS. ) CIVIL ACTION NO.
) 4:24-cv-00433-P
AMERICAN AIRLINES, INC., )
)
Defendant. )

-----------------------------------
ORAL AND VIDEO DEPOSITION OF
RICHARD LEVY
JANUARY 24, 2025
-----------------------------------

CERTIFIED STENOGRAPHIC

COURT REPORTER'S CERTIFICATE

I, Mercedes Arellano, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, RICHARD LEVY, was duly sworn by the officer and that the transcript of the oral



deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on ____________________ to the witness or to the attorney for the witness for examination, signature and return to me by ____________________;

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

FOR THE PLAINTIFF:
Hannah M. Crowe
and Clay Mahaffey
BURNS CHAREST LLP
900 Jackson Street
Suite 500
Dallas, Texas 75202
(469) 904-4550
hcrowe@burnscharest.com

FOR THE DEFENDANT:
Shauna Wright
KELLY HART & HALLMAN LLP
201 Main Street
Suite 2500
Fort Worth, Texas 76102
(817) 332-2500
shauna.wright@kellyhart.com



That $___________ is the deposition officer's charges to the Defendant for preparing the original deposition transcript and any copies of exhibits;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or ...hich this proceeding was ... not financially or ... outcome of the action.



...13th day of February, 2025.

_____________________________________
MERCEDES ARELLANO, Texas CSR 8395
Expiration Date: January 31, 2026
VERITEXT LEGAL SOLUTIONS
Firm No. 571
300 Throckmorton Street, Suite 1600
Fort Worth, Texas 76102
(817) 336-3042
(800) 336-4000



hcrowe@burnscharest.com

February 13, 2025

RE: Arzu, Melissa Suzette v. American Airlines, Inc, Et Al.

DEPOSITION OF: Captain Richard Levy 7064389

The above-referenced witness transcript is available for read and sign.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those on the attached Errata Sheet.

The witness should sign and notarize the attached Errata pages and return to Veritext at errata-tx@veritext.com.

According to applicable rules or agreements, if the witness fails to do so within the time allotted, a certified copy of the transcript may be used as if signed.

Yours,
Veritext Legal Solutions

# Exhibit A-7

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| MELISSA SUZETTE ARZU, Individually and as the Administrator of the Estate of KEVIN GREENIDGE, Deceased, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civ. No. 4:24-cv-00433-P |
| AMERICAN AIRLINES, INC., | § § | |
| Defendant. | § § | |

**AMENDED COMPLAINT**

1. Plaintiff, Melissa Suzette Arzu, as an individual and as the Administrator of the Estate of Kevin Greenidge, Deceased ("Plaintiff"), by her undersigned counsel, brings her Amended Complaint against Defendant American Airlines, Inc. ("Defendant") and alleges as follows:

**INTRODUCTION**

2. This civil action arises out of personal injuries to and the wrongful death of 14-year-old Kevin Greenidge ("Greenidge"), who died following a series of accidents that occurred while he and his family were traveling internationally via American Airlines from Honduras to New York.

3. While in flight, Greenidge experienced a medical emergency and became unconscious. Greenidge's family immediately yelled out for assistance, but American Airlines' flight personnel delayed in responding to their cries for help and failed to render effective assistance.

4. American Airlines flight personnel failed to timely respond to Greenidge's medical emergency, failed to timely transfer Greenidge from his window seat to the back of the airplane where aid could be rendered, failed to timely request the assistance of medically trained passengers on board AA Flight 614, and failed to timely initiate automated external defibrillator ("AED") resuscitation on Greenidge.

5. When flight personnel eventually attempted to use the AED on Greenidge, they were either unable to properly operate the machine or the machine did not function properly. According to eyewitnesses, each time the AED gave a "clear" warning for people to step back from Greenidge's body so that a shock could be administered, a shock was not delivered. Instead, the machine simply kept advising that CPR should be continued.

6. The airline records discovered to date reveal that, in violation of federal law, American Airlines flight personnel were not trained to use the type of AED machine that was on board AA Flight 614.

7. The airline records discovered to date also reveal that, in violation of federal law, the contents of the airline emergency medical kit on board AA Flight 614 were unmarked.

8. Had AA Flight 614 been properly equipped with the necessary and functional medical equipment, had American Airlines properly trained its airline personnel for in-flight medical events, and had airline personnel timely responded to Greenidge's medical emergency and effectively implemented the skills learned in their training, Greenidge would not have experienced the intense physical and emotional pain he suffered on AA Flight 614.

9. Had AA Flight 614 been properly equipped with the necessary medical equipment—including but not limited to a medical kit with clearly marked contents and an operable AED machine—and had flight personnel been properly trained regarding the use of such equipment and effectively implemented the skills learned in their training, an operable AED machine would have been timely utilized on Greenidge, vastly increasing his chances for survival.

10. Tragically, and as a direct result of American Airlines' actions and failures outlined in this Amended Complaint, Greenidge passed away at the young age of 14 years old.

**PARTIES**

11. Plaintiff Melissa Suzette Arzu and her son, Kevin Greenidge, Deceased, have been, at all relevant times, residents of the State of New York, residing in the County of The Bronx, and citizens of the United States of America.

12. Melissa Suzette Arzu ("Arzu") was appointed as the Administrator of the Estate of her minor son, Kevin Greenidge, Deceased ("Greenidge"), by the Bronx County Surrogate's Court on October 27, 2022 pursuant to Section 702(1) of the New York Surrogate Court Procedure Act.

13. Defendant American Airlines, Inc. ("American Airlines") is incorporated under the laws of the State of Delaware and headquartered in the State of Texas. American Airlines also does extensive business within the State of New York, including having two of its ten national hubs within the State of New York and conducting business from multiple airports in New York where Plaintiff resides.

14. On and before June 4, 2022, Defendant American Airlines was in the business of selling tickets for international carriage of passengers.

15. On and before June 4, 2022, Defendant American Airlines operated services for the carriage of passengers by air and conducted its business of carriage of passengers by air from premises leased or owned by American Airlines itself, or by another carrier with which it has a commercial agreement, at the Dallas Fort Worth International Airport in Dallas, Texas.

16. On and before June 4, 2022, Defendant American Airlines operated services for the carriage of passengers by air and conducted its business of carriage of passengers by air from premises leased or owned by American Airlines itself, or by another carrier with which it has a commercial agreement, at the John F. Kennedy International Airport in New York, New York and LaGuardia Airport in New York, New York.

## JURISDICTION

17. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because a federal question is presented pursuant to the Convention for the Unification of Certain Rules for International Carriage by Air done at Montreal on May 28, 1999 (hereinafter "Montreal Convention").

18. This Court has general personal jurisdiction over American Airlines because American Airlines is headquartered in Fort Worth, Texas.

19. Venue is proper in this District pursuant to Article 33 of the Montreal Convention because American Airlines is domiciled and has its principal place of business in Fort Worth, Texas.

## FACTUAL ALLEGATIONS

20. On June 4, 2022, Greenidge embarked on a flight itinerary under American Airlines Confirmation Number UDUZFG to fly internationally from Ramón Villeda Morales International Airport ("SAP") in Honduras to LaGuardia Airport ("LGA") in New York.

21. Greenidge's UDUZFG American Airlines itinerary included roundtrip travel on American Airlines from New York to Honduras on May 28, 2022 and June 4, 2022.

22. On May 28, 2022, Greenidge traveled via American Airlines from New York to Honduras on American Airlines Flight 1249 ("AA Flight 1249") from LGA to Miami International Airport ("MIA") and American Airlines Flight 1635 from MIA to SAP.

23. On June 4, 2022, the return portion of Greenidge's international itinerary included American Airlines Flight 614 ("AA Flight 614") from SAP to MIA, an approximate two-hour layover in MIA, and American Airlines Flight 1171 ("AA Flight 1171") from MIA to LGA.

24. Greenidge was a New York resident and a citizen of the United States of America.

25. The purchase of Greenidge's ticket to fly internationally via American Airlines roundtrip from New York to Honduras was made in New York.

Case 4:24-cv-00433-P Document 18 Filed 08/28/24 Page 5 of 21 PageID 256

26. A true and accurate copy of Greenidge's American Airlines itinerary is attached to Plaintiff's Amended Complaint as **Exhibit 1** and incorporated herein by reference.

27. At all relevant times, AA Flights 614 and 1171 were operated and controlled by Defendant American Airlines, acting by and through its authorized employees and/or agents.

28. With respect to Greenidge, Defendant American Airlines operated AA Flights 614 and 1171 as a single itinerary constituting same-day international carriage from Honduras to New York.

29. All transportation of passengers by American Airlines, including the transportation of Greenidge from Honduras to New York, is subject to the American Airlines Conditions of Carriage.

30. A true and accurate copy of the American Airlines Conditions of Carriage in effect in June 2022 is attached to Plaintiff's Amended Complaint as **Exhibit 2** and incorporated herein by reference.

31. A true and accurate copy of the "Liability for international flights" section of the American Airlines Conditions of Carriage regarding the Montreal Convention and in effect in June 2022 is attached to Plaintiff's Amended Complaint as **Exhibit 3** and incorporated herein by reference.

32. At all relevant times, the American Airlines Conditions of Carriage expressly incorporated the "American Airlines General Rules of the International Tariff."

33. A true and accurate copy of the American Airlines General Rules of the International Tariff in effect in June 2022 is attached to Plaintiff's Amended Complaint as **Exhibit 4** ("Tariff No. AA1") and incorporated herein by reference.

34. At all relevant times, the American Airlines Conditions of Carriage specified that, to the extent not preempted by federal law, Texas law applies to a passenger's contract with American Airlines and any dispute from a passenger's ticket purchase or travel on American Airlines.

35. Greenidge was a fare-paying passenger ticketed to travel aboard AA Flights 614 and 1171, which Defendant American Airlines "regarded as a single operation" under Rule 55(A) of Tariff No. AA1.

36. Greenidge was traveling from Honduras to New York with several members of his family.

37. On AA Flight 614 from Honduras to Miami, Greenidge and his family were seated at the back of the airplane in rows 31 and 32.

38. During AA Flight 614, Greenidge experienced a medical emergency.

39. Greenidge's family members immediately started yelling out for help.

40. Greenidge became unconscious and was unresponsive.

41. Greenidge's uncle began trying to transfer unconscious Greenidge from his window seat to the aisle.

42. After some delay, two flight attendants responded to Greenidge's family's urgent calls for help and came to the back of the airplane to assess the situation.

43. Airline personnel eventually assisted Greenidge's uncle in transferring unconscious Greenidge from his window seat to the aisle and to the back of the airplane.

44. At least one member of the airline personnel team was panicking and appeared to have no idea what to do during Greenidge's medical emergency.

45. A different member of the airline personnel team made an overhead announcement to ask if there were any doctors on board the airplane.

46. At least two medically-trained passengers came to the back of the airplane to render aid to Greenidge. One of these passengers began administering CPR to Greenidge.

47. After further additional delay, airline personnel brought out the automated external defibrillator ("AED") machine present on AA Flight 614.

48. Airline personnel struggled to figure out how to turn on and operate the AED machine.

49. After airline personnel eventually figured out how to turn on the AED machine and position the patches on Greenidge's chest, the machine advised that CPR should continue to be administered.

50. Each time the AED gave a "clear" warning for people to step back from Greenidge's body so that a shock could be administered, a shock was not delivered. Instead, the machine simply kept advising that CPR should be continued.

51. AA Flight 614 made an unscheduled, emergency landing in Cancun, Mexico. Greenidge was deplaned on a stretcher and transported to the hospital in an ambulance, where he was pronounced dead at the age of 14.

52. Upon information and belief, American Airlines has written policies and procedures that American Airlines personnel must follow if a passenger presents with a medical issue or emergency.

53. Upon information and belief, these policies and procedures are intended to ensure the safety of all passengers on board American Airlines flights.

54. Upon information and belief, the airline personnel on board AA Flight 614 did not adhere to American Airlines policies and procedures.

55. Contrary to American Airlines policies and procedures, the airline personnel on board AA Flight 614 did not timely respond to Greenidge's medical emergency.

56. Contrary to American Airlines policies and procedures, the airline personnel on board AA Flight 614 did not timely transfer Greenidge from his seat to the back of the airplane where aid could be rendered.

57. Contrary to American Airlines policies and procedures, the airline personnel on board AA Flight 614 did not timely request the assistance of medically trained passengers on board AA Flight 614.

58. Contrary to American Airlines policies and procedures, the airline personnel on board AA Flight 614 did not timely initiate AED resuscitation on Greenidge.

59. Contrary to American Airlines policies and procedures, the airline personnel on board AA Flight 614 did not effectively utilize the AED machine on board AA Flight 614 on Greenidge.

60. Upon information and belief, and in violation of federal law, American Airlines failed to equip AA Flight 614 with requisite medical equipment, including but not limited to a medical kit with clearly marked contents and an operable AED machine.

61. Upon information and belief, and in violation of federal law, American Airlines failed to regularly and sufficiently inspect the AED machine on board AA Flight 614 to ensure its readiness to perform during an emergency.

62. Upon information and belief, and in violation of federal law, American Airlines failed to provide sufficient training for in-flight medical emergencies to the flight personnel on board AA Flight 614, including but not limited to recurrent training in the proper use of AEDs and cardiopulmonary resuscitation.

63. Before traveling from New York to Honduras via American Airlines, 14-year-old Greenidge was an active eighth grader who enjoyed swimming at the YMCA, playing games with his friends, and spending time with his younger cousin.

64. After embarking on his American Airlines voyage, however, Greenidge's short life was tragically cut short.

65. Due to multiple accidents aboard AA Flight 614, each of which was the result of an act or omission by American Airlines personnel, Greenidge suffered a tragic death at the young age of 14. Each of these accidents was external to the medical emergency Greenidge suffered while on board AA Flight 614.

66. Arzu, as Greenidge's mother, has experienced and continues to experience excruciating pain and suffering as a result of the sudden loss of her young son.

67. On April 9, 2024, Plaintiff, through counsel, sent written correspondence to American Airlines regarding Plaintiff's significant pain and suffering associated with the loss of her 14-year-old son as well as the significant economic burden of preparing and internationally transporting Greenidge's remains from Mexico to New York.

68. On April 9, 2024, Plaintiff, also through counsel, demanded from American Airlines the full value of the 113,100 special drawing rights to which the Estate of Kevin Greenidge is entitled as an advance payment.

69. To date, Defendant has not tendered any advance payment to Plaintiff.

**COUNT I – DEFENDANT'S LIABILITY UNDER THE MONTREAL CONVENTION**

70. Greenidge was severely injured and died while he was flying internationally via American Airlines from Honduras to New York.

71. The return portion of Greenidge's international itinerary included AA Flight 614 from SAP to MIA, an approximate two-hour layover in MIA, and AA Flight 1171 from MIA to LGA.

72. With respect to Greenidge, Defendant American Airlines operated AA Flights 614 and 1171 as a single itinerary constituting international carriage from Honduras to New York.

73. Greenidge's American Airlines travel was subject to the American Airlines Conditions of Carriage incorporated into Greenidge's ticket.

74. At all relevant times, AA Flights 614 and 1171 were operated and controlled by Defendant American Airlines through its employees, agents, and/or servants.

75. At all relevant times, AA Flights 614 and 1171 were operated as common carriers engaged in the business of transporting fare paying passengers.

76. As a common carrier, American Airlines, including its agents, servants, and employees, owed the highest duty of care to its passengers, including Greenidge.

77. Federal regulations govern the conduct and procedures of common carriers like Defendant American Airlines.

78. For example, 14 C.F.R. § 121.801-805 requires airline vessels to be equipped with specific emergency medical equipment and requires airlines to provide crew members with specific emergency medical training.

