UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**MELISSA SUZETTE ARZU,**

Plaintiff,

v. **No. 4:24-cv-00433-P**

**AMERICAN AIRLINES, INC.,**

Defendant.

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendant American Airlines, Inc.'s Motion to Exclude Expert Testimony of Dr. Corwin Warmink, ECF No. 104, and Second Motion for Summary Judgment, ECF No. 111. The Court **GRANTS in part** the Motion to Exclude and **GRANTS** the Second Motion for Summary Judgment. The case is therefore **DISMISSED with prejudice**.

Fourteen-year-old Kevin Greenidge died after his heart stopped on an American flight. The Fifth Circuit held that a jury could find that the flight's defibrillator malfunctioned and the malfunction was an "accident" under the Montreal Convention. But the Convention also requires proof that the "accident" caused Kevin's death. Arzu's only evidence that could carry her burden is Dr. Warmink's survival opinion that Kevin more likely than not would have survived. Yet the studies behind that opinion report that most patients who received a shock did not survive, and Dr. Warmink offers no reliable way to bridge that gap. The Court therefore excludes his opinion. Without it, no reasonable jury could find that the malfunction caused Kevin's death.

## BACKGROUND

### A. Kevin Greenidge died after his heart stopped on an American flight

The facts of this case are well known. In June 2022, fourteen-year-old Kevin Greenidge flew with his family on American Airlines Flight 614 from Honduras to Miami. *Arzu v. Am. Airlines, Inc.*, 176 F.4th 343, 348 (5th Cir. 2026). He weighed 319 pounds and had asthma, high blood pressure, Type II diabetes, and sleep apnea. *Id.* Forty-five minutes after takeoff, Kevin struggled to breathe, clutched his chest, and lost consciousness. It took several minutes to move him to the rear galley, where a nurse and a surgical resident who were aboard began CPR. *Id.*

As bystanders performed CPR, a flight attendant brought the aircraft's automated external defibrillator (AED). *Arzu* 176 F.4th at 348. The AED first detected asystole, meaning no electric activity in the heart, which a shock cannot treat. *Id.* at 348 n.1. So, it advised continued CPR. *Id.* After eight minutes of continuous CPR, it finally detected a shockable rhythm and advised a shock. *Id.* One of the attendants then pressed the button, and the AED's data recorded a shock, but four witnesses testified that none was discharged. *Id.* Two flight attendants testified that, while the AED was in use, Kevin opened his eyes. ECF No. 99 at 38–39; Dep. 85:6-24; Dep. 17:19-18:2. Nevertheless, by the time the aircraft touched down, Kevin was dead.

### B. The Fifth Circuit revived one accident theory and declined to affirm on causation

Kevin's aunt, Melissa Arzu, sued American individually and as administrator of Kevin's estate. ECF No. 1. She alleged that two "accidents" under Article 17 of the Montreal Convention caused Kevin's death: the crew's slow response, and the AED's failure to shock him. *Arzu*, 176 F.4th at 348. This Court granted summary judgment for American, holding that the crew's response was not an accident. ECF No. 82 at 5–8. That opinion addressed the crew's response to Kevin's emergency, but not the AED theory. Because it did not find an Article 17 accident, it did not reach causation. ECF No. 82 at 8 n.7.

The Fifth Circuit affirmed in part and reversed in part. It agreed that the crew's *response* was not an accident: "absent unusual circumstances and willing inaction, an ineffective response to a medical emergency is not an Article 17 accident." *Arzu*, 176 F.4th at 349. It also affirmed the dismissal of Arzu's breach-of-contract claim, holding that the Montreal Convention preempts it. *Id.* at 354–55. However, it held that a jury could find that the AED malfunctioned, and that a *malfunction* could be an accident because federal regulations required the flight to carry a working AED. *Id.* at 352–53; *see* 14 C.F.R. § 121.803(c). The panel therefore revived Arzu's derivative loss-of-consortium claim along with the AED theory. *Arzu* 176 F.4th at 353.