79. Specifically, as of April 12, 2004, 14 C.F.R. § 121.803(c)(4) requires passenger-carrying vessels to be equipped with an approved automated external defibrillator ("AED") machine.

80. Pursuant to 14 C.F.R. § 121.803(b)(1), an aircraft's AED machine must be inspected regularly at specific inspection periods "<u>to ensure its condition for continued serviceability and immediate readiness to perform its intended emergency purposes</u>" (emphasis added).

81. Pursuant to 14 C.F.R. § 121.803(b)(2)-(4), an aircraft's AED machine must be readily accessible to the crew, clearly identified, marked to indicate its method of operation, and marked as to date of last inspection.

82. Pursuant to 14 C.F.R. § 121.805(b), airlines must provide crewmember training for in-flight medical emergencies, including instruction in emergency medical event procedures,

coordination among crewmembers, instruction in the location, function, and intended operation of medical emergency equipment, and instruction in the content of the emergency medical kit.

83. Specifically, each flight attendant must be trained "in the proper use of automated external defibrillators" and "cardiopulmonary resuscitation." This "recurrent training" is to "include performance drills . . . at least once every 24 months." *See* 14 C.F.R. § 121.805(b)(5)(i)-(iii).

84. In addition to the AED machine, 14 C.F.R. § 121.803(c)(1)-(3) also requires passenger-carrying vessels to be equipped with approved first-aid kits and emergency medical kits.

85. Pursuant to 14 C.F.R. § 121.803(b)(3), the contents of first-aid kits and emergency medical kits must be "clearly identified and <u>clearly marked</u>" (emphasis added).

86. Upon information and belief, American Airlines flight personnel have specific protocols they must follow when a passenger is experiencing a medical emergency or otherwise appears unwell or in need of medical assistance.

87. Upon information and belief, American Airlines flight personnel are trained on and required to follow specific American Airlines policies and procedures.

88. Upon information and belief, American Airlines policies and procedures instruct flight personnel to timely respond to medical emergencies, timely request assistance from medically-trained passengers in the event of a medical emergency, and timely initiate AED resuscitation in the event that a passenger is experiencing a medical emergency that requires such response.

89. It is alleged that American Airlines, through its authorized employees and/or agents, failed to engage in the following activities:

a. Failure to equip AA Flight 614 with an operable AED machine in violation of 14 C.F.R. § 121.803(c)(4);

b. Failure to regularly and sufficiently inspect the AED machine on board AA Flight 614 "to ensure its condition for continued serviceability and

immediate readiness to perform its intended emergency purposes" in violation of 14 C.F.R. § 121.803(b)(1);

c. Failure to provide sufficient training for in-flight medical emergencies to the flight personnel on board AA Flight 614 in violation of 14 C.F.R. § 121.805(b);

d. Failure to provide sufficient, "recurrent training" "in the proper use of automated external defibrillators" and "cardiopulmonary resuscitation" to the flight personnel on board AA Flight 614 in violation of 14 C.F.R. § 121.805(b)(5);

e. Failure to incorporate "performance drills" regarding AED use and cardiopulmonary resuscitation into the training of the flight personnel on board AA Flight 614 in violation of 14 C.F.R. § 121.805(b)(5);

f. Failure to equip AA Flight 614 with a "clearly marked" first-aid and/or medical kit in violation of 14 C.F.R. § 121.803(c)(1)-(3);

g. Failure to follow established American Airlines protocol, including but not limited to the failure to timely respond to Greenidge's medical emergency, the failure to timely transfer unconscious Greenidge from his seat to the back of the airplane, the failure to timely request the assistance of medically-trained passengers on board AA Flight 614, and the failure to timely initiate AED resuscitation on Greenidge; and

h. Failure to effectively utilize the AED machine on board AA Flight 614 on unconscious minor Greenidge.

90. Had AA Flight 614 been properly equipped with the necessary and functional medical equipment as required by federal law (including but not limited to a medical kit with clearly

marked contents and an operable AED machine), had American Airlines properly trained the airline personnel on board AA Flight 614 for in-flight medical events as required by federal law, and had airline personnel timely responded to Greenidge's medical emergency and effectively implemented the skills learned in their required training, Greenidge would not have experienced intense physical and emotional pain and tragically died at the age of 14.

91. Pursuant to Article 17(1) of the Montreal Convention, American Airlines "is liable for damage sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or bodily injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

92. Under the provisions of Article 17 of the Montreal Convention, American Airlines' conduct, including but not limited to the acts and omissions set forth above, constitutes an accident, in that it was an unexpected or unusual event or happening external to the passenger, Greenidge, and was causally linked to Greenidge's bodily injuries and ultimate demise.

93. Under the provisions of Article 17 of the Montreal Convention, American Airlines is liable for damages sustained by both Plaintiff Arzu and by Greenidge in the bodily injury and death of Greenidge that occurred on AA Flight 614.

**Spoliation of Evidence Material to Plaintiff's Montreal Convention Claim:**

94. Plaintiff hereby alleges and incorporates all paragraphs in the preceding sections by reference herein.

95. Plaintiff also seeks from this Court a finding that Defendant spoliated material evidence and the eventual submission of a spoliation instruction to the jury.

96. As set forth in detail in the preceding paragraphs, the flight personnel on board AA Flight 614 attempted to utilize an AED machine on minor Greenidge, and the AED did not work properly. Plaintiff's counsel has made numerous attempts to inspect the AED machine prior to filing

this suit. Based on conversations with American Airlines' counsel and the airline's refusal to permit inspection of the AED machine, it appears the AED machine has either been destroyed or put back into service and "lost."

97. Upon information and belief, Defendant American Airlines either no longer retains possession of the AED machine (and associated data) utilized on minor Greenidge or does not know where the machine is located.

98. Defendant American Airlines knew or reasonably should have known that there was a substantial chance that a wrongful death claim would be filed following the death of 14-year-old Greenidge.

99. Defendant knew or reasonably should have known that the AED machine (and associated data) utilized on minor Greenidge on AA Flight 614 is both material and relevant to Plaintiff's wrongful death claim against the airline.

100. Defendant had a duty to reasonably preserve evidence in the form of the AED machine (and associated data) utilized on Greenidge.

101. Specifically, Defendant should have removed the AED machine from service, created a copy and/or backup of the data contained on the AED machine, and ensured that both the AED machine and the data backup were preserved and available for discovery in subsequent litigation.

102. Defendant either intentionally or negligently breached its preservation duty by failing to preserve the AED machine utilized on Greenidge and the data contained therein.

103. By failing to preserve the AED machine utilized on Greenidge and the data contained therein, Defendant American Airlines acted with the subjective purpose of concealing or destroying discoverable evidence that is material to Plaintiff's case.

104. The AED machine (and associated data) utilized on Greenidge is materially relevant to key issues in Plaintiff's case. Among other things, Plaintiff alleges that American Airlines wrongfully delayed in utilizing the AED machine on Greenidge, that American Airlines personnel were not properly trained to use the AED machine that was on board AA Flight 614, that American Airlines personnel incorrectly utilized the AED machine on board AA Flight 614 on Greenidge, and that the AED machine utilized on Greenidge did not function properly. The AED machine and the data contained therein are materially relevant to each and every one of these key allegations.

105. Among other things, the missing evidence would provide concrete proof of key details and contested facts such as the exact time that the AED machine was turned on and utilized on Greenidge, how long the AED machine was utilized on Greenidge, and whether or not the AED machine delivered a shock to Greenidge's body.

106. As a result of Defendant's intentional or negligent conduct in failing to preserve the AED machine and its associated data, Plaintiff does not have access to the primary source of evidence regarding key elements of her allegations.

107. Moreover, if the AED was "put back into service" and cannot now be located, this too is a violation of 14 C.F.R. § 121.803(b)(1), which requires AA to regularly inspect each AED machine "to ensure its condition for continued serviceability and immediate readiness to perform its intended emergency purposes."

108. The AED machine utilized on Greenidge and the data contained therein is the best evidence of the performance, functionality, and maintenance of the AED machine and is not cumulative of other competent evidence that may be used instead of the spoliated device and data.

109. By failing to preserve the AED machine utilized on Greenidge and the data contained therein, Defendant American Airlines acted with the subjective purpose of concealing or

destroying discoverable evidence that is material to Plaintiff's case, and Defendant did, in fact, conceal or destroy discoverable evidence that is material to Plaintiff's case.

110. As a result of Defendant's spoliation of the AED machine utilized on minor Greenidge and the data contained therein, Arzu is entitled to a finding by this Court that Defendant spoliated material evidence, the submission of a spoliation instruction to the jury, and the prohibition of American submitting evidence or argument to the jury that the AED machine was properly maintained and in working order.

**COUNT II – LOSS OF CONSORTIUM UNDER MONTREAL CONVENTION**

111. Plaintiff hereby alleges and incorporates all paragraphs in the preceding section by reference herein.

112. Pursuant to Article 29 of the Montreal Convention, domestic law controls the issue of whether loss of consortium is cognizable.

113. Texas law permits a parent's loss of consortium claim resulting from the death of a minor child.

114. At all relevant times, Greenidge was the minor son of Arzu.

115. As alleged herein, Greenidge was seriously injured and ultimately died from a series of accidents that occurred while he was traveling internationally from Honduras to New York via American Airlines.

116. As a direct result of Greenidge's death caused by the accidents that occurred during Greenidge's international travel via American Airlines, Arzu has suffered a loss of consortium.

117. Pursuant to the pass-through provisions of Article 29 of the Montreal Convention and Texas law, American Airlines is liable for Arzu's loss of consortium.

Case 4:24-cv-00433-P Document 11 Filed 08/14/24 Page 17 of 21 PageID 268

## MONTREAL CONVENTION DAMAGES

118. Plaintiff hereby alleges and incorporates all paragraphs in the preceding sections by reference herein.

119. As a direct and proximate result of the aforesaid accidents, Greenidge was seriously injured and died.

120. As a direct and proximate result of the aforesaid accidents, Arzu and Greenidge were both caused to suffer great pain, distress, agony, and mental anguish.

121. As a direct and proximate result of the aforesaid accidents, Arzu and Greenidge were both caused to suffer great economic loss and, in the future, shall continue to suffer great economic loss.

122. As a direct and proximate result of the aforesaid accidents, Arzu and Greenidge were forced to expend great sums of money on medical treatment, transportation of Greenidge's remains, and funeral expenses.

123. As a direct and proximate result of the aforesaid accidents, Greenidge was caused to suffer the complete loss of all future income.

124. As a direct and proximate result of the aforesaid accidents, Arzu, as the administrator of Greenidge's estate, is entitled to compensation for the wrongful death of Greenidge, past and future lost earnings, past and future lost accumulations, past and future medical expenses, and mental anguish and suffering.

125. As a direct and proximate result of the aforesaid accident, Arzu, as an individual, is entitled to compensation for past and future loss of services, comfort, society, companionship, moral support, loss of consortium, and mental anguish and suffering.

**COUNT III – BREACH OF CONTRACT UNDER TEXAS LAW**

126. Plaintiff hereby alleges and incorporates all paragraphs in the preceding section by reference herein.

127. In addition to Plaintiff's claims under the Montreal Convention, there is a binding and enforceable contract between Greenidge and Defendant American Airlines, as set forth in Exhibits 1 – 4, attached to this Amended Complaint (the "AA Contract").

128. The AA Contract specifies that "[t]o the extent not preempted by federal law, Texas law applies to this contract and any dispute from your ticket purchase or travel on American Airlines without regard to conflict of law principles." See Exhibit 2 at 2.

129. Through the AA Contract's incorporation of Tariff No. AA1 and its "Rule 55 Liability of Carriers" provision (Exhibit 4 at 55-6), American Airlines altered the terms defining its liability and made contractual commitments to Greenidge (and his next of kin) that are separate and apart of its liability under the Montreal Convention. These changes include:

a. American Airlines limits its liability under the Convention.

   Specifically, for cases of bodily injury under Article 17 of the Convention, the AA Contract limits a passenger's special drawing rights to 113,100. Rule 55(C)(1)(a). Under the Convention, however, injured passengers are entitled to 128,821 in special drawing rights. *See* 85 FR 3104.

b. American Airlines waives its exoneration defense.

   Specifically, American agrees to "not invoke" its article 20 (exoneration) defense "in a manner inconsistent" with its commitment in paragraph 55(C)(1)(a) that it "shall not be able to exclude or limit its

liability for damages not exceeding 113,100 special drawing rights for each passenger." Rule 55(C)(1)(c).

c. <u>American Airlines agrees to make advance payments.</u>

Specifically, the AA Contract provides American Airlines "shall make an advance payment" up to the special drawing rights of 113,100 where American Airlines "determines it is necessary to meet the immediate economic needs of, and hardship suffered by" the passenger. Rule 55(C)(2). It further agreed to make this payment "without delay" for "an amount or amounts determined by the carrier in its sole discretion." Rule 55(C)(2)(a). These payments were to be made "as an advance against . . . liability" and subject to American Airlines' claimed rights to contest liability, seek contribution or indemnity from third parties, and/or to recover the advance payment. Rule 55(C)(2)(b)-(e).

d. <u>In the event of passenger death, American Airlines must make a payment of at least 16,000 Special Drawing Rights to the deceased passenger's next of kin.</u>

The AA Contract further states that "[i]n the event of <u>death of a Passenger</u>, the amount of the payment <u>shall not be less than</u> 16,000 Special Drawing Rights." Rule 55(C)(2)(a).

130. On April 9, 2024, Defendant was provided with notice of Plaintiff's significant pain, suffering, immediate economic needs, and general hardship associated with the loss of her minor son, Greenidge, entitling Plaintiff to at least 16,000 (and up to 113,100) in special drawing rights from American Airlines as an advance payment.

131. Defendant American Airlines was provided with notice establishing that the full value of the special drawing rights was necessary to meet the significant "hardship suffered by" Plaintiff as a result of the loss of her minor son, Kevin Greenidge.

132. The expenses associated with the preparation and international transportation of Kevin Greenidge's remains from Mexico to New York and his funeral expenses, alone, exceed the 16,000 Special Drawing Rights minimum owed by Defendant in the event of the death of a passenger.

133. Under the AA Contract, American Airlines was required to (1) make a determination of the "immediate economic needs of, and hardship suffered by" Plaintiff, (2) to make "as an advance" a payment sufficient to meet those needs, up to the contractual limit of 113,100 in special drawing rights, (3) because this had been an event involving the death of a passenger, make an advance payment of <u>at least</u> 16,000 in special drawing rights, and (4) to do the above "without delay" and without waiver of any defenses it may assert.

134. Upon information and belief, American Airlines has no written policy, procedure or guidance regarding the implementation of its contractual obligation to make advance payments under Rule 55(C)(2) of Tariff No. AA1.

135. Upon information and belief, American Airlines has no written policy, procedure or guidance regarding its obligation to make a determination of "the immediate economic needs of, and hardship suffered by" a passenger claiming bodily injury under Rule 55(C)(2) of Tariff No. AA1.

136. Upon information and belief, Defendant American Airlines has never made an advance payment to <u>any</u> injured passenger or the family of a deceased passenger.

137. Accordingly, Defendant breached the AA Contract by failing to perform.

138. Despite knowledge of passenger Greenidge's death and receipt of Plaintiff's demand for advance payment, Defendant did not tender the 16,000 Special Drawing Rights minimum owed by Defendant to Greenidge's next of kin under the terms of the AA Contract.

139. As of the date of this filing, Defendant has not tendered any advance payment to Plaintiff.

**CONTRACT DAMAGES**

140. Defendant's breaches caused Plaintiff to suffer damages by depriving her of her contractual right to advance payment.

141. As a result of Defendant's breaches of the AA Contract, Plaintiff has incurred and continues to suffer damages in the form of financial hardship, increased costs and expenses, and attorney's fees.

142. Plaintiff seeks and demand is hereby made for attorney's fees for Defendant's breach of the AA Contract pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code.