Despite American's urging, the panel declined to affirm on causation. *Id*. at 353–54. American argued that Dr. Warmink "misapprehended survival statistics for patients who receive defibrillation." *Id.* at 353. But the panel held this argument went to admissibility, which American had not raised in this Court. *Id.* It further held that, "[a]dmissibility aside," Arzu's causation evidence—derived principally from the survival opinion—"creates a genuine dispute on the issue." *Id*. at 354. It added that American "may challenge [Dr. Warmink's] opinion and its basis" and explained that American should have raised that challenge by motion in this Court. *Id* at 353.

### C. On remand, American moved to exclude Dr. Warmink and for summary judgment on causation

On remand, Arzu amended her complaint to add a survival claim under Texas law. ECF No. 99. American then moved under Rule 702 to exclude Dr. Warmink's expert testimony, ECF No. 104, and, with leave, moved again for summary judgment on causation. ECF No. 111. Both motions are fully briefed, ECF Nos. 105, 107, 112, 114, 118, and are accordingly ripe for review.

## LEGAL STANDARDS

### A. Summary judgment

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact" and "is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is

"genuine" if the evidence presented would allow a reasonable jury to return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" when it might affect the outcome of a case. *Id.* Generally, the "substantive law will identify which facts are material," and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.*

When determining whether summary judgment is appropriate, the Court views the evidence in the light most favorable to the nonmovant. *First Am. Title Ins. Co. v. Cont'l Cas. Co.*, 709 F.3d 1170, 1173 (5th Cir. 2013). In conducting its evaluation, the Court may rely on any admissible evidence available in the record but need only consider those materials cited by the parties. FED. R. CIV. P. 56(c)(1)–(3). The Court need not sift through the record to find evidence in support of the nonmovant's opposition to summary judgment; the burden falls on the moving party to simply show a lack of evidence supporting the nonmovant's case. See *Malacara v. Garber*, 353 F.3d 393, 404–05 (5th Cir. 2003).

**B. Expert testimony**

Federal Rule of Evidence 702 allows a witness who is qualified as an expert by knowledge, skill experience, training, or education, to testify regarding his opinions if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's specialized knowledge will help the trier of fact to understand the evidence or determine a fact at issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case. FED. R. EVID. 702(a)–(d). Courts act as gatekeepers "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

"District courts enjoy wide latitude in determining the admissibility of expert testimony." *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988 (5th

Cir. 1997). A court need not admit an opinion connected to the data only by the expert's say-so. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). It may conclude that "there is simply too great an analytical gap between the data and the opinion proffered." *Id.* The proponent need not show that the opinion is correct, but she must show by a preponderance of the evidence that it is relevant and reliable. *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) ("[E]xpert testimony is admissible only if it is both relevant and reliable."). Reliability must hold at every step, including the step from the data to the conclusion. *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007).

The Advisory Committee's note on the 2023 amendment to Rule 702 reinforces these points. The note explains that "arguments about the sufficiency of an expert's basis" will not always go to the weight of an expert's opinion, but instead to the admissibility. FED. R. EVID. 702 advisory committee's note to 2023 amendment. It observes that "many courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. *These rulings are an incorrect application of Rules 702 and 104(a).*" *Id.* (emphasis added). Rather, it is the Court's duty to ensure that "each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." *Id.*

## ANALYSIS

The Court first clarifies what Article 17 requires Arzu to prove. Then, it explains why Dr. Warmink's survival opinion is inadmissible. Given what remains, it concludes that Arzu cannot carry her burden. Last, it addresses her other claims.

### A. Article 17 requires Arzu to prove that the alleged malfunction caused Kevin's death

Article 17 makes a carrier liable only for an accident that caused the passenger's death. So Arzu must prove, by a preponderance of the evidence, that Kevin would have survived but for the alleged accident. Proving that the alleged malfunction was an accident is not enough. She must also prove that it caused his death.

This conclusion follows from the text, which sets two conditions. A carrier is liable for a passenger's death "upon condition only that the accident which caused the death or injury took place on board the aircraft." Montreal Convention art. 17(1). Liability thus requires an (1) accident (2) that caused the death. The Supreme Court's leading Article 17 cases address the first condition. They do not address the second.