**DEMAND FOR JUDGMENT**

143. Plaintiff Arzu, as an Individual and as the Administrator of the Estate of Kevin Greenidge, Deceased, hereby demands judgment against Defendant American Airlines, Inc. in an amount to be determined at trial, together with attorney's fees pursuant to Tex. Civ. Prac. & Rem. Code § 38.001, *et seq.*, interest, costs, and disbursements of this action.

**DEMAND FOR JURY TRIAL**

144. Pursuant to Federal Rules of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims and issues so triable.

Dated: August 26, 2024

Respectfully submitted:

*/s/ Darren P. Nicholson*

Darren P. Nicholson
State Bar No. 24032789
Hannah M. Crowe
State Bar No. 24131156
Clay R. Mahaffey (*pro hac vice*)
Wyoming Bar No. 6-3355
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, TX 75202
Telephone: (469) 904-4550
dnicholson@burnscharest.com
hcrowe@burnscharest.com
cmahaffey@burnscharest.com

ATTORNEYS FOR PLAINTIFF

# Exhibit A-8

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| MELISSA SUZETTE ARZU, Individually and as the Administrator of the Estate of KEVIN GREENIDGE, Deceased, | § § § § | |
| Plaintiff, | § | CIVIL ACTION NO. 4:24-cv-00433-P |
| v. | § § § | |
| AMERICAN AIRLINES, INC., | § § | |
| Defendant. | § | |

**PLAINTIFF MELISSA SUZETTE ARZU'S RULE 26(a)(2) EXPERT DISCLOSURES**

Plaintiff Melissa Suzette Arzu, Individually and as the Administrator of the Estate of Kevin Greenidge, deceased ("Plaintiff") hereby furnishes the following information pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure.

**Rule 26(a)(2)(B): The following witnesses are ones retained or specially employed to provide expert testimony in this case or one whose duties as the party's employee regularly involve giving expert testimony. A written report accompanies this disclosure for each.**

1. Bonnie Hayes
   6015 King Road
   Double Oak, Texas 75077-7308
   Area of expertise: Air Carrier Access Act and airline policy and procedures for passengers with disabilities

2. Richard Lazar, Esq.
   Readiness Systems, LLC
   19215 SE 34th Street, #106-236
   Camas, Washington 98607
   Area of expertise: emergency medical services and automated external defibrillator

3. Captain (Ret.) Richard J. Levy
   Aviation Expert Consulting
   5105 River Hill Drive
   Flower Mound, Texas 75022
   Area of expertise: aviation

4. Kathleen Lord-Jones
   Robson Forensic
   1999 South Bascom Avenue, Ste. 700
   Campbell, California
   Area of expertise: aviation cabin safety

5. Thomas Roney
   Eric Lang Ph.D.
   Thomas Roney, LLC
   PO Box 2152
   Coppell, Texas 75019
   Area of expertise: economist

6. E. Lawrence Vincent, Esq.
   Burns Charest LLP
   900 Jackson Street, Suite 500
   Dallas, Texas 75202
   Area of expertise: attorney's fees

7. Corwin Warmink, MD
   4521 Cloudview Road
   Fort Worth, Texas 76109
   Area of expertise: pediatric emergency medicine

Dated: November 2, 2024

Respectfully submitted:

*/s/ Hannah M. Crowe*

Darren P. Nicholson
State Bar No. 24032789
Hannah M. Crowe
State Bar No. 24131156
Clay R. Mahaffey (admitted *pro hac vice*)
**BURNS CHAREST LLP**
900 Jackson Street, Suite 500
Dallas, TX 75202
Telephone: (469) 904-4550
dnicholson@burnscharest.com
hcrowe@burnscharest.com
cmahaffey@burnscharest.com

ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

I hereby certify that on November 2, 2024 the foregoing document was served electronically to all counsel of record pursuant to the Federal Rules of Civil Procedure.

*/s/ Hannah M. Crowe*
Hannah M. Crowe

# Exhibit A-9

***(Filed Under Seal)***

# Exhibit A-10

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**MELISSA SUZETTE ARZU,**

Plaintiff,

v. **No. 4:24-cv-00433-P**

**AMERICAN AIRLINES, INC.,**

Defendant.

## OPINION & ORDER

Before the Court are two cross-motions for summary judgment: one filed by Melissa Suzette Arzu, the administrator of the estate of Kevin Greenidge, and another filed by American Airlines Inc. ("American Airlines"). ECF Nos. 49, 53. Having considered both Motions, other relevant docket filings, and the applicable law, the Court will **DENY** Arzu's Motion and **GRANT** American Airlines' Motion.

## BACKGROUND

This case follows the tragic death of fourteen-year-old Kevin Greenidge. On June 4, 2022, Kevin boarded American Airlines Flight 614 from San Pedro Sula, Honduras to Miami, Florida. Kevin flew with his aunt Anna, his uncle Leonard, Leonard's partner Janell, and Leonard and Janell's daughter. Leonard, Janell, and their daughter sat in row 31. Anna and Kevin sat in row 32. Kevin sat in the window seat and Anna in the aisle seat. Nobody sat in the seat between Kevin and Anna.

Following a multi-hour weather delay, Flight 614 departed. After takeoff, Kevin asked Anna for his asthma inhaler to help him breathe, which Anna provided. But Kevin's breathing only worsened. Shortly after reaching altitude, Kevin became unconscious. Anna began calling for help, and Leonard unsuccessfully attempted to lift Kevin from his window seat in row 32.

When the flight attendants responded to Anna's calls, they found Kevin unconscious and unresponsive and called a Code Red. The flight attendants made multiple announcements requesting assistance from medically trained passengers. The first passenger to respond was Karenna Thatcher, a nurse. The second passenger to respond was Rachel Amador, a general surgeon. When Thatcher saw Kevin, she indicated that Kevin needed to be placed on the floor. With the help of multiple people, Kevin was removed from his seat and placed on the ground.

Once Kevin was on the ground, Thatcher and Amador, with the help of one flight attendant, began administering CPR. Another flight attendant brought a medical kit and an automated external defibrillator ("AED"). Thatcher and Amador set up the AED and placed the pads on Kevin. The flight deck was then alerted of the medical emergency, and just over an hour into the flight, the pilots began an emergency descent into Cancún International Airport at 7:33 p.m. The plane arrived at the gate at 7:50 p.m. During the descent, Amador and Thatcher continued administering CPR and applying the AED machine. Emergency medical services were waiting at the gate to transport Kevin to Amerimed Hospital via ambulance. Kevin was pronounced dead at 8:45 p.m. At the time of the flight, Kevin weighed 319 pounds and suffered from a host of diagnosed health complications including asthma, obesity, sleep apnea, and type II diabetes.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact" and "is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" if the evidence presented would allow a reasonable jury to return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" when it might affect the outcome of a case. *Id.* Generally, the "substantive law will identify which facts are material," and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.*

When determining whether summary judgment is appropriate, the Court views the evidence in the light most favorable to the nonmovant. *First Am. Title Ins. Co. v. Cont'l Cas. Co.*, 709 F.3d 1170, 1173 (5th Cir. 2013). In conducting its evaluation, the Court may rely on any admissible evidence available in the record but need only consider those materials cited by the parties. FED. R. CIV. P. 56(c)(1)–(3). The Court need not sift through the record to find evidence in support of the nonmovant's opposition to summary judgment; the burden falls on the moving party to simply show a lack of evidence supporting the nonmovant's case. *See Malacara v. Garber*, 353 F.3d 393, 404–05 (5th Cir. 2003).

## ANALYSIS

American Airlines' Motion seeks summary judgment on all three of Arzu's claims: (1) the Montreal Convention claim; (2) the loss-of-consortium claim; and (3) the breach-of-contract claim. Arzu's Motion only seeks summary judgment on her first and third claims. The Court will address each claim in the order presented in American Airlines' Motion.

### A. Montreal Convention Claim

Known formally as the Convention for Unification of Certain Rules for International Carriage by Air, the Montreal Convention is an international treaty to which the United States is a signatory. The Montreal Convention "applies to all international carriage of persons, baggage or cargo performed by aircraft for reward."[1]

Article 17 provides a remedy to passengers for damages caused by "accidents" on international flights.[2] Strict liability is imposed against air carriers "for damage sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft or in the course of any of the

[1]Convention for the Unification of Certain Rules for International Carrier by Air, art. 1(1), May 28, 1999, reprinted in S. TREATY DOC. NO. 106–45 (2000), 1999 WL 33292734, at *33 (1999) (hereinafter "Montreal Convention").

[2]*See id.* art. 17.

operations of embarking or disembarking."[3] "Accident" is not defined anywhere in the Montreal Convention. However, in *Air France v. Saks*, the Supreme Court of the United States clarified that an "accident" is "an unexpected or unusual event or happening that is external to the passenger." 470 U.S. 392, 395 (1985).[4] The *Saks* Court determined that "accident" should "be flexibly applied after assessment of all the circumstances surrounding a passenger's injuries." *Id.* at 405. In addition to identifying an unusual or unexpected event, liability only arises if "a passenger's injury is caused by [the] . . . event." *Id.* at 392. The Court further recognized that "[a]ny injury is the product of a chain of causes." *Id.* at 406. Thus, when evaluating causation, a plaintiff need only show that "some link in the chain was an unusual or unexpected event external to the passenger." *Id.*

Roughly twenty years after *Saks*, another Supreme Court case considered an "accident" that occurred when an airline's crew refused to help a passenger three times. *See Olympic Airways v. Husain*, 540 U.S. 644 (2004). In *Husain*, two airline passengers, husband and wife, boarded a flight that allowed smoking. *See id.* at 646–47. The husband suffered from asthma and was sensitive to secondhand smoke. *Id.* at 647. Upon boarding, the husband and wife were seated "three rows in front of the economy-class smoking section." *Id.* The wife told a flight attendant about the husband's condition and asked to be moved, but the flight attendant refused, saying the plane was full and she was too busy. *See id.* Following two more refusals by the flight attendant to aid the husband, the husband moved to the front of the plane to get fresh air but soon after began struggling to breathe and passed away. *Id.* at 648. The lower court determined that "the flight attendant's conduct in three

---

[3]*Id.*

[4]*Air France v. Saks* considered a claim under the Warsaw Convention, which predated the Montreal Convention. In 1999, the Montreal Convention replaced the Warsaw Convention, and courts have found that interpretations of the Warsaw Convention, such as in *Saks,* apply to the Montreal Convention. *White v. Emirates Airlines*, Inc., 493 Fed. App'x 526 (5th Cir. 2012) (citations omitted) (The Montreal Convention replaces the "Warsaw Convention and all of its related instruments and . . . eliminate[s] the need for the patchwork of regulation and private voluntary agreements.").

times refusing to move [the husband] was unusual or unexpected" and therefore constituted an "accident." *Id.* at 652. The lower court's finding of an "accident" was not challenged on appeal. *Id.* As for causation, and despite the husband's pre-existing asthma condition, the Supreme Court found that the "flight attendant's refusal on three separate occasions to move [the husband]" was "a link in the chain of causes that led to [the husband's] death." *Id.* at 653 (quotations omitted). Thus, the plaintiffs also proved causation. *Id.*

On the other hand, courts have found that a flight crew's "imperfect" response to a passenger's medical emergency does not necessarily constitute an "accident." *See, e.g.*, *White v. Emirates Airlines, Inc.*, 493 Fed. App'x 526, 531 (5th Cir. 2012). For example, in *White*, a man and his mother traveled aboard an Emirates Airlines flight from Dubai to Houston. *Id.* at 527. As the plane began its descent, the mother used the lavatory, and five minutes later, a flight attendant found that the mother had collapsed. *Id.* The flight crew took the mother out of the lavatory, placed her on the ground, administered oxygen through a mask, and alerted the captain. *Id.* The plaintiff alleged that the flight crew's non-compliance with the man's request that the flight crew perform CPR or use a defibrillator constituted an "accident." *Id.* at 530–31. But the Fifth Circuit affirmed the district court's grant of summary judgment in the airline's favor because "a flight crew's arguably imperfect response to a passenger's medical emergency does not necessarily constitute an Article 17 'accident.'" *Id.* at 531.

Plaintiff alleges that the American Airlines crew's response to Kevin's emergency included four different "accidents": (1) failure to immediately notify the flight deck; (2) failure to immediately administer CPR; (3) failure to contact the physician on call; and (4) failure to establish and adhere to emergency team roles. ECF No. 55 at 22–28. All four relate to policies found in the American Airlines Inflight Manual.

For the first, the Inflight Manual requires that flight attendants contact the flight deck immediately in the event of a medical emergency. ECF No. 56, App. 045. Plaintiff argues that the evidence shows such notification did not occur immediately. *See* ECF No. 55 at 22. Rather, finding Kevin unconscious and unresponsive, the flight attendant

waited until Kevin was transferred from his seat to the galley, Thatcher and Amador began administering CPR, and the AED began analyzing Kevin's heart rhythm; only then was the flight deck notified. *Id.*

As for the alleged failure to immediately administer CPR, the Inflight Manual directs that CPR be "administered immediately" if an unconscious person is not breathing and there are no signs of life. ECF No. 56, App. 058. Plaintiff contends the flight crew did not immediately administer CPR. ECF No. 55 at 24. Instead, the flight attendants waited for medically trained passengers to arrive and for Kevin to be removed from his seat and placed in the galley. *Id.* At this time, Amador initiated CPR. *Id.*

Next, Arzu points out that the Inflight Manual states that when there is a "Code Red," the crew should contact the physician on call. ECF No. 56, App. 042. The physician on call is a doctor "specially trained in handling inflight medical emergencies and advising which diversion city is most capable of handling the ill/injured person's condition." *Id.* The flight crew never contacted the physician on call.

Lastly, the Inflight Manual requires that flight attendants establish and adhere to certain roles during an inflight emergency. ECF No. 56, App. 057. Those roles include establishing a communicator, responder, and runner. *Id.* Arzu asserts that such roles were not clearly established by the flight crew. ECF No. 55 at 26. For example, one flight attendant was acting as both the runner and the communicator. *Id.*

Even under Arzu's version of the facts, the American Airlines crew's response to Kevin's emergency does not amount to an "accident" under the Montreal Convention.[5] This case is unlike other cases in which

---

[5]In reaching this holding, the Court notes its agreement with Judge Edward C. Burks of the Supreme Court of Virginia, who in 1878, and writing in an equally heartrending opinion, stated: "The unhappy condition of the appellee excites my commiseration; but courts of justice are not allowed to be controlled in their decisions by considerations of that character. 'Compassion,' said an eminent Virginia chancellor, 'ought not to influence a judge, in whom, acting officially, apathy is less a vice than sympathy.'" *Harris v. Harris*, 72 Va. 31 Gratt. 13, 32 (1878) (quoting Chancellor George Wythe, Commentary on *Field's Ex'x v. Harrison & wife, in* Wythe's Reports 282 (Minor's Ed. 1794)).

courts have found an "accident." For example, the facts here are not analogous to those in *Husain*, where the flight crew's multiple refusals to move the husband from the smoking section constituted an "accident." To the contrary, the four instances highlighted by Arzu reflect concerted efforts by the crew to provide emergency assistance to Kevin.

Moreover, courts have found that a departure from an airline's policy does not necessarily mean that an "accident" occurred. *See Blansett v. Cont'l Airlines, Inc.*, 379 F.3d 177, 182 (5th Cir. 2004). In *Blansett*, the Fifth Circuit held that there is *no per se* rule that any deviation from an airline's policy would constitute an "accident." *Id.* Instead, any departure from policy must still undergo the "unexpected or unusual" analysis. *See id.* at 181–82.