In *Saks*, the Supreme Court considered whether a loss of hearing proximately caused by normal operation of the aircraft's pressurization system is an 'accident' within the meaning of Article 17. *Air France v. Saks*, 470 U.S. 392, 395 (1985). The question assumed causation: it asked whether an injury "proximately caused by" the aircraft's normal operation was an accident. *Id.* at 395. It pointed out that liability "arises only if a passenger's injury is caused by an unexpected or unusual event or happening that is external to the passenger." *Id.* at 394. Thus, for purposes of the "accident" inquiry, a plaintiff need only be able to prove that "some link in the chain" of events that caused injury was unusual. *Olympic Airways v. Husain*, 540 U.S. 644, 651–52 (2004) (quoting *Saks,* 470 U.S. at 406). But the Court focused only on "what causes can be considered accidents." *Id.* at 646 (quoting *Saks,* 470 U.S. at 404).

*Husain* asked the same question as *Saks*, but this time about a longer chain of events. There, a flight attendant three times refused to move an asthmatic passenger away from the smoking section, and he died after breathing the smoke. *Husain,* 540 U.S. at 646–48. The airline argued that the relevant event was the smoke, a normal condition of the flight. The Court disagreed. It held that any unusual event in that chain, which included the passenger's seat near the smoking section, the smoke, the refusal to move him, and his asthma, could be the accident. *Id.* at 653–54. So, the refusal could be an accident even if the smoke did the harm. But here too, this inquiry *took as a given* that the chain of events was the but-for cause of death. *Id.* (writing that these were "all factual events contributing to the death of the passenger" which together "combine to cause any given injury"). The only question was whether one of those interrelated causes was an accident.

*Saks* and *Husain* therefore asked which causes are accidents. The Court did not, however, focus on which *accidents* are *causes*. That is,

they said nothing about when an accident is a cause of the passenger's injury. But that is the gravamen of this case.

Neither *Saks* nor *Husain* purported to collapse those separate inquiries. The "link in the chain" language answers only the first question. It tells courts where in a chain of causes an unusual event may be. But it does not make an event a cause. The alleged malfunction did not start Kevin's cardiac arrest. Arzu's theory is that a working AED would have rescued him from it. On that theory, the alleged malfunction is a link in the chain of causes only if the shock it failed to deliver would have saved him.[1]

Arzu mistakenly reads the "link in the chain" language as the causation test itself. ECF No. 114 at 1, 8–11; ECF No. 105 at 6–7. On her reading, proving that the malfunction was an accident also proves that it caused Kevin's death. That reading would merge Article 17's conditions into one and read "which caused" out of the treaty. It would also make a carrier liable for an accident that changed nothing. Article 17 dispenses with proof of fault, *see* Montreal Convention art. 21, but it does not dispense with proof of cause.

The Fifth Circuit's opinion is consistent with this reading. The panel described the accident inquiry as an inquiry into "[t]he injury's cause." *Arzu*, 176 F.4th at 349. In discussing causation, it stated that "[s]o long as an Article 17 accident is one of those events, causation is satisfied." *Id*. at 354. By "those events," the panel referred to "multiple interrelated factual events that combine to cause any given injury." *Id*. (quoting *Husain*, 540 U.S. at 653). This statement means that an accident need not be the only cause of death. It does not mean, as Arzu would have it, that an accident is a cause whenever it occurs. And the panel's next sentence, that Arzu "must" prove that some link in the causal chain was unusual, states a necessary, not a sufficient, condition. The panel's

[1] Suppose, for example, an AED failed on a passenger who could not have been saved. The failure would be unusual and unexpected, and it would occur during events that ended in death. But it would not have caused the death, because the passenger would have died anyway. So, the question is one of cause in fact: whether Kevin more likely than not would have survived absent the accident.

application confirms the point. On whether a jury could find the malfunction was "a 'link in the chain' that caused Kevin's death," the panel answered by pointing to Dr. Warmink's opinion that Kevin "more likely than not would have survived." *Id.* If proof of an accident were enough, the panel would not have needed that survival opinion.

That is why this case turns on Arzu's evidence of causation, given by Dr. Warmink's expert testimony. The Fifth Circuit's accident holding settles the first condition. The second turns on whether Kevin would have survived, and on that question Arzu offers only Dr. Warmink's survival opinion. The panel considered that opinion "[a]dmissibility aside." *Id.* Whether it is admissible is the question the panel left open, and it is one this Court now turns to.[2]

**B. Dr. Warmink's survival opinion is inadmissible**

Dr. Warmink's opinion that Kevin more likely than not would have survived is inadmissible. The studies on which it rests report that most patients who received a shock did not survive, and he offers no reliable way to get from those studies to his conclusion. His other opinions are admissible.