For this reason, this case more closely resembles *White*, in which the Fifth Circuit determined no accident occurred. *White*, 493 Fed. App'x. at 535. Just as in *White*, here it is "undisputed . . . that the [American Airlines] flight crew responded to [Kevin's family's] request for medical assistance." *Id.* at 531. The Court accepts Arzu's contentions that there may have been reactionary delays, confusion of roles, and departures from policy, such as the failure to contact the physician on call. Notwithstanding all of that, the flight crew "took action to assist" Kevin in multiple ways. *Id.* at 531. The flight attendants sought medical assistance from other passengers, provided a medical kit and AED machine, and alerted the flight deck to facilitate a diversion to Cancún for quicker medical attention. The Court has little doubt that the American Airlines crew could have done *more* to aid Kevin.[6] In fact, there is rarely, if ever, a perfect response to a medical emergency. But ultimately, even accepting Arzu's recitation of the facts, the failure of American Airlines to follow all relevant procedures, "when evaluated in context . . . was not unusual or unexpected." *Id.* at 534.

Kevin's underlying conditions also suggest that the flight crew's response was not unusual or unexpected. Again, the unusual and unexpected inquiry must be applied "flexibly" after "assessment of all

[6]The same argument was made in *White*. *See White*, 493 Fed. App'x at 531 ("[Plaintiff] faults the flight crew for failing to do more.").

the circumstances surrounding a passenger's injuries." *Saks*, 470 U.S. at 405. The Court finds that Kevin's pre-existing conditions including asthma, obesity, sleep apnea, and diabetes complicated the flight crew's emergency response efforts. Indeed, amid the various emergency protocols, the crew also navigated the unexpected difficulty of removing Kevin from his seat, which required assistance from multiple passengers. As a consequence, CPR could not be administered immediately because Kevin needed to be placed on the floor first, as Amador and Thatcher directed. This complication also likely contributed to the delay in alerting the flight deck of the emergency. Any deficiency in following the protocol can, at least to some extent, be attributed to unique challenges presented in this situation.

For these reasons, the Court finds that American Airlines' response to Kevin's medical emergency does not constitute an "accident" under the Montreal Convention and will therefore grant summary judgment in favor of American Airlines on this claim.[7]

### B. Loss-of-Consortium Claim

Under Texas law, a loss-of-consortium claim is a derivative claim. *See, e.g.*, *Brewerton v. Dalrymple*, 997 S.W.2d 212, 217 (Tex. 1999). Arzu's loss-of-consortium claim is derivative of her Montreal Convention claim. Accordingly, given the Court's ruling on Arzu's Montreal Convention claim that there was no "accident," American Airlines is also entitled to summary judgment on the loss-of-consortium claim.

### C. Breach-of-Contract Claim

Both Parties move for summary judgment on Arzu's breach-of-contract claim. American Airlines makes two arguments: (1) that Arzu's breach-of-contract claim is preempted by the Montreal Convention; and (2) that American Airlines' decision to make a payment was merely discretionary under the terms of the contract and therefore the claim

---

[7]Given the Court's ruling, it need not determine whether American Airlines was the "cause" of Kevin's death. And as a result, American Airlines' Motion for Leave to File Reply Appendix concerning expert opinion on the cause of Kevin's death is unnecessary. ECF No. 72.

fails as a matter of law. Arzu disputes both contentions and argues that there is no genuine dispute of material fact that American Airlines owes Arzu 16,000 Special Drawing Rights ("SDR")[8] as a mandatory, minimum payment. The Court will first discuss whether the breach-of-contract claim is preempted by the Montreal Convention before determining whether the agreement required a discretionary or mandatory payment from American Airlines.

1. <u>Preemption by the Montreal Convention</u>

As discussed above, the Montreal Convention applies to "accidents" that occur during the course of an international flight.[9] Generally, the Montreal Convention provides an exclusive remedy to address injuries under its purview.[10] This is true even if "a passenger['s] . . . injury is not compensable under the Convention," as the Court has found here. *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 160 (1999); *see also Best v. BWIA W. Indie Airways Ltd.*, 581 F. Supp. 2d 359, 362 (E.D.N.Y. 2008) (citations omitted) ("By its own terms, the [Montreal Convention], where applicable, preempts the remedies of a signatory's domestic law, whether or not the application of the [Montreal] Convention will result in recovery in a particular case.").

Nonetheless, as cited by Arzu, there are instances where the Montreal Convention does not preempt contractual claims based on *nonperformance*. *See Nankin v. Cont'l Airlines, Inc.*, No. CV-09-07851, 2010 WL 342632, at *7 (C.D. Cal. Jan. 29, 2010) (finding the Montreal Convention not applicable to plaintiffs' claims because airlines refused to perform the contract); *Mullaney v. Delta Air Lines, Inc.*, No. 08-civ-7324, 2009 WL 1584899, at *3 (S.D.N.Y. June 3, 2009) (same); *In re Nigeria Charter Flights Contract Litig.*, 520 F. Supp. 2d 447, 455 (E.D.N.Y. 2007) (same); *Weiss v. El Al Israel Airlines, Ltd.*, 433 F. Supp.

---

[8]Approximately $21,000 USD.

[9]*See* Montreal Convention, art. 17.

[10]*Id.* art. 29 ("In the carriage of passengers . . . any action for damages, however founded, whether under this Convention or in contract or in tort or otherwise, can only be brought subject to the conditions and such limits as are set out in this Convention . . . .").

2d 361, 369 (S.D.N.Y. 2006) (same). In each of these cases, the plaintiff's contract claim dealt with an airline failing to transport a passenger. The court in each case concluded that such nonperformance by the airline was not preempted by the Montreal Convention because such "claims [do] not fall within the scope of the Montreal Convention." *See, e.g.*, *Nankin*, 2010 WL 342632, at *7 (citations omitted). Arzu contends that, like these cases, American Airlines failed to perform its contractual obligations by not tendering an advance payment of at least 16,000 SDR following Kevin's death on Flight 614.

But unlike the cases Arzu cites, her claim of nonperformance does not deal with an airline failing to transport Kevin. This distinction is important because in *Nankin*, for example, the court reasoned that the Montreal Convention would preempt passengers' claims for "delays" but not nonperformance of transportation. *Id.* And "courts scrutinize the facts to determine whether the claim" actually related to a refusal to transport or just a delay. *Id.* Thus, the cases cited by Arzu do not suggest that *all* suits involving nonperformance of contracts avoid preemption by the Montreal Convention. Rather, they stand for the proposition that an airline's nonperformance of *transportation* is not preempted because such claims fall outside the scope of the Montreal Convention.

For this reason, if the Court concluded that Arzu's nonperformance claim of the advance payment was not preempted by the convention, such a holding would expand the preemption exceptions set forth in Arzu's cases. The Court is further wary of making such a determination given that the nonperformance of the advance payment is directly tied to Kevin's death on Flight 614, and the death of a passenger on an international flight is indisputably covered by the Montreal Convention.

Nonetheless, the Court need not decide whether the breach-of-contract claim was preempted by the Montreal Convention because the Conditions of Carriage are unambiguous and merely provide for a discretionary payment by American Airlines. Therefore, the Court declines to rule on whether Arzu's breach-of-contract claim is preempted by the Montreal Convention.

2. <u>Mandatory vs. Discretionary Nature of Contract</u>

As discussed above, the Conditions of Carriage are unambiguous and do not require any mandatory payment by the "carrier": American Airlines. The Conditions of Carriage provides in relevant part:

> (2) In cases of bodily injury or death, the Carrier shall make an advance payment where [American] determines it is necessary to meet the economic needs of, and hardship suffered by, a Passenger as provided under the following paragraphs:
>
> (a) Unless a dispute arises over the identity of the person to whom an advance payment shall be made, [American] shall, without delay, make the advance payment to the Passenger in an amount or amounts determined by the Carrier in its sole discretion. In the event of death of a Passenger, the amount of the advance shall not be less than 16,000 Special Drawing Rights, which shall be paid to a representative of the Passenger's next of kin eligible to receive such advance payment as determined by [American] in its sole discretion.

ECF No. 18-3 ¶ 2.

The plain language of the Conditions of Carriage suggests that American Airlines' advance payment in the event of a passenger's death was non-mandatory. As a threshold to making an advance payment for bodily injury or death of a passenger, American Airlines must "determine[] it is necessary to meet the immediate economic needs of, and hardship suffered by, a Passenger . . . ." *Id.* Subparagraph (a) then says that, "in the event of death of a Passenger, the amount of the advance payment shall not be less than 16,000 Special Drawing Rights . . . ." *Id.* ¶ 2(a). Thus, American Airlines must *first* determine that such an advance payment is necessary to meet the needs of a Passenger, and *second*, if such a determination is made, and a death of a passenger occurred, the payment must not be less than 16,000 SDR. Given this threshold requirement, American Airlines was not obligated to make any advance payment. And failure to make a discretionary payment

does not constitute a breach of contract under Texas law. *See, e.g.*, *Farmer v. Ben E. Keith Co.*, 919 S.W.2d 171, 177 (Tex. App.—Fort Worth 1996, no writ) (employer's failure to make a discretionary payment to employee did not constitute breach of contract).[11]

For these reasons, the Court finds there is no genuine dispute of material fact that American Airlines did not breach any agreement, and summary judgment should be entered on behalf of American Airlines.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Arzu's Motion. ECF No. 53. The Court **GRANTS** American Airlines' Motion and **ENTERS** summary judgment in American Airlines' favor on all three counts. ECF No. 49. Given the Court's rulings, the Court further finds that American Airlines' Motion for Leave to File Reply Appendix is **MOOT**. ECF No. 72.

**SO ORDERED** on this **8th day of May 2025.**

Mark T. Pittman

**MARK T. PITTMAN**
UNITED STATES DISTRICT JUDGE

[11]The Parties make various contentions about the origin of the contractual language. American Airlines argues that the Conditions of Carriage originate from the Montreal Convention itself, further confirming that its provisions are potentially preempted by the Convention. Arzu argues that the language is taken from an order by the Department of Transportation ("DOT") and that American Airlines is estopped from making its argument that the advance payment is discretionary given previous arguments made by American Airlines' representative trade organization before DOT. Regardless, "[i]f a contract is unambiguous on its face, the contract's meaning and intent of the parties must be sought within the four corners of the document and cannot be explained or contradicted by extrinsic evidence." *Shocklee v. Mass. Mut. Ins. Co.*, 369 F.3d 437, 439–40 (5th Cir. 2004). A determination of the origin of the Conditions of Carriage is therefore unnecessary for this Court because the language of the agreement is clear—the advance payment was non-mandatory.

# Exhibit A-11

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| MELISSA SUZETTE ARZU, Individually and as the Administrator of the Estate of KEVIN GREENIDGE, Deceased, | § § § § | |
| Plaintiff, | § | CIVIL ACTION NO. 4:24-cv-00433-P |
| | § | |
| v. | § | Plaintiff's Sur-Reply to Defendant's Reply and Brief in Support of its Motion for Summary Judgment |
| AMERICAN AIRLINES, INC., | § § | |
| Defendant. | § | |

**PLAINTIFF'S SUR-REPLY TO DEFENDANT'S REPLY**
**<u>AND BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiff Melissa Suzette Arzu, Individually and as the Administrator of the Estate of Kevin Greenidge, deceased ("Plaintiff"), submits this Sur-Reply to Defendant American Airlines, Inc.'s ("Defendant" or "American") Reply and Brief in Support of its Motion for Summary Judgment. Plaintiff respectfully shows the Court as follows:

## INTRODUCTION

Notwithstanding the new evidence and arguments American advances in its Reply, American's Motion for Summary Judgment still fails. American's new evidence and arguments are premised entirely on the airline's misstatement of the relevant Montreal Convention "accident" inquiry and persistent misrepresentation of what a plaintiff must demonstrate to survive a summary judgment challenge. American also grossly mischaracterizes Dr. Warmink's expert testimony, while failing to proffer <u>any</u> expert evidence of its own.

Case 4:24-cv-00433-P Document 80 Filed 01/10/25 Page 2 of 8 PageID 2489

### A. The Relevant Montreal Convention "Accident" Inquiry is Whether an Unusual or Unexpected Event Occurred on Flight 614.

American moved for summary judgment on the basis that no "accident" occurred on Flight 614 that would give rise to liability under the Montreal Convention. As explained by the Supreme Court, an "accident" under the Convention is an "unexpected or unusual event or happening that is external to the passenger." *Olympic Airways v. Husain*, 540 U.S. 644, 646, (2004) (emphasis added)[1]; *see* Dkt. 50 at 6. American did not move for summary judgment on the separate issue of "negligence," where American carries the burden of proof. Montreal Convention, art. 21(2) ("The carrier shall not be liable . . . if the carrier proves that: (a) such damage was not due to the negligence or other wrongful act or omission of the carrier or its servants or agents; or (b) such damage was solely due to the negligence or other wrongful act or omission of a third party.") (emphasis added); *see, e.g.*, *Delgado v. Delta Air Lines, Inc.*, 2013 WL 9838339, at *4 (S.D. Fla. Oct. 31, 2013) (confirming the airline carrier bears the burden of proof on liability); *Mansour v. British Airways PLC*, 2020 WL 1847750, at *3 (W.D. Wash. Apr. 13, 2020) ("[t]he burden of proving non-negligence is on Defendants").

In its Reply, American cites to "survivability statistics" at "hospital discharge" and argues for the first time that "the relevant inquiry is whether, within a reasonable degree of medical certainty, Kevin would have survived the medical event—not whether he would have survived transportation to the hospital." Dkt. 74 at 5. Not surprisingly, American's Reply cites no case to support this new proposition. Proving a plaintiff would survive "at hospital discharge" is not, and has never been, the test for whether an "accident" giving rise to liability under the Montreal Convention occurred on an international flight. On the contrary, at trial a Plaintiff "need only prove

---

[1] American is correct that Plaintiff "relies heavily on *Husain*" [Dkt. 75 at 6; *see also* Dkt. 63-1 at 19]. *Husain* is one of the two seminal Supreme Court cases on the Convention's "accident" inquiry.

that some link in the chain was an unusual or unexpected event" external to Kevin, not that Kevin "would have survived at hospital discharge" or at any other point in the future. *Husain*, 540 U.S. at 644–45 (emphasis added) (internal quotations omitted).[2]

## B. Plaintiff Need Not Prove "Proximate Cause" to Defeat American's Motion for Summary Judgment.

More fundamentally, American's Reply misstates the summary judgment standard and argues that Plaintiff must prove "the complained of accident ***proximately caused*** Kevin's injury or death." Dkt. 74 at 2 (emphasis in original). This is the wrong summary judgment standard.

Under the Montreal Convention, at summary judgment a Plaintiff need only "present evidence sufficient to create a triable issue of fact . . . that [a passenger's] injuries would have been in any way reduced had the flight crew acted differently." *Dizon v. Asiana Airlines, Inc.*, 240 F. Supp. 3d 1036, 1045 (C.D. Cal. 2017) (emphasis added). In responding to Defendant's motion, Plaintiff need only "present evidence sufficient to create a triable issue of fact that Defendant's conduct was a link in the causal chain of [Kevin's death]." *Id.* at 1045 (emphasis added). Plaintiff has more than done so here. *See, e.g.*, Dkt. 54, Appx. 197, 201, Ex. 32, Warmink Report ("[T]he delay in initiation of cardiopulmonary resuscitation coupled with the delayed and ineffectual automatic external defibrillator usage contributed to Kevin Greendige not surviving this event."); Appx. 001, 003, Ex. 17, Warmink Dec. ¶ 5 ("[I]t is my opinion . . . Kevin Greendige ("Kevin") more likely than not would have survived his cardiac arrest on Flight 614 had the American flight

[2] American's invention of survival "**at hospital discharge**" as the "relevant inquiry" is bizarre and at odds with the plain text of the Convention. Dkt. 74 at 5 (emphasis in original). An international carrier's duty is to transport passengers from one country to another. Accordingly, the benefits and burdens of the Convention begin at boarding and end at deplaning. Montreal Convention, art. 17(1) ("The carrier is liable for damage sustained in the case of death . . . t[aking] place on board the aircraft or in the course of any of the operations of embarking or disembarking.") (emphasis added).

crew promptly initiated cardiopulmonary resuscitation (CPR) and effectively utilized a functional automatic external defibrillator (AED)."); *see also*, *Parnass v. Brit. Airways, PLC*, 2021 WL 4311342, at *7 (S.D.N.Y. Sept. 21, 2021) ("The report alone raises questions of material fact related to causation sufficient to overcome summary judgment; that is, Plaintiff's expert suggests that Plaintiff's injury was at least related to the events on the May 29 flight, while Defendant suggests that the injury entirely predated it. *See, e.g.*, Report of Robert Meislin, M.D. [ECF No. 98-2] ("I conclude that his left knee injury relates to flight of May 29, 2017."). This disputed issue of fact must be resolved by a jury.") (emphasis added).