1. <u>Dr. Warmink relies on the wrong measure of survival</u>

American does not challenge Dr. Warmink's qualifications. He is board certified in pediatric emergency medicine, has practiced pediatric emergency medicine since 2003, and once directed the emergency department at Cook Children's Medical Center. ECF No. 106, App. 048 (Warmink Decl. ¶¶ 1–3). He estimates he has treated more than one hundred children in cardiac arrest. *Id.* at App. 023–24 (Warmink Dep.

---

[2] The mandate does not bar this ruling. The Fifth Circuit decided causation on the assumption Dr. Warmink's opinion was admissible. It left admissibility to this Court, and deciding that question carries out the mandate. On remand, a district court may not reexamine an issue the appellate court decided. *Ball v. LeBlanc*, 881 F.3d 346, 351 (5th Cir. 2018). But it "is free to pass upon any issue which was not expressly or impliedly disposed of on appeal." *Newball v. Offshore Logistics Int'l*, 803 F.2d 821, 826 (5th Cir. 1986). The panel did not decide admissibility, which is for the Court to decide, before trial or during it. FED. R. EVID. 104(a). Excluded testimony cannot create a genuine dispute. FED. R. CIV. P. 56(c)(2). Once the survival opinion is excluded, the record is no longer the one the panel reviewed.

102:20–103:6). American does not challenge, and the Court admits, Dr. Warmink's opinions on the physiology of cardiac arrest, AED and defibrillation, and the general proposition that delay reduces a patient's chance of survival.

But the studies Dr. Warmink relies upon do not support his survival opinion. That opinion appears in its fullest form in his declaration that Kevin "more likely than not would have survived his cardiac arrest on Flight 614 had the American flight crew promptly initiated [CPR] and effectively utilized a functional [AED]." ECF No. 106, App. 048 (Warmink Decl. ¶ 5). For support, Dr. Warmink points to two studies. One reports "a 71.4% survival rate to hospital admission" for children shocked by an AED. *Id.* at App. 049 (Warmink Decl. ¶ 6). The other, he says, reports "an 86% survival rate to hospital admission." *Id.* He reasoned similarly at his deposition. Children shocked by an AED had a "survival to hospital" rate of "71.4 percent," so Kevin had "way-better-than-coin-flip odds of surviving." *Id.* at App. 015–16 (Warmink Dep. 64–65).

The problem is that those figures measure the wrong thing. Surviving to hospital admission is not surviving. The closest measure of survival these studies report is survival to discharge—i.e., making it out of the hospital alive. Those same studies upon which Dr. Warmink bases his survival opinion detail how many patients left the hospital, and in every relevant group <u>most did not</u>. In the Menant Study, children shocked by an AED had a 34.3% survival-to-discharge rate. It was even lower for those, like Kevin, whose first rhythm was non-shockable but were later shocked: 23.1%. The Weisfeldt Study fares not much better: it found that only 38% of patients whom a bystander's AED delivered a shock made it out of the hospital alive. ECF No. 101-3, App. 167–68; ECF No. 106, App. 049, 064. Arzu does not dispute these figures. ECF No. 105 at 14–15. Dr. Warmink himself distinguished survival-to-admission from survival-to-discharge. ECF No. 106, App. 049 (Warmink Decl. ¶ 7).

The question is not whether Kevin would have reached a hospital alive. It is whether a shock would have made his death unlikely. *See Providence Health Ctr. v. Dowell*, 262 S.W.3d 324, 328 (Tex. 2008)

(explaining that when failure to render treatment was alleged, that under the more-likely-than-not standard, the issue is whether treatment would have made the death or injury unlikely). Under the Texas law Arzu invokes, ECF No. 99, she must show that Kevin "would have been among those patients who materially benefit" from defibrillation, not among those who receive it and die anyway. *See Young v. Mem'l Hermann Hosp. Sys.*, 573 F.3d 233, 236 (5th Cir. 2009) (per curiam). A patient who reaches the hospital with a pulse and dies there has received the shock without that benefit. Survival to admission does not measure the relevant outcome, and data valid for one question may not fit another. *See Daubert v. Merrell Dow Pharms., Inc.* 509 U.S. 579, 591. Survival to discharge comes closest to tracking the correct measure and, if anything, overstates long-term survival, which neither study tracked.