Plaintiff need not "prove" anything to defeat American's Motion for Summary Judgment. Plaintiff need only present evidence demonstrating a "genuine dispute of material fact." *Golatt v. Perot Museum of Nature and Science*, 659 F. Supp. 3d 745, 750 (N.D. Tex. 2023) (stating nonmoving party "must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact").[3] Plaintiff has done so here.

**C. American Mischaracterizes Dr. Warmink's Opinion and Supporting Materials.**

American's Reply argues that "Plaintiff has not adduced competent medical expert opinion to support a finding that any of the flight crew's complained-of actions or inactions caused Kevin's death." Dkt. 74 at 3. American's Reply also directly attacks Dr. Warmink, arguing that "Dr. Warmink has ***never*** opined that Kevin would have survived his cardiac arrest," that Dr. Warmink "materially misrepresent[s] [the Menant] study's findings" and that Dr. Warmink "conce[ded]" that the Weisfeldt Study "is inapplicable to the case at hand." Dkt. 74 at 3–4. All of this is simply wrong.

[3] The conflicting record regarding who operated the onboard AED, whether the machine delivered a shock (and if so, how many), and what these "shocks" looked like more than raises triable issues of fact sufficient to defeat American's Motion for Summary Judgment. Dkt. 66-1 at 7–9.

First, Dr. Warmink's opinion that "**Kevin more likely than not would have survived his cardiac arrest on Flight 614 had the American flight crew promptly initiated cardiopulmonary resuscitation (CPR) and effectively utilized a functional automatic external defibrillator (AED)**" [Appx. 001, 003, Ex. 17, Warmink Dec. ¶ 5–6] is informed not only by the Menant Study, but also by the Weisfeldt Study, other scholarly articles, Kevin's medical records, Kevin's autopsy report, and Dr. Warmink's own specialized knowledge and extensive experience as the Medical Director of the Emergency Department and Chief Clinical Officer at Cook Children's. *See, e.g.*, Dkt. 66-1 at 4–5, 15–16. While American may disagree with Dr. Warmink's opinions, they are by definition "triable issues of fact" that defeat American's Motion for Summary Judgment.

Second, Dr. Warmink did not "disclaim the [Weisfeldt] study providing the 86% chance of survival because it evaluated only adult patients, not pediatric patients." Dkt. 72 at 3–4. Dr. Warmink also did not testify that the Weisfeldt Study is "not applicable to Kevin." *Id.* at 4. Rather, Dr. Warmink stated (correctly) that the Weisfeldt Study participants were not "equivalent" to those in the Menant Study because the Weisfeldt Study included adults, while the Menant Study included only pediatric patients. *See* Dkt. 72 at 4 (quoting Dr. Warmink's deposition testimony). Dr. Warmink properly relied on the Weisfeldt Study and listed it as a source in his January 2025 Report. *See* Dkt. 54, Appx. 194, 195, Ex. 31, January 2025 Warmink Report; *see also* Appx. 001, 003, Ex. 17, Warmink Dec. ¶ 6.

Third, American's Reply attempts to obfuscate Dr. Warmink's overall opinion by directly attacking the Menant Study. Putting aside the fact that American proffers no expert testimony to address the Menant Study or otherwise support its Motion for Summary Judgment or Reply, its citation to the Menant Study's "hospital discharge" statistic is irrelevant. Dkt. 74 at 4–5. The

"accident" inquiry under the Convention is whether American unexpectedly or unusually deviated from airline protocol, and if that deviation served as a "link in the chain" of events **resulting in Kevin's death on Flight 614**. *Husain*, 540 U.S. at 645. Conjecture about what would have happened to Kevin had he not died on the flight has no bearing on the inquiry of whether an "accident" happened on the flight that was a "link in the chain" of events that caused Kevin's death on the flight. Notably, American did not question Dr. Warmink about these conclusions during his deposition. Had Dr. Warmink been asked about the 34.3% survival at hospital discharge statistic in the Menant Study, Dr. Warmink would have testified that the discharge statistic is inapplicable to Kevin because it "did not exclude children who suffered cardiac arrest as a result of severe trauma, congenital heart defects, and terminal illnesses, which Kevin did not have." Appx. 001, 003, Ex. 17, Warmink Dec. ¶ 7. Dr Warmink's review of Kevin's medical records and post-mortem autopsy report revealed that Kevin suffered from none of these conditions. *Id.* Moreover, Dr. Warmink's review of the medical evidence revealed that "Kevin did not have a condition that precluded him from being resuscitated or from surviving following resuscitation." *Id.* at ¶ 8.

Fourth, American's footnote citation to the 3.52% survivability of patients with an initial non-shockable rhythm is likewise irrelevant. Dkt. 74 at 5. A primary allegation in Plaintiff's case—borne out by the evidence—is that American unusually and unexpectedly delayed in providing basic life support to Kevin in explicit violation of the American Airlines Inflight Manual and flight attendant training. *See, e.g.*, Dkt. 54, Appx. 131, 135–36, Ex. 24, Amador Dep. 19:20–20:1 (testifying that "nothing was really being done" by the time Dr. Amador arrived at Kevin's row after responding to a second overhead request for passenger assistance). As Dr. Warmink testified, the AED data American produced demonstrates Kevin "got [] back to shockable rhythm" during Flight 614 and that "his heart probably was initially in a shockable rhythm" before the delay in

getting him treatment. Dkt. 54, Appx. 114, 148, Ex. 27, Warmink Dep. 57:6–8; *see also id.* at 70:19–23 ("So to say like, "Oh, hey, he was in a non-shockable rhythm when we put on the AED," it's like, well, yeah, he was probably in a non-shockable rhythm because it took quite some time to get him on to that AED.").

**D. American Has No Countervailing Expert Evidence.**

Finally, and most importantly, American's focus on Dr. Warmink's opinions underscores the fact that American's Motion for Summary Judgment and Reply are <u>unsupported by any expert opinion at all</u>. To attack the expert opinion offered by Dr. Warmink, the Chief Clinical Officer at Cook Children's, American's Motion and Reply offers nothing more than the *ipse dixit* of its own lawyers. This is not evidence, much less a basis to ignore the opinions of Dr. Warmink and grant summary judgment.

**CONCLUSION**

The Court should deny American's Motion for Summary Judgment.

Dated: April 10, 2025

Respectfully submitted:

*/s/ Hannah M. Crowe*

Darren P. Nicholson
State Bar No. 24032789
Hannah M. Crowe
State Bar No. 24131156
Clay R. Mahaffey (*pro hac vice*)
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, TX 75202
Telephone: (469) 904-4550
dnicholson@burnscharest.com
hcrowe@burnscharest.com
cmahaffey@burnscharest.com

ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

On April 10, 2025, this Motion was served on Defendant, in compliance with Federal Rule of Civil Procedure 5(b)(1), (2)(E), by filing it with the Court's electronic-filing system.

*/s/ Hannah M. Crowe*
Hannah M. Crowe

# Exhibit A-12

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| MELISSA SUZETTE ARZU, Individually and as the Administrator of the Estate of KEVIN GREENIDGE, Deceased, | § | |
| Plaintiff, | § | |
| v. | § | Civ. No. 4:24-cv-00433-P |
| AMERICAN AIRLINES, INC., | § | |
| Defendant. | § | |

**<u>SECOND AMENDED COMPLAINT</u>**

In accordance with the Court's June 23, 2026, Order [Dkt No. 96], Plaintiff Melissa Suzette Arzu, as an individual and as the Administrator of the Estate of Kevin Greenidge, Deceased ("Plaintiff"), by her undersigned counsel, brings her Second Amended Complaint[1] against Defendant American Airlines, Inc. ("Defendant") and alleges as follows:

**<u>INTRODUCTION</u>**

1. This civil action arises out of personal injuries to and the wrongful death of 14-year-old Kevin Greenidge ("Greenidge"), who died following an accident that occurred while he and his family were traveling internationally via American Airlines from Honduras to New York.

2. While in flight, Greenidge experienced a medical emergency and became unconscious. Greenidge's family immediately yelled out for assistance, but American Airlines' flight personnel delayed in responding to their cries for help and failed to render effective aid.

---

[1] Plaintiff files this Amended Complaint without waiver of any right to appeal the Fifth Circuit's affirmance of the dismissal of certain claims.

3. Among other things, American Airlines was required by federal law to equip AA Flight 614 with an automated external defibrillator ("AED"). But when medically trained passengers attempted to use the onboard AED on Greenidge, the machine did not function properly.

4. Had AA Flight 614 been properly equipped with a functioning AED machine as required by federal law, Greenidge would not have experienced the intense physical and emotional pain he suffered on AA Flight 614, and he more likely than not would have survived.

5. Tragically, and as a direct result of American Airlines' failures outlined in this Amended Complaint, Greenidge passed away at the young age of 14 years old.

**PARTIES**

6. Plaintiff Melissa Suzette Arzu and her son, Kevin Greenidge, Deceased, have been, at all relevant times, residents of the State of New York, residing in the County of The Bronx, and citizens of the United States of America.

7. Melissa Suzette Arzu ("Arzu") was appointed as the Administrator of the Estate of her minor son, Kevin Greenidge, Deceased ("Greenidge"), by the Bronx County Surrogate's Court on October 27, 2022 pursuant to Section 702(1) of the New York Surrogate's Court Procedure Act.

8. Defendant American Airlines, Inc. ("American Airlines") is incorporated under the laws of the State of Delaware and headquartered in the State of Texas.

9. On and before June 4, 2022, Defendant American Airlines was in the business of selling tickets for international carriage of passengers.

10. On and before June 4, 2022, Defendant American Airlines operated services for the carriage of passengers by air and conducted its business of carriage of passengers by air from

premises leased or owned by American Airlines itself, or by another carrier with which it has a commercial agreement, at the Dallas Fort Worth International Airport in Texas.

**JURISDICTION**

11. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because a federal question is presented pursuant to the Convention for the Unification of Certain Rules for International Carriage by Air done at Montreal on May 28, 1999 (hereinafter "Montreal Convention").

12. This Court has general personal jurisdiction over American Airlines because American Airlines is headquartered in Fort Worth, Texas.

13. Jurisdiction and venue are proper in this District pursuant to Article 33(1) of the Montreal Convention and 28 U.S.C. § 1391(b) because American Airlines is domiciled and has its principal place of business in Fort Worth, Texas.

**FACTUAL ALLEGATIONS**

14. On June 4, 2022, Greenidge embarked on a flight itinerary under American Airlines Confirmation Number UDUZFG to fly internationally from Ramón Villeda Morales International Airport ("SAP") in Honduras to LaGuardia Airport ("LGA") in New York.

15. Greenidge's UDUZFG American Airlines itinerary included roundtrip travel on American Airlines from New York to Honduras on May 28, 2022 and June 4, 2022.

16. On May 28, 2022, Greenidge traveled via American Airlines from New York to Honduras on American Airlines Flight 1249 ("AA Flight 1249") from LGA to Miami International Airport ("MIA") and American Airlines Flight 1635 from MIA to SAP.

17. On June 4, 2022, the return portion of Greenidge's international itinerary included American Airlines Flight 614 ("AA Flight 614") from SAP to MIA, an approximate two-hour layover in MIA, and American Airlines Flight 1171 ("AA Flight 1171") from MIA to LGA.

18. Greenidge was a New York resident and a citizen of the United States of America.

19. A true and accurate copy of Greenidge's American Airlines itinerary is attached to this Second Amended Complaint as **Exhibit 1** and incorporated herein by reference.

20. At all relevant times, AA Flights 614 and 1171 were operated and controlled by Defendant American Airlines, acting by and through its authorized employees and/or agents.

21. Greenidge was traveling from Honduras to New York with several members of his family.

22. On AA Flight 614 from Honduras to Miami, Greenidge and his family were seated at the back of the airplane in rows 31 and 32.

23. During AA Flight 614, Greenidge experienced a medical emergency.

24. Greenidge's family members immediately started yelling out for help.

25. Greenidge became unconscious and was unresponsive.

26. Greenidge's uncle began trying to transfer unconscious Greenidge from his window seat to the aisle.

27. After some delay, two flight attendants responded to Greenidge's family's urgent calls for help and came to the back of the airplane to assess the situation.

28. At least one member of the airline personnel team was panicking and appeared to have no idea what to do during Greenidge's medical emergency.

29. Multiple overhead announcements were made requesting the assistance of any medical personnel on board the airplane.

30. A doctor and a nurse came to Greenidge's row to render aid.

31. The doctor took control of the chaotic situation and organized the response to Greenidge.

32. Greenidge was eventually transferred from his window seat to the back of the airplane.

33. The doctor and nurse then began to administer CPR to Greenidge.

34. The doctor and nurse turned on the AED machine and positioned the pads on Greenidge's chest.

35. The AED's pads initially had difficulty adhering to Greenidge's chest. Upon analyzing Greenidge's heart rhythm, the AED first advised that CPR be continued. Approximately eight minutes after the AED was activated, however, the AED detected a shockable rhythm and advised that a shock be administered. Although the AED's shock button was pressed and the AED's internal data recorded that a shock was attempted, no shock was actually delivered to Greenidge.

36. The doctor and nurse saw no indication that a shock was ever delivered to Greenidge.

37. Because no shock was delivered when Greenidge had a shockable rhythm, the AED machine was unable to revive Greenidge and he died on the flight.

38. According to Flight Attendant De Fitzpatrick, while the AED machine was being used on Greenidge, "he opened his eyes" and "grabbed my hand."

39. According to Flight Attendant Judy Blanchard, while the AED machine was being used on Greenidge, "his eyes opened, and he looked at us."

40. AA Flight 614 made an unscheduled, emergency landing in Cancún, Mexico. Greenidge was deplaned on a stretcher and transported to the hospital in an ambulance, where he was pronounced dead at the age of 14.

41. In violation of federal law, American Airlines failed to equip AA Flight 614 with requisite medical equipment, including but not limited to an operable AED machine.

42. In violation of federal law, American Airlines failed to regularly and sufficiently inspect the AED machine onboard AA Flight 614 to ensure its readiness to perform during an emergency.

43. Before traveling from New York to Honduras via American Airlines, 14-year-old Greenidge was an active eighth grader who enjoyed swimming at the YMCA, playing games with his friends, and spending time with his younger cousin.

44. After embarking on his American Airlines voyage, however, Greenidge's short life was tragically cut short.

45. Due to the accident that occurred during AA Flight 614, namely the malfunction of the AED aboard the aircraft, Greenidge suffered a tragic death at the young age of 14. The malfunction of the AED aboard AA Flight 614 was an unexpected and unusual event external to Greenidge within the meaning of Article 17(1) of the Montreal Convention.

46. Arzu, as Greenidge's mother, has experienced and continues to experience excruciating pain and suffering as a result of the sudden loss of her young son.