Nothing here questions the studies themselves. American concedes their reliability, ECF No. 107 at 9, and they bear directly on Kevin's chance of survival. The problem is the step from what they report to what Dr. Warmink concludes. A reliable source misapplied yields an unreliable opinion. *See Joiner*, 522 U.S. at 146.

2. <u>Nothing bridges the gap between those studies and Dr. Warmink's conclusion</u>

Dr. Warmink offers three reasons to place Kevin above fifty percent. None reliably applies his data to the case.

First, he says that the Menant study understates Kevin's chances because it did not exclude children whose arrests stemmed from severe trauma, heart defects, or terminal illness, none of which Kevin had. ECF No. 106, App. 049–50 (Warmink Decl. ¶¶ 7–8). That may suggest that Kevin's odds differed from the study's. But it does not say by how much, and nothing in the record fills that gap. Nor does Dr. Warmink account for factors that point the other way. His declaration also ignores the Menant subgroup whose initial rhythm, like Kevin's, was non-shockable. Dr. Warmink moves from 34.3% to more likely than not without any reliable basis or mention of the 23.1% figure for the subgroup most similar to Kevin.

Second, he relies on his clinical experience. ECF No. 106, App 048 (Warmink Decl. ¶ 5). An expert may do so. But he "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." FED. R. EVID. 702 advisory committee's note to 2000 amendment. Dr. Warmink does not. When asked to assign Kevin a survival ratio, he answered it "would be folly for me to claim that I could do that." ECF No. 106, App. 015 (Warmink Dep. 64:8–9). His survival opinion supplies a conclusion, not a method.

Third, he says timely treatment would have made Kevin's survival "several times more likely." *Id.* at App. 070 (Warmink Report at 3). That is a relative measure. Without a baseline, it says nothing about Kevin's actual chance of survival. Several times a small number is still small. The Weisfeldt data show as much. Survival among patients shocked by a bystander's AED (38%) was more than five times the study's overall rate (7%). *Id.* at App 051, 064. But that still doesn't get you to more-likely-than-not. Without a base rate for survival, Dr. Warmink's opinion that Kevin's survival would have been "several times more likely" cannot support his opinion that Kevin more likely than not would have survived.

The Fifth Circuit has long rejected opinions of this kind. Credentials and a subjective belief that "it is so" are not enough. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). Courts examine the basis of an opinion, not the bare conclusion, because "[a] claim cannot stand or fall on the mere ipse dixit of a credentialed witness." *McManaway v. KBR, Inc.*, 852 F.3d 444, 449 (5th Cir. 2017) (cleaned up). Physicians are no exception. In *Black v. Food Lion, Inc.*, the Fifth Circuit held that a physician's causation testimony should have been excluded because his "general methodology cannot vindicate a conclusion for which there is no underlying medical support." 171 F.3d 308, 313 (5th Cir. 1999). Nor does experience earn an exemption. An expert who relies on it must bring the "same level of intellectual rigor" that governs practice in his field. *Kumho Tire*, 526 U.S. at 152. An expert who testified that estimating Kevin's odds would be folly needed some method to reach a more-likely-than-not conclusion. Dr. Warmink identifies none.

Arzu's reliance on *Pipitone*, 288 F.3d at 239 is misplaced. ECF No. 105 at 14. There, the court credited a physician's experience-based causation opinion where no studies addressed the question and he explained how he ruled out other causes. *Pipitone,* 288 F.3d at 248. By contrast, here the studies exist—Dr. Warmink chose them—and they point the other way. Experience may fill a gap in the literature. But it cannot overrule the literature without explanation.