**DEFENDANT'S LIABILITY UNDER THE MONTREAL CONVENTION**

47. Greenidge was severely injured and died while he was flying internationally via American Airlines from Honduras to New York.

48. The return portion of Greenidge's international itinerary included AA Flight 614 from SAP to MIA, an approximate two-hour layover in MIA, and AA Flight 1171 from MIA to LGA.

49. At all relevant times, AA Flight 614 was operated and controlled by Defendant American Airlines through its employees, agents, and/or servants.

50. At all relevant times, AA Flight 614 was operated as a common carrier engaged in the business of transporting fare paying passengers.

51. As a common carrier, American Airlines, including its agents, servants, and employees, owed the highest duty of care to its passengers, including Greenidge.

52. Federal regulations govern the conduct and procedures of common carriers like Defendant American Airlines.

53. For example, 14 C.F.R. §§ 121.801–121.805 require passenger-carrying airplanes to be equipped with specific emergency medical equipment and requires airlines to provide crew members with specific emergency medical training.

54. Specifically, as of April 12, 2004, 14 C.F.R. § 121.803(c)(4) requires passenger-carrying airplanes to be equipped with an approved automated external defibrillator ("AED") machine.

55. Pursuant to 14 C.F.R. § 121.803(b)(1), an aircraft's AED machine must be inspected regularly at specific inspection periods "<u>to ensure its condition for continued serviceability and immediate readiness to perform its intended emergency purposes</u>" (emphasis added).

56. Pursuant to 14 C.F.R. § 121.803(b)(2)-(4), an aircraft's AED machine must be readily accessible to the crew, clearly identified, marked to indicate its method of operation, and marked as to date of last inspection.

57. It is alleged that American Airlines, through its authorized employees and/or agents, failed to engage in the following activities:

a. Failure to equip AA Flight 614 with an operable AED machine in violation of 14 C.F.R. § 121.803(c)(4); and

b. Failure to regularly and sufficiently inspect the AED machine on board AA Flight 614 "to ensure its condition for continued serviceability and immediate readiness to perform its intended emergency purposes" in violation of 14 C.F.R. § 121.803(b)(1).

58. Had AA Flight 614 been properly equipped with an operable AED machine as required by federal law, Greenidge would not have experienced intense physical and emotional pain and tragically died at the age of 14.

59. Pursuant to Article 17(1) of the Montreal Convention, American Airlines "is liable for damage sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking."

60. Under the provisions of Article 17 of the Montreal Convention, American Airlines' failure to equip AA Flight 614 with a functional AED as required by 14 C.F.R. § 121.803(c) as set forth above, constitutes an accident, in that it was an unexpected or unusual event or happening external to the passenger, Greenidge, and was causally linked to Greenidge's bodily injuries and ultimate demise.

61. Under the provisions of Article 17 of the Montreal Convention, American Airlines is liable for damages sustained by both Plaintiff Arzu and by Greenidge in the bodily injury and death of Greenidge that occurred on AA Flight 614.

**COUNT I – WRONGFUL DEATH**

62. Plaintiff hereby alleges and incorporates all paragraphs in the preceding section by reference herein.

63. Pursuant to Article 29 of the Montreal Convention, Plaintiff pleads an action for Wrongful Death under Chapter 71, Subchapter A, of Tex. Civ. Prac. & Rem. Code §§ 71.001-71.012.

64. As a direct and proximate result of the accident aboard AA Flight 614—American Airlines' failure to equip the aircraft with a functional AED—Greenidge died. Plaintiff Melissa Suzette Arzu is the mother of Kevin Greenidge and a statutory wrongful-death beneficiary under Tex. Civ. Prac. & Rem. Code § 71.004. As a direct and proximate result of the accident, Plaintiff has sustained the following damages:

a. Pecuniary loss. Plaintiff has suffered the loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value that she would, in reasonable probability, have received from Greenidge had he lived.

b. Loss of companionship and society. Plaintiff has suffered, and will continue to suffer, the loss of the positive benefits flowing from the love, comfort, companionship, society, and guidance that she would, in reasonable probability, have received from Greenidge had he lived. Fourteen years old at his death, Greenidge shared a close, loving, and day-to-day relationship with his mother.

c. Mental anguish. Plaintiff has suffered, and will continue to suffer, the emotional pain, torment, and mental anguish resulting from the death of her son. The circumstances of Greenidge's death—including his conscious respiratory and cardiac distress and the failure of the onboard

AED to deliver a life-saving shock after it detected a shockable rhythm—have deepened and aggravated Plaintiff's grief and mental anguish.

d. Loss of inheritance. Plaintiff has suffered the loss of the present value of the assets that Greenidge, in reasonable probability, would have added to his estate and left to Plaintiff had he lived a natural life.

e. Funeral and burial expenses. Plaintiff and/or the Estate incurred reasonable funeral and burial expenses, and the expense of transporting and repatriating Greenidge's remains from Cancún, Mexico, as a result of his death.

65. Plaintiff's damages for wrongful death are not limited under Article 21 of the Montreal Convention—because American Airlines cannot prove, under Article 21(2), that the damage was not due to its negligence or other wrongful act or omission—and Plaintiff's damages exceed the limit set forth in Article 21(1).

**COUNT II – SURVIVAL**

66. Plaintiff hereby alleges and incorporates all paragraphs in the preceding section by reference herein.

67. Pursuant to Article 29 of the Montreal Convention, Plaintiff pleads an action for Survival under Chapter 71, Subchapter B, of Tex. Civ. Prac. & Rem. Code §§ 71.021-71.022.

68. The cause of action for the personal injuries Greenidge sustained aboard AA Flight 614 survived his death and is prosecuted by Plaintiff, as Administrator of his Estate, under Tex. Civ. Prac. & Rem. Code § 71.021. As a direct and proximate result of the accident—American Airlines' failure to equip AA Flight 614 with a functional AED—the Estate of Kevin Greenidge has sustained conscious pain and suffering and mental anguish. Between the onset of his medical emergency and his death, Greenidge endured conscious physical pain and suffering

and mental anguish, including the distress of his respiratory and cardiac emergency and the failure of the onboard AED to deliver a life-saving shock when he presented a shockable rhythm.

69. Plaintiff's damages for survival are not limited under Article 21 of the Montreal Convention—because American Airlines cannot prove, under Article 21(2), that the damage was not due to its negligence or other wrongful act or omission—and Plaintiff's damages exceed the limit set forth in Article 21(1).

**DEMAND FOR JUDGMENT**

70. Plaintiff Arzu, as an Individual and as the Administrator of the Estate of Kevin Greenidge, Deceased, hereby demands judgment against Defendant American Airlines, Inc. in an amount to be determined at trial, prejudgment interest, post-judgment interest, costs, and disbursements of this action.

**DEMAND FOR JURY TRIAL**

71. Pursuant to Federal Rules of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims and issues so triable.

Dated: July 17, 2026

Respectfully submitted:

*/s/ Hannah M. Crowe*

Darren P. Nicholson
State Bar No. 24032789
Hannah M. Crowe
State Bar No. 24131156
Anna Katherine Benedict
State Bar No. 24143946
Clay R. Mahaffey (*pro hac vice*)
Wyoming Bar No. 6-3355
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, TX 75202
Telephone: (469) 904-4550
dnicholson@burnscharest.com
hcrowe@burnscharest.com
abenedict@burnscharest.com
cmahaffey@burnscharest.com

ATTORNEYS FOR PLAINTIFF

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| MELISSA SUZETTE ARZU, Individually and as the Administrator of the Estate of KEVIN GREENIDGE, Deceased, | § § § § | |
| Plaintiff, | § | CIVIL ACTION NO. 4:24-cv-00433-P |
| v. | § § § | |
| AMERICAN AIRLINES, INC., | § § | |
| Defendant. | § | |

**AFFIDAVIT OF DEBRA SHAFFER**

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TARRANT | § |

BEFORE ME, the undersigned authority, on this day personally appeared Debra Shaffer, who is personally known to me, and first being duly sworn according to law, on his oath deposed and stated:

1. "My name is Debra Shaffer. I am over twenty-one years of age and I am of sound mind. I have never been convicted of any crime or offense that would disqualify me from making this Affidavit. I have personal knowledge of the statements made herein and they are all true and correct. I am fully competent to testify to the matters stated herein.

2. "This affidavit is offered in support of American Airlines, Inc.'s ('American') Motion for Summary Judgment.

3. "I am currently employed as a member of the Corporate Insurance and Risk Management division at American and act as custodian of the records attached.

4. "In my role as a member of the Corporate Insurance and Risk Management division, I assisted in maintaining and gathering documentary evidence with respect to the above-captioned litigation.

5. "Attached hereto as Exhibit C-1 is a true and correct copy of a document produced in this matter by American with the Bates label beginning with AA000051.

6. "Attached hereto as Exhibit C-2 is a true and correct copy of a document produced in this matter by American with the Bates label beginning with AA000040.

7. "Attached hereto as Exhibit C-3 is a true and correct copy of a document produced in this matter by American with the Bates label beginning with AA000252.

8. "Attached hereto as Exhibit C-4 is a true and correct copy of a document produced in this matter by American with the Bates label beginning with AA000001.

9. "Attached hereto as Exhibit C-5 is a true and correct copy of a document produced in this matter by American with the Bates label beginning with AA000027.

10. "Attached hereto as Exhibit C-6 is a true and correct copy of a document produced in this matter by American with the Bates label beginning with AA000018.

11. "Attached hereto as Exhibit C-7 is a true and correct copy of a document produced in this matter by American with the Bates label beginning with AA000041.

12. "Attached hereto as Exhibit C-8 is a true and correct copy of a document produced in this matter by American with the Bates label beginning with AA000338.

13. "Attached hereto as Exhibit C-9 is a true and correct copy of a document produced in this matter by American with the Bates label beginning with AA000253.

14. "Attached hereto as Exhibit C-10 is a true and correct copy of a document produced in this matter by American with the Bates label beginning with AA000551.

15. "Attached hereto as Exhibit C-11 is a true and correct copy of a document produced in this matter by American with the Bates label beginning with AA000211.

16. "Attached hereto as Exhibit C-12 is a true and correct copy of a document produced in this matter by American with the Bates label beginning with AA000036.

17. "Attached hereto as Exhibit C-13 is a true and correct copy of a document produced in this matter by American with the Bates label beginning with AA000544.

18. "Attached hereto as Exhibit C-14 is a true and correct copy of a document produced in this matter by American with the Bates label beginning with AA000528.

19. "I hereby certify that the above-cited and attached business records from American (a) were made at or near the time of the occurrence of the matters set forth by, or from information by, a person with knowledge of those matters; (b) were kept in the course of the regularly conducted activity; and (c) were made by the regularly conducted activity as a regular practice.

20. "FURTHER, AFFIANT SAYETH NAUGHT."

Debra Shaffer

Debra Shaffer

SUBSCRIBED AND SWORN TO BEFORE ME on the 28 day 02, 2025, to certify which witness my hand and official seal.

Keisha N Castillo Morales

Notary Public in and for the State of Texas

KEISHA NICOLE CASTILLO MORALES
Notary ID #134535760
My Commission Expires
August 31, 2027

NOTARY PUBLIC STATE OF TEXAS

# Exhibit B-1

Form# 2020-01-23

American Airlines

# Medical Emergency Information Sheet (MEIS)

Tell the medical volunteer "The captain or FA will be talking with an emergency physician on the ground"

Tell the captain immediately if one of these is occurring

- ☐ CPR is in progress
- ☐ Uncontrolled bleeding
- ☐ AED delivers a shock
- ☐ Pregnancy with active labor

Then complete the MEIS form

**Customer information:**

☒ Male ☐ Female Age: 14 Seat#: ______

Customer's name: ______

Accompanied by: aunt & uncle

**Problems/symptoms:**

Check appropriate symptoms:

☒ Fainted ☒ Vomiting ☐ Chest pain ☐ Abdominal pain
☐ Seizure ☐ Dizziness ☐ Nausea ☐ Back pain

☐ Stroke symptoms
Stroke symptoms include:
- Slurred speech
- Facial droop
- Weakness in one arm or leg

Pain level: Least 1 2 3 4 5 6 7 8 9 10 Most

Current status: ☐ Alert & oriented ☐ Semi-conscious ☒ Unconscious

Other symptoms: pulseless, dilated symptoms, clamy, diaphoretic

Duration: 45 min *per aunt, patient complaining of calf pain throughout the week, saying his legs hurt and couldn't walk. He didn't eat or drink anything out of normal

**Vital signs:**

Must be numerical values; not high, low, normal etc.

Blood pressure: unknown

Heart rate: Ø / beats per minute

Breathing rate: Ø / per minute

**Skin:**

☐ Normal ☒ Pale ☐ Flushed ☐ Sweaty ☐ Other ______

**Medical history:**

Check if history of:

☐ Heart disease ☐ Seizures ☒ Diabetes ☐ High blood pressure ☐ Fainting asthma

Uses oxygen at home? (Y) (N) [N filled]

Prescribed medication taken today? (Y) (N) [Y filled]

Name of medication, if known: metformin, rescue inhalers

Known allergies? (Y) (N) [Y filled] shellfish and nuts

**Medical volunteer:**

Name: Rachael Amador

Specialty: Surgical Resident physician

**Inflight treatment:**

Check treatment provided:

☐ Oxygen ☐ Nitroglycerin ☐ Phenergan ☐ Aspirin ☐ Benadryl
☐ Juice / Beverage ☐ IV fluid ☒ AED pads applied → RUE & LLE

Lying down? (Y) (N) [Y filled] Other treatment: epi x 2, BVM ventilation

Feet elevated? (Y) (N) [N filled] Has the customer improved with treatment? (Y) (N) [N filled] CPR x 45min

**Death and communicable disease reporting:**

Apparent death in flight? (Y) (N) [Y filled] (See Flight Operations Manual section 1p.2.7)

Communicable disease symptoms - Check if present:

☐ Fever > 100° F - for 48 hours or longer

☐ Fever > 100° F - with other symptoms: rash - swollen glands - jaundice -persistent cough persistent vomiting - unexplained bleeding - persistent diarrhea

☐ Other ______

AA000040

# Exhibit B-2

**American Airlines**

Record Locator: UIGUYU Sabre Status Purged Report Date & Time: Jul 15, 2022 10:11:16 AM

**Passenger Information**

| Pax nbr | Name | Grp Qty | Group |
|---|---|---|---|
| 1.01 | GREENIDGE/KEVIN | | |

**Flight Information**

| Seq Nbr | Flight | Class | Date | Dep | Arv | Stat | Qty | Dep Time | Arv Time | Operat Flight | Operat Class | Operat Rec Loc | Market Flight | Market Class |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | AA1249 | B | May 28, 2022 | LGA | MIA | HK | 1 | 06:00 | 09:15 | | | | | |
| 2 | AA1635 | B | May 28, 2022 | MIA | SAP | HK | 1 | 11:30 | 11:53 | | | | | |
| 3 | AA1171 | B | Jun 4, 2022 | MIA | LGA | NO | 1 | 19:39 | 22:40 | | | | | |
| 4 | AA614 | B | Jun 4, 2022 | CUN | MIA | HK | 1 | 22:30 | 17:19 | | | | | |

**Ticket Information**

| Seq Nbr | Ticket or TLT Text |
|---|---|
| 1 | T-03APR |
| 2 | TE 0017757081867 GREEN/K SYSSYS 2002/03APR* |
| 3 | TK 0010266021088 ARZU/A SAP5SSM 1105/04JUN |
| 4 | TK 0010266021090 GREEN/K SAP5SSM 1105/04JUN |

**Phone Information**

| Seq Nbr | City | Phone Number | Type |
|---|---|---|---|
| 1 | MIA | 347 964 2418 PACHECOS | O |