In the end, the step from studies reporting survival below fifty percent to an opinion that Kevin more likely than not would have survived rests only on Dr. Warmink's say-so. That is the "analytical gap" that *Joiner* permits a court to reject. 522 U.S. at 146; *see Knight*, 482 F.3d at 355. The Court need not choose between experts. This analysis does not rely on the contrary opinions of American's experts or the studies American added that Dr. Warmink did not cite. The defects lie in Dr. Warmink's own sources. Because Arzu has not shown that the survival opinion rests on sufficient facts or data or reliably applies its sources to Kevin's case, the Court excludes it. FED R. EVID. 702(b), (d).[3]

**C. Without the survival opinion, no reasonable jury could find the alleged malfunction caused Kevin's death**

Arzu bears the burden to prove the alleged malfunction caused Kevin's death. She must provide "affirmative evidence" from which jury could find that Kevin more likely than not would have survived. *Anderson*, 477 U.S. at 257. Even viewing the evidence in the light most favorable to Arzu, the record contains no evidence from which a reasonable jury could find that he would have lived.

For one, the lay-witness evidence shows what happened, not what would have happened. The no-shock testimony of four witnesses, ECF

[3] Arzu's suggestion that these defects only go to weight misreads Rule 702. ECF No. 105 at 11–12. The Fifth Circuit's rule that an expert's bases usually go to weight has always had an exception for sources 'of such little weight that the jury should not be permitted to receive that opinion." *Viterbo*, 826 F.2d at 422. And the 2023 amendment confirms that sufficiency of basis and reliable application are questions for the Court. Dr. Warmink may reason from the closest available data, but he must reason from what those data show, and his data show survival below fifty percent.

No. 106, App. 009, 032, 038, 042, 045, supports only the accident element. It says nothing about whether a shock would have saved him. Similarly, Mr. Lazar, Arzu's AED expert, explains why the AED may have failed, not what the failure may have changed. ECF No. 115, App. 106–07. The autopsy noting that Kevin had no condition that made resuscitation impossible, ECF No. 114 at 5, sheds light on possibility, not the probability required for a jury to conclude he would have lived.

That is why expert testimony is required to carry that burden. Although Arzu argues that a jury could find causation without expert testimony, ECF No. 114 at 10–12, it could not. Whether a shock would more likely than not have saved Kevin is a medical question beyond the common knowledge of jurors. Both parties apply Texas law on this point. Under that law, "expert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of jurors." *Guevara v. Ferrer*, 247 S.W.3d 662, 665 (Tex. 2007). Lay evidence suffices only when "general experience and common sense" allow laypersons to evaluate whether an occurrence probably caused the condition. *Jelinek v. Casas*, 328 S.W.3d 526, 533–34 (Tex. 2010). The Fifth Circuit has held that the response to a cardiac arrest in a patient with a complex medical history is not within the "obvious" knowledge of laypeople. *Patton v. Mobile Medic Ambulance Serv., Inc.*, 330 F. App'x 64, 65 (5th Cir. 2009).

A jury knows that a defibrillator can restart a heart. It cannot estimate, without expert help, the likelihood that a shock delivered after eight minutes of CPR, to a fourteen-year-old whose heart initially showed no electrical activity, would have restored a pulse and led to survival. *Morgan v. Compugraphic Corp.* does not rescue Arzu. 675 S.W.2d 729, 733 (Tex. 1984). *Morgan* holds that lay testimony establishing a sequence of events can prove causation when common experience lets a layperson connect the event to the condition. *Id*. Arzu's sequence of events constructed by lay witnesses shows what happened on Flight 614. But it cannot show *what would have happened* had the AED delivered the shock she alleges it did not. That comparison requires expert testimony.

As explained above, even viewing the facts and remaining expert evidence in the light most favorable to Arzu, no reasonable jury could conclude that Kevin more likely than not would have survived.

**D. Arzu's remaining claims fail**

Arzu's remaining loss-of-consortium claim and survival claim must both yield to the above reasoning. Because this Court granted summary judgment on her contract claim, and the Fifth Circuit affirmed it, no other claim remains.

1. The loss-of-consortium claim falls with the Article 17 claim

Arzu's loss-of-consortium claim is derivative of her Article 17 claim. *Arzu*, 176 F.4th at 355. Any action for damages, "however founded," may be brought only subject to the Convention's conditions. Montreal Convention art. 29. Because Arzu cannot establish Article 17 liability, American is entitled to summary judgment on the loss-of-consortium claim.