**Pre Requested Seats Info**

| Seq Nbr | Pax Nbr | Airline | Flight | Class | Seat | Depart | Arrive | Status | Type | | | Name |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2 | AA | 1249 | B | 32B | LGA | MIA | HK | N | P | G | GREENIDGE, KEVIN |
| 2 | 2 | AA | 1635 | B | 28B | MIA | SAP | HK | N | P | G | GREENIDGE, KEVIN |

**Agency IATA Information**

| Agency IATA |
|---|
| 33616343 |

**OSI Info**

| Seq Nbr | OSI Type | OSI Text |
|---|---|---|
| 1 | AA FACTS | OSI AA CTCP MIA347 964 2418 PACHECOS |
| 2 | AA FACTS | OSI AA TCP2 1GREENIDGE/KEVIN |
| 3 | AA FACTS | OSI AA WAIVER 24HR |
| 4 | AA FACTS | OSI AA RLOC HDQ1SUDUZFG |

**SSR**

| SSR Seq | SSR Type | Airline | Status | Qty | Board | Arrive | Flight | Class | Date | SSR Text |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | YADT | | NN | 1 | | | | | | YADT /15MAR08 NN1 |
| 2 | TKNE | AA | HK | 1 | LGA | MIA | 1249 | B | May 28, 2022 | LGAMIA1249B28MAY/0017757081867C1 |
| 3 | TKNE | AA | HK | 1 | MIA | SAP | 1635 | B | May 28, 2022 | MIASAP1635B28MAY/0017757081867C2 |
| 4 | BESH | AA | NN | 1 | | | 1249 | B | May 28, 2022 | 1249B28MAY/NN1 |
| 5 | BESH | AA | NN | 1 | | | 1635 | B | May 28, 2022 | 1635B28MAY/NN1 |
| 6 | DBSS | | NN | 2 | | | | | | /AA1635IMIASAP202205281530AUCB202205281753LGASAP202205280930 NN2 |
| 7 | PCTC | AA | HK | | | | | | | PSGR/DECLINED |
| 8 | PCTC | AA | HK | | | | | | | KEVIN GREENIDGE/US4685341275 |
| 9 | PTPH | AA | HK | 1 | | | | | | PTPH AA HK1/10000000000 |

AA000001

# American Airlines

Record Locator: UIGUYU Sabre Status Purged Report Date & Time: Jul 15, 2022 10:11:16 AM

**SSR**

| SSR Seq | SSR Type | Airline | Status | Qty | Board | Arrive | Flight | Class | Date | SSR Text |
|---|---|---|---|---|---|---|---|---|---|---|
| 10 | PTEM | AA | HK | 1 | | | | | | PTEM AA HK1/NOEMAILADDRESS//NULL.COM |
| 11 | WCHR | | NN | 1 | | | | | | 1 |
| 12 | IRSS | | NN | 1 | | | | | | /AA0614ISAPMIA202206041851DLYB202206050240SAPLGA202206071851Y0 NN1 |
| 13 | DOCS | AA | HK | 1 | | | | | | /P/USA/658829274/USA/15MAR08/M/12AUG26/GREENIDGE/KEVIN/ISMAEL//S1 |
| 14 | DOCA | AA | HK | 1 | | | | | | /R/US |
| 15 | PCTC | AA | HK | | | | | | | PSGR/DECLINED |
| 16 | PCTC | AA | HK | | | | | | | KEVIN GREENIDGE/US4685341275 |
| 17 | ADTK | YY | KK | 1 | | | | | | ADTK YY KK01 AA WILL CANCEL IF NO TKT BY 2359 04APR CST |
| 18 | SEAT | AA | KK | 1 | LGA | MIA | 1249 | B | May 28, 2022 | LGAMIA1249B28MAY-1ARZU/ANNA VICTORIA.32AC |
| 19 | SEAT | AA | KK | 1 | LGA | MIA | 1249 | B | May 28, 2022 | LGAMIA1249B28MAY-1GREENIDGE/KEVIN.32BC |
| 20 | SEAT | AA | KK | 1 | MIA | SAP | 1635 | B | May 28, 2022 | MIASAP1635B28MAY-1ARZU/ANNA VICTORIA.28AC |
| 21 | SEAT | AA | KK | 1 | MIA | SAP | 1635 | B | May 28, 2022 | MIASAP1635B28MAY-1GREENIDGE/KEVIN.28BC |
| 22 | SEAT | AA | KK | 1 | MIA | LGA | 1171 | B | Jun 4, 2022 | MIALGA1171B04JUN-1ARZU/ANNA VICTORIA.32AC |
| 23 | SEAT | AA | KK | 1 | MIA | LGA | 1171 | B | Jun 4, 2022 | MIALGA1171B04JUN-1GREENIDGE/KEVIN.32BC |
| 24 | SEAT | AA | NO | 1 | MIA | LGA | 1171 | B | Jun 4, 2022 | MIALGA1171B04JUN-1ARZU/ANNA VICTORIA.32A |
| 25 | SEAT | AA | NO | 1 | MIA | LGA | 1171 | B | Jun 4, 2022 | MIALGA1171B04JUN-1GREENIDGE/KEVIN.32B |
| 26 | SEAT | AA | NO | 1 | SAP | MIA | 614 | B | Jun 4, 2022 | SAPMIA0614B04JUN-1GREENIDGE/KEVIN.32D |
| 27 | SEAT | AA | NO | 1 | MIA | LGA | 1735 | B | Jun 5, 2022 | MIALGA1735B05JUN-1GREENIDGE/KEVIN.27E |

**Remarks Information**

| Seq Nbr | Type | Remarks Text |
|---|---|---|
| 1 | H- | DOX OK |
| 2 | H- | TIMATIC AUTOCHECK - CONDITIONAL ID 1 |
| 3 | H- | MESSAGE - TMID 10672 |
| 4 | H- | N PARSAN/LGA/28MAY/0442AM |
| 5 | H- | DOX OK |
| 6 | H- | TIMATIC AUTOCHECK - CONDITIONAL ID 1 |
| 7 | H- | MESSAGE - TMID 10672 |
| 8 | H- | N PARSAN/LGA/28MAY/0444AM |
| 9 | H- | /OSO$04JUN13 |
| 10 | H- | /OSO$DLY$INTL$04JUN |
| 11 | | BAG-01UPTO50LB 23KG AND62LI 30.00USD |
| 12 | | BAG-01UPTO50LB 23KG AND62LI 30.00USD |
| 13 | | BAG-TAG ACCEPTED 5001914937 04JUN2022 1208/SAP/8MSG |
| 14 | | BAG-TAG ACCEPTED 5001914939 04JUN2022 1208/SAP/8MSG |
| 15 | | BAG-SELFTAG 914937 D ACTIVATED BY 737564 04JUN2022 1208/SAP |
| 16 | | BAG-SELFTAG 914939 D ACTIVATED BY 737564 04JUN2022 1208/SAP |
| 17 | H- | /OSO$04JUN13 |

AA000002

## American Airlines

Record Locator: UIGUYU Sabre Status Purged Report Date & Time: Jul 15, 2022 10:11:16 AM

**Remarks Information**

| Seq Nbr | Type | Remarks Text |
|---|---|---|
| 18 | H- | /OSOSDLYSINTLS04JUN |
| 19 | H- | /OSOS04JUN13 |
| 20 | H- | /OSOSDLYSINTLS04JUN |
| 21 | H- | /OSOS04JUN13 |
| 22 | H- | /OSOSDLYSINTLS04JUN |
| 23 | H- | /OSOS04JUN13 |
| 24 | H- | /OSOSDLYSINTLS04JUN |
| 25 | H- | C-**************************************************** |
| 26 | H- | C-****CUSTOMER ILLNESS EVENT 220601262 ***** |
| 27 | H- | C-0614/4 SAP-MIA DIVERTED CUN ACCOUNT 14YRS MALE |
| 28 | H- | C-PASSENGER KEVIN GREENIDGE UNCONSCIOUS AND HAD NO PULSE. |
| 29 | H- | C-DOCTOR AND NURSE ONBOARD RENDERED AID. EMERGENCY WAS |
| 30 | H- | C-DECLARED AND FLIGHT LANDED OVERWEIGHT WITHOUT INCIDENT |
| 31 | H- | C-PARAMEDICS MET THE FLIGHT AND TRANSPORTED PASSENGER |
| 32 | H- | C-TO HOSPITAL. PASSENGER WILL REQUIRE A MEDICAL CERTIF |
| 33 | H- | C-STATING HE IS STABLE FOR AIR TRAVEL. |
| 34 | H- | C-SCSM/JTORRES/4JUN22. |
| 35 | H- | C-***************************************************** |
| 36 | H- | ************************************************ |
| 37 | H- | -***CUSTOMER WAS TAKEN BY PARAMEDICS TO********* |
| 38 | H- | ***AMERIMED CANCUN HOPITAL*********************** |
| 39 | H- | ************************************************* |
| 40 | | DIVIDED/CUN55RL 0825/05JUN22 LRCITD |
| 41 | H- | SPLIT FR/082547/05JUN22 LRCITD 02/02 01/01 GREENIDGE/KEVI |
| 42 | H- | ORIG PNR SIGNATURE PLT.PLTRM1S |
| 43 | H- | *************************************** |
| 44 | H- | COMPANION REPORTED AT GATE FOR FLT 614 THAT PAX |
| 45 | H- | KEVIN IN WCHR WAS ASTHMATIC AND DIABETIC AND SHE WANTED |
| 46 | H- | TO MODIFY THEIR CONNECTION FROM MIA TO LGA FOR AN EARLIER |
| 47 | H- | FLIGHT BUT NONE WAS AVAILABLE AND PAX WAS ALREADY |
| 48 | H- | REBOOKED. PAX DIDNT NOTIFY ANY OTHER ISSUE WITH HER OR |
| 49 | H- | COMPANION IN WHCR |
| 50 | H- | ***************************************** |
| 51 | H- | 05JUN22 -CC C CRUZ SAP 073041 AM |

AA000003

# American Airlines

Record Locator: UIGUYU Sabre Status Purged Report Date & Time: Jul 15, 2022 10:11:16 AM

**Received From Information**

| Trans Received From |
|---|
| HDQRM1S031747/DKAE5444C17A05/15B543000000217D 3CB1672D-001 |

**Signature Line Information**

| OA Record Locator | AAA Code | Home Station Code | TTY Office | TTY Airline or CRS Code | Duty Code | Agent Sine | Create Time | Create Date | Record Locator | Sabre Purge Date | History Indicator |
|---|---|---|---|---|---|---|---|---|---|---|---|
| HDQ1SYNKTPK/85BA/33616343/MIA/1S/T/US/USD/AS | PLT | PLT | | | | | 12:47:00 PM | Apr 3, 2022 | UIGUYU | Jun 5, 2022 | H |

**Baggage Info**

| Bag Routing Checkin Seq Nbr | Bag Routing Airline | Bag Routing Flight | Bag Routing Flight Arrive | Bag Routing Seq Nbr | History Bag Routing Seq Nbr | History Bag Routing | Bag Routing Status | Bag Psgr Checkin Seq Nbr | Bag Psgr Name | Bag Tag Destination | Bag Tag Airline | Bag Tag Number | Bag Checkin Agent | Bag Checkin Time | Bag Checkin Date | Bag Status | Bag Tag Index Code |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | AA | 1735 | LGA | 1 | 1 | ROUTE | REROUTE | 2 | GREENIDGE/ KEVIN | LGA | AA | 5001914939 | SAP 5SSM | 11:05:00 AM | Jun 4, 2022 | | 5 |
| 1 | AA | 614 | MIA | 1 | | | ROUTE | 2 | GREENIDGE/ KEVIN | LGA | AA | 5001914939 | SAP 5SSM | 11:05:00 AM | Jun 4, 2022 | | 5 |
| 1 | AA | 1171 | LGA | 2 | | | ROUTE | 2 | GREENIDGE/ KEVIN | LGA | AA | 5001914939 | SAP 5SSM | 11:05:00 AM | Jun 4, 2022 | | 5 |

**BPPR Status Info**

| BPPR Psgr Nbr | BPPR Psgr Name | BPPR Itn Nbr | BPPR INF Ind | BPPR Seq Nbr | BPPR Status |
|---|---|---|---|---|---|
| 2 | GREENIDGE/KEVIN | 0 | N | 3 | DHS CLEARED |
| 2 | GREENIDGE/KEVIN | 2 | N | 3 | DHS CLEARED |
| 2 | GREENIDGE/KEVIN | 3 | N | 9 | DHS CLEARED |
| 2 | GREENIDGE/KEVIN | 7 | N | 8 | DHS CLEARED |

| Hist Seq ID | Update Date/Time | Received From | AAA Code | Home Station Code | TTY Office | TTY Airline or CRS Code | Duty Code | Agent Sine | Trans Seq Nbr | Code | History Data |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 37 | Jun 5, 2022 6:08:00 PM | PDCAAMIA | MIA | MIA | | | 5 | PD | 1 | X4S* | SSR BESH AA NN1 1735B5JUN/NN1 |
| | | | | | | | | | 2 | X3S* | SSR SEAT AA KK1 MIALGA1735B05JUN-1ARZU/ANNA VICTORIA.28EC |
| | | | | | | | | | 3 | X3S* | SSR SEAT AA KK1 MIALGA1735B05JUN-1GREENIDGE/KEVIN.27EC |
| | | | | | | | | | 4 | SC | AA 1735 B Jun05,2022 MIALGA /NS1 18:25 21:20 |
| 36 | Jun 5, 2022 5:25:00 PM | CKI | | | | | | | 1 | A3S | SSR SEAT AA NO1 MIALGA1735B05JUN-1GREENIDGE/KEVIN.27E |
| | | | | | | | | | 2 | X4G | AA1735B Jun05,2022 MIALGA HK/ 27E |
| 35 | Jun 5, 2022 10:41:00 AM | PDCAACUN | CUN | CUN | | | 5 | PD | 1 | X4S* | SSR TKNE AA HK1 SAPMIA0614B04JUN/0017757081867C3 |
| | | | | | | | | | 2 | X4S* | SSR BESH AA NN1 614B4JUN/NN1 |
| | | | | | | | | | 3 | X3S* | SSR SEAT AA KK1 SAPMIA0614B04JUN-1ARZU/ANNA VICTORIA.32CC |
| | | | | | | | | | 4 | X3S* | SSR SEAT AA KK1 SAPMIA0614B04JUN-1GREENIDGE/KEVIN.32DC |
| | | | | | | | | | 5 | A3S | SSR SEAT AA NO1 SAPMIA0614B04JUN-1GREENIDGE/KEVIN.32D |
| | | | | | | | | | 6 | X4G* | AA614B Jun04,2022 SAPMIA HK/ 32D |
| | | | | | | | | | 7 | XS | AA 614 B Jun04,2022 SAPMIA /HK1 12:51 17:19 |
| | | | | | | | | | 8 | AS | AA 614 B Jun04,2022 CUNMIA /HK1 22:30 17:19 |
| 34 | Jun 5, 2022 8:30:00 AM | | SAP | SAP | | | 5 | -CC | 1 | A5H | H-************************************** |
| | | | | | | | | | 2 | A5H | H-COMPANION REPORTED AT GATE FOR FLT 614 THAT PAX |
| | | | | | | | | | 3 | A5H | H-KEVIN IN WCHR WAS ASTHMATIC AND DIABETIC AND SHE WANTED |