2. The survival claim fails for lack of causation

Arzu's survival claim falters for the same reason. Texas law defines what the estate may recover: the pain and mental anguish Kevin consciously experienced before death and his funeral expenses. *See Zicherman v. Korean Air Lines Co.*, 516 U.S. 217, 228 (1996) (providing that compensable harms are to be determined by domestic law). But Article 17 requires that the accident cause the harm for which Arzu seeks damages. So Arzu must show Kevin consciously suffered something he would not have suffered had the AED worked.

Start with what the malfunction could not have caused. Kevin's struggle to breathe and his chest pains preceded the alleged malfunction. So did the eight minutes of CPR before the AED advised a shock. The crew's response during that time is not an Article 17 accident. *Arzu*, 176 F.4th at 349. Whatever Kevin experienced before the AED advised a shock, no accident caused it.

That leaves the time after the alleged malfunction. Two flight attendants testified that Kevin opened his eyes while the AED was in

use. ECF No. 99 ¶¶ 38–39.[4] Even so, Arzu must show that the malfunction made a difference—that it caused his pain and suffering—and she offers no evidence that it did. Her own explanation is that CPR, not a shock, briefly revived him. ECF No. 114 at 14. On that account, the malfunction did not cause Kevin's moments of awareness, and so a working AED would not have prevented whatever he felt.[5] By contrast, what a delivered shock would have meant for his awareness and pain is a medical question: whether it would have restored consciousness, and whether it would have diminished pain or increased it. Arzu offers no expert on that question, ECF No. 112 at 6 n.4, and it lies beyond the common knowledge of jurors for the reasons given above. *See supra* Section C. In any event, Arzu points to no lay-witness account of visible signs discomfort. The best a jury could do to answer the question of whether the malfunction caused Kevin pain and suffering is to speculate.

Funeral expenses fare no better. They flow from the death, and Article 17 permits recovery only if the accident caused the death. For all of the reasons above, they are not recoverable either.

## CONCLUSION

It would be easy to read this opinion as holding that an airline need not keep a working defibrillator on an international flight. On that reading, the Montreal Convention forgives a faulty machine whenever the passenger was likely to die anyway. That would be a bad rule. It is not the rule of this case.

This opinion does not disturb other forms of liability. Federal law requires the defibrillator. 14 C.F.R. § 121.803(c). Nothing here relaxes that requirement or contradicts the Fifth Circuit's holding that a malfunctioning defibrillator can be an accident. Nor does the opinion

---

[4] At this stage, the Court credits the attendants and assumes, without resolving, that Kevin was briefly conscious after the alleged malfunction.

[5] The Court rejects American's alternative argument that any return to consciousness proves the AED worked. ECF No. 112 at 12–13. That argument asks the Court to decide whether a shock was delivered, the very dispute the Fifth Circuit held is for the jury. *Arzu*, 176 F.4th at 352–53.

leave the requirement without teeth. The FAA may penalize a carrier that flies without working equipment, and it need not prove that the lapse killed anyone. 49 U.S.C. § 46301. But a plaintiff seeking damages for death must. That is the difference between regulation and compensation. Article 17 makes carriers pay for the harm their accidents cause, largely without regard to fault. It does not make them pay for harm their accidents did not cause. A rule that awarded damages whenever a regulatory violation coincided with a death would convert carriers into insurers of their passengers' health.

But suppose, as the studies in this record suggest, that fewer than half of the patients who receive even a properly delivered shock survive. Then no estate will ever be able to prove that a failed shock more likely than not caused a death. Yet across many of those failed shocks, some passengers who died would have lived with a functioning defibrillator. The carrier will have caused those deaths in the aggregate but pay for none in any given case. An all-or-nothing rule of causation, applied to a treatment that works less than half the time, never holds the defendant liable for the lives the treatment would have saved.