| Hist Seq ID | Update Date/Time | Received From | AAA Code | Home Station Code | TTY Office | TTY Airline or CRS Code | Duty Code | Agent Sine | Trans Seq Nbr | Code | History Data |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 34 | Jun 5, 2022 8:30:00 AM | | SAP | SAP | | | 5 | -CC | 4 | A5H | H-TO MODIFY THEIR CONNECTION FROM MIA TO LGA FOR AN EARLIER |
| | | | | | | | | | 5 | A5H | H-FLIGHT BUT NONE WAS AVAILABLE AND PAX WAS ALREADY |
| | | | | | | | | | 6 | A5H | H-REBOOKED. PAX DIDNT NOTIFY ANY OTHER ISSUE WITH HER OR |
| | | | | | | | | | 7 | A5H | H-COMPANION IN WHCR |
| | | | | | | | | | 8 | A5H | H-**************************************** |
| | | | | | | | | | 9 | A5H | H-05JUN22 -CC C CRUZ SAP 073041 AM |
| 33 | Jun 5, 2022 8:25:00 AM | HDQRM1S051325 52AC0C4A-001 NRL | PLT | PLT | | | | | 1 | A4O | OSI AA RLOC HDQ1SUDUZFG |
| | | | | | | | | | | A5H | H-ORIG PNR SIGNATURE PLT.PLTRM1S |
| 32 | | | CUN | CUN | | | 5 | 5RL | 1 | A5H | H-SPLIT FR/082547/05JUN22 LRCITD 02/02 01/01 GREENIDGE/KEVI |
| 31 | Jun 5, 2022 3:51:00 AM | CKI | | | | | | | 1 | X4S | SSR DOCS AA HK1 /P/USA/658829274/USA/15MAR08/M/12AUG26/GREENIDGE/KEVIN/ ISMAEL//S1 |
| | | | | | | | | | 2 | X4S | SSR DOCA AA HK1 /R/US |
| | | | | | | | | | 3 | A4S | SSR DOCS AA HK1 /P/USA/658829274/USA/15MAR08/M/12AUG26/GREENIDGE/KEVIN/ ISMAEL//S1 |
| | | | | | | | | | 4 | A4S | SSR DOCA AA HK1 /R/US |
| | | | | | | | | | 5 | A4S | SSR PCTC AA HK PSGR/DECLINED |
| | | | | | | | | | 6 | A4S | SSR PCTC AA HK KEVIN GREENIDGE/US4685341275 |
| 30 | Jun 4, 2022 8:55:00 PM | | CUN | CUN | | | 7 | JAA | 1 | A5H | H-*********************************************** |
| | | | | | | | | | 2 | A5H | H--***CUSTOMER WAS TAKEN BY PARAMEDICS TO********* |
| | | | | | | | | | 3 | A5H | H-***AMERIMED CANCUN HOPITAL********************** |
| | | | | | | | | | 4 | A5H | H-************************************************ |
| 29 | Jun 4, 2022 8:40:00 PM | | FTW | FTW | | | 7 | JCT | 1 | A5H | H-C-**************************************************** |
| | | | | | | | | | 2 | A5H | H-C-****CUSTOMER ILLNESS EVENT 220601262 ***** |
| | | | | | | | | | 3 | A5H | H-C-0614/4 SAP-MIA DIVERTED CUN ACCOUNT 14YRS MALE |
| | | | | | | | | | 4 | A5H | H-C-PASSENGER KEVIN GREENIDGE UNCONSCIOUS AND HAD NO PULSE. |
| | | | | | | | | | 5 | A5H | H-C-DOCTOR AND NURSE ONBOARD RENDERED AID. EMERGENCY WAS |
| | | | | | | | | | 6 | A5H | H-C-DECLARED AND FLIGHT LANDED OVERWEIGHT WITHOUT INCIDENT |
| | | | | | | | | | 7 | A5H | H-C-PARAMEDICS MET THE FLIGHT AND TRANSPORTED PASSENGER |
| | | | | | | | | | 8 | A5H | H-C-TO HOSPITAL. PASSENGER WILL REQUIRE A MEDICAL CERTIF |
| | | | | | | | | | 9 | A5H | H-C-STATING HE IS STABLE FOR AIR TRAVEL. |
| | | | | | | | | | 10 | A5H | H-C-SCSM/JTORRES/4JUN22. |
| | | | | | | | | | 11 | A5H | H-C-***************************************************** |

# American Airlines

Record Locator: UIGUYU    Sabre Status    Purged    Report Date & Time: Jul 15, 2022 10:11:16 AM

| Hist Seq ID | Update Date/Time | Received From | AAA Code | Home Station Code | TTY Office | TTY Airline or CRS Code | Duty Code | Agent Sine | Trans Seq Nbr | Code | History Data |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 28 | Jun 4, 2022 3:31:00 PM | WWW$RPTODM | CRC | CRC | | | 8 | OD3 | 1 | A4G | AA1735B Jun05,2022 MIALGA SS/ 27E |
| 27 | Jun 4, 2022 3:25:00 PM | RIPACLIENT | CRC | CRC | | | 8 | OD2 | 1 | A4S | SSR BESH AA NN1 1735B5JUN/NN1 |
| 26 | Jun 4, 2022 3:24:00 PM | REAACCOM UPDATE | CRC | CRC | | | 8 | YMG | 1 | A5H | H-/OSO$04JUN13 |
| | | | | | | | | | 2 | A5H | H-/OSO$DLY$INTL$04JUN |
| | | | | | | | | | 3 | X4S | SSR TKNE AA HK1 MIALGA1171B04JUN/0017757081867C4 |
| | | | | | | | | | 4 | X4S | SSR BESH AA NN1 1171B4JUN/NN1 |
| | | | | | | | | | 5 | X4G | AA1171B Jun04,2022 MIALGA HK/ 32B |
| | | | | | | | | | 6 | SC | AA 1171 B Jun04,2022 MIALGA /NO2 19:39 22:40 |
| | | | | | | | | | 7 | AS | AA 1735 B Jun05,2022 MIALGA /KK2 18:25 21:20 |
| 25 | Jun 4, 2022 2:56:00 PM | WWW$RPTREACCOM | HDQ | HDQ | | | 5 | IRP | 1 | X4S | SSR IRSS<br>NN2 /<br>AA0614ISAPMIA202206041851DLYB202206050240SAPLGA202206071851Y0<br>NN2 |
| | | | | | | | | | 2 | A4S | SSR IRSS<br>NN2 /<br>AA0614ISAPMIA202206041851DLYB202206050240SAPLGA202206071851Y0<br>NN2 |
| 24 | Jun 4, 2022 2:19:00 PM | WWW$RPTREACCOM | HDQ | HDQ | | | 5 | IRP | 1 | X4S | SSR IRSS<br>NN2 /<br>AA0614ISAPMIA202206041851DLYB202206050240SAPLGA202206071851Y0<br>NN2 |
| | | | | | | | | | 2 | A4S | SSR IRSS<br>NN2 /<br>AA0614ISAPMIA202206041851DLYB202206050240SAPLGA202206071851Y0<br>NN2 |
| 23 | Jun 4, 2022 2:08:00 PM | WWW$RPTREACCOM | HDQ | HDQ | | | 5 | IRP | 1 | X4S | SSR IRSS<br>NN2 /<br>AA0614ISAPMIA202206041851DLYB202206050240SAPLGA202206071851Y0<br>NN2 |
| | | | | | | | | | 2 | A4S | SSR IRSS<br>NN2 /<br>AA0614ISAPMIA202206041851DLYB202206050240SAPLGA202206071851Y0<br>NN2 |
| 22 | Jun 4, 2022 1:22:00 PM | REAACCOM UPDATE | CRC | CRC | | | 8 | YMG | 1 | A5H | H-/OSO$04JUN13 |
| | | | | | | | | | 2 | A5H | H-/OSO$DLY$INTL$04JUN |
| 21 | Jun 4, 2022 1:17:00 PM | WWW$RPTREACCOM | HDQ | HDQ | | | 5 | IRP | 1 | X4S | SSR IRSS<br>NN2 /<br>AA0614ISAPMIA202206041851DLYB202206050240SAPLGA202206071851Y0<br>NN2 |
| | | | | | | | | | 2 | A4S | SSR IRSS |

AA000006

# American Airlines

Record Locator: UIGUYU    Sabre Status Purged    Report Date & Time: Jul 15, 2022 10:11:16 AM

| Hist Seq ID | Update Date/Time | Received From | AAA Code | Home Station Code | TTY Office | TTY Airline or CRS Code | Duty Code | Agent Sine | Trans Seq Nbr | Code | History Data |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 21 | Jun 4, 2022 1:17:00 PM | WWW$RPTREACCOM | HDQ | HDQ | | | 5 | IRP | | | NN2 / AA0614ISAPMIA202206041851DLYB202206050240SAPLGA202206071851Y0 NN2 |
| 20 | Jun 4, 2022 1:15:00 PM | REAACCOM UPDATE | CRC | CRC | | | 8 | YMG | 1 | A5H | H-/OSO$04JUN13 |
| | | | | | | | | | 2 | A5H | H-/OSO$DLY$INTL$04JUN |
| 19 | Jun 4, 2022 1:10:00 PM | SAPEBH | SAP | SAP | | | 5 | EBH | 1 | A4S | SSR WCHR NN1 1 |
| 18 | Jun 4, 2022 1:03:00 PM | WWW$RPTREACCOM | HDQ | HDQ | | | 5 | IRP | 1 | X4S | SSR IRSS NN2 / AA0614ISAPMIA202206041851DLYB202206050240SAPLGA202206071851Y0 NN2 |
| | | | | | | | | | 2 | A4S | SSR IRSS NN2 / AA0614ISAPMIA202206041851DLYB202206050240SAPLGA202206071851Y0 NN2 |
| 17 | Jun 4, 2022 12:39:00 PM | REAACCOM UPDATE | CRC | CRC | | | 8 | YMG | 1 | A5H | H-/OSO$04JUN13 |
| | | | | | | | | | 2 | A5H | H-/OSO$DLY$INTL$04JUN |
| 16 | Jun 4, 2022 12:35:00 PM | WWW$RPTREACCOM | HDQ | HDQ | | | 5 | IRP | 1 | X4S | SSR IRSS NN2 / AA0614ISAPMIA202206041851DLYB202206050240SAPLGA202206071851Y0 NN2 |
| | | | | | | | | | 2 | A4S | SSR IRSS NN2 / AA0614ISAPMIA202206041851DLYB202206050240SAPLGA202206071851Y0 NN2 |
| 15 | Jun 4, 2022 12:03:00 PM | | HDQ | HDQ | | | 4 | TVL | 1 | A4S | SSR PCTC AA HK KEVIN GREENIDGE/US4685341275 |
| | | | | | | | | | 2 | A4S | SSR PTPH AA HK1 PTPH AA HK1/10000000000 |
| | | | | | | | | | 3 | A4S | SSR PTEM AA HK1 PTEM AA HK1/NOEMAILADDRESS//NULL.COM |
| 14 | Jun 4, 2022 11:50:00 AM | WWW$RPTIROP | HDQ | HDQ | | | 5 | IRP | 1 | A4S | SSR IRSS NN2 / AA0614ISAPMIA202206041851DLYB202206050240SAPLGA202206071851Y0 NN2 |
| 13 | Jun 4, 2022 11:10:00 AM | RIPACLIENT | CRC | CRC | | | 8 | OD2 | 1 | XS | AA 1389 B Jun04,2022 MIALGA /HK2 20:32 23:30 |
| 12 | | | SAP | SAP | | | 5 | -FR | 1 | AS | AA 1389 B Jun04,2022 MIALGA /SS2 20:32 23:30 |
| 11 | Jun 4, 2022 12:02:00 AM | REAACCOM UPDATE | CRC | CRC | | | 8 | YMG | 1 | A5H | H-/OSO$04JUN13 |
| | | | | | | | | | 2 | A5H | H-/OSO$DLY$INTL$04JUN |
| 10 | May 28, 2022 4:38:00 AM | CKI | | | | | | | 1 | X4S | SSR DOCS AA HK1 /DB/15MAR08/M/GREENIDGE/KEVINISMAEL |
| | | | | | | | | | 2 | A4S | SSR DOCS AA HK1 /P/USA/658829274/USA/15MAR08/M/12AUG26/GREENIDGE/KEVIN/ ISMAEL//S1 |
| 9 | May 28, 2022 | | LGA | LGA | | | 5 | 4NP | 1 | A5H | H-DOX OK |

AA000007

American Airlines

Record Locator: UIGUYU Sabre Status Purged Report Date & Time: Jul 15, 2022 10:11:16 AM

| Hist Seq ID | Update Date/Time | Received From | AAA Code | Home Station Code | TTY Office | TTY Airline or CRS Code | Duty Code | Agent Sine | Trans Seq Nbr | Code | History Data |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 9 | 3:44:00 AM | | LGA | LGA | | | 5 | 4NP | 2 | A5H | H-TIMATIC AUTOCHECK - CONDITIONAL ID 1 |
| | | | | | | | | | 3 | A5H | H-MESSAGE - TMID 10672 |
| | | | | | | | | | 4 | A5H | H-N PARSAN/LGA/28MAY/0444AM |
| 8 | | CKI | | | | | | | 1 | A4S | SSR PCTC AA HK PSGR/DECLINED |
| 7 | | CKI | | | | | | | 1 | A4S | SSR DOCA AA HK1 /R/US |
| 6 | May 28, 2022 3:42:00 AM | | LGA | LGA | | | 5 | 4NP | 1 | A5H | H-DOX OK |
| | | | | | | | | | 2 | A5H | H-TIMATIC AUTOCHECK - CONDITIONAL ID 1 |
| | | | | | | | | | 3 | A5H | H-MESSAGE - TMID 10672 |
| | | | | | | | | | 4 | A5H | H-N PARSAN/LGA/28MAY/0442AM |
| 5 | Apr 3, 2022 8:16:00 PM | WWW$RPTODM | CRC | CRC | | | 8 | OD1 | 1 | A4G | AA1249B May28,2022 LGAMIA SS/ 32B |
| | | | | | | | | | 2 | A4G | AA1635B May28,2022 MIASAP SS/ 28B |
| | | | | | | | | | 3 | A4G | AA614B Jun04,2022 SAPMIA SS/ 32D |
| | | | | | | | | | 4 | A4G | AA1171B Jun04,2022 MIALGA SS/ 32B |
| 4 | Apr 3, 2022 8:05:00 PM | RIPACLIENT | CRC | CRC | | | 8 | OD2 | 1 | A4S | SSR BESH AA NN1 1249B28MAY/NN1 |
| | | | | | | | | | 2 | A4S | SSR BESH AA NN1 1635B28MAY/NN1 |
| | | | | | | | | | 3 | A4S | SSR BESH AA NN1 614B4JUN/NN1 |
| | | | | | | | | | 4 | A4S | SSR BESH AA NN1 1171B4JUN/NN1 |
| 3 | Apr 3, 2022 8:03:00 PM | HDQRM1S040103 533D1CF5-001 | PLT | PLT | | | | | 1 | A4S | SSR TKNE AA HK1 LGAMIA1249B28MAY/0017757081867C1 |
| | | | | | | | | | 2 | A4S | SSR TKNE AA HK1 MIASAP1635B28MAY/0017757081867C2 |
| | | | | | | | | | 3 | A4S | SSR TKNE AA HK1 SAPMIA0614B04JUN/0017757081867C3 |
| | | | | | | | | | 4 | A4S | SSR TKNE AA HK1 MIALGA1171B04JUN/0017757081867C4 |
| 2 | Apr 3, 2022 4:10:00 PM | RIPACLIENT | CRC | CRC | | | 8 | OD2 | 1 | A4S | SSR YADT NN1 YADT /15MAR08 NN1 |
| 1 | Apr 3, 2022 4:02:00 PM | HDQRM1S032102 520BD4A0-001 | PLT | PLT | | | | | 1 | A4S | SSR DOCS AA HK1 /DB/15MAR08/M/GREENIDGE/KEVINISMAEL |

AA000008

# Exhibit B-3

***(Filed Under Seal)***

# Exhibit B-4

## *(Filed Under Seal)*

# Exhibit B-5

***(Filed Under Seal)***

# Exhibit B-6

***(Filed Under Seal)***