This problem is familiar, and the law has an answer for it, *but not one this Court is free to adopt*. Some jurisdictions award damages in proportion to the lost chance. If a working defibrillator would have given a passenger a one-in-three chance of surviving, the carrier pays a third of the value of the life. *See, e.g., Matsuyama v. Birnbaum*, 890 N.E.2d 819, 832–38 (Mass. 2008). Texas, whose law defines the harm Arzu may recover, considered that approach and rejected it. *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 404–07 (Tex. 1993); *see also Slade v. City of Marshall,* 814 F.3d 263, 266–67 (5th Cir. 2016). And the Convention asks whether the accident "caused the death," not whether it reduced the chance of avoiding death. Montreal Convention art. 17(1). A federal district court is not free to rewrite either rule because a different one would give carriers better incentives. If the all-or-nothing rule misfires,

the correction belongs to the Texas legislature or Supreme Court, to the parties to the Convention, or to the regulators.[6]

Nor does the opinion decide that a failed defibrillator can never cause death. It holds that Arzu offered no admissible evidence that this one did. Kevin's heart first showed no electrical activity. A shockable rhythm appeared only after eight minutes of CPR. And the studies in this record report that most patients in those circumstances did not survive even when shocked. A different arrest, shockable from the start and treated promptly, might yield different evidence and a different result. But that case is not this one.

Kevin's death is a tragedy, and nothing in this opinion diminishes it. But sympathy cannot supply what the law and the record do not.[7] The

---

[6] For the sake of our Republic, district courts must avoid exercising authority in areas best left to others. *See* Letter from Thomas Jefferson to Charles Hammond (Aug. 18, 1821), in 15 THE WRITINGS OF THOMAS JEFFERSON 330–33 (Albert Ellery Bergh ed., 1905) ("It has long however been my opinion, and I have never shrunk from its expression. . . that the germ of dissolution of our federal government is in the constitution of the federal judiciary. . . working like gravity by night and by day, gaining a little-to-day and a little tomorrow, and advancing its noiseless step like a thief, over the field of jurisdiction . . . [t]o this I am opposed because . . . it will render powerless the checks provided of one government on another . . . ."). Rather, as the late Senator Orrin Hatch said, "[i]f a judge crosses the line between interpreting and making the law, he has crossed the line separating his legitimate authority from the legislative branch's authority. Now, to me that's a very serious matter if we believe, as America's founders did, that the separation of powers—not just in theory or in textbook but in practice in the actual functioning of the government—is the linchpin of limited government and liberty." *Confirmation Hearing on the Nomination of John G. Roberts, Jr. to be Chief Justice of the United States: Hearing Before the S. Comm. on the Judiciary*, 109th Cong. (2005) (statement of Sen. Orrin Hatch, member, S. Jud. Comm.).

[7] The Court once more notes its agreement with Judge Edward C. Burks of the Supreme Court of Appeals of Virginia, who wrote in 1878:

> The unhappy condition of the appellee excites my commiseration; but courts of justice are not allowed to be controlled in their decisions by considerations of that character. "Compassion," said an eminent Virginia chancellor, "ought not to influence a judge, in whom, acting officially, apathy is less a vice than sympathy."

Court may not write a different rule from the one the law provides. Nor may it send to the jury a question the evidence cannot answer: whether a working defibrillator would more likely than not have saved Kevin. A trial would only postpone the result, because a verdict for Arzu, resting on no admissible evidence of causation, could not stand.

For these reasons, the Court **ORDERS**:

1. American's Motion to Exclude, ECF No. 104, is **GRANTED in part** and **DENIED in part**. Dr. Warmink may not testify that Kevin Greenidge would have survived, or more likely than not would have survived, had CPR begun sooner or the AED delivered a shock. Nor may he testify that the crew's response or the AED's failure caused or contributed to Kevin's death. The motion is otherwise **DENIED**.
2. American's Second Motion for Summary Judgment, ECF No. 111, is **GRANTED**. Arzu's remaining claims are **DISMISSED with prejudice**.
3. Because the record is complete, Arzu's request for a hearing, ECF No. 114 at 15, is **DENIED.**

**SO ORDERED** on this **25th day of September 2026.**

Mark T. Pittman
UNITED STATES DISTRICT JUDGE

---

*Harris v. Harris*, 72 Va. (31. Gratt.) 13, 32 (1878) (quoting Chancellor George Wythe, Commentary on *Field's Ex'x v. Harrison & Wife*, in WYTHE'S REPORTS 282 (Minor's ed., 1794)); *see* Judge Brockenbrough Lamb*, The Duty of Judges: A Government of Laws and Not of Men*, in HANDBOOK FOR JUDGES 93 (Donald K. Carroll ed., 1961) ("we must declare the law as we find it written and comfort ourselves with the confident belief that in its results it will promote the ends of justice to all").